**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BEN & JERRY'S HOMEMADE, INC. and CLASS I DIRECTORS OF BEN & JERRY'S INDEPENDENT BOARD, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No.: 24-cv-8641 (PKC) |
| v. | ) ) | |
| UNILEVER PLC and CONOPCO, INC., | ) ) | |
| *Defendants*. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## UNILEVER PLC'S AND CONOPCO, INC.'S MOTION TO DISMISS PLAINTIFFS'
## <u>FIRST AMENDED COMPLAINT</u>

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Defendants*
*Unilever PLC and Conopco, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ........................................................................................................4

    A.    The Merger Agreement And Shareholders Agreement Memorialize Unilever's
        Acquisition Of Ben & Jerry's ......................................................................................4

    B.    The Parties Reach, Then Amend, A Settlement Agreement................................6

    C.    The Class I Directors Propose Controversial Organizations For Donations ......................9

    D.    The Class I Directors Unilaterally Pursue A Reckless Public Relations Strategy............10

PROCEDURAL HISTORY........................................................................................................13

LEGAL STANDARD ...............................................................................................................13

ARGUMENT ..........................................................................................................................14

    A.    The Class I Directors Lack Authority To Sue In The Name Of Ben & Jerry's................15

    B.    The Breach Of Contract Claim Should Be Dismissed Because Plaintiffs Fail To
        Allege They Have Suffered Damages...................................................................17

    C.    In The Alternative, The Court Should Dismiss The Declaratory Judgment Claim
        Regarding Donations To Third Parties As Duplicative ................................................19

    D.    The Court Should Dismiss The Declaratory Judgment Claim Regarding Payments
        To CFT Because It Presents No Justiciable Controversy .................................................20

CONCLUSION.........................................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) .................................................................................................14, 21, 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................................14

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap.*, Inc., 2011 WL
   2610661 (S.D.N.Y. June 27, 2011) .................................................................................22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................................14

*Brokamp v. James*,
   66 F. 4th 374 (2d Cir. 2023) .............................................................................................13

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)...........................................................................................4, 14

*Charles Schwab & Co. v. Retrophin, Inc.*,
   2015 WL 5729498 (S.D.N.Y. Sept. 30, 2015)...................................................................9

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
   587 F. Supp. 3d 56 (S.D.N.Y. 2022) .................................................................................6

*Cracco v. Vance*,
   830 Fed. App'x 43 (2d Cir. 2020).....................................................................................21

*Dane v. UnitedHealthcare Ins. Co.*,
   974 F.3d 183 (2d Cir. 2020)..............................................................................................14

*Doyle v. Midland Credit Mgmt., Inc.*,
   722 F.3d 78 (2d Cir. 2013) ..........................................................................................21, 22

*Edwards v. Sequoia Fund, Inc.*,
   938 F.3d 8 (2d Cir. 2019)..................................................................................................17

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
   309 F. Supp. 3d 89 (S.D.N.Y. 2018)................................................................................20

*In re George Washington Bridge Bus Station Dev. Venture LLC*,
   65 F.4th 43 (2d Cir. 2023) ................................................................................................17

*Goldberg v. Pace Univ.*,
   88 F. 4th 204 (2d Cir. 2023) ........................................................22

*Gordon v. Dino De Laurentiis Corp.*,
   529 N.Y.S.2d 777 (N.Y. App. Div. 1988) .................................18, 19

*House of Eur. Funding I, Ltd. v. Wells Fargo Bank, N.A.*,
   2014 WL 1383703 (S.D.N.Y. Mar. 31, 2014) ...........................18, 19

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co. Inc.*,
   936 F.2d 759 (2d Cir. 1991).........................................................21

*Jujamcyn Theaters LLC v. Fed. Ins. Co.*,
   659 F. Supp. 3d 372 (S.D.N.Y. 2023).........................................20

*Khodeir v. Sayyed*,
   323 F.R.D. 193 (S.D.N.Y. 2017) .................................................18

*Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*,
   651 N.Y.S.2d 490 (N.Y. App. Div 1996) .....................................18

*Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*,
   52 F. Supp. 3d 601 (S.D.N.Y. 2014).......................................17, 19

*Mendez v. Banks*,
   65 F.4th 56 (2d Cir. 2023) ..........................................................22

*Murphy v. Hunt*, 455 U.S. 478, 481 (1982) ......................................21

*Palm Beach Strategic Income, LP v. Salzman*,
   457 F. App'x 40 (2d Cir. 2012) ...................................................16

*Quadrant Structured Prods. Co. v. Vertin*,
   992 N.Y.S.2d 687 (2014) ............................................................17

*Russman v. Bd. of Educ.*,
   260 F.3d 114 (2d Cir. 2001)....................................................21, 22

*Solutia Inc. v. FMC Corp.*,
   385 F. Supp. 2d 324 (S.D.N.Y. 2005)..........................................16

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008).........................................................14

*Sternkopf v. White Plains Hosp.*,
   2015 WL 5692183 (S.D.N.Y. Sept. 25, 2015)...............................9

*Williams v. Hernandez*,
   2006 WL 156411 (S.D.N.Y. Jan. 18, 2006) .................................14

2

*Yak v. Bank Brussels Lambert*,
    252 F.3d 127 (2d Cir. 2001)..............................................................22

*Zhang v. Schlatter*,
    2013 WL 12618757 (S.D.N.Y. Mar. 13, 2013), *aff'd* 557 F. App'x 9 (2d Cir.
    2014) ...............................................................................16

**Statutes**

11A V.S.A. § 20.09................................................................4, 15

N.Y. Bus. Corp. Law § 626(a) .....................................................17

**Rules**

Fed. R. Civ. P. 12(b)(1)....................................................13, 21, 22, 23

Fed. R. Civ. P. 12(b)(6)........................................................14, 19, 23

**Other Authorities**

5 C. Wright & A. Miller, Federal Practice & Procedure § 1327 ...................22

*Delegation of authority by directors—Limitations on power*, 2 Fletcher Cyc.
    Corp. § 496 (Sept. 2024) ......................................................16

F. Hodge O'Neal et al., 1 Close Corp and LLCs: Law and Practice § 3:18 (Rev.
    3d ed.) (Nov. 2024) ...........................................................16

## PRELIMINARY STATEMENT

Ben & Jerry's ("**B&J's**") is supposed to have a "progressive, nonpartisan social mission,"[1] which has been synonymous with the B&J's brand. It is one of the core reasons why Unilever chose to acquire B&J's and why it agreed to preserve its unique character by creating a limited purpose, independent board of directors tasked with primary responsibility over the social mission and brand integrity of B&J's.

For more than two decades, Unilever worked together with the Class I Directors of B&J's Board (the "**Class I Directors**")[2] to preserve and enhance B&J's social mission and brand integrity, supporting causes such as LGBTQ+ rights, campaign finance reform, climate change, Black Lives Matter, and GMO labelling. *See* FAC ¶ 10.[3] Unilever continues to support B&J's and its social advocacy work.[4] Over time, the social mission of B&J's shifted, but in recent years it has come to a head as B&J's seeks to advocate for one-sided, highly controversial, and polarizing topics that put Unilever, B&J's, and their employees at risk.

This change in course, driven by B&J's Chair Anuradha Mittal, began in 2021, when the Class I Directors made the decision to stop selling ice cream in the West Bank. The decision came with severe consequences for both Unilever and B&J's. Following the announcement, many states found Unilever to be in violation of their anti-boycott, divestment, and sanctions laws ("**anti-**

---

[1] *See Our Values, Activism and Mission*, Ben & Jerry's, https://www.benjerry.com/values (last visited Mar. 19, 2025); *see also* Ex. A, Merger Agreement, Exhibit A, Article III.

[2] B&J's has an 11-member board ("**Board**"). The independent directors are referred to as the Class I Directors. Ex. A, Merger Agreement § 6.14(a). The Board consists of up to nine Class I Directors, one "Class U" Director appointed by Unilever, and the CEO of B&J's. *Id.*

[3] *See also Issues We Care About*, Ben & Jerry's, https://www.benjerry.com/values/issues-we-care-about (last visited Mar. 19, 2025).

[4] For example, on March 10, 2025, B&J's posted in support of National Abortion Provider Appreciation Day. *See, e.g.*, benandjerrys, Instagram (Mar. 10, 2025), https://www.instagram.com/benandjerrys/p/DHB4WtePo2w/.

**BDS**"), leading to multiple lawsuits in the United States and Israel, accusations of antisemitism, severe sanctions, and the divestment of hundreds of millions of dollars in Unilever's stock.[5] Faced with a legal and public relations crisis, Unilever ultimately sold its intellectual property rights to its Israeli distributor, who thereafter continued to sell B&J's ice cream (under the Hebrew language) in the West Bank. This led to a lawsuit by the Class I Directors, which led to the Settlement Agreement that resolved that suit and is at issue in this dispute. Unilever, however, continues—to this day—to suffer the consequences of that decision. B&J's and/or Unilever still remain on at least nine states' anti-BDS lists and Indonesia has a "fatwah" on Unilever. These are just two examples of the world-wide response to the Board's decision that have negatively impacted B&J's and Unilever.

This litigation arises from the Class I Directors' decision to continue to embroil B&J's and Unilever in the Israeli-Palestinian conflict, one of the most divisive and polarizing topics of our time. Specifically, the Class I Directors allege that Unilever breached the terms of the Settlement Agreement in three ways: (i) unreasonably withholding consent to donate funds to two controversial organizations, Jewish Voice for Peace and CAIR-SF; (ii) 'muzzling' the Class I Directors when they sought to issue one-sided public statements in connection with the Israeli-Palestinian conflict (and, more recently, an Inauguration Day statement critical of President Trump); and (iii) failing to make payments to an almond collective, Canaan Fair Trade ("**CFT**"), and report such payments to the Class I Directors. FAC ¶¶ 43, 49.

These claims are all without merit. ***First***, the Class I Directors serve on a Board with limited rights specifically allocated to them under the operative agreements. Those rights do not include

---

[5] *See, e.g.*, *Unilever sells off Ben & Jerry's in Israel to avoid West Bank row*, The Guardian (Jun. 29, 2022), https://www.theguardian.com/business/2022/jun/29/unilever-sells-off-ben-jerrys-in-israel-to-avoid-west-bank-row.

the right to bring claims for or on behalf of B&J's. The Merger Agreement and the Shareholders Agreement, under which B&J's affairs are managed, expressly limit the authority of the Class I Directors to social mission and brand integrity and delegate *everything else*, including authority to bring lawsuits on behalf of B&J's, to Conopco, Inc. (the sole shareholder of B&J's) and the CEO.[6] Likewise, nothing in the Settlement Agreement allows the Class I Directors to bring claims on behalf of B&J's. Simply put, in this case by both law and contract, the Class I Directors are not B&J's, they do not control B&J's, and they cannot sue as if they are B&J's. Accordingly, the claims brought in the name of B&J's should be dismissed with prejudice.

*Second*, Plaintiffs fail to plead any damages resulting from Unilever's alleged breaches. Plaintiffs merely make the conclusory assertion that they have been damaged but fail to explain *how* the allegations have damaged the Class I Directors (or even B&J's).[7] Thus, Plaintiffs' breach of contract claim should be dismissed. And, if the breach of contract claim survives, Plaintiffs' declaratory judgment claim regarding donations is duplicative of the breach of contract claim and should be dismissed.

*Third*, Unilever has, to date, fully complied with its obligations under the Settlement Agreement to purchase almonds from CFT, an almond collective. Accordingly, Plaintiffs' declaratory judgment claim as to Unilever's obligations to purchase almonds from CFT is moot and should be dismissed.

For each of these reasons, the Court should dismiss all claims of the First Amended Complaint ("**FAC**") brought in the name of B&J's as a plaintiff. Additionally, the Court should

---

[6] Conopco, Inc. ("**Conopco**") is the sole shareholder of B&J's. Conopco is an indirect subsidiary of Unilever PLC. Together, Conopco and Unilever PLC will be referred to herein as "**Unilever**."

[7] Even if the Class I Directors were able to bring claims on behalf B&J's, they do not allege that B&J's suffered any damages.

dismiss Counts I (breach of contract) and III (declaratory judgment). Should the Court decline to dismiss the breach of contract claim (Count I), the first declaratory judgment claim (Count II) should be dismissed as duplicative.

## STATEMENT OF FACTS

**A.**    **The Merger Agreement And Shareholders Agreement Memorialize Unilever's Acquisition Of Ben & Jerry's**

B&J's is a close corporation incorporated under Vermont law, which allows the shareholder of B&J's to restrict the discretion or powers of the Board or to eliminate the Board entirely. *See* 11A V.S.A. § 20.09. Under the Merger Agreement and Shareholders Agreement, Conopco, the sole shareholder of B&J's, explicitly limited the Board's powers to social mission and brand integrity issues.

Specifically, pursuant to the Merger Agreement between Conopco, B&J's, and Vermont All Natural Expansion Company (a Conopco holding company), dated July 5, 2000 (the "**Merger Agreement**"), Conopco delegated to the Board:

> primary responsibility for preserving and enhancing the objectives of the historical social mission of the Company as they may evolve from time to time consistent therewith ('Social Mission Priorities') . . . and safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name (the 'Essential Integrity of the Brand').

*See* Ex. A,[8] Merger Agreement § 6.14(e), (f); *see also id.* at Schedule 6.14.[9] Conopco otherwise retained, and delegated to the CEO, the responsibility to "manage the affairs of the Company,"

---

[8] The FAC explicitly refers to the Merger Agreement and Shareholders Agreement. *See, e.g.*, FAC ¶¶ 11, 42. Accordingly, they are properly considered in deciding a motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (a district court may consider documents not attached to but incorporated by reference in a complaint).

[9] Schedule 6.14 of the Merger Agreement lists B&J's Social Mission Priorities, which include: achieving a compostable pint; creating a sustainable "footprint" for the business; maintaining sustainable agriculture efforts; obtaining milk from the St. Albans Cooperative; opposing the use of rBGH (recombinant bovine growth hormone); producing GMO-free products; expanding the

and Conopco further retained "primary responsibility for the financial and operation aspects of [B&J's] and the other aspects of [B&J's] not allocated to the Company Board." *See id.* §§ 6.14(b), (j).

The Class I Directors are not a party to the Merger Agreement. The Merger Agreement is explicit when third parties have the rights to enforce certain provisions of that Agreement and otherwise makes clear that the Merger Agreement is "not intended to confer upon any person other than the parties any rights or remedies." *Id.* § 9.07. As it pertains to the Board, the Merger Agreement gives the Board certain limited rights only to enforce section 6.14(a)—a section not at issue in this case pertaining to the removal and appointment of directors. It does not confer on the Board the right to enforce the provisions at issue here relating to Social Mission Priorities or Essential Integrity of the Brand. *See id.*

Conopco and B&J's also executed a Shareholders Agreement that prescribed the division of responsibilities among B&J's, the Board, and Conopco. *See* Ex. B, Shareholders Agreement, dated August 3, 2000 ("**Shareholders Agreement**"). The Class I Directors are not a party to the Shareholders Agreement either. Like the Merger Agreement, the Shareholders Agreement delegated to the Board the primary responsibility for "preserving and enhancing the objectives of the historical social mission of the Company as they may evolve from time to time consistent therewith" and "safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name." *Id.* §§ 1(e), (f). The Shareholders Agreement also makes clear that, "[i]n the exercise of

---

PartnerShop program where ScoopShops are owned by nonprofits, especially programs that serve youth; developing sourcing relationships consistent with the social missions, such as obtaining brownies from Greyston Bakery, which is owned by the Greyston Foundation that provides social services to Yonkers, New York; continuing partnerships with nonprofits such as the Children's Defense Fund and Greenpeace; and continuing to donate profits through employee-led philanthropy to nonprofits that promote positive social change. Notably, none of these priorities extend to global conflicts (or conflicts generally), like the Israeli-Palestinian conflict.

powers and the management of the business and affairs of the Company, the Company Board shall have only those powers and functions expressly granted to it in this Agreement. All other powers and functions are reserved to the Shareholder." *Id.* § 1(a); *see also id.* § 1(l) ("The rights, powers and authority of the Company Board are set forth in their entirety in this Agreement, and the Company Board shall not have any rights, powers or authority, express or implied, except as specifically set forth in this Agreement. All rights, powers and authority not specifically granted pursuant to this Section 1 are reserved to the Shareholder [i.e., to Conopco].")). Like in the Merger Agreement, the Shareholders Agreement provides limited rights to the Board to enforce certain provisions in the Articles of Incorporation relating to the removal and appointment of directors, not social mission or brand integrity. *Id.* § 4.

**B.**     **The Parties Reach, Then Amend, A Settlement Agreement**

While the social mission has evolved from those outlined in the Merger Agreement with the cooperation of the Board and Unilever, in recent years, the Class I Directors have shifted to one-sided polarizing topics, including the Israeli-Palestinian conflict, which has prompted protests, boycotts, and political unrest across the globe.[10] The current dispute is the direct result of the Class I Directors' decision to wade into this highly controversial topic without any regard to the negative impact on both B&J's and Unilever.

In July 2021, the Class I Directors announced that B&J's would stop selling ice cream in the West Bank allegedly in order to take a stance against Israeli settlements in the West Bank. *See* FAC ¶ 10. The Class I Directors claimed that it was "inconsistent with [B&J's] values for [B&J's]

---

[10] "A court may properly take judicial notice of the fact of press coverage on a motion to dismiss." *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 84 (S.D.N.Y. 2022) (Castel, J.) (citation omitted).

product to be present within an internationally recognized illegal occupation."[11] The backlash was immediate, "setting off a firestorm of criticism and a series of major divestments in Unilever as multiple US states obeyed laws against the anti-Israel BDS movement."[12] And the application of anti-BDS laws was just one of many forms of nationwide and international fallout.[13]

To this day, Unilever and B&J's remain on several states' anti-BDS lists, which results in decreased investments and the inability to contract with state agencies and local governments.[14] To manage the legal and the public relations crisis that resulted from the decision to cease sales in the West Bank, in June 2022, Unilever sold B&J's intellectual property rights to its Israeli distributor, who agreed to continue sales of B&J's ice cream in the West Bank. *See* FAC ¶ 11. Notwithstanding the turmoil and Unilever's efforts to ameliorate the backlash, the Class I Directors sued Unilever on July 5, 2022, alleging that the June 2022 sale usurped their role as custodians of the B&J's-brand image with responsibility for the social mission of B&J's and the integrity of the B&J's brand-name. *See id.; see also* Amended Complaint, *Ben & Jerry's Homemade, Inc. v. Conopco, Inc. et al.,* Case No. 22-cv-05681-ALC (S.D.N.Y. Sept. 30, 2022), ECF No. 58, ¶ 102.

---

[11] *Ben & Jerry's Will End Sales of Our Ice Cream in the Occupied Palestinian Territory*, Ben & Jerry's, https://www.benjerry.com/about-us/media-center/opt-statement (last visited Mar. 19, 2025).

[12] Luke Triess, *Ben & Jerry's Israel, parent company Unilever reach deal to end settlement boycott*, The Times of Israel (Jun. 29, 2022), https://www.timesofisrael.com/ben-jerrys-israel-parent-company-unilever-reach-deal-to-end-settlement-boycott/; *see also* Gina Gambetta, *US States with BDS ban respond to Unilever's sale of Ben & Jerry's Isreal*, Responsible Investor (Jun. 30, 2022), https://www.responsible-investor.com/us-states-with-bds-bans-respond-to-unilevers-sale-of-ben-jerrys-israel/ (noting over 30 states discouraged support for the pro-Palestinian Boycott, Divestment and Sanctions Initiative).

[13] *Paxton Joins Coalition to Stop Ben & Jerry's Boycott of Israel*, Attorney General of Texas (Nov. 22, 2021), https://www.texasattorneygeneral.gov/news/releases/paxton-joins-coalition-stop-ben-jerrys-boycott-israel.

[14] *See* Peter Castango, *NC prohibits investments in Ben & Jerry's for position on Israel*, Port City Daily (Dec. 27, 2023), https://portcitydaily.com/latest-news/2023/12/27/nc-prohibits-investments-in-ben-jerrys-for-position-on-israel/.

Unilever and the Class I Directors resolved the 2022 lawsuit, agreeing to settle all claims in a Confidential Settlement and Release Agreement on December 13, 2022. *See* ECF No. 32-2 (Confidential Settlement and Release Agreement) (as later amended, the "**Settlement Agreement**"). The Settlement Agreement provides that Conocpo and Unilever agree to "[r]espect and acknowledge Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity and agree to work in good faith with the Independent Board to ensure that both are protected and furthered." Settlement Agreement § 2(b). Unilever also agreed to source a portion of their non-dairy mix from CFT, an almonds collective in Palestine, subject to availability of supply, consumer safety, or quality concerns. *See* FAC ¶ 35; *see also* Settlement Agreement § 2(f). Finally, Unilever agreed to make two payments of $2.5 million to B&J's—one each in 2023 and 2024—for subsequent disbursement to "humanitarian and human rights organizations" selected by the Chair of the Board, Anuradha Mittal, after good faith consultation with Unilever, with consent not to be "unreasonably withheld" by Unilever. Settlement Agreement § 2(g).

On August 30, 2023, Unilever and the Class I Directors agreed to amend the Settlement Agreement, under which Unilever agreed that it would directly, or through a third party, pay $2 million annually to CFT for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers) for at least ten years and confirm such payments with Mittal each quarter. *See* FAC ¶ 35.[15] In 2024, Unilever made the required payments to CFT and notified Mittal of those payments. *See* Ex. C, Jan. 2, 2025 Email Thread.

---

[15] The evidence will show that the Board refused to agree to allow Unilever to adopt a new consumer-preferred, non-dairy mix that did not use almonds, unless Unilever agreed to make these payments to CFT.

**C.**     **The Class I Directors Propose Controversial Organizations For Donations**

In 2023, Mittal designated the Institute for Middle East Understanding ("**IMEU**") and the United Nations Special Rapporteur on the Palestinian Territories Occupied Since 1967 (the "**Special Rapporteur**") as the organizations to receive Unilever's charitable donations under the Settlement Agreement. *See* Ex. D, Confidential Arbitration by Agreement Award, dated Mar. 27, 2024 ("**Arbitration Award**") at 3.[16] Given the resulting backlash to Unilever and its business from the decision to withdraw from the West Bank, Unilever exercised its discretion to withhold consent to donate the funds to the IMEU and the Special Rapporteur because the organizations had publicly accused Israel of genocide and are high-profile supporters of the movement to boycott, divest from, and sanction Israel (the "**BDS Movement**"). *Id.* at 3-6. After trying, but failing, to reach agreement, Unilever and the Class I Directors submitted the issue of whether Unilever reasonably withheld consent to the donations to an arbitrator pursuant to the terms of Section 2(g) of the Settlement Agreement. *See id*. On March 27, 2024, following a two-day hearing, the Honorable Christopher Droney, serving as the arbitrator, concluded that withholding consent to contribute money to IMEU and the Special Rapporteur was a "reasonable decision by Unilever, based on objective evidence." *Id.* at 6. The arbitrator found that Unilever's concerns that Unilever would be perceived as "taking the side of the Palestinians" and "supporting the BDS movement against Israel"—and the resulting negative impact to its business—were reasonable given its prior experience with the West Bank and the controversial and polarized nature of the conflict. *Id.*

---

[16] The Court may take judicial notice of the arbitration award "because it is an opinion issued in a prior proceeding." *Sternkopf v. White Plains Hosp.*, 2015 WL 5692183, at *5 (S.D.N.Y. Sept. 25, 2015); *see also Charles Schwab & Co. v. Retrophin, Inc.*, 2015 WL 5729498, at *6-7 (S.D.N.Y. Sept. 30, 2015) (same).

On June 7, 2024, Mittal notified Unilever that she selected Jewish Voice for Peace ("**JVP**") and the San Francisco-Bay Area chapter of the Council on American-Islamic Relations ("**CAIR-SF**") to receive Unilever's 2024 donations. *See* FAC ¶ 30. Unilever conducted diligence on the two organizations and, like the IMEU and the Special Rapporteur, found that both JVP and CAIR-SF had made inflammatory comments following Hamas's October 2023 attack on Israel about Israel and the Israeli-Palestinian conflict, and have been highly critical of the United States Government's approach to the conflict. *See id.* ¶ 31.

On August 16, 2024, following the principles set forth in the prior arbitration ruling, Unilever responded with detailed objections to the selection of JVP and CAIR-SF and exercised its right to withhold consent to donate to the two organizations. *Id.* Unilever did not want to again be perceived as taking sides on the Gaza conflict and/or associating itself with organizations that supported Hamas's attack on Israel and its abduction of hundreds of hostages and made highly divisive comments about Israel. *See id*.

**D.  The Class I Directors Unilaterally Pursue A Reckless Public Relations Strategy**

The Class I Directors also allege that Unilever has "silenced" the Class I Directors' efforts to maintain B&J's social mission and brand integrity by failing to approve the posting of certain one-sided and partisan public statements. *See* FAC ¶¶ 14-27. But the Class I Directors have hardly been silent.

**1. Ceasefire Statement:** Following the October 2023 Hamas attack, in December 2023, Unilever received a proposed public statement for B&J's to issue, calling for "an immediate and permanent ceasefire" in Gaza. FAC ¶ 15. Unilever was resistant to issue a statement at that time without also condemning terrorism and calling for the release of hostages—which would align

with the position articulated by the Pope.[17] The Board refused to include either (condemn terrorism or call for the release of hostages) and Unilever indicated that without these points, it would not support issuance of the post. Despite these reasonable requests, on January 16, 2024, Mittal submitted a statement to the Financial Times for publication: identifying herself as the Chair of the Independent Board of B&J's, she stated that "we call for peace and a permanent and immediate ceasefire." *See* Ex. E, Financial Times Article. No mention was made calling for hostages to be released or condemning terrorism. *See id.*

**2. Palestinian Refugees:** In May 2024, B&J's "social activism managers" in the United Kingdom sought to issue a public statement calling for specific actions it wanted the British government to take regarding the resettlement of Palestinian refugees. *See* FAC ¶¶ 16-17. After Mittal inquired why Unilever opposed the release of the statement, Unilever President of Ice Cream Peter ter Kulve responded on July 1, 2024, that Unilever was sensitive about issuing a statement at that time because Iranian forces had recently attacked Israel and because of the continued perception that anti-Israeli statements promoted antisemitism. *See id.* ¶ 19.

**3. Campus Protests:** Also in May 2024, B&J's wanted to publish a social media post in support of students protesting the war in Gaza. *See id.* ¶ 20. Unilever raised reasonable concerns about the need to condemn the violence associated with the protests and support rights of Jewish students as well. Less than one week later, the Class I Directors released a statement in support of campus protests, via Reuters, without addressing the primary concerns raised by Unilever: "[l]unch counter sit-ins, student-led protests against the Vietnam War and Apartheid South Africa, and now

---

[17] *See* Joseph Tulloch, *Pope renews appeal for immediate Gaza ceasefire*, Vatican News (Dec. 13, 2023), https://www.vaticannews.va/en/pope/news/2023-12/pope-francis-israel-palestine-no-to-weapons-yes-to-peace.html.

the campus protests in solidarity with Gaza, all are part of our rich history of free speech and non-violent protest that makes change and is essential to a strong democracy."[18]

**4. Bernie Sanders Statement:** In September 2024, Mittal advised B&J's CEO Dave Stever that the Class I Directors intended to issue a statement in the name of B&J's in support of Senator Bernie Sanders's proposed legislation blocking American aid to Israel. *See* FAC ¶¶ 21-22. After Unilever raised concerns, Mittal instead took to social media via the Oakland Institute, of which she is a founder and executive director, to support Senator Sanders's proposal.[19]

**5. President Trump:** In January 2025, leading up to the inauguration of President Trump, the Class I Directors advised Unilever of a public statement that B&J's intended to issue about President Trump. *See* FAC ¶¶ 24-25. Because of the partisan nature of the proposed statement, Unilever offered to work with the Board to craft an appropriate statement focused on substantive issues without personal attacks on President Trump. *See id.* ¶ 24. The Board declined. Ultimately, B&J's posted to its Instagram: "This MLK Day, Should We Choose Chaos or Community?" with fives quotes from Martin Luther King Jr. with the caption "[o]nly community will save us from chaos."[20]

These episodes reveal that the Class I Directors, far from being "muzzled" in their pursuit of B&J's social missions as alleged, have issued public statements notwithstanding Unilever's

---

[18] *See* Jessica DiNapoli, *Ben & Jerry's board say pro-Palestinian campus protests are 'essential' to democracy*, Reuters (May 13, 2024), https://www.reuters.com/business/ben-jerrys-board-says-pro-palestinian-campus-protests-are-essential-democracy-2024-05-13/.

[19] Oakland Institute, Facebook, (Nov. 19, 2024) https://www.facebook.com/story.php?story_fbid=973875221439945&id=100064524288452&rdid=HPLVoeCWW966bchH; Oakland Institute, X (Sept. 24, 2024), https://x.com/oak_institute/status/1838622104666939657.

[20] BenandJerrys, Instagram, (Jan. 20, 2025), https://www.instagram.com/p/DFDM5fdOugP/?img_index=7&igsh=bTNqaWQ4MWd4YnBj.

reasonable and prudent calls for balance. Unilever does not make these decisions lightly, as they consider a myriad of factors such as: geopolitical tensions, country-specific election advocacy laws, employee and customer safety, and public reception. Unilever's efforts, especially when circumvented by the Class I Directors, cannot serve as any grounds for relief.

## PROCEDURAL HISTORY

Plaintiffs filed their original complaint in the name of B&J's on November 14, 2024, asserting a single cause of action for breach of contract. *See* ECF No. 5 (Complaint). After an exchange of pre-motion letters, *see* ECF Nos. 28, 29, the Court issued an order granting B&J's leave to amend the complaint. *See* ECF No. 30.

On January 27, 2025, Plaintiffs filed their First Amended Complaint adding the Class I Directors as additional Plaintiffs. *See generally* FAC. In addition to the breach of contract claim, Plaintiffs assert two claims for declaratory judgment for Unilever's alleged breaches of the Settlement Agreement. *See id.* ¶¶ 46-54. After another exchange of pre-motion letters, *see* ECF Nos. 33, 35, on February 19, 2025, the Court issued an order staying discovery and setting a briefing schedule for the instant motion. *See* ECF No. 36.[21]

## LEGAL STANDARD

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it." *Brokamp v. James*, 66 F. 4th 374, 386 (2d Cir. 2023) (internal quotations and citations omitted). If "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," the case is rendered moot because it is "no longer a 'Case' or 'Controversy'" sufficient

---

[21] On March 18, 2025, Plaintiffs moved to again amend their complaint. ECF Nos. 37, 38. As the FAC is the currently-operative complaint, Unilever moves to dismiss the FAC and will address Plaintiffs' motion to amend in the appropriate course.

to maintain the Court's Article III jurisdiction. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90-91 (2013). Dismissal is appropriate where an issue is not "ripe for adjudication." *Williams v. Hernandez*, 2006 WL 156411, at *3 (S.D.N.Y. Jan. 18, 2006) (Castel, J.) (citation omitted).

Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To state a plausible claim for relief, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When evaluating the sufficiency of a claim for relief, the Court must "accept as true all factual allegations and draw from them all reasonable inferences," but is "not required to credit conclusory allegations or legal conclusions couched as factual . . . allegations." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020) (citation omitted).

On a Rule 12(b)(6) motion, the Court may consider documents "attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," as well as "document[s] integral to the complaint." *Chambers*, 282 F.3d at 152-53 (internal quotations and citations omitted). The Court may also "take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contain[] certain information, without regard to the truth of their contents." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

## ARGUMENT

The claims brought in the name of B&J's should be dismissed in their entirety because the Class I Directors have no standing to bring claims on behalf of B&J's. Plaintiffs' breach of contract claim—which alleges that Unilever unreasonably withheld consent to donate to JVP and CAIR-SF and "muzzled" the Class I Directors—fails because Plaintiffs do not plead any facts showing that the Class I Directors (or even B&J's) suffered *any* damages as a result of Unilever's alleged

14

breaches. The declaratory judgment claims are also deficient. Because the first declaratory judgment claim asks the Court to resolve the exact legal and factual questions at issue in the breach of contract claim, the Court should dismiss it as duplicative if the breach of contract claim is allowed to proceed. The second declaratory judgment claim, which seeks a declaration that Unilever must purchase almonds from CFT under the Settlement Agreement, presents no justiciable controversy because, as Plaintiffs are well aware, Unilever has complied and continues to comply with its obligations under the Settlement Agreement, rendering the claim moot.

## A.    <u>The Class I Directors Lack Authority To Sue In The Name Of Ben & Jerry's</u>

The Class I Directors brought this action on behalf of and in the name of B&J's, but the Class I Directors have no standing to bring claims on behalf of B&J's for disputes arising under the Settlement Agreement. Accordingly, all claims alleged in the name of B&J's should be dismissed.

B&J's is a close corporation under Vermont law with a single shareholder, Conopco. *See* Ex. B, Shareholders Agreement, at 1. Pursuant to 11A V.S.A. § 20.09, Conopco elected to "regulate the corporate powers and the management of the business of the [Company]," including by creating and delegating to the Board "primarily responsibility for preserving and enhancing the objectives of the historical social mission of the Company," and "primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name" as "custodians of the Ben & Jerry's-brand image." *Id.* § 1(e), (f). The Class I Directors' rights are expressly limited to those delineated rights under the Merger Agreement and Shareholders Agreement. *See* Ex. A, Merger Agreement §§ 6.14(e), (f); *see also* Ex. B, Shareholders Agreement § 1(a) ("The Company Board shall have only those powers and functions expressly granted to it under this [Shareholders] Agreement. ***All other powers and functions are reserved to the Shareholder***.") (emphasis added). The Class I Directors, therefore, do not have the power or

15

responsibilities of a typical board of directors. *See* Ex. A, Merger Agreement §§ 6.14(b)-(j) (outlining the responsibilities of the Board and Conopco); Ex. B, Shareholders Agreement § 1(a); *see also* F. Hodge O'Neal et al., 1 Close Corp and LLCs: Law and Practice § 3:18 (Rev. 3d ed.) (Nov. 2024) ("In many closely held enterprises, there is really no need for a board of directors."); *Delegation of authority by directors—Limitations on power*, 2 Fletcher Cyc. Corp. § 496 (Sept. 2024) ("Under close corporation statutes, agreements in which the power or discretion of the board is restricted are not invalid."). The Class I Directors have no responsibility over B&J's finances or operations, nor do they have the ability or standing to commence lawsuits in the name of B&J's.[22]

Rather, the Merger Agreement and Shareholders Agreement delegate authority to the CEO of B&J's or Conopco to bring lawsuits in the name of B&J's.[23] *See* Ex. A, Merger Agreement § 6.14(b) (delegating authority "to manage the affairs of the Company, substantially in the form of Exhibit B," to the CEO); *id.* § (j) ("Conopco shall have primary responsibility for the financial and operational aspects of the [B&J's] and the other aspects of [B&J's] not allocated to the Company Board pursuant to this Section 6.14.").[24] Moreover, the Merger Agreement explicitly

---

[22] Because the Board is a self-perpetuating, self-appointing board, they appear unconcerned about the decisions they make, even decisions that are inimical to the best interests of B&J's and Unilever.

[23] To the extent that the Class I Directors are alleging a breach of the Merger Agreement, those claims would fail because the Class I Directors are not a party to the Merger Agreement and therefore do not have standing to sue under the Merger Agreement. *See Zhang v. Schlatter*, 2013 WL 12618757, at *7 (S.D.N.Y. Mar. 13, 2013), *aff'd* 557 F. App'x 9 (2d Cir. 2014) (dismissing claim because plaintiff was not a party to the allegedly breached agreement); *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 44 (2d Cir. 2012) (affirming dismissal for lack of standing to sue for breach of an agreement to which the plaintiff was not a party). Instead, the CEO or Conopco could bring such claims, including for any actual breaches of the social mission provision, as appropriate given their delegation of authorities under the relevant agreements.

[24] As the sole shareholder, Conopco is the only entity that may bring a derivative action on behalf of B&J's. *See Solutia Inc. v. FMC Corp.,* 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) ("a shareholder always has standing to sue for harm to the corporation, as long as the suit is brought derivatively, with any recovery going to the corporation") (citing N.Y. Bus. Corp. Law § 626(a)).

disclaims third-party beneficiary claims, except for limited circumstances not applicable here. *See* Ex. A, Merger Agreement § 9; *see also In re George Washington Bridge Bus Station Dev. Venture LLC*, 65 F.4th 43, 55 (2d Cir. 2023) (under New York law, plaintiff could not be a third-party beneficiary because a contract's specific provision naming other third-party beneficiaries indicated that "'the parties to [the] contract . . . intended the omission'" of the plaintiff as a third-party beneficiary) (quoting *Quadrant Structured Prods. Co. v. Vertin*, 992 N.Y.S.2d 687, 694 (2014)). In other words, to the extent that the Class I Directors allege that the Merger Agreement allows them to bring claims on behalf of B&J's, the Merger Agreement expressly disclaims those rights.

Likewise, the Settlement Agreement does not give the Class I Directors authority to sue on behalf of B&J's. The Class I Directors are a party to the Settlement Agreement and can sue in their own name. But no provision in the Settlement Agreement gives the Class I Directors the right to sue in the name of B&J's or on behalf of B&J's. Because the Class I Directors have no standing to bring claims on behalf of B&J's under any relevant agreement, the claims alleged in the name B&J's should be dismissed.

**B.     The Breach Of Contract Claim Should Be Dismissed Because Plaintiffs Fail To Allege They Have Suffered Damages**

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (internal quotations and citation omitted). Pleading sufficient "factual allegations showing damages [is] essential" to survive a motion to dismiss. *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014). Without "any allegations *of fact* showing damage" to the plaintiffs, "mere allegations of breach of contract are not sufficient to sustain a complaint."

*Id.* (emphasis added) (quoting *Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*, 651 N.Y.S.2d 490, 492 (N.Y. App. Div 1996)).

Plaintiffs have alleged no facts to support their claim that they have been damaged by Unilever's purported breaches of the Settlement Agreement. Plaintiffs allege—in conclusory form—that "Defendants' actions (including their censorship) have damaged Ben & Jerry's Social Mission and brand integrity (including its goodwill) and encroached on the Independent Board's duties as the custodians of Ben & Jerry's brand." FAC ¶ 44. But other than saying it, Plaintiffs have not alleged *how* they've been damaged. Plaintiffs' conclusory allegation of damage is insufficient to sustain a claim for breach of contract. *See Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777, 779 (N.Y. App. Div. 1988); *see also House of Eur. Funding I, Ltd. v. Wells Fargo Bank, N.A.*, 2014 WL 1383703, at *11 (S.D.N.Y. Mar. 31, 2014) (dismissing breach of contract claim where plaintiff's "conclusory" damages allegation contained "no *facts* showing that [it] bore any of the loss" described in the complaint) (emphasis in original).

Nor have Plaintiffs alleged any facts to support their claim that Unilever's purported "encroach[ment] on the Independent Board's duties" caused them damage. FAC ¶ 44. A plaintiff must "plausibly plead how he was damaged by" the alleged breach to survive a motion to dismiss. *See Khodeir v. Sayyed*, 323 F.R.D. 193, 202 (S.D.N.Y. 2017). The FAC includes no allegation that the Class I Directors or B&J's suffered financial, reputational, or other harm due to Unilever's alleged encroachment. As such, the FAC "does not plausibly show any damage at all that resulted from the alleged" encroachment. *Id.*

Finally, Plaintiffs' allegation that they or B&J's suffered "damage[] through its non-receipt of" donations is equally conclusory and fails to state a claim. FAC ¶ 45. The Settlement Agreement contemplated that Unilever would make a $2.5 million payment intended for "disbursement to

human rights and humanitarian organizations," *not* to B&J's or the Class I Directors. *Id.* ¶ 28. Neither B&J's nor the Class I Directors are the beneficiaries of those funds. Plaintiffs do not allege how Unilever's decision to decline to donate funds to two specific organizations harmed *Plaintiffs*. Disappointment that donations were not made to their preferred organizations is a far cry from a legally cognizable loss. Without any "facts showing that [Plaintiffs] bore any of the loss" from Unilever's alleged non-payment of donations to JVP and CAIR-SF, Plaintiffs have failed to plausibly plead that they have suffered damages due to Unilever's alleged breach. *House of Eur. Funding I*, 2014 WL 1383703, at *11 (dismissing one plaintiff's breach of contract claim where the complaint failed to allege that plaintiff was affected by its co-plaintiff's financial loss). Without more specific allegations of fact explaining the nature or scope of the injury suffered by Plaintiffs, "[t]hese vague and conclusory allegations are insufficient to sustain a breach of contract cause of action." *Gordon*, 529 N.Y.S. at 779.

Accordingly, the Court should dismiss the breach of contract claim pursuant to Fed. R. Civ. P. 12(b)(6) because Plaintiffs fail to adequately allege that they have suffered any damages. *See Mariah Re Ltd.*, 52 F. Supp. 3d at 611.

**C.    In The Alternative, The Court Should Dismiss The Declaratory Judgment Claim Regarding Donations To Third Parties As Duplicative**

Plaintiffs seek a declaratory judgment from this Court that Unilever breached Section 2(g) of the Settlement Agreement by "unreasonably withholding its consent to" donate to the charitable organizations designated by the Board's Chair and that Unilever must disburse or permit B&J's to disburse $2.5 million to those designees, including JVP and CAIR-SF. *See* FAC ¶¶ 48-50. Although this claim too has no merit, as a matter of pleading, this is the appropriate claim for the Class I Directors to bring in their own name. However, if the breach of contract claim is allowed to proceed, a declaratory judgment claim would be duplicative and should be dismissed.

19

When "contract claims will necessarily settle the issues for which the declaratory judgment is sought," a claim for declaratory judgment "will serve no useful purpose and will not serve to offer relief from uncertainty." *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 100 (S.D.N.Y. 2018) (internal quotations marks and citations omitted). Because declaratory relief in such cases would "not clarify any uncertainty in the parties' legal relations that would otherwise remain unresolved as part of the breach of contract claim," district courts regularly dismiss a "declaratory judgment cause of action [as] clearly duplicative of Plaintiff[s'] cause of action for breach of contract." *Jujamcyn Theaters LLC v. Fed. Ins. Co.*, 659 F. Supp. 3d 372, 382 (S.D.N.Y. 2023).

Plaintiffs' declaratory judgment claim rests on allegations identical to those underpinning the breach of contract claim—*i.e.*, that Unilever breached the Settlement Agreement by "preventing Ben & Jerry's from donating to" JVP and CAIR-SF. *Compare* FAC ¶ 49 *with id.* ¶ 45. Because the declaratory judgment would "serve no useful purpose" in resolving the legal issues that the breach of contract claim will "necessarily settle," the Court should dismiss this claim as duplicative if the breach of contract claim is allowed to proceed. *EFG Bank AG*, 309 F. Supp. 3d at 100.

**D.  The Court Should Dismiss The Declaratory Judgment Claim Regarding Payments To CFT Because It Presents No Justiciable Controversy**

Plaintiffs' last claim for declaratory judgment, which seeks a declaration from this Court that Unilever must make $2 million annual payments to CFT, must send Mittal confirmation of such payments, and may not "erect extracontractual barriers to such payment," is moot and should be dismissed. FAC ¶¶ 52, 54.

Article III's "Cases and Controversies" requirement demands that federal courts may only exercise jurisdiction over "actual controvers[ies] [that] exist not only at the time the complaint is

filed, but through all stages of the litigation." *Already*, 568 U.S. at 90-91 (internal quotation marks and citations omitted). Therefore, "at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already*, 568 U.S. at 91 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)) (*per curiam*); *see also Cracco v. Vance*, 830 Fed. App'x 43, 44 (2d Cir. 2020) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (internal quotations and citations omitted). Dismissal under Rule 12(b)(1) is therefore proper when a case presents no justiciable controversy, including when it becomes moot. *See Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (*per curiam*).

There is no dispute that Unilever has, to date, made all payments to CFT and sent confirmation of such payments to Mittal. *See* Ex. C, Jan. 2, 2025 Email Thread. By the interim Board call on December 18, 2024, Unilever had made all 2024 payments to CFT required by the Settlement Agreement. *See id*. Unilever updated the Class I Directors during that Board call regarding the last payment and further confirmed all payments were received by CFT via email to Mittal on January 2, 2025. *See id.* Despite receiving documents confirming Unilever's 2024 payments to CFT, Plaintiffs do not attach such documents or refer to them in the FAC. Such creative pleading does not prevent this Court from considering these materials on a motion to dismiss, particularly under Rule 12(b)(1). *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co. Inc.*, 936 F.2d 759, 762 (2d Cir. 1991) (on a motion to dismiss, the court "decline[d] to close [their] eyes to the contents" of a document that was not attached to or referenced in the complaint

because the document was "integral" to the complaint) (collecting cases); *see also Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001); *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap.*, Inc., 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011) ("In deciding a motion to dismiss, this Court may consider the full text of . . . documents that the plaintiff either possessed or knew about and relied upon in bringing the suit."); 5 C. Wright & A. Miller, Federal Practice & Procedure § 1327, at 489 & n. 15 (when "plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading").

Because Unilever has satisfied all past and pending payment obligations under the Settlement Agreement and has notified the Class I Directors of such payment, there is no live controversy underpinning any potential or alleged breach of the Settlement Agreement. *See Russman*, 260 F.3d at 118. Accordingly, Unilever's payments to CFT and confirmation of its payments renders the declaratory judgment claim moot and requires dismissal under Rule 12(b)(1). *See Already*, 568 U.S. at 91; *Doyle*, 722 F.3d at 80.[25]

## CONCLUSION

For the reasons set forth above, the Court should (a) dismiss the FAC in its entirely as brought in the name of B&J's; (b) dismiss the breach of contract claim (Count I) pursuant to Rule 12(b)(6), or, if Count I is not dismissed, dismiss the first declaratory judgment claim regarding

---

[25] To the extent Plaintiffs allege a future controversy with respect to the CFT payments, those claims are not ripe for the Court's review. *See Mendez v. Banks*, 65 F.4th 56, 60 (2d Cir. 2023) (noting ripeness is a "constitutional prerequisite to exercise of jurisdiction by federal courts" that cannot "depend[] upon contingent future events that may not occur") (internal quotations and citations omitted); *see also Goldberg v. Pace Univ.*, 88 F. 4th 204, 213 (2d Cir. 2023) ("a claim must present a real, substantial controversy, not a mere hypothetical question") (internal quotation marks and citations omitted).

donations (Count II) as duplicative of the breach of contract claim; and (c) dismiss the second

declaratory judgment claims regarding payments to CFT (Count III) pursuant to Rule 12(b)(1).


                                          Respectfully submitted,

Dated:  New York, New York               WEIL, GOTSHAL & MANGES LLP
        March 19, 2025


                                          /s/ David J. Lender
                                          David J. Lender
                                          Luna N. Barrington
                                          Alexandra Rose
                                          767 Fifth Avenue
                                          New York, NY 10153
                                          Telephone: (212) 310-8000
                                          Facsimile: (212) 310-8007
                                          david.lender@weil.com
                                          luna.barrington@weil.com
                                          alexandra.rose@weil.com

                                          *Attorneys for Defendants Unilever PLC and
                                          Conopco, Inc.*

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Local Rule 7.1(c), I hereby certify that the total number of words in this memorandum, excluding the caption, table of contents, table of authorities, signature block, and word count certification is 7,328.

<i>/s/ David J. Lender</i><br>David J. Lender