**UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT
OF NEW YORK**

| | |
|---|---|
| BEN & JERRY'S HOMEMADE, INC., ) CLASS I DIRECTORS OF BEN & JERRY'S ) INDEPENDENT BOARD ) ) Plaintiffs, ) v. ) ) UNILEVER PLC AND CONOPCO, INC. ) ) Defendants. | Case No. 1:24-cv-08641-PKC JURY TRIAL DEMANDED |

~~FIRST~~**[PROPOSED] SECOND AMENDED COMPLAINT**

Plaintiffs Ben & Jerry's Homemade, Inc. and the Class I Directors of the Ben & Jerry's Independent Board (together, "Plaintiffs" or "Ben & Jerry's"), by and through their undersigned attorneys, as and for their ~~first~~second amended complaint (the "Complaint") against defendants Conopco, Inc. ("Conopco") and Unilever PLC ("Unilever," and together with Conopco, "Unilever" or "Defendants"), hereby allege upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1.      This dispute centers on Unilever's failure to adhere to its contractual obligations vis-a-vis the parties' Merger Agreement, Settlement Agreement, and Settlement Amendment. Specifically, Unilever has repeatedly failed to recognize and respect the Independent Board's primary responsibility over Ben & Jerry's Social Mission and Brand Integrity, including threatening Ben & Jerry's personnel should the company speak out regarding issues ~~which~~that Unilever prefers to censor.  The Independent Board initiates this litigation to protect Ben & Jerry's three-part mission from Unilever's unilateral erosion and to safeguard the company from Unilever's repeated overreaches.

1

Exhibit No.

A

## PARTIES

2.      Plaintiff Ben & Jerry's Homemade, Inc. is a Vermont corporation with its principal place of business in Burlington, Vermont.

3.      Plaintiffs Class I Directors of the Ben & Jerry's Independent Board consist of the Class I Directors of Ben & Jerry's Homemade, Inc., who bring suit in their capacity as Directors of the Independent Board with the authority to enforce the Settlement Agreement.  The Class I Directors of Ben & Jerry's Homemade, Inc. are citizens of California, Nevada, and Georgia:

> a.   Anuradha Mittal – California
>
> b.   Daryn Dodson – California
>
> c.   Jennifer Henderson – Nevada
>
> d.   Detavio Samuels – Georgia
>
> e.   Chivy Sok – California

4.      Defendant Conopco, Inc. is a New York corporation headquartered in Englewood Cliffs, New Jersey.

5.      Defendant Unilever PLC is a United Kingdom public limited company headquartered in London, England.

## PERSONAL JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over Unilever because Unilever has consented to personal jurisdiction in any federal court located in the State of New York under Section 14 of the Settlement Agreement with respect to the claims being brought in this Complaint.

7.      This Court has personal jurisdiction over Conopco because Conopco has consented to personal jurisdiction in any federal court located in the State of New York under Section 14 of the Settlement Agreement with respect to the claims being brought in this Complaint.  Conopco is also subject to the general personal jurisdiction of this Court as a domestic corporation.  *See* N.Y.

C.P.L.R. § 301.

8.      Venue lies within this District pursuant to Section 14 of the Settlement Agreement. On information and belief, venue also lies in this District under 28 U.S.C. § 1392(b)(2) because Defendants conduct, transact, and/or solicit substantial business in New York.

## SUBJECT MATTER JURISDICTION

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars.

## FACTUAL BACKGROUND

I.      **Unilever Has Breached the Parties' Settlement Agreement by Inappropriately Halting Ben & Jerry's Social Mission.**

A.      **Under the Parties' Multiple Agreements, The Independent Board Holds Primary Responsibility Over Ben & Jerry's Social Mission and Brand Integrity.**

10.     Social justice and human rights are core to Ben & Jerry's DNA.  For over four decades, the company has pursued its unique Social Mission via its public, progressive stances on issues such as migrant justice, LGBTQ+ rights, Black Lives Matter, GMO labeling, and a variety of other economic and social causes affecting historically marginalized communities. Consistent with its decades-long history of supporting peace and human rights, in July 2020, Ben & Jerry's Independent Board unanimously passed a resolution that instructed company management to develop a plan to end all distribution of Ben & Jerry's products in Israeli-only settlements in the Occupied Palestinian Territory.  Unilever's appointee to the Independent Board voted in favor of the resolution.  Approximately one year later, in July 2021, Ben & Jerry's announced to the public that it would be ending sales of its products in the area, with Unilever concurrently issuing a press

3

release declaring that it had "*always recognised the right* of the brand and its independent Board to take decisions about its social missions."[1]

11.    On June 23, 2022, Unilever announced that it had sold Ben & Jerry's intellectual property in Israel and the Occupied Palestinian Territory to a distributor who would continue sales in the settlements.  The Independent Board—who had not consented to nor been consulted about the sale—initiated litigation on behalf of Ben & Jerry's within a matter of days, alleging that Unilever's actions constituted breaches of the parties' 2000 Merger Agreement and 2000 Shareholders Agreement, both of which cemented "primary responsibility" over Ben & Jerry's Social Mission and Brand Integrity with the Independent Board.

12.    The parties negotiated for several months thereafter. A primary objective of the Independent Board was to enshrine guardrails preventing any dilution of the company's Social Mission and Brand Integrity. Following over six months of negotiations, in December 2022, Ben & Jerry's and Unilever ultimately entered into a Settlement Agreement, which was expressly conditioned on Unilever respecting the Independent Board's authority over Ben & Jerry's Social Mission and Brand Integrity.  Per Section 2(b) of the Settlement Agreement, Unilever must "[r]espect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity" and "work in good faith with the Independent Board to ensure that both are protected and furthered."[2]

13.    Unilever has breached its contractual obligations to both Ben & Jerry's and the

---

[1]    Exhibit 1 (Unilever Statement on Ben & Jerry's Decision) at 2.

[2]    Exhibit 2 (Settlement Agreement) at 1.  This provision underscored the Independent Board's authority as outlined in the Merger Agreement.  Indeed, the Settlement Agreement repeatedly references the Merger Agreement, and uses the following statement to summarize its purpose and extent: "Unilever respects the Merger Agreement with Ben & Jerry's Homemade Inc., including the company's three-part mission and the Independent Board's primary responsibility over the company's Essential Brand Integrity and Social Mission . . . As provided in Sections 6.14(e), (f) of the Merger Agreement, any decisions implicating Ben & Jerry's Essential Brand Integrity and Social Mission should be made after consultation with and approval of the Independent Board of Ben & Jerry's." *Id.* at 2-3.

Independent Board through various threats, reprisals, and censorship.

### B.    Unilever Has Repeatedly Halted Ben & Jerry's Social Mission in Direct Contravention of the Settlement Agreement.

14.    Mere months after the parties entered the Settlement Agreement, Unilever had already begun its efforts to undermine it.  Specifically, during the ongoing humanitarian crisis in Gaza, which has claimed the lives of over ~~18~~20,000 innocent Palestinian children, Ben & Jerry's has on four occasions attempted to publicly speak out in support of peace and human rights. Despite its contractual commitment to "[r]espect and acknowledge" the Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity, ***Unilever has silenced each of these efforts***.

15.    *First*, in December 2023, approximately two months into the humanitarian crisis, the Independent Board alongside Ben & Jerry's management informed Unilever that Ben & Jerry's would be issuing the following statement: "Ben & Jerry's calls for peace and a permanent and immediate ceasefire."  By this time, over 140 countries around the world (including England, France, and Canada), Doctors Without Borders, and the Pope had also called for a ceasefire.  In response, Unilever threatened to ***dismantle the Independent Board*** and ***sue the board members individually*** if Ben & Jerry's—with its decades-long motto of "peace, love, & ice cream"—issued the statement supporting "peace" and a "ceasefire."  These threats were coupled with personal calls from Peter ter Kelve and Jeff Eglash (Unilever's President of Ice Cream and Global Head of Litigation), who attempted to intimidate Ben & Jerry's personnel with professional reprisals if the company issued the ceasefire statement.

16.    *Second*, approximately five months later, in May 2024, Ben & Jerry's social activism managers in Europe sought to release the following statement in support of the safe passage of Palestinian refugees:



17.    This statement was consistent with Ben & Jerry's long history of supporting safe passage for refugees from multiple countries, including Rwanda, Afghanistan, and Ukraine, among others.  In fact, Ben & Jerry's showcases a statement titled "the Rights and Dignity of Refugees and Asylum Seekers" under the "Issues We Care About" section of the company's website. Nevertheless, Unilever prevented Ben & Jerry's social activism managers from publishing the statement, without the Independent Board's knowledge or consent.

18.    In June 2024, after the Independent Board became aware of Unilever's inappropriate muzzling, Ben & Jerry's Chairwoman, Anuradha Mittal, wrote to Mr. ter Kelve emphasizing Ben & Jerry's "long history of work on refugee rights," including supporting safe passage for refugees from multiple countries.  The Chairwoman continued: "Safe passage is the right of every single person from every single country; to single out Gazan refugees' right to safe passage is discriminatory and contravenes international human rights and humanitarian laws, not to mention Unilever's stated commitment to human rights principles in general.  This work also

falls squarely under the Merger Agreement which grants the Board primary decision-making authority."

19.    On July 1, 2024, Mr. ter Kelve responded: "[T]o my understanding the communications team initially reviewed [the statement] and was concerned about the timing of it – it coincided with the Iranian missile attack on Israel.  When the matter was escalated to me, I expressed concerns about the continued perception of antisemitism that is a persistent issue.  It was my judgment that in light of the timing and nature of the post it, it was not an appropriate message at this time."  Disturbed that Mr. ter Kelve would intentionally create a false equivalency between calling for the safe passage of Gazan refugees and antisemitism, Ms. Mittal wrote on July 7, 2024: "[O]ther than your clairvoyant intuition, could you please point to any objective data point—such as a market study or third-party evaluation—that objectively confirmed your unilateral judgment that calling for safe passage of all refugees, including from Gaza will be viewed as antisemitism?"  To this day, Mr. ter Kelve has never provided any such evidence.

20.    *Third*, in June 2024, as college campuses around the country were protesting the civilian deaths and humanitarian catastrophe in Gaza, Ben & Jerry's management and the Independent Board aligned on issuing a public statement supporting the protesters' First Amendment rights.  Ben & Jerry's has a long history of supporting such discourse, including a post titled "Silence is NOT an Option" regarding the murder of George Floyd, which remains live on Ben & Jerry's website.  When Ben & Jerry's management informed Unilever that they would be publishing the statement supporting the protesters' rights, Jeffrey Eglash (Unilever Global Head of Litigation) barred its release.

21.    *Fourth*, on September 25, 2024, Senator Bernie Sanders issued the following tweet:



22.     In conjunction with Senator Sander's post, Ben & Jerry's management and the Independent Board agreed on releasing the following statement:

> We Support the Sanders Resolution. As the one-year anniversary of October 7th approaches, with tens of thousands of innocent Palestinian civilians killed and dozens of Israeli hostages still held, we believe in providing critical humanitarian aid, not in sending more weapons. We urge you to join us in calling on the Senate to pass the Sanders Resolution and halt an additional $20 billion in military aid to Israel.

23.     On September 25, 2024, Ms. Mittal wrote to Ben & Jerry's CEO requesting publication of the statement as approved by the Independent Board, the entity with "primary responsibility" over Ben & Jerry's Social Mission.  The Chair followed up on September 29, 2024, requesting a status update.  The following day, Ms. Mittal was informed that Mr. ter Kelve had

unilaterally vetoed the statement in what amounted to Unilever's fourth act of censoring Ben & Jerry's social mission in less than a six-month span.

24.     Unilever's overreach has recently expanded to other portions of the Social Mission as well.[3]  For example, following the November 2024 election, Ben & Jerry's management worked collaboratively with the Independent Board to release a post on Inauguration Day that identified several social issues Ben & Jerry's believed would be challenged during the Trump administration, including minimum wage, universal healthcare, abortion, and climate change.  Despite weeks of working on the statement, including feedback from Unilever's Global Head of Litigation, on January 18, 2024, Peter ter Kelve unilaterally barred Ben & Jerry's from issuing the post because it specifically mentioned "Donald Trump."

25.     Mr. ter Kelve's objection, of course, ignored Ben & Jerry's consistent history of challenging the Trump administration, including launching the flavor "Pecan Resist" in 2018 alongside the following public statement:  "The company cannot be silent in the face of President Trump's policies that attack and attempt to roll back decades of progress on racial and gender equity, climate change, LGBTQ rights and refugee and immigrant rights – all issues that have been at the core of the company's social mission for 40 years."  Mr. ter Kelve—clearly unaware of the Pecan Resist statement—provided *no evidence whatsoever* regarding any commercial implications of previous posts regarding the Trump administration or of the Inauguration Day post which he unilaterally blocked.  Rather, Mr. ter Kelve appeared to base his decision solely ~~off~~on his intuition.

---

[3]  ~~Plaintiffs allege these additional facts as a part of their pleading amendment "as a matter of course" under Federal Rule of Civil Procedure 15(a)(1)(B).  All material facts alleged in Paragraphs 24–26 of this Complaint occurred after Plaintiffs' December 19, 2024 Letter to the Court, and thus could not be addressed therein.~~

26.     Unilever's ~~springing~~ objection to mentioning "Trump" coincides with its prominent board member, Nelson Peltz, publicly supporting Mr. Trump. ~~Unsurprisingly, within~~Within twenty-four hours of Mr. ter Kelve blocking the Inauguration Post ~~based of a hunch rather than evidence,~~on the grounds that it was "partisan," he hosted an Ice Cream Townhall, where he publicly touted that Mr. Peltz had been the one to introduce Elon Musk to Donald Trump. According to Mr. ter Kelve, despite four decades of progressive social activism—and years of challenging ~~the Trump administration's~~ policies ~~specifically~~under both Democratic and Republican presidents—criticizing Trump was now too taboo for the brand synonymous with "Peace, Love, and Ice Cream."

27.     As the aforementioned conduct underscores, Unilever has exhibited a pattern and practice of usurping the Independent Board's authority, while concurrently stymieing Ben & Jerry's Social Mission and Brand Integrity.

## II.     Unilever Has Breached the Parties' Settlement Agreement by Blocking Donations to Jewish Voice for Peace and the Council on American Islamic Relations.

### A.     Per the Settlement Agreement, the Chair of the Independent Board Designates Donation Recipients.

28.     As another condition to the Settlement Agreement, Unilever must make a total of $5 million in payments to Ben & Jerry's for disbursement to human rights and humanitarian organizations. Per Section 2(g) of the Settlement Agreement:

> Unilever will make two $2,500,000 payments to Ben & Jerry's Homemade Inc. (totaling $5,000,000). The first payment will occur in 2023 and the second payment in 2024. Under no circumstances will the first payment be made later than July 30, 2023, or the second payment be made later than July 30, 2024. The Chair of the Independent Board in good faith consultation with Unilever will determine to which humanitarian and human rights organizations the funds will be disbursed. Unilever's consent will not be unreasonably withheld.

29.     Per the plain terms of the Settlement Agreement, the Chair of Ben & Jerry's Independent Board is to "determine" the donation recipients.  It is a breach of contract for Unilever to unreasonably object to the Chair's designees.

**B.      Unilever Has Unreasonably Blocked Ben & Jerry's from Donating to Jewish Voice for Peace and the Council on American-Islamic Relations.**

30.     On June 7, 2024, Ben & Jerry's Chairwoman provided Maria Varsellona— Unilever's Chief Legal Officer—a list of her designees, which included Jewish Voice for Peace and the San Francisco-Bay Area Chapter of the Council on American-Islamic Relations (CAIR-SFBA), among others.  This initial correspondence led to a two-month-long negotiation process over the designees.

31.     On multiple occasions, the Chair requested any objections Unilever had to the groups in writing.  After initially refusing, Unilever finally provided its written objections on August 16, 2024 via a chart of grievances which simply regurgitated offensive stereotypes regarding each of the Chair's designees.  These objections were riddled with inconsistencies.  For example, despite expressly agreeing to donate to "human rights organizations" in the parties' Settlement Agreement, each of Unilever's objections boiled down to the same issue: the organizations were advocating for human rights, namely Palestinian human rights.  As an illustration, Unilever's objection to donations for ***Jewish Voice for Peace*** was that the group was too critical of the Israeli government.  Unilever's asserted objections were inconsistent with ***its own public*** Human Rights Policy which states that "[b]usinesses ***must not support any actions, directly or indirectly***, which impinge upon human rights defenders' right to ***freedom of expression***, association, or assembly."[4]

---

[4]   *See* Unilever Principles in Support of Human Rights Defenders (https://www.unilever.com/files/a9ee0484-3dad-4f48-9f0b-69cea560ebba/unilever-principles-in-support-of-human-rights-defenders-sept-2023.pdf) at 7.

32.     Unilever's pretext for blocking the donations was that it allegedly seeks to remain "neutral" on the Palestinian-Israeli conflict.  Unilever's actions, however, belie its assertions of neutrality.  For example, following October 7, Unilever publicly made a 500,000 Euro donation to Magen David Adom, an Israeli organization which acts as an auxiliary service to the Israeli Defense Forces (IDF).  Magen David Adom has appointed to head its rabbinical committee Rabbi Schmuel Eliyahu, who has been repeatedly criticized for his "racist statements and extremist views." Mr. Eliyahu has called on Jews "not to rent apartments to Arabs" and for the indiscriminate bombing of Palestinians ("If they don't stop after we kill 100, then we must kill a thousand. And if they do not stop after 1,000 then we must kill 10,000. If they still don't stop we must kill 100,000, even a million").  As Rabbi Rick Jacobs, President of the Union for Reform Judaism, has described: "Rabbi Shmuel [sic] Eliyahu is well known for his racist views which most Jews and supporters of Israel find offensive and which the Israeli Supreme Court strongly condemned."[5] He further described Rabbi Eliyahu as a "purveyor of hatred towards Arabs."[6]  Most recently, Rabbi Eliyahu has called for the nuking of Gaza.[7]

33.     Moreover, Unilever has not remained "neutral" in other contexts.  For example, Unilever's website contemporaneously showcases its position on the Ukraine/Russia conflict: Unilever "continue[s] to condemn the war in Ukraine as a **_brutal and senseless act by the Russian state_**."[8] In support of this position, Unilever "ceased all imports and exports of [its] products into and out of Russia . . . stopped all media and advertising spend . . . [and] ceased all capital flows

---

[5]   Exhibit 3 (Sam Sokol, _Israeli Rabbi Accused of Racism Says Barred ~~From~~from U.S. by 'anti-Zionists'_, HAARETZ (May 31, 2022)) at 2.

[6]   _Id._

[7]   Exhibit 4 (_Rabbi Backs Remark by his Son, a Far-right Minister, that Nuking Gaza is an Option_, TIMES OF ISRAEL (Nov. 14, 2023)) at 1-2.

[8]   Exhibit 5 (Unilever Statement on the War in Ukraine) at 2.

into and out of the country."[9]

34.    On August 28, 2024, Ms. Mittal provided the following response to Unilever's objections chart: "We have provided ample evidence of Unilever taking sides in both this conflict and others completely negating your assertions, including the head rabbi of David Magen Adom calling for a nuclear bomb to drop on Gaza.  It is disappointing that you attempt to portray Palestinian human rights as a 'needless dispute'   We have reviewed your 'evidence' and find your objections to be riddled with caricatures and stereotypes.  There is nothing unreasonable with promoting basic human rights for Palestinians."  Ms. Varsellona never responded.

## III.    Unilever Has Failed to Adhere to Its Contractual Payment Obligations to Indigenous Palestinian Farmers.

### A.    Per the Parties' Settlement Amendment, Unilever Is to Disburse $20 Million to Canaan Fair Trade Over the Next 10 Years.

35.    On August 30, 2023, the Parties negotiated a Settlement Agreement Amendment. Per the Amendment, Unilever "will make payments totaling $2 million USD annually to Canaan Fair Trade ('Canaan'), directly or through a third party, for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers), for at least ten years   Payments to Canaan will be verified by auditors selected by the Independent Board and reported on an annual basis in SEAR.  Confirmation of payments made hereunder will be sent to the Chair of the Independent Board quarterly."[10] Canaan has sourced ingredients for Ben & Jerry's products for nearly a decade, with its almonds being recognized for their high quality alongside Canaan's promotion of values-led sourcing and fair trade.

### B.    Unilever Has Failed to Adhere to Its Contractually Mandated Reporting

---

[9]    *Id.*
[10]    __Exhibit 6 (Settlement Agreement Amendment) at 1.

**Requirements While Scapegoating Its Former Executives.**

36.    Per the plain terms of the Settlement Amendment, "[c]onfirmation of payments made" to Canaan "will be sent to the Chair of the Independent Board quarterly." The end of the first quarter occurred on March 31, 2024. Unilever failed to provide such confirmation.

37.    Instead, on April 2, 2024, Mr. ter Kelve wrote to Ben & Jerry's Chairwoman that he "[h]ad not been briefed on this yet and will investigate what the status of this agreement is. Who is this Canaan group could not find when I googled?"

38.    As Ms. Mittal pointed out in her response, Mr. ter Kelve's ignorance was eye-popping: "We have had a nearly-**decade long** commitment with Canaan. **As referenced in the language of the Settlement Amendment**, they are a supplier of fair-trade ingredients from Palestinian farmers: https://canaanpalestine.com/." (emphasis added).

39.    On April 11, 2024, Ms. Mittal and Mr. ter Kelve had a telephone conference to further discuss the issue. During the call, Mr. ter Kelve lamented the Settlement Amendment as a bad agreement, badmouthing and suggested that his predecessor, Matt Close, was fired for agreeing to it. When Ms. Mittal pointed out that the Settlement Amendment involved a multi-month negotiation process and review by multiple Unilever executives, Mr. ter Kelve was at a loss for excuses.

40.    In addition to attempting to renegotiate the parties' agreement, Unilever has unilaterally added hurdles to Cannan's receipt of the funds, conditions which do not appear in the Settlement Amendment. These extracontractual conditions highlight Unilever's chronic overreach and disregard of the parties' agreement.

**IV.    Unilever Is Attempting to Replace Ben & Jerry's CEO for Defending the Social Mission in Violation of Unilever's Obligations Under the Merger and Settlement Agreements.**

41.    Like the Settlement Agreement, Section 6.14 of the parties' Merger Agreement

14

protects the Social Mission and Brand Integrity of Ben & Jerry's, positions the Independent Board as the "custodians" of the same, and obligates Unilever to work with the Independent Board in good faith.[11]

42.    The Merger Agreement further protects Ben & Jerry's interests by precluding the unilateral removal of its CEO. Specifically, under Section 6.14(c), any decision regarding the replacement of Ben & Jerry's CEO shall only occur "*after* good faith consultation with, and the participation in the discussion of, an advisory committee of the Company Board (the 'Appointment Committee')."  The power to appoint members to this committee is vested exclusively in the Class I Directors of the Independent Board.

43.    Contrary to their obligations under Section 6.14, Unilever has repeatedly threatened Ben & Jerry's personnel, including CEO David Stever, should they fail to comply with Unilever's efforts to silence the Social Mission.

44.    This month, ter Kelve and Unilever followed through with their threats.  On March 3, 2025, Unilever informed the Independent Board that they were removing and replacing Mr. Stever as Ben & Jerry's CEO.  Ter Kelve informed third parties of the same soon thereafter. Despite the Merger Agreement's clear obligation that any decision regarding the CEO's removal can only occur "*after* good faith consultation with, and the participation in the discussion of, an advisory committee of the Company Board," Unilever announced their decision before the committee had even been appointed and attempted to force the Independent Board into rubberstamping the decision by unilaterally dictating artificial and hasty deadlines.

---

[11]    *See* Exhibit 7 (Merger Agreement), at 48–52. 1.  The good faith cooperation of the CEO, the Independent Board, and Conopco in furthering Ben & Jerry's Social Mission and Brand Integrity is an essential term of the Merger Agreement.  Sections 6.14(e) and 6.14(f) provide that the Independent Board "shall work together with the CEO" to integrate the Social Mission into Ben & Jerry's business plan and conduct the business in a manner that "preserves and enhances" Brand Integrity.  Section 6.14(d) contemplates that the Company and Conopco shall work together in good faith to devise the annual business plan.  And Section 6.14(i) specifically provides that "Conopco shall not prevent [Ben & Jerry's] from fulfilling its obligations" under Section 6.14.

45.     For example, Unilever attempted to impose an arbitrary *four-day* deadline for the Independent Board to convene, appoint a committee, analyze the merits of removal, draft a "consultation" in writing, and send it to Unilever, despite Unilever claiming they had been contemplating the removal for over *four months*.  According to Unilever, *four days* was plenty of time for good faith discussions regarding replacing the CEO of a billion-dollar business.

46.     In response, the Independent Board pointed out that Unilever's four-day timeline was inconsistent with the Merger Agreement and offered instead to appoint a committee on April 1, the date for the next Independent Board meeting. The Independent Board also requested access to Unilever's minutes, notes, and materials related to the removal decision so that the committee— once appointed—could meaningfully participate in the contractually-mandated discussions. Unilever refused the request.

47.     On information and belief, Unilever's motive for removing Mr. Stever is his commitment to Ben & Jerry's Social Mission and Essential Brand Integrity and his willingness to collaborate in good faith with the Independent Board, rather than any genuine concerns regarding his performance history.  Under Mr. Stever's tenure, Ben & Jerry's **outperformed** Unilever's ice cream portfolio and was ranked #2 on the Brand 500 Authenticity Index in both 2023 and 2024.

48.     In fact, in January 2025, Unilever literally wrote out their true intentions in Mr. Stever's annual performance review authored by Gerardo Rozanski (Unilever's President of Ice Cream for North America) and Ronald Schellekens (Unilever's Chief Human Resources Officer). In that review, Unilever chastised Stever for "repeatedly acquiesce[ing] to the demands of the Independent Social Mission Board" by allowing Ben & Jerry's to post statements the Independent Board had collaboratively worked on with Ben & Jerry's management.

49.     Unilever's actions breached the Merger Agreement by obstructing the CEO's duties, purposely undermining Ben & Jerry's Social Mission and Brand Integrity, and failing to

abide by the agreed procedure for removal of Ben & Jerry's CEO.  These actions also breached the Settlement Agreement:  Unilever's attempt to replace Mr. Stever for preserving Ben & Jerry's Social Mission and working respectfully with the Independent Board is antithetical to its contractual obligations to respect the Social Misson and work with the Independent Board in good faith to ensure it is furthered.

50.     Concurrently with their efforts to remove Mr. Stever, Unilever's suppression of Ben & Jerry's Social Mission has reached startling new levels of oppressiveness—and irony.  For example, Unilever prevented Ben & Jerry's—the company that has openly called for "Dismantling White Supremacy"—from issuing a post commemorating Black History Month. And most recently, after Columbia graduate Mahmoud Khalil was detained by ICE for expressing pro-Palestine views on a college campus, Unilever blocked Ben & Jerry's from making the following post:  "Protect the First Amendment! Free speech and peaceful protests are the lifeblood of our democracy, and student activists have always been at the center of the fight for justice. Political speech is protected by our constitution and peaceful civil disobedience should never be the basis for deportation. Protect your right to dissent and take action with the @ACLU," followed by a link to an ACLU petition for Mr. Khalil's release.  Once again, Unilever provided no explanation for the censorship.

51.     Unilever's repeated threats (including to dismantle the Independent Board), inappropriate muzzling, and campaign of professional reprisals are particularly concerning given their simultaneous efforts to restructure the company.  Beginning in 2024, Unilever began taking steps to spin off Unilever's ice cream business, including Ben & Jerry's Homemade, Inc. into a standalone company.  To date, Unilever has failed to engage with the Independent Board in good faith regarding how the restructuring will preserve the rights, duties, and obligations specified in the parties' agreements, including Ben & Jerry's Social Mission and Brand Integrity and the

Independent Board's authority over the same.  Instead, they have repeatedly threatened Ben & Jerry's personnel, encroached on the Independent Board's authority over the Social Mission, and are now moving to replace those who they deem to have sided with the Independent Board.

52.    On March 5, 2025, Unilever informed the Independent Board that the restructuring was "imminent."

## CAUSES OF ACTION:

## COUNT I –BREACH OF CONTRACT:  SETTLEMENT AGREEMENT

~~41.~~53.  Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

54.    Plaintiffs and Defendant entered into the Settlement Agreement in December 2022. ~~42.~~    Per Section 2(b) of the Settlement Agreement, Unilever must "[r]espect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity" and "work in good faith with the Independent Board to ensure that both are protected and furthered." These commitments echo previous promises Defendant made to Plaintiffs in the Merger Agreement ~~and Shareholders Agreement.~~.

~~43.~~55.  Defendants have breached this provision by threatening to dismantle the Independent Board, sue Board members, and intimidate Ben & Jerry's personnel.  Defendants' breaches also include censoring Ben & Jerry's from publicly voicing support for peace and refugee rights and for social and economic justice under the Trump administration.  Defendants have also failed to ensure that the Social Mission is protected and furthered, often acting unilaterally. Defendants' actions are unreasonable, hindering Ben & Jerry's Social Mission and tarnishing its Brand Integrity, areas over which the Independent Board retains primary responsibility.

~~44.~~56.  Defendants' actions (including their censorship) have damaged Ben & Jerry's Social Mission and ~~brand integrity~~Brand Integrity (including its goodwill) and encroached on the

Independent Board's authority, including their duties as the custodians of the Ben & Jerry's brand.

57.    Per Section 2(g) of the Settlement Agreement, "Unilever will make two $2,500,000 payments to Ben & Jerry's Homemade Inc. (totaling $5,000,000). The first payment will occur in 2023 and the second payment in 2024." Unilever failed to make the 2024 payment. Ben & Jerry's has thus been damaged through its non-receipt of the promised funds.

58.    Unilever's breaches have also damaged Ben & Jerry's by injuring its reputation and goodwill with customers, both of which are highly dependent upon a sustained public perception that Ben & Jerry's steadfastly promotes its social goals and refuses to compromise its integrity. Ben and Jerry's customers expect the Company to publicly comment on pressing social issues and expect its highest-ranking officials—including the CEO and the independent Board—to be supportive of these causes.[12] Ben & Jerry's unwavering commitment to the Social Mission and Essential Brand Integrity is one of the primary reasons customers choose Ben & Jerry's over other brands, and a key part of its business model. Consequently, every act of muzzling, suppressing, or publicly undermining the company's social activism causes real, calculable, and significant financial and reputational harm to Ben & Jerry's. Unilever's breaches have also undermined the Independent Board and damaged its authority over the Social Mission and Brand Integrity of the company, including their roles as "custodians" of the same.

**COUNT II – DECLARATORY JUDGMENT: SETTLEMENT AGREEMENT**

45.59.  Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

60.    A Per Section 2(b) of the Settlement Agreement, Unilever must "[r]espect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's

---

[12]  *See, e.g.*, Ben & Jerry's January 24, 2025 TikTok post and user comments thereunder: (https://www.tiktok.com/@benandjerrys/video/7463526456144989486?lang=en).

Social Mission and Essential Brand Integrity" and "work in good faith with the Independent Board to ensure that both are protected and furthered."  Unilever's ongoing silencing of Ben & Jerry's Social Mission breaches this obligation, including its present bar on any posts criticizing the Trump administration's policies.

46.61.  Additionally, a present, actual, and justiciable controversy exists between Plaintiffs and Defendants regarding whether Unilever has unreasonably objected to the Chair's designees under the terms of Settlement Agreement such that Unilever is now bound to disburse the funds to the Chair's designees.  28 U.S.C. § 2201.

47.62.  Under Section 2(g) of the Settlement Agreement, the "Chair of the Independent Board in good faith consultation with Unilever will determine to which humanitarian and human rights organizations the funds will be disbursed. Unilever's consent will not be unreasonably withheld."

48.63.  Defendants have breached these provisions by preventing Ben & Jerry's from donating to the Chair's designees, including Jewish Voice for Peace and CAIR-SFBA, among others.

64.    Under Section 2(i) of the Settlement Agreement, Unilever and Conopco are required to ensure that "[r]espect and adherence to the Merger Agreement and a respectful work relationship with the Independent Board will be a stated component of the job description of every CEO of Ben & Jerry's."

65.    Defendants are in breach of this provision, as well as the obligation to protect and further the Social Mission under Section 2(b), if they persist in replacing Ben & Jerry's CEO for respecting the Social Mission and collaborating with the Independent Board.  These actions also breach the implied duty of good faith and fair dealing by undermining the agreement's purpose and the parties' obligations under these sections.

66.    Unilever's habitual breaches are particularly concerning given their ongoing restructuring.  Any restructuring inconsistent with preserving the Independent Board's authority would constitute a breach of Unilever's contractual obligations, damaging the Independent Board's authority as well as the rights they are granted within the agreement.

49.67.  Accordingly, Plaintiffs seek a declaration that:

a.   Unilever has unreasonably withheld its consent to the Chair's designees.

b.   By unreasonably withholding its consent and failing to make the payments by the agreed upon dates, Unilever has breached the Settlement Agreement.

c.   Any attempt by Unilever to remove Ben & Jerry's CEO for protecting the Social Mission or Essential Brand Integrity or for respecting the independent Board would breach Defendants' obligations under the Settlement Agreement.

d.   Any attempt to prevent Ben & Jerry's from criticizing the Trump administration's policies or speaking out on other social issues under the purview of its Social Mission would constitute a breach of its commitment to "[r]espect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity" and "work in good faith with the Independent Board to ensure that both are protected and furthered."

e.   Any attempt to eliminate the Independent Board or its members, or to substantially alter or diminish the Independent Board's responsibility and rights over the Social Mission and Essential Brand Integrity, or to restructure the company in a way that would have the same effect would breach Defendants' obligations under the Settlement Agreement.

e.f. Unilever must immediately disburse or allow Ben & Jerry's to disburse $2,500,000 in funds to the Chair's designees, including Jewish Voice for Peace and CAIR.

**COUNT III– DECLARATORY JUDGMENT: SETTLEMENT AMENDMENT**

50.68.  Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

51.69.  A present, actual, and justiciable controversy exists between Plaintiffs and Defendants regarding whether Unilever has failed to adhere to its contractual obligations regarding disbursements to Canaan Fair Trade and failing to send quarterly confirmation reports to the

Independent Board.

52.70.  Per the 2023 Settlement Amendment, Unilever "will make payments totaling $2 million USD annually to Canaan Fair Trade ('Canaan'), directly or through a third party, for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers), for at least ten years.   Payments to Canaan will be verified by auditors selected by the Independent Board and reported on an annual basis in SEAR.   Confirmation of payments made hereunder will be sent to the Chair of the Independent Board quarterly." Defendants have breached the Settlement Amendment by failing to abide by the quarterly reporting requirements, by failing to make payments in compliance with the Amendment's requirements, and by unilaterally erecting extracontractual hurdles.

53.71.  Accordingly, Plaintiffs seek a declaration that:

    a. Under the terms of the Settlement Amendment, Unilever must make annual payments of $2 million to Canaan Fair trade, for the use of Palestinian almonds or the direct benefit of Palestinian almond farmers, for a period of ten years.

    b. Unilever must send confirmation of the payments to the Chair of the Independent Board, reporting on a quarterly basis.

    c. Unilever must not erect extracontractual barriers to such payment.

**COUNT IV—DECLARATORY JUDGMENT: MERGER AGREEMENT**

72.     Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

73.     Defendants' proposed restructuring of the company threatens to eliminate the Independent Board's, which would breach Section 6.14(a)'s provision that Conopco "shall not otherwise remove any member of the Company Board," as well as violating the duty of good faith and fair dealing as to this and other subsections of Section 6.14.  Eliminating the Independent Board or its custodial role would irreparably harm Ben & Jerry's by leaving the Social Mission

and Brand Integrity unprotected, contrary to the clear intent of the Merger Agreement.

74. Further, Section 6.14(c) of the Merger Agreement requires Conopco to consult an Independent Board-appointed advisory committee in good faith *before* deciding to remove, appoint, or change the compensation of the CEO. This advisory committee is entitled to "participation in the discussions" of any such contemplated decision.

75. By attempting to remove the CEO of Ben & Jerry's for cooperating with the Independent Board on the Social Mission and Essential Brand Integrity, Conopco threatens to undermine these critical aspects of the Merger Agreement and cause irreparable harm to Ben & Jerry's. If completed, Mr. Stever's removal would breach Section 6.14(c)'s requirements of good faith consultation and meaningful participation in discussions. Removal under these circumstances would also breach the implied duty of good faith and fair dealing as to Sections 6.14(d), 6.14(e), and 6.14(f) by obstructing the ability of the CEO and the Independent Board to work together in furthering the Social Mission and Essential Brand Integrity.

76. Accordingly, Plaintiffs seek a declaration that:

a. Unilever must engage in good faith consultation with the Independent Board's Appointment Committee to remove Ben & Jerry's CEO or appoint a new CEO and must also allow the Appointment Committee to participate in all such discussions. Unilever must provide any notes, minutes, or other memorandum to the Appointment Committee for any discussions which have taken place without their participation.

b. Under the terms of the Merger Agreement, Defendants may not fire the CEO of Ben & Jerry's for defending the Social Mission or for cooperating with the Independent Board, and persisting in their current attempt to do so would be a breach of contract.

c. Eliminating the Independent Board or substantially altering or diminishing its rights, duties, or responsibilities would materially breach the Merger Agreement; therefore, any restructuring of Unilever, Conopco, and/or Ben & Jerry's Homemade Inc. must preserve the Independent Board's existence and role as custodian of the Social Mission and Essential Brand Integrity.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Ben & Jerry's respectfully requests judgment in its favor and other appropriate relief against Defendants as follows:

1. Actual, direct, indirect, unjust enrichment, incidental, consequential, and nominal damages;

2. Declaratory relief ordering Defendants to prospectively respect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over the brand's Essential Brand Integrity and Social Mission; ensure any decisions impacting the Essential Brand Integrity and Social Mission ~~after~~follow consultation with and the approval of the Independent Board; release funds to the Chair's designees, including Jewish Voice for Peace and CAIR, ~~and~~ make agreed payments to Canaan Fair Trade for the next ten years; respect the CEO's obligation to work with the Independent Board in good faith to further the Social Mission and Essential Brand Integrity; comply with the CEO appointment and removal procedure required by the Merger Agreement; and ensure that any restructuring of Ben & Jerry's or its parents does not eliminate or diminish the authority of the Independent Board;

3. An award of Plaintiffs' reasonable attorney's fees and costs; and

4. Any and all other relief that this Court deems just and proper.

Dated: ~~January 24~~March 18, 2025____                    Respectfully submitted,


                                        **AHMAD, ZAVITSANOS & MENSING PLLC**

                                        By: /s/ *Shahmeer Halepota*_____
                                        Shahmeer Halepota
                                        Daryl Moore
                                        Edward Goolsby (admitted *pro hac vice*)
                                        Weining Bai (admitted *pro hac vice*)
                                        Angela M. Peterson (admitted *pro hac vice*)
                                        Sean Healey (admitted *pro hac vice*)
                                        1221 McKinney, Suite 2500
                                        Houston, Texas 77010
                                        Phone:  (713) 655-1101
                                        Fax:  (713) 655-0062

                                        *Attorneys for Plaintiffs Ben & Jerry's Homemade, Inc.*
                                        *and the Class I Directors of the Ben & Jerry's Board*


## CERTIFICATE OF SERVICE

   The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically on ~~January 24, 2025~~ March 18, 2025.  As such, this document was served on all counsel of record pursuant to the Federal Rules of Civil Procedure.

                                        /s/*Shahmeer Halepota*_____
                                        Shahmeer Halepota



Home ▶ Press releases

# Unilever statement on Ben & Jerry's decision

Published: **18/07/2021**

Average read time: **1 minute**



The Israeli-Palestinian conflict is a very complex and sensitive situation. As a global company, Unilever's brands are available in more than 190 countries and in all of them, our priority is to serve consumers with essential products that contribute to their health, wellbeing and enjoyment.

We remain fully committed to our presence in Israel, where we have invested in our people, brands and business for several decades.

Exhibit No.

**A1**

**Cookie Settings**

Ben & Jerry's was acquired by Unilever in 2000. As part of the acquisition agreement, we have always recognised the right of the brand and its independent Board to take decisions about its social mission. We also welcome the fact that Ben & Jerry's will stay in Israel.

**Please read Ben & Jerry's statement here**.

# Media Contacts

- **press-office.london@unilever.com**

## Safe Harbour

Where relevant, these actions are subject to the appropriate consultations and approvals.

This announcement may contain forward looking statements, including 'forward looking statements' within the meaning of the United States Private Securities Litigation Reform Act of 1995. Words such as 'will', 'aim', 'expects', 'anticipates', 'intends', 'looks', 'believes', 'vision', or the negative of these terms and other similar expressions of future performance or results, and their negatives, are intended to identify such forward looking statements. These forward looking statements are based upon current expectations and assumptions regarding anticipated developments and other factors affecting the Unilever Group (the 'Group'). They are not historical facts, nor are they guarantees of future performance.

Because these forward-looking statements involve risks and uncertainties, there are important factors that could cause actual results to differ materially from those expressed or implied by these forward-looking statements. Among other risks and uncertainties, the material or principal factors which could cause actual results to differ materially are: Unilever's global brands not meeting consumer preferences; Unilever's ability to innovate and remain competitive; Unilever's investment choices in its portfolio management; the effect of climate change on Unilever's business; Unilever's ability to find sustainable solutions to its plastic packaging; significant changes or deterioration in customer relationships; the recruitment and retention of talented employees; disruptions in our supply chain and distribution; increases or volatility in the cost of raw materials and commodities; the production of safe and high quality products; secure and reliable IT infrastructure; execution of acquisitions, divestitures and business transformation projects; economic, social and political risks and natural disasters; financial risks; failure to meet high and ethical standards; and managing regulatory, tax and legal matters. A number of these risks have increased as a result of the current Covid-19 pandemic.

Cookie Settings

These forward-looking statements speak only as of the date of this document. Except as required by any applicable law or regulation, the Group expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in the Group's expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based.

Further details of potential risks and uncertainties affecting the Group are described in the Group's filings with the London Stock Exchange, Euronext Amsterdam and the US Securities and Exchange Commission, including in the Unilever Annual Report and Accounts 2020.

---

**Business & Finance**

## Share this page

# Connect with us

We're always looking to connect with those who share an interest in a sustainable future.

# Contact us

Get in touch with Unilever PLC and specialist teams in our headquarters, or find contacts around the world.

**Contact us**     ▶

This is Unilever's global company website

© Unilever 2022

**Cookie Settings**

What's i

Contact

Legal notice

UK Modern Slavery Act Transparency Statement

Accessibility

Vulnerability Disclosure Policy

Cookie Notice

Privacy Notice

Sitemap

Search Jobs

Cookie Settings

## CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT

This CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT (the "Settlement Agreement"), effective December 13, 2022 (the "Effective Date"), is entered into by Conopco, Inc. ("Conopco" or "Defendant"), Unilever IP Holdings B.V., and Unilever PLC (collectively "Unilever"), on the one hand, and Ben & Jerry's Homemade Inc. and the Class I Directors of the Ben & Jerry's Board of Directors ("Ben & Jerry's" or "Plaintiff"), on the other hand, each hereinafter sometimes referred to as a "Party" and collectively as the "Parties".



2.    Conopco and Unilever agree to:

 

(b)    Respect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity and agree to work in good faith with the Independent Board to ensure that both are protected and furthered.

**Exhibit No.**

**A2**



(g)    Unilever will make two $2,500,000 payments to Ben & Jerry's Homemade Inc. (totaling $5,000,000). The first payment will occur in 2023 and the second payment in 2024. Under no circumstances will the first payment be made later than July 30, 2023, or the second payment be made later than July 30, 2024. The Chair of the Independent Board in good faith consultation with Unilever will determine to which humanitarian and human rights organizations the funds will be disbursed. Unilever's consent will not be unreasonably withheld.

(h)    Make the following annual statement to the Unilever Leadership Executive ("ULE") and Unilever executives with responsibility for ice cream regarding the Independent Board's role under the Merger Agreement with respect to the Social Mission and Essential Brand Integrity of Ben & Jerry's; include this statement in the orientation process for new Unilever executives with responsibility for ice cream; and confirm that this will also apply in the event of a reorganization with respect to Unilever executives with responsibility for ice cream. The statement is: "Unilever respects the Merger Agreement with Ben & Jerry's Homemade Inc., including the company's three-part mission and the Independent Board's primary responsibility over the company's Essential Brand Integrity and Social Mission. Unilever and Ben & Jerry's are aligned in their commitment to the Merger Agreement. As provided in Sections 6.14(e), (f) of the Merger Agreement, any decisions implicating Ben & Jerry's Essential Brand Integrity and Social Mission should be made after consultation with and approval of the Independent Board of Ben & Jerry's " For the avoidance of

2

doubt, this statement is intended to be a summary of the Merger Agreement. Nothing in this statement is intended to alter, modify, or add to the terms of the Merger Agreement or modify the parties' rights thereunder. This statement is not meant to provide a legal interpretation of the Merger Agreement in any form or modify any rights under the Merger Agreement.

(i)     Respect and adherence to the Merger Agreement and a respectful work relationship with the Independent Board will be a stated component of the job description of every CEO of Ben & Jerry's. The onboarding process for the Ben & Jerry's CEO will include a comprehensive review of the Merger Agreement and the corresponding role of the Independent Board. A set of KPIs reflecting the provisions of the Merger Agreement and the role of the Independent Board will be included in every CEO evaluation.

(j)     Refrain from making any statement on behalf of Ben & Jerry's regarding the Social Mission that is inconsistent with the Social Mission of Ben & Jerry's as previously stated by Ben & Jerry's or approved by the Independent Board, without the consent of a majority of the Independent Board.







13. Governing Law: This Settlement Agreement and any dispute arising out of this Settlement Agreement shall be governed by, and construed in accordance with, the laws of the state of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

14. Each of the Parties hereto (a) consents to submit itself to the personal jurisdiction of any state or Federal court located in the State of New York in the event any dispute arises regarding this agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any action relating to the settlement agreement in any court other than a court sitting in the State of New York.

**IN WITNESS WHEREOF**, the Parties have each signed this Settlement Agreement as of the Effective Date.

For: Conopco, Inc.

By: _____
Jeffrey Eglash

Jeffrey Eglash

Date: _____12/14/2022_____

For: Unilever IP Holdings B.V.

By: _____
Matt Close

Matt Close

Date: _____12/14/2022_____

For: Unilever PLC

By: _____
Maria Varsellona

Maria Varsellona

Date: _____12/14/2022_____

For: Ben & Jerry's Homemade, Inc.

By: _____
Matthew McCarthy

Matthew McCarthy

Date: _____12/14/2022_____

For: Unilever IP Holdings B.V.

_____
By: Sarah Woodhouse

Date:    14/12/22

For: Class I Directors

By: _____
Anuradha Mittal

Anuradha Mittal

Date: _____14/12/22_____

By: _____
Daryn Dodson

Daryn Dodson

Date: _____14/12/22_____

By: _____
Jennifer Henderson

Jennifer Henderson

Date: _____14/12/22_____

By: _____
Detavio Samuels

Detavio Samuels

Date: _____14/12/22_____

By: _____
Chivy Sok

Chivy Sok

Date: _____14/12/22_____

🔍 **Search**      ✡**HAARETZ**

**Haaretz** | Israel News

# Israeli Rabbi Accused of Racism Says Barred From U.S. by 'anti-Zionists'

## Shmuel Eliyahu's bureau accused the Reform movement of 'silencing' the controversial rabbi after his travel visa was revoked

**Sam Sokol** May 31, 2022   🔔 **Follow**

A controversial Israeli state rabbi claims to have been barred from travelling to the United States, asserting that Embassy officials revoked his travel visa before expiry at the instigation of anti-Zionist and non-Orthodox groups.

"Despite appeals to the U.S. Consulate, we have received no reasoning to explain the reason for the revocation of a visa that had been valid for decades," the bureau of Shmuel Eliyahu, the chief rabbi of the northern Israeli city of Safed, said in a statement on Tuesday.

"Our inquiries show that this is an act of anti-Zionists such as the Reform movement, bodies that frequently try to infringe on freedom of expression and silence the rabbi. After failing to silence Rabbi Eliyahu in legal ways, they are now trying to silence the rabbi [through] petty methods. There is no reason to worry – they will not succeed."

Eliyahu's son Amihai confirmed that his father's U.S. visa had been revoked while the rabbi's chief of staff Ahiya Medad told Haaretz that he had not received an explanation for the American decision "despite our attempts to understand."



Exhibit No.

A3

Medad declined to elaborate on his office's statement nor did he offer any proof for his assertion.

Asked for comment, a U.S. Embassy spokesperson said that "visa records are confidential under U.S. law; therefore, we cannot discuss the details of individual visa cases."

Rabbi Rick Jacobs, president of the Union for Reform Judaism, said in response to the statements: "Rabbi Shmuel Eliyahu is well known for his racist views which most Jews and supporters of Israel find offensive and which the Israeli Supreme Court strongly condemned. As a purveyor of hatred towards Arabs, non-Orthodox Jews, LGBTQ and others, his views sully the strong moral case we regularly make on behalf of the State of Israel."

He continued, "Our Israeli Reform Movement's Israel Religious Action Center (IRAC) has led and will continue to lead the legal fight against his regular incitement of racism. We were not involved in the decision to deny him a visa but if the rabbi is upset he should undertake a thorough *cheshbon hanefesh*, an honest assessment of his deeds, which is surely the reason he's not a welcome figure across the Jewish and democratic world."

Eliyahu, the son of former Sephardic Chief Rabbi Mordechai Eliyahu, is known for his extreme stances, and has previously been indicted for incitement to racism. In one occasion, he called to remove all of Safed Academic College's Arab students following a suicide attack on a bus near Meron in northern Israel.

In 2008, he called on the government to carry out "state-sanctioned revenge" against Arabs in order to, in his words,

restore Israel's deterrence in the wake of a terrorist attack at Jerusalem's Mercaz Harav yeshiva in which eight students were killed.

In 2013, Israel's then-attorney general called on him not to run for the post of Sephardi chief rabbi, in light of certain contentious remarks and the "legal difficulties" posed by his candidacy.

In response, the rabbi denied having made racist remarks, explaining some of his comments as being taken out of context while insisting others were never uttered.

"Must I as a rabbi explain why I oppose intermarriage?" he wrote in a letter defending his record. "Must I explain why I oppose same-sex marriages or support people becoming observant?"

In 2019, the rabbi told teenagers suspected of murdering a Palestinian woman in the West Bank that they shouldn't fear prison since that's where the road to political power begins, prompting several rights groups to call for disciplinary action and criminal charges to be filed against him.

Two months earlier, the High Court of Justice had ordered then-Justice Minister Ayelet Shaked to explain why she had not taken disciplinary action against Eliyahu for a number of statements that he made, including disparaging remarks about Arabs and gays.

The following year, the court ordered that Eliyahu, whose salary is paid by the state, be subject to a disciplinary hearing for his comments, citing, among other statements, one in which he said that "we must try to make sure that anyone who raises a hand against a Jew should be killed,

revenge must be taken. Even if he didn't kill but just hit [a Jew] or wanted to kill him."

It was the first time a municipal rabbi in Israel was subject to such action.

**Click the alert icon to follow topics:**

🔔 Ultra-Orthodox     🔔 Israel - U.S.

# Rabbi backs remark by his son, a far-right minister, that nuking Gaza is an option

Top Safed rabbi Shmuel Eliyahu, no stranger to controversy, says authorities can't fire him for echoing comments that got Minister Amichai Eliyahu suspended from cabinet meetings

By **TOI STAFF**

14 November 2023, 6:33 pm

7



Chief Rabbi of Safed Rabbi Shmuel Eliyahu speaks at the 'Besheva' group, on February 7, 2022. (Olivier Fitoussi/Flash90)

The chief rabbi of Safed, whose government minister son raised a ruckus with the suggestion that dropping a nuclear weapon on the Gaza Strip could be a viable option, backed the radical idea and challenged authorities to punish him for it in a speech Monday.

Heritage Minister Amichai Eliyahu was quick to walk back his comments as "metaphorical" after they sparked an international outcry and internal coalition sanctions earlier this month, but in a weekly lecture on the Torah portion delivered Monday, Rabbi Shmuel Eliyahu appeared to take up the idea with gusto.

**Exhibit No.**

**A4**

"There's now much discussion on what to do with Gaza. To erase them? What is going to be done? Drop an atom [bomb] on them? It's an option," the rabbi said, smiling during a digression in the talk.

"They won't fire me," he continued. "My son, they wanted to [fire], but me they won't."

A video of the Jerusalem speech, titled "How to defeat Ishmael's kingdom," was uploaded to YouTube late Monday by the rabbi's office. The biblical Ishmael is used by some Orthodox Jews to refer to Arabs, often derogatorily.

**Get The Times of Israel's Daily Edition by email and never miss our top stories**

Your email    GET IT

By signing up, you agree to the terms

The elder Eliyahu, a prominent figure on the radical fringe of Israel's right-wing nationalist movement, has generated criticism in the last several years for a variety of statements and rulings on Jewish law, including one that forbade the rental or sale of Jewish-owned property in the northern city of Safed to Arabs.



Otzma Yehudit MK Amichai Eliyahu speaks in the Knesset on December 6, 2022. (Noam Moskowitz/Knesset)

The rabbi has also drawn censure for criticizing the Reform movement, the LGBTQ community and women serving in IDF combat units, but remains a potent political force. Last year, the US suspended the rabbi's visa in reaction to his comments.

On November 5, his son, a member of National Security Minister Itamar Ben Gvir's far-right Otzma Yehudit party, was giving a radio interview when a host asked him whether "your expectation is that tomorrow morning we'd drop what amounts to some kind a nuclear bomb on all of Gaza, flattening them, eliminating everybody there?"

ADVERTISEMENT

"That's one way," Eliyahu responded. "The second way is to work out what's important to them, what scares them, what deters them... They're not scared of death."

He also appeared to defend collective punishment of Gazans, charging that "there is no such thing as uninvolved civilians in Gaza."

The minister later attempted to walk back his assertion, tweeting that "it is clear to all sensible people that the statement about the atom [bomb] is metaphorical."



A smoke plume erupts in Rafah in the southern Gaza Strip on November 14, 2023. (Said Khatib/AFP)

The comments from the younger Eliyahu, who does not have influence over the three-member war cabinet directing the war against the Hamas terror group, were quickly disavowed by Prime Minister Benjamin Netanyahu, Defense Minister Yoav Gallant and others.

Answering calls for Eliyahu to be fired, Netanyahu instead suspended him from cabinet meetings indefinitely, though he has continued to take part in phone votes held by the cabinet, which has rarely convened in person since war broke out last month.

Netanyahu initially sought to fire Eliyahu, but backpedaled after Ben Gvir said he would not go along with the move, Channel 12 news reported.

ADVERTISEMENT

Despite a series of scandals and calls for his removal over the years, Shmuel Eliyahu has remained chief rabbi in Safed since the late 1980s, though he has twice failed to be elected as Israel's chief Sephardic rabbi, a position his father held from 1983 to 1996. In 2020, the High Court of Justice ordered disciplinary action against Shmuel Eliyahu for making a series of offensive comments and for taking "explicit" political stances forbidden to him due to his status as a government employee.

In 2007, the father, former chief rabbi Mordechai Eliyahu, wrote a letter to then-prime minister Ehud Olmert saying all Gazans should be considered

guilty for rocket attacks, and Shmuel Eliyahu said his father preferred "carpet bombing" Gaza rather than risking soldiers' lives.

Many of Shmuel Eliyahu's past comments have been construed as supporting or inciting violence against Arabs.

"A Jew should not flee from Arabs. A Jew should make the Arabs flee. There is a silent war going on here for land"; "Most of the violence in Israeli society stems from the Arabs"; and "The Arabs have a different code, and violent norms that have become an ideology" — were among the statements Eliyahu made in a 2010 interview with the Maariv daily.

In 2011, then-attorney general Yehuda Weinstein called for a criminal investigation into Eliyahu's comments for suspected incitement, but by 2012, the Justice Ministry, then headed by Yaakov Neeman, closed all proceedings, citing lack of evidence.



Charred debris and objects are scattered inside a building in Kibbutz Alumim, following the October 7 attack by Hamas terrorists, in southern Israel near the Gaza Strip on October 18, 2023. (Gil Cohen-Magen/AFP)

Israel launched its war against Hamas after the terror group carried out a brutal assault on southern Israel communities, killing some 1,200 people, mostly civilians, and taking over 240 hostages, including small children and the elderly.

In response to the killings, Israel vowed to eradicate the terror group and has since hit thousands of Hamas targets inside the Strip with airstrikes and an ongoing ground operation, saying that it is working to minimize civilian casualties in Gaza.

The Hamas-run health ministry in Gaza says more than 11,000 Palestinians have been killed. The figures, which cannot be independently confirmed, do not differentiate between terror operatives and civilians nor between those killed in Israeli strikes and those killed by rockets fired by terror groups that have fallen short inside the Strip.

Israel maintains a policy of official ambiguity around its alleged nuclear weapons program, which has been reported on in the foreign press.



Search site          Menu

[Home](Home)  ▶  [Press releases](Press releases)

# Unilever statement on the war in Ukraine

Published: **13 February 2023**

 Average read time: **2 minutes**

We continue to condemn the war in Ukraine as a brutal and senseless act by the Russian state.



Our focus remains on ensuring the wellbeing of our Ukrainian employees and their families, including by helping them find safety in nearby countries and by setting up accommodation in the west of Ukraine for those who have chosen to stay. We have also donated more than €15m of support and essential Unilever products to the humanitarian relief effort.

**Cookie settings**

Exhibit No.

**A5**

Since March 2022, we have ceased all imports and exports of our products into and out of Russia, and we have stopped all media and advertising spend. We have also ceased all capital flows into and out of the country. We continue to supply our everyday food and hygiene products made in Russia to people in the country.

We understand why there are calls for Unilever to leave Russia. We also want to be clear that we are not trying to protect or manage our business in Russia. However, for companies like Unilever, which have a significant physical presence in the country, exiting is not straightforward.

We have three primary options when assessing the future of our business in Russia.

The first option would be to try to close down the business, which currently employs around 3,000 people across four manufacturing sites and a head office. However, it is clear that were we to abandon our business and brands in the country, they would be appropriated – and then operated – by the Russian state. In addition, we do not think it is right to abandon our people in Russia.

The second option would be to sell the business, but to date we have not been able to find a solution which avoids the Russian state potentially gaining further benefit, and which safeguards our people.

The third option is to allow the business to run with the strict constraints that we put in place last March.

To be clear, none of these options are desirable. Nevertheless, we believe the third remains the best option, both to avoid the risk of our business ending up in the hands of the Russian state, either directly or indirectly, and to help protect our people.

We will of course continue to keep this position under close review.

# Media Contacts

**Press-Office.London@unilever.com**

**Share this page**

**Cookie settings**

# Connect with us

We're always looking to connect with those who share an interest in a sustainable future.

   

# Contact us

Get in touch with Unilever PLC and specialist teams in our headquarters, or find contacts around the world.

Contact us    

What's in our products?

Contact

Legal notice

UK Modern Slavery Act Transparency Statement

Vulnerability Disclosure Policy

Cookie Notice

Privacy Notice

Sitemap

Search Jobs

Accessibility

Digital Sustainability

This is Unilever's global company website



© Unilever 2024

Cookie settings

**CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT
AMENDMENT**

This CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT AMENDMENT (the "Amendment"), effective August 30, 2023 (the "Effective Date"), is entered into by Conopco, Inc. ("Conopco"), Unilever IP Holdings B.V., and Unilever PLC (collectively "Unilever"), on the one hand, and Ben & Jerry's Homemade Inc. and the Class I Directors of the Ben & Jerry's Board of Directors ("Ben & Jerry's"), on the other hand, each hereinafter sometimes referred to as a "Party" and collectively as the "Parties".

**WHEREAS**, on December 13, 2022, the Parties entered into a Confidential Settlement and Release Agreement (the "Settlement Agreement");

**NOW, THEREFORE**, with no Party admitting any liability or fault in relation thereto, and in consideration of the covenants, promises, agreements and other good and valuable consideration set forth herein, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties hereby agree to amend the Settlement Agreement as follows:

1. ████████ commencing in 2024, Ben & Jerry's/Unilever will make payments totaling $2 million USD annually to Canaan Fair Trade ("Canaan"), directly or through a third party, for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers), for at least ten years and execute the sourcing plan as reflected in Exhibit A (save for any language which decreases the total amount disbursed to Canaan). Payments to Canaan will be verified by auditors selected by the Independent Board and reported on an annual basis in SEAR. Confirmation of payments made hereunder will be sent to the Chair of the Independent Board quarterly. Any changes to the sourcing plan will require the Independent Board's approval.

2. All remaining portions of the Settlement Agreement remain binding, unchanged, and in effect.

**IN WITNESS WHEREOF**, the Parties have each signed this Amendment as of the Effective Date.

**Exhibit No.**

**A6**

For:    Conopco, Inc.

By:    Matt Close

    Matt Close

Date:    11th Sept 2023


For:    Ben & Jerry's Homemade, Inc.

By:    Dave Stever

    Dave Stever

Date:    September 6, 2023


For:    Unilever IP Holdings B.V.

By:    Matt Close

    Matt Close

Date:    11th Sept 2023


For:    Class I Directors

By:    Anuradha Mittal

    Anuradha Mittal

Date:    September 6, 2023


For:    Unilever PLC

By:    Matt Close

    Matt Close

Date:    11th Sept 2023


**Signature:**    _[signature]_

**Email:**    matt.close@unilever.com

**Signature:**    _Dave Stever_

**Email:**    dave.stever@benjerry.com

**Signature:**    _Anuradha Mittal_

**Email:**    amittal@oaklandinstitute.org

# Settlement Agreement Amendment

Final Audit Report                                                   2023-09-11

| | |
|---|---|
| Created: | 2023-09-06 |
| By: | Melissa Bland (melissa.bland@benjerry.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAJbVOJEPhI9BtT5g3E3JfYflaU8tbbqEY |

## "Settlement Agreement Amendment" History

📄 Document created by Melissa Bland (melissa.bland@benjerry.com)
2023-09-06 - 5:06:12 PM GMT- IP address: 165.225.220.112

📧 Document emailed to Matt Close (matt.close@unilever.com) for signature
2023-09-06 - 5:09:24 PM GMT

📧 Document emailed to Dave Stever (dave.stever@benjerry.com) for signature
2023-09-06 - 5:09:24 PM GMT

📧 Document emailed to Anuradha Mitta (amittal@oaklandinstitute.org) for signature
2023-09-06 - 5:09:24 PM GMT

📄 Email viewed by Anuradha Mitta (amittal@oaklandinstitute.org)
2023-09-06 - 6:02:38 PM GMT- IP address: 73.71.78.224

✍️ Signer Anuradha Mitta (amittal@oaklandinstitute.org) entered name at signing as Anuradha Mittal
2023-09-06 - 6:04:10 PM GMT- IP address: 73.71.78.224

✍️ Document e-signed by Anuradha Mittal (amittal@oaklandinstitute.org)
Signature Date: 2023-09-06 - 6:04:12 PM GMT - Time Source: server- IP address: 73.71.78.224

📄 Email viewed by Dave Stever (dave.stever@benjerry.com)
2023-09-06 - 8:49:53 PM GMT- IP address: 104.47.0.254

✍️ Document e-signed by Dave Stever (dave.stever@benjerry.com)
Signature Date: 2023-09-06 - 8:52:17 PM GMT - Time Source: server- IP address: 173.205.100.8

📄 Email viewed by Matt Close (matt.close@unilever.com)
2023-09-11 - 1:20:49 PM GMT- IP address: 147.161.173.78

✍️ Document e-signed by Matt Close (matt.close@unilever.com)
Signature Date: 2023-09-11 - 1:22:09 PM GMT - Time Source: server- IP address: 147.161.173.78



Powered by
**Adobe**
**Acrobat Sign**

 Agreement completed.
2023-09-11 - 1:22:09 PM GMT

 Powered by
Adobe
Acrobat Sign

AGREEMENT AND PLAN OF MERGER

Dated as of April 11, 2000,
As Amended and Restated as of July 5, 2000,

Among

CONOPCO, INC.,

VERMONT ALL NATURAL EXPANSION COMPANY

And

BEN & JERRY'S HOMEMADE, INC.

**Exhibit No.**

**A7 (Proposed Ex. 7)**

TABLE OF CONTENTS

Page

ARTICLE I

The Offer and the Merger

SECTION 1.01.   The Offer . . . . . . . . . . . . . . . .   2
SECTION 1.02.   Company Actions . . . . . . . . . . . . .   4
SECTION 1.03.   The Merger . . . . . . . . . . . . . . . .   5
SECTION 1.04.   Closing . . . . . . . . . . . . . . . . .   5
SECTION 1.05.   Effective Time . . . . . . . . . . . . . .   6
SECTION 1.06.   Effects . . . . . . . . . . . . . . . . .   6
SECTION 1.07.   Articles of Incorporation and By-laws . .   6
SECTION 1.08.   Directors . . . . . . . . . . . . . . . .   6
SECTION 1.09.   Officers . . . . . . . . . . . . . . . . .   6

ARTICLE II

Effect on the Capital Stock of the
Constituent Corporations; Exchange of Certificates

SECTION 2.01.   Effect on Capital Stock . . . . . . . . .   7
SECTION 2.02.   Exchange of Certificates . . . . . . . . .   8

ARTICLE III

Representations and Warranties of the Company

SECTION 3.01.   Organization, Standing and Power . . . . .  10
SECTION 3.02.   Company Subsidiaries; Equity Interests . .  11
SECTION 3.03.   Capital Structure . . . . . . . . . . . .  11
SECTION 3.04.   Authority; Execution and Delivery;
                Enforceability . . . . . . . . . . . . . .  14
SECTION 3.05.   No Conflicts; Consents . . . . . . . . . .  15
SECTION 3.06.   SEC Documents; Undisclosed Liabilities . .  17
SECTION 3.07.   Information Supplied . . . . . . . . . . .  17
SECTION 3.08.   Absence of Certain Changes or Events . . .  18
SECTION 3.09.   Taxes . . . . . . . . . . . . . . . . . .  20
SECTION 3.10.   Absence of Changes in Benefit Plans . . .  21
SECTION 3.11.   ERISA Compliance; Excess Parachute
                Payments . . . . . . . . . . . . . . . . .  22
SECTION 3.12.   Litigation . . . . . . . . . . . . . . . .  24
SECTION 3.13.   Compliance with Applicable Laws . . . . .  25
SECTION 3.14.   Environmental Matters . . . . . . . . . .  25

SECTION 3.15.  Contracts; Debt Instruments . . . . . . 26
SECTION 3.16.  Intellectual Property . . . . . . . . . 27
SECTION 3.17.  Labor Matters . . . . . . . . . . . . . 27
SECTION 3.18.  Title to Properties . . . . . . . . . . 27
SECTION 3.19.  Equipment . . . . . . . . . . . . . . . 28
SECTION 3.20.  Suppliers . . . . . . . . . . . . . . . 28
SECTION 3.21.  Brokers; Schedule of Fees and Expenses . . 29
SECTION 3.22.  Opinion of Financial Advisor . . . . . . 29

## ARTICLE IV

### Representations and Warranties of Conopco and Sub

SECTION 4.01.  Organization, Standing and Power . . . . . 29
SECTION 4.02.  Sub . . . . . . . . . . . . . . . . . . 29
SECTION 4.03.  Authority; Execution and Delivery;
               Enforceability . . . . . . . . . . . . . 30
SECTION 4.04.  Consents . . . . . . . . . . . . . . . . 30
SECTION 4.05.  Information Supplied . . . . . . . . . . 30
SECTION 4.06.  Brokers . . . . . . . . . . . . . . . . 31
SECTION 4.07.  Conopco Plans . . . . . . . . . . . . . 31

## ARTICLE V

### Covenants Relating to Conduct of Business

SECTION 5.01.  Conduct of Business . . . . . . . . . . 32
SECTION 5.02.  No Solicitation . . . . . . . . . . . . 36

## ARTICLE VI

### Additional Agreements

SECTION 6.01.  Preparation of Proxy Statement;
               Shareholders Meeting . . . . . . . . . . 39
SECTION 6.02.  Access to Information; Confidentiality . . 40
SECTION 6.03.  Best Efforts; Notification . . . . . . . 40
SECTION 6.04.  Stock Options . . . . . . . . . . . . . 42
SECTION 6.05.  Benefit Plans and Special Bonus Program . 43
SECTION 6.06.  Indemnification . . . . . . . . . . . . 44
SECTION 6.07.  Fees and Expenses; Liquidated Damages . . 45
SECTION 6.08.  Public Announcements . . . . . . . . . . 46
SECTION 6.09.  Transfer Taxes . . . . . . . . . . . . . 46
SECTION 6.10.  Interim Directors . . . . . . . . . . . 46
SECTION 6.11.  Company Capital Stock . . . . . . . . . 47

SECTION 6.12.   Rights Agreements; Consequences if
                Rights Triggered . . . . . . . . . . . 48
SECTION 6.13.   Shareholder Litigation . . . . . . . . . 48
SECTION 6.14.   Operations of the Surviving Corporation  . 48
SECTION 6.15.   The Foundation . . . . . . . . . . . . . 52
SECTION 6.16.   Certain Employee Matters . . . . . . . . 52
SECTION 6.17.   Social Milestones  . . . . . . . . . . . 52
SECTION 6.18.   The Social Venture Fund  . . . . . . . . 53


                        ARTICLE VII


SECTION 7.01.   Conditions to the Offer  . . . . . . . . 53
SECTION 7.02.   Conditions to the Merger . . . . . . . . 57


                        ARTICLE VIII

              Termination, Amendment and Waiver


SECTION 8.01.   Termination  . . . . . . . . . . . . . . 57
SECTION 8.02.   Effect of Termination  . . . . . . . . . 59
SECTION 8.03.   Amendment  . . . . . . . . . . . . . . . 60
SECTION 8.04.   Extension; Waiver  . . . . . . . . . . . 60
SECTION 8.05.   Procedure for Termination, Amendment,
                Extension or Waiver  . . . . . . . . . . 60


                        ARTICLE IX

                    General Provisions


SECTION 9.01.   Nonsurvival of Representations and
                Warranties . . . . . . . . . . . . . . . 61
SECTION 9.02.   Notices  . . . . . . . . . . . . . . . . 61
SECTION 9.03.   Definitions  . . . . . . . . . . . . . . 62
SECTION 9.04.   Interpretation; Disclosure Letters . . . . 63
SECTION 9.05.   Severability . . . . . . . . . . . . . . 63
SECTION 9.06.   Counterparts . . . . . . . . . . . . . . 63
SECTION 9.07.   Entire Agreement; No Third-Party
                Beneficiaries  . . . . . . . . . . . . . 64
SECTION 9.08.   GOVERNING LAW  . . . . . . . . . . . . . 64
SECTION 9.09.   Assignment . . . . . . . . . . . . . . . 65
SECTION 9.10.   Enforcement  . . . . . . . . . . . . . . 65
SECTION 9.11.   Separate Parties . . . . . . . . . . . . 65

EXHIBIT A          Articles of Incorporation
EXHIBIT B          Form of Delegation of Authority

AMENDED AND RESTATED AGREEMENT AND PLAN
OF MERGER, dated as of April 11, 2000,
as amended and restated as of July 5, 2000,
among CONOPCO, INC., a New York corporation
("<u>Conopco</u>"), VERMONT ALL NATURAL EXPANSION
COMPANY, a Vermont corporation ("<u>Sub</u>"), and
BEN & JERRY'S HOMEMADE, INC., a Vermont
corporation (the "<u>Company</u>").

WHEREAS Conopco, Sub and the Company entered into
an Agreement and Plan of Merger, dated as of April 11, 2000
(the "Original Merger Agreement"), and they now desire to
amend and restate the Original Merger Agreement to make
certain modifications to Section 6.18 of the Original Merger
Agreement (it being understood that all references herein to
this "Agreement" refer to the Original Merger Agreement as
amended and restated hereby and that all references herein
to the date hereof or the date of this agreement refer to
April 11, 2000);

WHEREAS Conopco believes that it is uniquely
positioned to further the Company's three-part mission
through a business combination that leverages the strengths
of both Conopco and the Company;

WHEREAS the respective Boards of Directors of
Conopco, Sub and the Company have approved the acquisition
of the Company by Conopco on the terms and subject to the
conditions set forth in this Agreement;

WHEREAS, in furtherance of such acquisition,
Conopco proposes to cause Sub to make a tender offer (as it
may be amended from time to time as permitted under this
Agreement, the "<u>Offer</u>") to purchase all the outstanding
shares of Class A Common Stock of the Company, par value
$.033 per share (the "<u>Class A Common Stock</u>"), including the
associated Class A Rights (as defined in Section 3.03), and
all the outstanding shares of Class B Common Stock of the
Company, par value $.033 per share (the "<u>Class B Common
Stock</u>", and together with the Class A Common Stock, the
"<u>Company Common Stock</u>"), including the associated Class B
Rights (as defined in Section 3.03), at a price per share of
Company Common Stock (including the associated Company Right
(as defined in Section 3.03)) of $43.60, net to the seller
in cash, on the terms and subject to the conditions set
forth in this Agreement;

WHEREAS the respective Boards of Directors of
Conopco, Sub and the Company have approved the merger (the
"<u>Merger</u>") of Sub into the Company, or (at the election of
Conopco) the Company into Sub, on the terms and subject to

the conditions set forth in this Agreement, whereby (a) each issued share of Company Common Stock not owned by Conopco, Sub or the Company, and (b) each share of Company Common Stock, not owned directly or indirectly by Conopco or the Company, shall be converted into the right to receive $43.60 in cash;

WHEREAS, immediately following the acceptance for payment of shares of Company Common Stock pursuant to the Offer, the Company shall cause the outstanding shares of the Company's $1.20 Class A Preferred Stock, par value $1.00 per share (the "Company Preferred Stock" and, together with the Company Common Stock, the "Company Capital Stock"), to be redeemed;

WHEREAS simultaneously with the execution and delivery of this Agreement Ben & Jerry's Homemade Holdings, Inc. and the Company are granting an international license to Unilever N.V. and Unilever PLC pursuant to a License Agreement (the "License Agreement");

WHEREAS simultaneously with the execution and delivery of this Agreement the Company and Conopco are entering into a stock option agreement (the "Stock Option Agreement" and, together with this Agreement and the License Agreement, the "Transaction Agreements"), pursuant to which the Company is granting Conopco an option to purchase shares of Class A Common Stock on the terms and subject to the conditions set forth therein; and

WHEREAS Conopco, Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Offer and the Merger and also to prescribe various conditions to the Offer and the Merger.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I

### The Offer and the Merger

SECTION 1.01. The Offer. (a) Subject to the conditions of this Agreement, as promptly as practicable but in no event later than five business days after the date of this Agreement, Sub shall, and Conopco shall cause Sub to, commence the Offer within the meaning of the applicable rules and regulations of the Securities and Exchange

Commission (the "SEC"). The obligation of Sub to, and of Conopco to cause Sub to, commence the Offer and accept for payment, and pay for, any shares of Company Common Stock tendered pursuant to the Offer are subject to the conditions set forth in Section 7.01. The initial expiration date of the Offer shall be the 20th business day following the commencement of the Offer (determined using Rule 14d-2 of the SEC). Sub expressly reserves the right to modify the terms of the Offer or waive any condition to the Offer, except that, without the consent of the Company, Sub shall not (i) reduce the number of shares of Company Common Stock subject to the Offer, (ii) reduce the price per share of Company Common Stock to be paid pursuant to the Offer, (iii) reduce or waive the Minimum Tender Condition (as defined in Section 7.01), (iv) modify, in any manner adverse to the holders of Company Common Stock, or add to, the conditions set forth in Section 7.01, (v) extend the Offer or (vi) change the form of consideration payable in the Offer. Notwithstanding the foregoing, Sub may, without the consent of the Company, (i) extend the Offer in increments of not more than five business days each, if at the scheduled expiration date of the Offer any of the conditions to Sub's obligation to purchase shares of Company Common Stock are not satisfied, until such time as such conditions are satisfied or waived, (ii) extend the Offer for any period required by any rule, regulation, interpretation or position of the SEC or the staff thereof applicable to the Offer and (iii) make available a subsequent offering period (within the meaning of Rule 14d-11 of the SEC). Without limiting the right of Sub to extend the Offer, in the event that any condition set forth in paragraph (a) of Section 7.01 is not satisfied or waived at the scheduled expiration date of the Offer, at the request of the Company Sub shall, and Conopco shall cause Sub to, extend the expiration date of the Offer in increments of five business days each until the earliest to occur of (w) the satisfaction or waiver of such condition, (x) Conopco reasonably determines that such condition to the Offer is not capable of being satisfied on or prior to September 30, 2000, (y) the termination of this Agreement in accordance with its terms and (z) September 30, 2000. In addition, on the terms and subject to the conditions of the Offer and this Agreement, Sub shall pay for all shares of Company Common Stock validly tendered and not withdrawn pursuant to the Offer that Sub becomes obligated to purchase pursuant to the Offer as soon as practicable after the expiration of the Offer.

(b) On the date of commencement of the Offer, Conopco and Sub shall file with the SEC a Tender Offer Statement on Schedule TO with respect to the Offer, which

4

shall contain an offer to purchase and a related letter of transmittal and summary advertisement (such Schedule TO and the documents included therein pursuant to which the Offer will be made, together with any supplements or amendments thereto, the "Offer Documents"). Each of Conopco, Sub and the Company shall promptly correct any information provided by it for use in the Offer Documents if and to the extent that such information shall have become false or misleading in any material respect, and each of Conopco and Sub shall take all steps necessary to amend or supplement the Offer Documents and to cause the Offer Documents as so amended or supplemented to be filed with the SEC and to be disseminated to the Company's shareholders, in each case as and to the extent required by applicable Federal securities laws. Conopco and Sub shall provide the Company and its counsel in writing with any comments Conopco, Sub or their counsel may receive from the SEC or its staff with respect to the Offer Documents promptly after the receipt of such comments.

SECTION 1.02. Company Actions. (a) Subject to the right of the Board of Directors of the Company (the "Company Board", which term shall mean, after the Effective Time (as defined in Section 1.05), the board of directors of the Surviving Corporation (as defined in Section 1.03)) to take action permitted by Section 5.02(b), the Company hereby approves of and consents to the Offer, the Merger and the other transactions contemplated by the Transaction Agreements (collectively, the "Transactions").

(b) On the date the Offer Documents are filed with the SEC, the Company shall file with the SEC a Solicitation/Recommendation Statement on Schedule 14D-9 with respect to the Offer, including an appropriate information statement (the "Information Statement") under Rule 14f-1 (such Schedule 14D-9 and Information Statement, as amended from time to time, the "Schedule 14D-9") and shall mail the Schedule 14D-9 to the holders of Class A Common Stock. The Schedule 14D-9 shall contain the recommendation described in Section 3.04(b), unless such recommendation has been withdrawn or modified in accordance with Section 5.02(b). Each of the Company, Conopco and Sub shall promptly correct any information provided by it for use in the Schedule 14D-9 if and to the extent that such information shall have become false or misleading in any material respect, and the Company shall take all steps necessary to amend or supplement the Schedule 14D-9 and to cause the Schedule 14D-9 as so amended or supplemented to be filed with the SEC and disseminated to the Company's shareholders, in each case as and to the extent required by applicable Federal securities laws. The Company shall provide Conopco and its counsel in writing with any comments the Company or its counsel may receive

from the SEC or its staff with respect to the Schedule 14D-9 promptly after the receipt of such comments.

(c) In connection with the Offer, the Company shall cause its transfer agent to furnish Sub promptly with mailing labels containing the names and addresses of the record holders of Company Common Stock as of a recent date and of those persons becoming record holders of Company Common Stock subsequent to such date, together with copies of all lists of shareholders, security position listings and computer files and all other information in the Company's possession or control regarding the beneficial owners of Company Common Stock, and shall furnish to Sub such information and assistance (including updated lists of shareholders, security position listings and computer files) as Conopco may reasonably request in communicating the Offer to the Company's shareholders. Subject to the requirements of applicable Law (as defined in Section 3.05), and except for such steps as are necessary to disseminate the Offer Documents and any other documents necessary to consummate the Transactions, Conopco and Sub shall hold in confidence the information contained in any such labels, listings and files, shall use such information only in connection with the Offer and the Merger and, if this Agreement shall be terminated, shall, upon request, deliver to the Company all copies of such information then in their possession.

SECTION 1.03. The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with the Vermont Business Corporation Act (the "VBCA"), Sub shall be merged with and into the Company at the Effective Time (as defined in Section 1.05). At the Effective Time, the separate corporate existence of Sub shall cease and the Company shall continue as the surviving corporation (the "Surviving Corporation"). At the election of Conopco, any direct or indirect wholly owned subsidiary of Conopco may be substituted for Sub as a constituent corporation in the Merger. In such event, the parties shall execute an appropriate amendment to this Agreement in order to reflect the foregoing.

SECTION 1.04. Closing. The closing (the "Closing") of the Merger shall take place at the offices of Cravath, Swaine & Moore, 825 Eighth Avenue, New York, New York 10019 at 10:00 a.m. on the second business day following the satisfaction (or, to the extent permitted by Law, waiver by all parties) of the conditions set forth in Section 7.02, or at such other place, time and date as shall be agreed in writing between Conopco and the Company. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date".

SECTION 1.05. <u>Effective Time.</u> Prior to the Closing, the Company shall prepare, and on the Closing Date or as soon as practicable thereafter the Surviving Corporation shall file with the Secretary of State of the State of Vermont, articles of merger or other appropriate documents (in any such case, the "<u>Articles of Merger</u>") executed in accordance with the relevant provisions of the VBCA and shall make all other filings or recordings required under the VBCA. The Merger shall become effective at such time as the Articles of Merger are duly filed with such Secretary of State, or at such other later time as Conopco and the Company shall agree and specify in the Articles of Merger (the time the Merger becomes effective being the "<u>Effective Time</u>").

SECTION 1.06. <u>Effects.</u> The Merger shall have the effects set forth in Section 11.06 of the VBCA.

SECTION 1.07. <u>Articles of Incorporation and By-laws.</u> (a) The Articles of Incorporation of the Surviving Corporation shall be amended at the Effective Time to read in the form of Exhibit A and, as so amended, such Articles of Incorporation shall be the Articles of Incorporation of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law.

(b) The By-laws of Sub as in effect immediately prior to the Effective Time shall be the By-laws of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law.

SECTION 1.08. <u>Directors.</u> The directors of the Company immediately prior to the Effective Time shall be the directors of the Surviving Corporation who elect to remain on or rejoin the Company Board, together with such other individuals appointed to the Company Board, all in accordance with the provisions of Section 6.14(a).

SECTION 1.09. <u>Officers.</u> The officers of the Company immediately prior to the Effective Time shall be the officers of the Surviving Corporation, until the earlier of their resignation or removal or until their respective successors are duly elected or appointed and qualified, as the case may be.

## ARTICLE II

### Effect on the Capital Stock of the
### Constituent Corporations; Exchange of Certificates

SECTION 2.01. <u>Effect on Capital Stock.</u> At the Effective Time, by virtue of the Merger and without any action on the part of the holder of any shares of Company Common Stock or any shares of capital stock of Sub:

(a) <u>Capital Stock of Sub.</u> Each issued and outstanding share of capital stock of Sub shall be converted into and become ten thousand fully paid and nonassessable shares of common stock, par value $0.01 per share, of the Surviving Corporation.

(b) <u>Cancelation of Treasury Stock and Conopco-Owned Stock.</u> Each share of Company Common Stock that is owned by the Company, Conopco or Sub shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and no consideration shall be delivered or deliverable in exchange therefor. Each share of Company Common Stock that is owned by any subsidiary of the Company or Conopco (other than Sub) shall automatically be converted into one fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation.

(c) <u>Conversion of Company Common Stock.</u> (1) Subject to Sections 2.01(b) and 2.01(d), each issued and outstanding share of Company Common Stock shall be converted into the right to receive $43.60 in cash.

(2) The cash payable upon the conversion of shares of Company Common Stock pursuant to this Section 2.01(c) is referred to collectively as the "<u>Merger Consideration</u>". As of the Effective Time, all such shares of Company Common Stock shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of a certificate representing any such shares of Company Common Stock shall cease to have any rights with respect thereto, except the right to receive Merger Consideration upon surrender of such certificate in accordance with Section 2.02, without interest.

(d) <u>Dissenters Rights.</u> Notwithstanding anything in this Agreement to the contrary, shares ("<u>Dissenters Shares</u>") of Company Common Stock that are outstanding immediately prior to the Effective Time and that are held by any person who is entitled to demand and properly demands payment of the fair value of such Dissenters Shares pursuant

to, and who complies in all respects with, Chapter 13 of the VBCA ("Chapter 13") shall not be converted into Merger Consideration as provided in Section 2.01(c), but rather the holders of Dissenters Shares shall be entitled to payment of the fair value of such Dissenters Shares in accordance with Chapter 13 of the VBCA; provided, however, that if any such holder shall fail to perfect or otherwise lose such holder's right to receive payment of fair value under Chapter 13, then the right of such holder to be paid the fair value of such holder's Dissenters Shares shall cease and such Dissenters Shares shall be deemed to have been converted as of the Effective Time into, and to have become exchangeable solely for the right to receive, Merger Consideration as provided in Section 2.01(c). The Company shall serve prompt notice to Conopco of any demands received by the Company for appraisal of any shares of Company Common Stock. Prior to the Effective Time, the Company shall not, without the prior written consent of Conopco, participate in negotiations or proceedings with respect to such demands or make any payment with respect to, or settle or offer to settle, any such demands, or agree to do any of the foregoing.

SECTION 2.02.  Exchange of Certificates.
(a)  Paying Agent.  Prior to the Effective Time, Conopco and the Company shall select a bank or trust company to act as paying agent (the "Paying Agent") for the payment of Merger Consideration upon surrender of certificates representing Company Common Stock.  Concurrently with the Effective Time, the Company shall provide to the Paying Agent the amount of cash required to pay the aggregate Merger Consideration (such cash being hereinafter referred to as the "Exchange Fund").

(b)  Exchange Procedure.  As soon as reasonably practicable after the Effective Time, the Paying Agent shall mail to each holder of record of a certificate or certificates (the "Certificates") that immediately prior to the Effective Time represented outstanding shares of Company Common Stock whose shares were converted into the right to receive Merger Consideration pursuant to Section 2.01, (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Paying Agent and shall be in such form and have such other provisions as Conopco and the Company may reasonably specify) and (ii) instructions for use in effecting the surrender of the Certificates in exchange for Merger Consideration.  Upon surrender of a Certificate for cancelation to the Paying Agent or to such other agent or agents as may be appointed by Conopco, together with such letter of transmittal, duly executed, and such other docu-

ments as may reasonably be required by the Paying Agent, the holder of such Certificate shall be entitled to receive in exchange therefor the amount of cash into which the shares of Company Common Stock theretofore represented by such Certificate shall have been converted pursuant to Section 2.01, and the Certificate so surrendered shall forthwith be canceled. In the event of a transfer of ownership of Company Common Stock that is not registered in the transfer records of the Company, payment may be made to a person other than the person in whose name the Certificate so surrendered is registered, if such Certificate shall be properly endorsed or otherwise be in proper form for transfer and the person requesting such payment shall pay any transfer or other taxes required by reason of the payment to a person other than the registered holder of such Certificate or establish to the satisfaction of Conopco that such tax has been paid or is not applicable. Until surrendered as contemplated by this Section 2.02, each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the amount of cash, without interest, into which the shares of Company Common Stock theretofore represented by such Certificate have been converted pursuant to Section 2.01. No interest shall be paid or shall accrue on the cash payable upon surrender of any Certificate.

(c) No Further Ownership Rights in Company Common Stock. The Merger Consideration paid in accordance with the terms of this Article II upon conversion of any shares of Company Common Stock shall be deemed to have been paid in full satisfaction of all rights pertaining to such shares of Company Common Stock, subject, however, to the Surviving Corporation's obligation to pay any dividends or make any other distributions with a record date prior to the Effective Time that may have been declared or made by the Company on such shares of Company Common Stock in accordance with the terms of this Agreement or prior to the date of this Agreement and which remain unpaid at the Effective Time, and after the Effective Time there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of shares of Company Common Stock that were outstanding immediately prior to the Effective Time. If, after the Effective Time, any certificates formerly representing shares of Company Common Stock are presented to the Surviving Corporation or the Paying Agent for any reason, they shall be canceled and exchanged as provided in this Article II.

(d) Termination of Exchange Fund. Any portion of the Exchange Fund that remains undistributed to the holders of Company Common Stock for six months after the Effective

Time shall be delivered to Conopco, upon demand, subject to compliance with any applicable abandoned property, escheat or similar Law.

(e) <u>No Liability.</u> To the extent permitted by applicable Law, none of Sub, Conopco, the Company or the Paying Agent shall be liable to any person in respect of any cash from the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate has not been surrendered prior to five years after the Effective Time (or immediately prior to such earlier date on which Merger Consideration in respect of such Certificate would otherwise escheat to or become the property of any Governmental Entity (as defined in Section 3.05)), any such shares, cash, dividends or distributions in respect of such Certificate shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any person previously entitled thereto.

(f) <u>Investment of Exchange Fund.</u> The Paying Agent shall invest any cash included in the Exchange Fund, as directed by Conopco, on a daily basis. Any interest and other income resulting from such investments shall be paid to Conopco.

(g) <u>Withholding Rights.</u> The Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable to any holder of Company Common Stock pursuant to this Agreement such amounts as may be required to be deducted and withheld with respect to the making of such payment under the Code (as defined in Section 3.11), or under any provision of state, local or foreign tax Law.

ARTICLE III

<u>Representations and Warranties of the Company</u>

The Company represents and warrants to Conopco and Sub as follows:

SECTION 3.01. <u>Organization, Standing and Power.</u> Each of the Company and each of its subsidiaries (the "<u>Company Subsidiaries</u>") is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized and has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and

assets and to conduct its businesses as presently conducted. The Company and each Company Subsidiary is duly qualified to do business in each jurisdiction where the nature of its business or their ownership or leasing of its properties make such qualification necessary or the failure to so qualify has had or would reasonably be expected to have a material adverse effect on the Company, a material adverse effect on the ability of the Company to perform its obligations under the Transaction Agreements or a material adverse effect on the ability of the Company to consummate the Offer, the Merger and the other Transactions (a "Company Material Adverse Effect"). The Company has delivered to Conopco true and complete copies of the Articles of Incorporation of the Company, as amended to the date of this Agreement (as so amended, the "Company Charter"), and the By-laws of the Company, as amended to the date of this Agreement (as so amended, the "Company By-laws"), and the comparable charter and organizational documents of each Company Subsidiary, in each case as amended through the date of this Agreement.

SECTION 3.02. Company Subsidiaries; Equity Interests. (a) The letter, dated as of the date of this Agreement, from the Company to Conopco and Sub (the "Company Disclosure Letter") lists each Company Subsidiary and its jurisdiction of organization. All the outstanding shares of capital stock of each Company Subsidiary have been validly issued and are fully paid and nonassessable and, except as set forth in the Company Disclosure Letter, are owned by the Company, by another Company Subsidiary or by the Company and another Company Subsidiary, free and clear of all pledges, liens, charges, mortgages, encumbrances and security interests of any kind or nature whatsoever (collectively, "Liens").

(b) Except for its interests in the Company Subsidiaries and except for the ownership interests set forth in the Company Disclosure Letter, the Company does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person.

SECTION 3.03. Capital Structure. (a) The authorized capital stock of the Company consists of 20,000,000 shares of Class A Common Stock and 3,000,000 shares of Class B Common Stock, as well as 900 shares of Company Preferred Stock. The Board of Directors of the Company has duly authorized the conversion of each issued and outstanding share of Class B Common Stock into one share of Class A Common Stock and has authorized the mailing of a notice of conversion pursuant to the Company Charter, upon

receipt of the notice from Conopco contemplated by Section 6.11(b), to all the holders of Class B Common Stock. At the close of business on March 31, 2000, (i) 6,130,582 shares of Class A Common Stock, 793,729 shares of Class B Common Stock and 900 shares of Company Preferred Stock were issued and outstanding, (ii) 644,606 shares of Class A Common Stock and 1,092 shares of Class B Common Stock were held by the Company in its treasury, (iii) 1,298,627 shares of Class A Common Stock were subject to outstanding Company Stock Options (as defined below) and 160,185 additional shares of Class A Common Stock were reserved for issuance pursuant to the Company Stock Plans (as defined below) (assuming for such purpose that, with respect to the offering period in effect on the date hereof under the Company's 1986 Employee Stock Purchase Plan (the "1986 ESPP"), (A) all current participants continue to contribute at current levels and (B) the purchase price of the shares purchasable in respect of such offering period is determined to be 85% of the fair market value of shares of Class A Common Stock on the first day of such offering period, and giving effect to such offering period), (iv)(A) 7,400,000 shares of Class A Common Stock were reserved for issuance in connection with the rights (the "Class A Rights") issued pursuant to the Rights Agreement dated as of July 30, 1998, as amended from time to time (the "Class A Rights Agreement"), between the Company and American Stock Transfer & Trust Company, and (B) 900,000 shares of Class B Common Stock were reserved for issuance in connection with the rights (the "Class B Rights" and, together with the Class A Rights, the "Company Rights") issued pursuant to the Rights Agreement dated as of July 30, 1998, as amended from time to time (together with the Class A Rights Agreement, the "Company Rights Agreements"), between the Company and American Stock Transfer & Trust Company and (v) 125,000 shares of Class A Common Stock reserved for issuance under the warrants held by Gordian Group, L.P. (the "Gordian Group Warrants"). Except as set forth above and except for the shares of Class A Common Stock reserved for issuance upon either (i) the exercise of the option granted to Conopco pursuant to the Stock Option Agreement or (ii) the conversion of shares of Class B Common Stock, at the close of business on March 31, 2000, no shares of capital stock or other voting securities of the Company were issued, reserved for issuance or outstanding. There are no outstanding Company SARs (as defined below) that were not granted in tandem with a related Company Stock Option. All outstanding shares of Company Capital Stock are, and all such shares that may be issued prior to the Effective Time (including shares of Company Capital Stock that shall be deemed to be shares of Class A Common Stock upon the automatic conversion of shares of Class B Common Stock) will

be when issued, duly authorized, validly issued, fully paid
and nonassessable and not subject to or issued in violation
of any purchase option, call option, right of first refusal,
preemptive right, subscription right or any similar right
under any provision of the VBCA, the Company Charter, the
Company By-laws or any Contract (as defined in Section 3.05)
to which the Company is a party or otherwise bound.  There
are not any bonds, debentures, notes or other indebtedness
of the Company having the right to vote (or convertible
into, or exchangeable for, securities having the right to
vote) on any matters on which holders of Company Common
Stock may vote ("<u>Voting Company Debt</u>").  Except as set forth
above or in Section 3.03(b), as of the date of this
Agreement, there are not any options, warrants, rights,
convertible or exchangeable securities, "phantom" stock
rights, stock appreciation rights, stock-based performance
units, commitments, Contracts, arrangements or undertakings
of any kind to which the Company or any Company Subsidiary
is a party or by which any of them is bound (i) obligating
the Company or any Company Subsidiary to issue, deliver or
sell, or cause to be issued, delivered or sold, additional
shares of capital stock or other equity interests in, or any
security convertible or exercisable for or exchangeable into
any capital stock of or other equity interest in, the
Company or any Company Subsidiary or any Voting Company
Debt, (ii) obligating the Company or any Company Subsidiary
to issue, grant, extend or enter into any such option,
warrant, call, right, security, commitment, Contract,
arrangement or undertaking or (iii) that give any person the
right to receive any economic benefit or right similar to or
derived from the economic benefits and rights accruing to
holders of Company Capital Stock.  Except as set forth in
Section 6.11, as of the date of this Agreement, there are
not any outstanding contractual obligations of the Company
or any Company Subsidiary to repurchase, redeem or otherwise
acquire any shares of capital stock of the Company or any
Company Subsidiary.  The Company has delivered to Conopco
complete and correct copies of the Company Rights
Agreements, as amended to the date of this Agreement.

          (b)  The authorized capital stock of The American
Company for Ice Cream Manufacturing E.I. Ltd. ("<u>ACICM</u>")
consists of 18,000 Ordinary Shares (the "<u>Subsidiary Ordinary
Shares</u>") and 18,000 Preferred Shares (the "<u>Subsidiary
Preferred Shares</u>"), each with a nominal value of 1.00 NIS.
At the close of business on March 31, 2000, 12,000
Subsidiary Ordinary Shares and 18,000 Subsidiary Preferred
Shares were issued and outstanding, and 3,333 Subsidiary
Ordinary Shares reserved for issuance under options and
1,200 Subsidiary Ordinary Shares were subject to outstanding
options to purchase Subsidiary Ordinary Shares and

Subsidiary Preferred Shares, respectively, and no other Subsidiary Ordinary Shares or Subsidiary Preferred Shares were issued, outstanding or reserved for issuance. As of such date, Ben & Jerry's Homemade, B.V., a wholly owned subsidiary of the Company, owned 18,000 Subsidiary Preferred Shares.

(c) For purposes of this Agreement:

"<u>Company Stock Option</u>" means any option to purchase Company Common Stock granted under any Company Stock Plan.

"<u>Company SAR</u>" means any stock appreciation right or other award linked to the price of Company Common Stock and granted under any Company Stock Plan.

"<u>Company Stock Plans</u>" means the Company's 1995 Equity Incentive Plan, 1999 Equity Incentive Plan, 1985 Stock Option Plan, 1986 Employee Stock Purchase Plan, 1992 Non-Employee Directors' Restricted Stock Plan and 1995 Non-Employee Directors' Plan for Stock in Lieu of Director's Cash Retainer, all separate stock option agreements under which options were issued in 1999 (the form of which is set forth in the Company Disclosure Letter) and the provisions of employment agreements for officers (disclosed in the Company Disclosure Letter) that include certain terms of options granted under the Company's 1985 Stock Option Plan and 1995 Equity Incentive Plan.

SECTION 3.04. <u>Authority; Execution and Delivery; Enforceability.</u> (a) The Company has all requisite corporate power and authority to execute and deliver each Transaction Agreement to which it is a party and, subject, in the case of the Merger, to receipt of the Company Shareholder Approval (as defined in Section 3.04(c)), to consummate the Transactions. The execution and delivery by the Company of the Transaction Agreements to which it is a party and the consummation by the Company of the Transactions have been duly authorized by all necessary corporate action on the part of the Company, subject, in the case of the Merger, to receipt of the Company Shareholder Approval. The Company has duly executed and delivered each Transaction Agreement to which it is a party, and each Transaction Agreement to which it is a party constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject, in the case of the Merger, to receipt of the Company Shareholder Approval.

(b)    The Company Board, at a meeting duly called and held, duly adopted resolutions (i) adopting this Agreement, (ii) approving the other Transaction Agreements, the Offer, the Merger and the other Transactions, (iii) determining that the terms of the Offer and the Merger are fair to and in the best interests of the shareholders of the Company, (iv) recommending that the holders of Company Common Stock accept the Offer and tender their shares of Company Common Stock pursuant to the Offer and (v) recommending that the Company's shareholders approve this Agreement.  No state takeover statute or similar statute or regulation applies or purports to apply to the Company with respect to this Agreement and the other Transaction Agreements, the Offer, the Merger or any other Transaction.

(c)    The only vote of holders of any class or series of Company Capital Stock necessary to approve this Agreement and the Merger is the approval, by person or proxy, of this Agreement by the holders of a majority of the outstanding shares of Class A Common Stock (the "<u>Company Shareholder Approval</u>").  The affirmative vote of the holders of Company Capital Stock, or any of them, is not necessary to approve any Transaction Agreement other than this Agreement or consummate the Offer or any Transaction other than the Merger.

SECTION 3.05.  <u>No Conflicts; Consents.</u>
(a)    Except as set forth in the Company Disclosure Letter, the execution and delivery by the Company of each Transaction Agreement to which it is a party do not, and the consummation of the Offer, the Merger and the other Transactions and compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancelation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any of the properties or assets of the Company or any Company Subsidiary under, any provision of (i) the Company Charter, the Company By-laws or the comparable charter or organizational documents of any Company Subsidiary, (ii) any contract, lease, license, indenture, note, bond, agreement, permit, concession, franchise or other instrument (a "<u>Contract</u>") to which the Company or any Company Subsidiary is a party or by which any of their respective properties or assets is bound or (iii) subject to the filings and other matters referred to in Section 3.05(b), any judgment, order or decree ("<u>Judgment</u>") or statute, law (including common

law), ordinance, rule or regulation ("Law") applicable to the Company or any Company Subsidiary or their respective properties or assets, other than, in the case of clause (iii) above, any such items that, individually or in the aggregate, have not had and would not reasonably be expected to have a Company Material Adverse Effect or result in a liability to the Company and the Company Subsidiaries, taken as a whole, in excess of $1,000,000.

(b)   No consent, approval, license, permit, order or authorization ("Consent") of, or registration, declaration or filing with, or permit from, any Federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign (a "Governmental Entity") is required to be obtained or made by or with respect to the Company or any Company Subsidiary in connection with the execution, delivery and performance of any Transaction Agreement to which it is a party or the consummation of the Transactions, other than (i) compliance with and filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (ii) the filing with the SEC of (A) the Schedule 14D-9, (B) a proxy or information statement relating to the approval of this Agreement by the Company's shareholders (the "Proxy Statement"), (C) the Information Statement and (D) such reports under Section 13 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") as may be required in connection with this Agreement and the other Transaction Agreements, the Offer, the Merger and the other Transactions, (iii) the filing of the Articles of Merger with the Secretary of State of the State of Vermont and appropriate documents with the relevant authorities of the other jurisdictions in which the Company is qualified to do business, (iv) compliance with and such filings as may be required under applicable Environmental Laws (as defined in Section 3.14), (v) such filings as may be required in connection with the Taxes described in Section 6.09, (vi) as may be required under any state securities laws and (vii) such other items as are set forth in the Company Disclosure Letter.

(c)   The Company Board has taken all action necessary to (i) render the Company Rights inapplicable to this Agreement and the other Transaction Agreements, the Offer, the Merger and the other Transactions and (ii) ensure that (A) neither Conopco nor Sub nor any of its affiliates or associates is or will become an "Acquiring Person" (as defined in each of the Company Rights Agreements) by reason of any Transaction Agreement, the Offer, the Merger or any other Transaction, and (B) a "Distribution Date" (as defined

in each of the Company Rights Agreements) shall not occur by reason of any Transaction Agreement, the Offer, the Merger or any other Transaction.

SECTION 3.06. <u>SEC Documents; Undisclosed Liabilities.</u> The Company has filed all reports, schedules, forms, statements and other documents required to be filed by the Company with the SEC since December 28, 1997 (the "<u>Company SEC Documents</u>"). As of its respective date, each Company SEC Document complied in all material respects with the requirements of the Exchange Act or the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), as the case may be, and the rules and regulations of the SEC promulgated thereunder applicable to such Company SEC Document, and did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Except to the extent that information contained in any Company SEC Document has been revised or superseded by a later filed Company SEC Document, none of the Company SEC Documents contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The consolidated financial statements of the Company included in the Company SEC Documents comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with generally accepted accounting principles ("<u>GAAP</u>") (except, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present the consolidated financial position of the Company and its consolidated subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). Except as set forth on the face of, or in the notes to, the most recent balance sheet of the Company included in the Filed Company SEC Documents (as defined in Section 3.08), neither the Company nor any Company Subsidiary had, as of such date, any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a consolidated balance sheet or in the notes thereto.

SECTION 3.07. <u>Information Supplied.</u> None of the information supplied or to be supplied by the Company for

inclusion or incorporation by reference in (i) the Offer
Documents, the Schedule 14D-9 or the Information Statement
will, at the time such document is filed with the SEC, at
any time it is amended or supplemented or at the time it is
first published, sent or given to the Company's
shareholders, contain any untrue statement of a material
fact or omit to state any material fact required to be
stated therein or necessary to make the statements therein
not misleading, or (ii) the Proxy Statement will, at the
date it is first mailed to the Company's shareholders or at
the time of the Company Shareholders Meeting (as defined in
Section 6.01), contain any untrue statement of a material
fact or omit to state any material fact required to be
stated therein or necessary in order to make the statements
therein, in light of the circumstances under which they are
made, not misleading. The Schedule 14D-9, the Information
Statement and the Proxy Statement will comply as to form in
all material respects with the requirements of the Exchange
Act and the rules and regulations thereunder, except that no
representation or warranty is made by the Company with
respect to statements made or incorporated by reference
therein based on information supplied by Conopco or Sub in
writing specifically for inclusion or incorporation by
reference therein.

    SECTION 3.08.  <u>Absence of Certain Changes or
Events.</u>  Except as disclosed in the Company SEC Documents
filed and publicly available on or prior to April 7, 2000
(the "<u>Filed Company SEC Documents</u>") or in the Company
Disclosure Letter, from the date of the most recent audited
financial statements included in the Filed Company SEC
Documents to the date of this Agreement, the Company has
conducted its business only in the ordinary course
consistent with recent past practice, and during such period
there has not been:

        (i) any event, change, effect or development that,
    individually or in the aggregate, has had or would
    reasonably be expected to have a Company Material
    Adverse Effect;

        (ii) any declaration, setting aside or payment of
    any dividend or other distribution (whether in cash,
    stock or property) with respect to any Company Capital
    Stock or any repurchase for value by the Company of any
    Company Capital Stock;

        (iii) any split, combination or reclassification of
    any Company Capital Stock or any issuance or the
    authorization of any issuance of any other securities
    in respect of, in lieu of or in substitution for shares

of Company Capital Stock, other than the authorization by the Company Board to convert all the outstanding shares of Class B Common Stock into shares of Class A Common Stock and to redeem the Company Preferred Stock;

(iv) (A) any granting by the Company or any Company Subsidiary to any director or officer of the Company or any Company Subsidiary of any increase in compensation, except in the ordinary course of business consistent with prior practice or as was required under employment or consulting agreements in effect as of the date of the most recent audited financial statements included in the Filed Company SEC Documents, (B) any granting by the Company or any Company Subsidiary to any such director or officer of any increase in severance or termination pay, except as was required under any employment, consulting, severance or termination agreements in effect as of the date of the most recent audited financial statements included in the Filed Company SEC Documents, or (C) any entry by the Company or any Company Subsidiary into, or any amendment of, any employment, consulting, deferred compensation, indemnification, severance or termination agreement with any such director or officer;

(v) any change in accounting methods, principles or practices by the Company or any Company Subsidiary materially affecting the consolidated assets, liabilities or results of operations of the Company, except insofar as may have been required by a change in GAAP;

(vi) any material elections with respect to Taxes by the Company or any Company Subsidiary or settlement or compromise by the Company or any Company Subsidiary of any material Tax liability or refund;

(vii) (A) any acquisition by the Company or any Company Subsidiary by merging or consolidating with, or by purchasing a substantial equity interest in or substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, joint venture, association or other business organization or division thereof or (B) any acquisition by the Company or any Company Subsidiary of any assets (other than inventory) that are material, individually or in the aggregate, to the Company and the Company Subsidiaries;

(viii) any sale, lease, license, encumbrance or other disposition of assets of the Company or any Company

Subsidiary in excess of $500,000 in the aggregate, other than sales of products to customers and immaterial dispositions of personal property and other than any encumbrance created in connection with financing the purchase of equipment and other property, in each case in the ordinary course of business consistent with past practice;

(ix) any incurrence of capital expenditures by the Company or any Company Subsidiary in excess of $500,000 individually, or in excess of $1 million in the aggregate; or

(x) any other transaction, contract or commitment of the Company or any Company Subsidiary other than in the ordinary course of business, consistent with past practice and on an arms' length basis.

SECTION 3.09.  Taxes.  (a)  Except as disclosed in the Company Disclosure Letter, each of the Company and each Company Subsidiary has timely filed, or has caused to be timely filed on its behalf, all Tax Returns required to be filed by it, and all such Tax Returns are true, complete and accurate.  All Taxes shown to be due on such Tax Returns, or otherwise owed, have been timely paid.

(b)  Except as disclosed in the Company Disclosure Letter, the most recent financial statements contained in the Filed Company SEC Documents reflect an adequate reserve (in addition to any reserve for deferred Taxes established to reflect timing differences between book and tax income) for all Taxes payable by the Company and the Company Subsidiaries for all Taxable periods and portions thereof through the date of such financial statements.  No deficiency with respect to any Taxes has been proposed, asserted or assessed against the Company or any Company Subsidiary, and no requests for waivers of the time to assess any such Taxes are pending.

(c)  Except as disclosed in the Company Disclosure Letter, the Federal income Tax Returns of the Company and each Company Subsidiary consolidated in such Returns have been examined by and settled with the United States Internal Revenue Service for all years through 1997.  All material assessments for Taxes due with respect to such completed and settled examinations or any concluded litigation have been fully paid.

(d)  Except as disclosed in the Company Disclosure Letter, there are no material Liens for Taxes (other than for current Taxes not yet due and payable) on the assets of

the Company or any Company Subsidiary. Neither the Company nor any Company Subsidiary is bound by any agreement with respect to Taxes.

(e) Except as disclosed in the Company Disclosure Letter, no claim has been made in the past five years by any authority in a jurisdiction within which the Company or any Company Subsidiary does not file Tax Returns that it is, or may be, subject to taxation by that jurisdiction.

(f) For purposes of this Agreement:

"Taxes" includes all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, Federal or other Governmental Entity, or in connection with any agreement with respect to Taxes, including all interest, penalties and additions imposed with respect to such amounts.

"Tax Return" means all Federal, state, local, provincial and foreign Tax returns, declarations, claims for refunds, statements, reports, schedules, forms and information returns and any amended Tax return relating to Taxes.

SECTION 3.10. Absence of Changes in Benefit Plans. Except as disclosed in the Company Disclosure Letter, from the date of the most recent audited financial statements included in the Filed Company SEC Documents to the date of this Agreement, there has not been any adoption or amendment in any material respect by the Company or any Company Subsidiary of any collective bargaining agreement or any bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, phantom stock, retirement, thrift, savings, stock bonus, restricted stock, cafeteria, paid time off, perquisite, fringe benefit, vacation, severance, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding) maintained, sponsored or funded, in whole or in part, by the Company or any Company Subsidiary providing benefits to any current or former employee, consultant, officer or director of the Company or any Company Subsidiary (collectively, "Company Benefit Plans"). Except as disclosed in the Filed Company SEC Documents or in the Company Disclosure Letter, as of the date of this Agreement there are not any consulting arrangements or agreements involving payments by the Company of more that $50,000 per year or any employment, indemnification, severance or termination agreements or arrangements between the Company

or any Company Subsidiary and any current or former employee, consultant, officer or director of the Company or any Company Subsidiary (collectively, "<u>Company Benefit Agreements</u>").

SECTION 3.11. <u>ERISA Compliance; Excess Parachute Payments.</u> (a) The Company Disclosure Letter contains a list and brief description of all "employee pension benefit plans" (as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>")) (sometimes referred to herein as "<u>Company Pension Plans</u>"), "employee welfare benefit plans" (as defined in Section 3(1) of ERISA) and all other Company Benefit Plans and Company Benefit Agreements maintained, or contributed to, by the Company or any Company Subsidiary or to which the Company or any Company Subsidiary is a party, for the benefit of any current or former employees, consultants, officers or directors of the Company or any Company Subsidiary. The Company has delivered to Conopco true, complete and correct copies of (i) each Company Benefit Plan and Company Benefit Agreement (or, in the case of any unwritten Company Benefit Plan or Company Benefit Agreement, a description thereof), (ii) the most recent annual report on Form 5500 filed with the Internal Revenue Service with respect to each Company Benefit Plan (if any such report was required), (iii) the most recent summary plan description for each Company Benefit Plan for which such summary plan description is required and (iv) each trust agreement and group annuity contract relating to any Company Benefit Plan.

(b) Except as disclosed in the Company Disclosure Letter, all Company Pension Plans that are intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), have received favorable determination letters from the Internal Revenue Service with respect to "TRA" (as defined in Section 1 of Rev. Proc. 93-39), to the effect that such Company Pension Plans are qualified and exempt from Federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, and no such determination letter has been revoked nor, to the knowledge of the Company, has revocation been threatened, nor has any such Company Pension Plan been amended since the date of its most recent determination letter or application therefor in any respect that would adversely affect its qualification or materially increase its costs. All Company Benefit Plans have been operated in all material respects in accordance with their terms and in substantial compliance with all applicable laws, including ERISA and the Code. There is no material pending or, to the knowledge of the Company, threatened litigation relating to the Company Benefit Plans.

(c) None of the Company, any Company Subsidiary or any entity that is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code contributes or has ever contributed or been obligated to contribute to any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA or to any defined benefit pension plan subject to Title IV of ERISA or to Part 3 of Subpart B of Title I of ERISA. Neither the Company nor any Company Subsidiary, nor to the knowledge of the Company or any Company Subsidiary, any officer of the Company or any of its Company Subsidiary or any of the Company Benefit Plans which are subject to ERISA, including the Company Pension Plans, any trusts created thereunder or any trustee or administrator thereof, has engaged in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) or any other breach of fiduciary responsibility that could subject the Company, any Company Subsidiary or any officer of the Company or any Company Subsidiary to the tax or penalty on prohibited transactions imposed by such Section 4975 or to any liability under Section 502(i) or 502(1) of ERISA. All contributions and premiums required to be made under the terms of any Company Benefit Plan as of the date hereof have been timely made or have been reflected on the most recent consolidated balance sheet filed or incorporated by reference in the Filed Company SEC Documents.

(d) With respect to any Company Benefit Plan that is an employee welfare benefit plan, except as disclosed in the Company Disclosure Letter, (i) no such Company Benefit Plan is unfunded or funded through a "welfare benefits fund" (as such term is defined in Section 419(e) of the Code), (ii) each such Company Benefit Plan that is a "group health plan" (as such term is defined in Section 5000(b)(1) of the Code), complies with the applicable requirements of Section 4980B(f) in all material respects of the Code and (iii) each such Company Benefit Plan (including any such Plan covering retirees or other former employees) may be amended or terminated without material liability to the Company and the Company Subsidiary on or at any time after the Effective Time. Neither the Company nor any Company Subsidiary has any obligations for retiree health and life benefits under any Company Benefit Plan or Company Benefit Agreement.

(e) Except as disclosed in the Company Disclosure Letter, the consummation of the Offer and the Merger or any of the other Transactions will not (i) entitle any employee, consultant, officer or director of the Company or any Company Subsidiary to severance pay, (ii) accelerate the time of payment or vesting or trigger any payment or funding

(through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or trigger any other material obligation pursuant to, any of the Company Benefit Plans or Company Benefit Agreements or (iii) result in any breach or violation of, or a default under, any of the Company Benefit Plans or Company Benefit Agreements.

(f)     Other than payments that may be made to the persons listed in the Company Disclosure Letter (the "Primary Company Executives"), any amount or economic benefit that could be received (whether in cash or property or in respect of the vesting of property) as a result of the Offer and the Merger or any other Transaction (including as a result of termination of employment on or following the Effective Time) by any employee, officer or director of the Company or any of its affiliates who is a "disqualified individual" (as such term is defined in proposed Treasury Regulation Section 1.280G-1) under any Company Benefit Plan or Company Benefit Agreement or otherwise would not be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code), and no disqualified individual is entitled to receive any additional payment from the Company or any Company Subsidiary or any other person in the event that the excise tax under Section 4999 of the Code is imposed on such disqualified individual.  Set forth in the Company Disclosure Letter is (i) the estimated maximum amount that could be paid to each Primary Company Executive as a result of the Merger and the other Transactions under all Company Benefit Plans and Company Benefit Agreements and (ii) the "base amount" (as defined in Section 280G(b)(3) of the Code) for each Primary Company Executive calculated as of the date of this Agreement.

SECTION 3.12.     Litigation.  Except as disclosed in the Company Disclosure Letter, there is no suit, action or proceeding pending or, to the knowledge of the Company, threatened against or affecting the Company or any Company Subsidiary (and the Company is not aware of any basis for any such suit, action or proceeding) that, individually or in the aggregate, has resulted in or would reasonably be expected to result in a Company Material Adverse Effect or in a liability to the Company and the Company Subsidiaries, taken as a whole, in excess of $1,000,000, nor is there any Judgment outstanding against the Company or any Company Subsidiary that, individually or in the aggregate, has resulted in or would reasonably be expected to result in a Company Material Adverse Effect or in a liability to the Company and the Company Subsidiaries, taken as a whole, in excess of $1,000,000.

SECTION 3.13. <u>Compliance with Applicable Laws.</u>
Except as disclosed in the Company Disclosure Letter, the
Company and the Company Subsidiaries are in compliance in
all material respects with all applicable Laws, including
those relating to occupational health and safety. Except as
set forth in the Company Disclosure Letter, neither the
Company nor any Company Subsidiary has received any written
communication during the past two years from a Governmental
Entity that alleges that the Company or a Company Subsidiary
is not in compliance with any applicable Law. This
Section 3.13 does not relate to matters with respect to
Taxes, which are the subject of Section 3.09, or to
environmental matters, which are the subject of
Section 3.14.

SECTION 3.14. <u>Environmental Matters.</u> (a) Except
as set forth in the Company Disclosure Letter, neither the
Company nor any Company Subsidiary has (i) placed, held,
located, released, transported or disposed of any Hazardous
Substances (as defined below) on, under, from or at any of
the Company's or any Company Subsidiary's properties or any
other properties, except for those actions that individually
or in the aggregate have not resulted in, or would not
reasonably be expected to result in, material liability to
the Company and the Company Subsidiaries, (ii) any knowledge
or reason to know of the presence of any Hazardous
Substances on, under or at any Company Subsidiary's
properties or any other property but arising from the
Company's or any Company Subsidiary's properties, other than
a reason to know of such presences that individually or in
the aggregate have not resulted in, or would not reasonably
be expected to result in, material liability to the Company
and the Company Subsidiaries, or (iii) received any written
notice (A) of any violation of any statute, law, ordinance,
regulation, rule, judgment, decree or order of any
Governmental Entity relating to any matter of pollution,
protection of the environment, environmental regulation or
control or regarding Hazardous Substances on or under any of
the Company's or any Company Subsidiary's properties or any
other properties (collectively, "<u>Environmental Laws</u>"),
(B) of the institution or pendency of any suit, action,
claim, proceeding or investigation by any Governmental
Entity or any third party in connection with any such
violation, (C) requiring the response to or remediation of
Hazardous Substances at or arising from any of the Company's
or any Company Subsidiary's properties or any other
properties, or (D) demanding payment for response to or
remediation of Hazardous Substances at or arising from any
of the Company's or any Company Subsidiary's properties or
any other properties. For purposes of this Agreement, the
term "<u>Hazardous Substance</u>" shall mean any toxic or hazardous

materials or substances, including asbestos, buried
contaminants, chemicals, flammable explosives, radioactive
materials, petroleum and petroleum products and any
substances defined as, or included in the definition of,
"hazardous substances", "hazardous wastes", "hazardous
materials" or "toxic substances" under any Environmental
Law.

(b)     Except as set forth in the Company Disclosure
Letter, no Environmental Law imposes any obligation upon the
Company or any Company Subsidiary arising out of or as a
condition to any Transaction, including, without limitation,
any requirement to modify or to transfer any permit or
license, any requirement to file any notice or other
submission with any Governmental Entity, the placement of
any notice, acknowledgment or covenant in any land records,
or the modification of or provision of notice under any
agreement, consent order or consent decree. No Lien has
been placed upon any of the Company's or its subsidiaries'
properties under any Environmental Law.

SECTION 3.15.  Contracts; Debt Instruments.  (a)
Except as disclosed in the Company Disclosure Letter,
(i) there is no Contract that has a future liability to the
Company and the Company Subsidiaries, taken as a whole, in
excess of $200,000 per annum or $500,000 over the lifetime
of such Contract (a "Material Contract"), and (ii) neither
the Company nor any Company Subsidiary is the lessee under
any lease (whether of real or personal property) that
requires annual payments in excess of $200,000 or $500,000
over the lifetime of such lease.  Neither the Company nor
any Company Subsidiary is in violation in any material
respect of or in default in any material respect under (nor
does there exist any condition which upon the passage of
time or the giving of notice would cause such a violation of
or default under) any Material Contract to which it is a
party or by which it or any of its properties or assets is
bound, and, to the knowledge of the Company, no other party
to any such Material Contract is (with or without the lapse
of time or the giving of notice, or both) in breach or
default in any material respect thereunder.

(b)     The Company Disclosure Letter sets forth
(i) a list of all loan or credit agreements, notes, bonds,
mortgages, indentures and other agreements and instruments
pursuant to which any indebtedness of the Company or any
Company Subsidiary in an aggregate principal amount in
excess of $100,000 is outstanding or may be incurred and
(ii) the respective principal amounts currently outstanding
thereunder.

(c) The Company Filed SEC Documents include as exhibits thereto all Contracts that are required to be filed by the Company under the Exchange Act.

SECTION 3.16. <u>Intellectual Property.</u> The Company Disclosure Letter sets forth a summary description of all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, copyrights and other proprietary intellectual property rights and proprietary computer programs necessary to produce the products of the Company and the Company Subsidiaries and to conduct the business of the Company and the Company Subsidiaries as currently conducted (collectively, "<u>Intellectual Property Rights</u>"). The Company and the Company Subsidiaries own, or are validly licensed or otherwise have the right to use, all Intellectual Property Rights necessary to conduct their respective businesses as currently conducted with no infringement of, or conflict with, the rights of any others. Except as set forth in the Company Disclosure Letter, no claims are pending or, to the knowledge of the Company, threatened that the Company or any Company Subsidiary is infringing or otherwise adversely affecting the rights of any person with regard to any Intellectual Property Right. Except as set forth in the Company Disclosure Letter, neither the Company nor any Company Subsidiary has granted to any third party a license or other right to any Intellectual Property Right. To the knowledge of the Company, except as set forth in the Company Disclosure Letter, no person is infringing the rights of the Company or any Company Subsidiary with respect to any Intellectual Property Right.

SECTION 3.17. <u>Labor Matters.</u> Except as set forth in the Company Disclosure Letter, there are no collective bargaining or other labor union agreements to which the Company or any Company Subsidiary is a party or by which any of them is bound. Since December 31, 1996, neither the Company nor any Company Subsidiary has encountered any labor union organizing activity, or had any actual or threatened employee strikes, work stoppages, slowdowns or lockouts.

SECTION 3.18. <u>Title to Properties.</u> (a) Except as set forth in the Company Disclosure Letter, each of the Company and each Company Subsidiary has good and marketable title to, or valid leasehold interests in, all its respective real properties except for such as are no longer used or useful in the conduct of its respective business or as have been disposed of in the ordinary course of business and assets which are material to the conduct of the business of the Company and the Company Subsidiaries ("<u>Material Assets</u>"). All such properties and Material Assets, other

than properties and Material Assets in which the Company or any Company Subsidiary has leasehold interests, are free and clear of all Liens other than (i) Liens imposed by Law that were incurred in the ordinary course of business such as carrier's, warehousemen's and mechanic's Liens, which Liens do not materially detract from the value of such properties and Material Assets or materially impair the use thereof in the operation of the respective businesses of the Company and the Company Subsidiaries, (ii) Liens arising pursuant to purchase money security interests relating to indebtedness representing an amount no greater than the purchase price of such properties or Material Assets, (iii) Liens for Taxes and assessments not yet due and payable or Liens for Taxes being contested in good faith and by appropriate proceedings for which adequate reserves have been established, or (iv) Liens set forth in the Company Disclosure Letter. The Company Disclosure Letter sets forth a complete list of all real property owned by the Company or any Company Subsidiary.

(b) Except as set forth in the Company Disclosure Letter, each of the Company and each Company Subsidiary has complied in all material respects with the terms of all leases with annual payments in excess of $50,000 to which it is a party and under which it is in occupancy, and all such leases are in full force and effect. Each of the Company and each Company Subsidiary enjoys peaceful and undisturbed possession under all such leases. To the knowledge of the Company, no other party to any of such leases is (with or without the lapse of time or the giving of notice, or both) in breach or default in any material respect thereunder.

SECTION 3.19. Equipment. Except as set forth in the Company Disclosure Letter, all (i) the material equipment of the Company and the Company Subsidiaries, and (ii) the equipment currently in use that, in the aggregate, is necessary to produce the products of the Company and the Company Subsidiaries (other than the Company's novelty product line and related equipment) or otherwise necessary to conduct the business of the Company and the Company Subsidiaries as currently conducted, is in good operating condition and repair (ordinary wear and tear excepted), taking into account its age and use, and is available for immediate use in the business of the Company and the Company Subsidiaries.

SECTION 3.20. Suppliers. Except as set forth in the Company Disclosure Letter, since January 1, 2000, there has not been (i) any material adverse change in the business relationship of the Company or any Company Subsidiary with any of their top 20 suppliers or (ii) any material adverse

change in the terms of the supply agreements or related arrangements with any such supplier. Except as set forth in the Company Disclosure Letter, to the knowledge of the Company, the Transactions will not adversely affect its or any Company Subsidiary's business relationship with any of their top 20 suppliers, other than as a result of a pre-existing relationship with Conopco or Sub.

SECTION 3.21. Brokers; Schedule of Fees and Expenses. No broker, investment banker, financial advisor or other person, other than Gordian Group, L.P., the fees and expenses of which will be paid by the Company, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Company. The estimated fees and expenses incurred and to be incurred by the Company in connection with the Offer, the Merger and the other Transactions (including the fees of Gordian Group, L.P. and the fees of the Company's legal counsel) are set forth in the Company Disclosure Letter. The Company has furnished to Conopco a true and complete copy of all agreements between the Company and Gordian Group, L.P. relating to the Offer, the Merger and the other Transactions.

SECTION 3.22. Opinion of Financial Advisor. The Company has received the opinion of Gordian Group, L.P., dated the date of this Agreement, to the effect that, as of such date, the consideration to be received in the Offer and the Merger by the holders of Company Common Stock is fair from a financial point of view, a signed copy of which opinion has been or promptly upon receipt will be, delivered to Conopco.

ARTICLE IV

Representations and Warranties of Conopco and Sub

Conopco and Sub jointly and severally represent and warrant to the Company as follows:

SECTION 4.01. Organization, Standing and Power. Each of Conopco and Sub is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized and has full corporate power and authority to conduct its businesses as presently conducted.

SECTION 4.02. Sub. (a) Since the date of its incorporation, Sub has not carried on any business or conducted any operations other than the execution of the

Transaction Agreements to which it is a party, the performance of its obligations hereunder and thereunder and matters ancillary thereto. Sub was incorporated solely for the consummation of the Transactions.

(b) The authorized capital stock of Sub consists of 1,000 shares of common stock, par value $0.01 per share, all of which have been validly issued, are fully paid and nonassessable and are owned by Conopco free and clear of any Lien.

SECTION 4.03. <u>Authority; Execution and Delivery; Enforceability.</u> Each of Conopco and Sub has all requisite corporate power and authority to execute and deliver each Transaction Agreement to which it is a party and to consummate the Transactions. The execution and delivery by each of Conopco and Sub of each Transaction Agreement to which it is a party and the consummation by it of the Transactions have been duly authorized by all necessary corporate action on the part of Conopco and Sub. Conopco, as sole shareholder of Sub, has approved this Agreement. No vote of Conopco's shareholders is required to approve this Agreement or the transactions contemplated hereby. Each of Conopco and Sub has duly executed and delivered each Transaction Agreement to which it is a party, and each Transaction Agreement to which it is a party constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 4.04. <u>Consents.</u> No Consent of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Conopco or any of its subsidiaries in connection with the execution, delivery and performance of any Transaction Agreement to which Conopco or Sub is a party or the consummation of the Transactions, other than (i) compliance with and filings under the HSR Act, (ii) the filing with the SEC of (A) the Offer Documents and (B) such reports under Sections 13 and 16 of the Exchange Act as may be required in connection with this Agreement, and the other Transaction Agreements, the Offer, the Merger and the other Transactions, (iii) the filing of the Articles of Merger with the Secretary of State of the State of Vermont, (iv) compliance with and such filings as may be required under applicable Environmental Laws and (v) such filings as may be required in connection with the Taxes described in Section 6.09.

SECTION 4.05. <u>Information Supplied.</u> (a) None of the information supplied or to be supplied by Conopco or Sub for inclusion or incorporation by reference (i) in the Offer

Documents, the Schedule 14D-9 or the Information Statement will, at the time such document is filed with the SEC, at any time it is amended or supplemented or at the time it is first published, sent or given to the Company's shareholders, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) in the Proxy Statement will, at the date it is first mailed to the Company's shareholders or at the time of the Company Shareholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

(b) The Offer Documents will comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations thereunder, except that no representation is made by Conopco or Sub with respect to statements made or incorporated by reference therein based on information supplied by the Company for inclusion or incorporation by reference therein.

SECTION 4.06. <u>Brokers.</u> Except as set forth in the letter, dated as of the date of this Agreement, from Conopco to the Company (the "<u>Conopco Disclosure Letter</u>") no broker, investment banker, financial advisor or other person, other than Morgan Stanley & Co. Incorporated, the fees and expenses of which will be paid by Conopco, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Conopco.

SECTION 4.07. <u>Conopco Plans.</u> Conopco has previously disclosed to the Company or its counsel each agreement or understanding between Conopco or its affiliates, on the one hand, and any member of the Company Board or of the Company's Office of the Chief Executive Officer (the "<u>OCEO</u>") or the Chief Executive Officer of the Company (the "<u>CEO</u>"), on the other hand, regarding (i) any plans that Conopco or its affiliates may have to cause to be terminated the employment, or cause to be changed the responsibilities, of the CEO or of any member of the OCEO, (ii) any plans that Conopco or its affiliates may have to cause to be terminated the directorship of any member of the Company Board, and (iii) any financial or other matter concerning support of the Transactions or directorship, employment or other arrangements with Conopco or the Company following the Effective Time.

## ARTICLE V

## Covenants Relating to Conduct of Business

SECTION 5.01. <u>Conduct of Business.</u> (a) <u>Conduct of Business by the Company.</u> Except for matters set forth in the Company Disclosure Letter or otherwise expressly permitted by the Transaction Agreements, from the date of this Agreement to the earlier of Conopco having designated a majority of the Company Board pursuant to Section 6.10 and the Effective Time the Company shall, and shall cause each Company Subsidiary to, conduct the business of the Company and the Company Subsidiaries, taken as a whole, in the usual, regular and ordinary course in substantially the same manner as previously conducted and use all reasonable efforts to preserve intact its current business organization, keep available the services of its current officers and employees and keep its relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with them to the end that its goodwill and ongoing business shall be unimpaired, in all material respects, at the Effective Time. In addition, and without limiting the generality of the foregoing, except for matters set forth in the Company Disclosure Letter or otherwise expressly permitted by the Transaction Agreements, from the date of this Agreement to the earlier of Conopco having designated a majority of the Company Board pursuant to Section 6.10 and the Effective Time, the Company shall not, and shall not permit any Company Subsidiary to, do any of the following without the prior written consent of Conopco:

(i) (A) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock, other than dividends and distri-butions by a direct or indirect wholly owned subsidiary of the Company to its parent, (B) split, combine or reclassify any of its capital stock or issue or author-ize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock (other than upon the conversion of shares of Class B Common Stock into shares of Class A Common Stock in accordance with the Company Charter), or (C) purchase, redeem or otherwise acquire any shares of capital stock of the Company or any Company Subsidiary or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

(ii) issue, deliver, sell or grant (A) any shares of its capital stock, (B) any Voting Company Debt or

other voting securities, (C) any securities convertible into or exchangeable for, or any options, warrants or rights to acquire, any such shares, Voting Company Debt, voting securities or convertible or exchangeable securities or (D) any "phantom" stock, "phantom" stock rights, stock appreciation rights or stock-based performance units, other than (x) the issuance of Class A Common Stock (and associated Class A Rights) (1) upon the exercise of Company Stock Options outstanding on the date of this Agreement and in accordance with their present terms, (2) pursuant to the Stock Option Agreement, (3) upon the conversion of shares of Class B Common Stock into shares of Class A Common Stock in accordance with the Company Charter, (4) upon exercise of Gordian Warrants or (5) pursuant to the 1986 ESPP (subject to Section 6.05(c)) and (y) the issuance of capital stock of ACICM upon the exercise of options to purchase such capital stock that are outstanding on the date of this Agreement and in accordance with their present terms;

(iii) amend its articles of incorporation, by-laws or other comparable charter or organizational documents;

(iv) acquire or agree to acquire (A) by merging or consolidating with, or by purchasing a substantial equity interest in or portion of the assets of, or by any other manner, any business or any corporation, partnership, joint venture, association or other business organization or division thereof or (B) any assets that are material, individually or in the aggregate, to the Company and the Company Subsidiaries, taken as a whole, except purchases of inventory in the ordinary course of business consistent with past practice or in the fulfillment of Contracts in existence on the date hereof and copies of which have been made available to Conopco;

(v) (A) grant to any employee, officer or director of the Company or any Company Subsidiary any increase in compensation, except in the ordinary course of business consistent with prior practice or to the extent required under employment or consulting agreements in effect as of the date of the most recent audited financial statements included in the Filed Company SEC Documents, (B) grant to any employee, officer or director of the Company or any Company Subsidiary any increase in severance or termination pay, except to the extent required under any employment, consulting, severance or termination

agreement in effect as of the date of the most recent audited financial statements included in the Filed Company SEC Documents, (C) establish, adopt, enter into or amend any Company Benefit Agreement, (D) establish, adopt, enter into or amend in any material respect any collective bargaining agreement or Company Benefit Plan or (E) take any action to accelerate any rights or benefits, or make any material determinations not in the ordinary course of business consistent with prior practice, under any collective bargaining agreement or Company Benefit Plan or Company Benefit Agreement;

(vi) make any change in accounting methods, principles or practices materially affecting the reported consolidated assets, liabilities or results of operations of the Company, except insofar as may have been required by a change in GAAP;

(vii) sell, lease (as lessor), license or otherwise dispose of or subject to any Lien any properties or assets, except for leases and disposals of trucks and trailers and sales of inventory and excess or obsolete assets, in all cases in the ordinary course of business consistent with past practice;

(viii) (A) incur any indebtedness for borrowed money or guarantee any such indebtedness of another person, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any Company Subsidiary, guarantee any debt securities of another person, enter into any "keep well" or other agreement to maintain any financial statement condition of another person or enter into any arrangement having the economic effect of any of the foregoing, except for short-term borrowings incurred in the ordinary course of business consistent with past practice, or (B) make any loans, advances or capital contributions to, or investments in, any other person, other than to or in the Company or any direct or indirect wholly owned subsidiary of the Company;

(ix) make or agree to make any new capital expenditure or expenditures that, individually, is in excess of $500,000 or, in the aggregate, are in excess of $1,000,000; provided, however, that with respect to proposed capital expenditures the written consent of Conopco shall not unreasonably be withheld;

(x) make or change any material Tax election or settle or compromise any material Tax liability or refund;

(xi) (A) pay, discharge or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise) in excess of $100,000, other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice or in accordance with their terms, of liabilities reflected or reserved against in, or contemplated by, the most recent consolidated financial statements (or the notes thereto) of the Company included in the Filed Company SEC Documents or incurred in the ordinary course of business consistent with past practice, (B) cancel any material indebtedness (individually or in the aggregate) or waive any claims or rights of substantial value or (C) waive the benefits of, or agree to modify in any manner, any confidentiality, standstill or similar agreement to which the Company or any Company Subsidiary is a party; or

(xii) authorize any of, or commit or agree to take any of, the foregoing actions.

(b) <u>Other Actions.</u> Subject to Section 5.02(b), the Company shall not, and shall not permit any Company Subsidiary to, take any action that would, or that would reasonably be expected to, result in (A) any of the representations and warranties of the Company set forth in any Transaction Agreement to which it is a party that is qualified as to Company Material Adverse Effect becoming untrue, (B) the representations and warranties that are not so qualified as to Company Material Adverse Effect becoming untrue where the failure of the representations and warranties referred to in this clause (B) to be so true, when taken together, would reasonably be expected to have a Company Material Adverse Effect, or (C) any condition to the Offer set forth in Section 7.01, or any condition to the Merger set forth in Section 7.02, not being satisfied. Conopco shall not, and shall not permit its subsidiaries to, take any action that would, or would reasonably be expected to, result in any condition to the Offer set forth in Section 7.01, or any condition to the Merger set forth in Section 7.02, not being satisfied.

(c) <u>Advice of Changes.</u> The Company shall promptly advise Conopco orally and in writing of any change or event that has or would reasonably be expected to have a Company Material Adverse Effect. The Company shall promptly provide to Conopco (or its counsel) copies of all filings made by the Company with any Governmental Entity in connection with this Agreement and the Transactions, except

with respect to the disclosure in Item 4(c) and any related materials in the Company's filing under the HSR Act.

(d) <u>Continuation of Contracts.</u> The Company shall use its best efforts to take such actions necessary to ensure the continuation of the contracts referred to in Section 3.05 of the Company Disclosure Letter; <u>provided</u>, <u>however</u>, that this Section 5.01(d) shall not require the payment by the Company of any consent or other similar fee under any such contract.

SECTION 5.02. <u>No Solicitation.</u> (a) The Company shall not, nor shall it authorize or permit any Company Subsidiary to, nor shall it authorize or permit any officer, director or employee of, or any investment banker, attorney or other advisor or representative (collectively, "<u>Representatives</u>") of, the Company or any Company Subsidiary to, (i) directly or indirectly solicit, initiate or encourage the submission of, any Company Takeover Proposal (as defined in Section 5.02(e)), (ii) enter into any agreement with respect to any Company Takeover Proposal or (iii) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate any inquiries or the making of any proposal that constitutes, or may reasonably be expected to lead to, any Company Takeover Proposal; <u>provided</u>, <u>however</u>, that prior to the acceptance for payment of shares of Class A Common Stock pursuant to the Offer the Company may, to the extent required by the fiduciary obligations of the Company Board, as determined in good faith by a majority of the disinterested members thereof after consultation with outside counsel, in response to a Company Takeover Proposal that was made by a person whom the Company Board determines, in good faith after consultation with outside counsel and an independent financial advisor, to be reasonably capable of making a Superior Company Proposal (as defined in Section 5.02(e)), that was not solicited by the Company and that did not otherwise result from a breach or a deemed breach of this Section 5.02(a), (x) furnish information with respect to the Company to the person or group making such Company Takeover Proposal and its Representatives pursuant to a customary confidentiality agreement not less restrictive of the other party than the Confidentiality Agreement (as defined in Section 6.02) and (y) participate in discussions and negotiations with such person or group and its Representatives to the extent required regarding such Company Takeover Proposal. Without limiting the foregoing, it is agreed that any violation of the restrictions set forth in the preceding sentence by any Representative or affiliate of the Company or any Company

Subsidiary, whether or not such person is purporting to act on behalf of the Company or any Company Subsidiary or otherwise, shall be deemed to be a breach of this Section 5.02(a) by the Company. Subject to the foregoing provisions of this Section 5.02, the Company shall, and shall cause its Representatives to, cease immediately all discussions and negotiations regarding any proposal that constitutes, or may reasonably be expected to lead to, a Company Takeover Proposal.

(b) Neither the Company Board nor any committee thereof shall (i) withdraw or modify, or propose to withdraw or modify, in a manner adverse to Conopco or Sub, the approval or recommendation by the Company Board or any such committee of this Agreement, the Offer or the Merger, (ii) approve any letter of intent, agreement in principle, acquisition agreement or similar agreement relating to any Company Takeover Proposal or (iii) approve or recommend, or propose to approve or recommend, any Company Takeover Proposal. Notwithstanding the foregoing, if, prior to the acceptance for payment of shares of Class A Common Stock pursuant to the Offer, the Company Board receives a Superior Company Proposal and a majority of the disinterested directors of the Company determine in good faith, after consultation with outside counsel, that it is necessary to do so in order to comply with their fiduciary obligations, the Company Board may withdraw its approval or recommendation of the Offer, the Merger and this Agreement and, in connection therewith, approve or recommend such Superior Company Proposal, provided, that the Company Board shall give Conopco five business days' notice prior to withdrawing its recommendation.

(c) The Company promptly shall advise Conopco orally and in writing of any Company Takeover Proposal or any inquiry with respect to or that could lead to any Company Takeover Proposal, the identity of the person or group making any such Company Takeover Proposal or inquiry and the material terms of any such Company Takeover Proposal or inquiry. The Company shall (i) keep Conopco fully informed of the status, including any change to the details, of any such Company Takeover Proposal or inquiry and (ii) provide to Conopco as soon as practicable after receipt or delivery thereof with copies of all correspondence and other written material sent or provided to the Company from any third party in connection with any Company Takeover Proposal or sent or provided by the Company to any third party in connection with any Company Takeover Proposal.

(d) Nothing contained in this Section 5.02 shall prohibit the Company from taking and disclosing to its

shareholders a position contemplated by Rule 14e-2(a) promulgated under the Exchange Act or from making any required disclosure to the Company's shareholders if, in the good faith judgment of the Company Board, after consultation with outside counsel, failure so to disclose would be inconsistent with its obligations under applicable Law.

(e)  For purposes of this Agreement:

"Company Takeover Proposal" means (i) any proposal or offer for a merger, consolidation, dissolution, recapitalization or other business combination involving the Company or any Company Subsidiary, (ii) any proposal for the issuance by the Company of a material amount of its equity securities as consideration for the assets or securities of another person or (iii) any proposal or offer to acquire in any manner, directly or indirectly, a material equity interest in any voting securities of, or a substantial portion of the assets of, the Company or any Company Subsidiary, in each case other than the Transactions.

"Superior Company Proposal" means any proposal made by a third party to acquire all or substantially all the equity securities or assets of the Company, pursuant to a tender or exchange offer, a merger, a consolidation, a liquidation or dissolution, a recapitalization or a sale of all or substantially all its assets, (i) on terms which a majority of the disinterested directors of the Company determines in its good faith judgment (A) to represent superior value for the holders of Company Common Stock than the Transactions (based on the written opinion, with only customary qualifications, of Gordian Group, L.P. or another independent financial advisor as to such proposal's financial superiority), taking into account all the terms and conditions of such proposal and this Agreement (including any proposal by Conopco to amend the terms of the Transactions), and (B) to be no less favorable to the Company's stakeholders (not including its shareholders), taken as a whole, than the Transactions, taking into account all the terms and conditions of such proposal and this Agreement (including any proposal by Conopco to amend the terms of the Transactions) and (ii) that is reasonably capable of being completed, taking into account all financial, regulatory, legal and other aspects of such proposal.

ARTICLE VI

Additional Agreements

SECTION 6.01.  Preparation of Proxy Statement;
Shareholders Meeting.  (a)  The Company shall, as soon as
practical following the expiration of the Offer, prepare and
file with the SEC the Proxy Statement in preliminary form,
and the Company and each of Conopco and Sub shall use its
best efforts to respond as promptly as practicable to any
comments of the SEC with respect thereto.  The Company shall
notify Conopco promptly of the receipt of any comments from
the SEC or its staff and of any request by the SEC or its
staff for amendments or supplements to the Proxy Statement
or for additional information and shall supply Conopco with
copies of all correspondence between the Company or any of
its representatives, on the one hand, and the SEC or its
staff, on the other hand, with respect to the Proxy
Statement.  If at any time prior to receipt of the Company
Shareholder Approval there shall occur any event that should
be set forth in an amendment or supplement to the Proxy
Statement, the Company shall promptly prepare and mail to
its shareholders such an amendment or supplement.  The
Company shall not mail any Proxy Statement, or any amendment
or supplement thereto, to which Conopco reasonably objects.
The Company shall use its best efforts to cause the Proxy
Statement to be mailed to the Company's shareholders as
promptly as reasonably practicable after filing with the
SEC.

(b)  The Company shall, as soon as reasonably
practical following the expiration of the Offer, duly call,
give notice of, convene and hold a meeting of its
shareholders (the "Company Shareholders Meeting") for the
purpose of seeking the Company Shareholder Approval.
Without limiting the generality of the foregoing, the
Company agrees that, unless this Agreement shall have been
terminated, its obligations pursuant to the first sentence
of this Section 6.01(b) shall not be affected by (i) the
commencement, public proposal, public disclosure or
communication to the Company of any Company Takeover
Proposal or (ii) the withdrawal or modification by the
Company Board of its approval or recommendation of this
Agreement, the Offer or the Merger.

(c)  Conopco shall cause all shares of Class A
Common Stock purchased by Sub pursuant to the Offer and all
other shares of Class A Common Stock owned by Sub or any
other direct or indirect subsidiary of either Parent to be
represented at the Company Shareholders Meeting and to be

voted in favor of obtaining the Company Shareholder
Approval.

SECTION 6.02. <u>Access to Information;</u>
<u>Confidentiality.</u> (a) The Company shall, and shall cause
each Company Subsidiary to, afford to Conopco, and to
Conopco's officers, employees, accountants, counsel,
financial advisors and other representatives, upon
reasonable notice reasonable access during normal business
hours during the period prior to the Effective Time to all
their respective properties, books, contracts, commitments,
personnel and records and, during such period, the Company
shall, and shall cause each Company Subsidiary to, furnish
promptly to Conopco (a) a copy of each report, schedule,
registration statement and other document filed by it during
such period pursuant to the requirements of Federal or state
securities laws and (b) all other information concerning its
business, properties and personnel as Conopco may reasonably
request; <u>provided</u>, <u>however</u>, that the Company may withhold
(i) any document or information that is subject to the terms
of a confidentiality agreement with a third party or
(ii) such portions of documents or information relating to
pricing or other matters that are highly sensitive and the
exchange of such documents (or portions thereof) or
information, as determined by the Company's outside counsel,
might reasonably result in antitrust difficulties between
the Company and Conopco (or any of its affiliates). If any
material is withheld from Conopco pursuant to the proviso to
the preceding sentence, the Company shall inform Conopco as
to what is being withheld. Without limiting the generality
of the foregoing, the Company shall, within two business
days of request therefor, provide to Conopco the information
described in Rule 14a-7(a)(2)(ii) under the Exchange Act and
any information to which a holder of Company Common Stock
would be entitled under Section 16.02 of the VBCA (assuming
such holder met the requirements of such section).

          (b)   The Company shall, as soon as practicable and
in any event by the end of the third week of each month,
furnish to Conopco such financial information for the
previous month in such form as is provided to the Company
Board.

          (c) ` All information exchanged pursuant to this
Section 6.02 shall be subject to the confidentiality
agreement dated September 27, 1999 between the Company and
Conopco (the "<u>Confidentiality Agreement</u>").

          SECTION 6.03.   <u>Best Efforts; Notification.</u>
(a)   Upon the terms and subject to the conditions set forth
in this Agreement, and subject to Section 5.02 and the

Company's right to make the disclosures to its shareholders permitted under Section 5.02(d), each of the parties shall use its best efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Offer, the Merger and the other Transactions, including (i) the obtaining of all necessary actions, waivers, consents and approvals from Governmental Entities and the making of all necessary registrations and filings (including filings with Governmental Entities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (ii) the obtaining of all necessary consents, approvals or waivers from third parties, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or any other Transaction Agreement or the consummation of the Transactions, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed and (iv) the execution and delivery of any additional instruments necessary to consummate the Transactions and to fully carry out the purposes of the Transaction Agreements; provided, however, that neither the Company nor Conopco shall be required to consent to any action described in Section 7.01(a). In connection with and without limiting the foregoing, the Company and the Company Board shall (i) take all action necessary to ensure that no state takeover statute or similar statute or regulation becomes applicable to any Transaction or this Agreement or any other Transaction Agreement and (ii) if any state takeover statute or similar statute or regulation becomes applicable to this Agreement or any other Transaction Agreement, take all action necessary to ensure that the Offer, the Merger and the other Transactions may be consummated as promptly as practicable on the terms contemplated by the Transaction Agreements and otherwise to minimize the effect of such statute or regulation on the Offer, the Merger and the other Transactions. Nothing in this Section 6.03 shall be deemed to require any party to waive any substantial rights or agree to any substantial limitation on its operations or to dispose of any significant asset or collection of assets.

(b) The Company shall give prompt notice to Conopco, and Conopco shall give prompt notice to the Company, of (i) any representation or warranty made by it contained in any Transaction Agreement that is qualified as to materiality being untrue or inaccurate in any respect when given or any such representation or warranty that is

not so qualified being untrue or inaccurate in any material respect when given or (ii) the failure by it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under any Transaction Agreement; provided, however, that no such notification shall affect the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the parties under the Transaction Agreements.

SECTION 6.04. Stock Options. (a) As soon as reasonably practicable following the date of this Agreement, the Company Board (or, if appropriate, any committee administering the Company Stock Plans) shall adopt resolutions or take such other actions as may be required to effect the following:

(i) adjust the terms of all outstanding Company Stock Options, whether vested or unvested, as necessary to provide that each Company Stock Option (and any Company SAR related thereto) outstanding immediately prior to the acceptance for payment of shares of Class A Common Stock pursuant to the Offer, including all vested and unvested Company Stock Options, shall be canceled effective immediately prior to the acceptance for payment of Class A Common Stock pursuant to the Offer, with the holder thereof becoming entitled to receive an amount in cash equal to (A) the excess, if any, of (1) $43.60 over (2) the exercise price per share of the Class A Common Stock subject to such Company Stock Option or Company SAR, multiplied by (B) the number of shares of the Class A Common Stock for which such Company Stock Option shall not theretofore have been exercised; provided, however, that no cash payment shall be made with respect to any Company SAR that is related to any Company Stock Option in respect of which such a cash payment is made; provided, further, that all amounts payable pursuant to this Section 6.04(a)(i) shall be subject to any required withholding of Taxes or proof of eligibility of exemption therefrom and to receipt of the written consent of the holder thereof and shall be paid at or as soon as practicable following the acceptance for payment of shares of Class A Common Stock pursuant to the Offer, without interest; and

(ii) make such other changes to the Company Stock Plans as the Company and Conopco may agree are appropriate to give effect to the Offer and the Merger.

(b) After the Effective Time, the Surviving Corporation shall establish an appropriate long-term incentive plan to properly incentivise its employees.

SECTION 6.05. Benefit Plans and Special Bonus Program. (a) Except as set forth in Section 6.04 and this Section 6.05, Conopco agrees that after the consummation of the Offer the Company shall honor, and, on and after the Effective Time, Conopco shall cause the Surviving Corporation to honor, all employment, severance, termination, consulting and retirement agreements to which the Company or any Company Subsidiary is presently a party and which have been disclosed in the Company Disclosure Letter, including all "constructive termination" provisions therein. Conopco confirms that, for purposes of such agreements, the acceptance for payment, and purchase, of the Company Common Stock pursuant to the Offer shall constitute a "change in control".

(b) Except as set forth in Sections 6.04 and 6.05(c), the Surviving Corporation shall maintain for a period of five years after the Effective Time the Company Benefit Plans (other than equity or equity-based programs), except to the extent provided in Section 6.04, in effect on the date of this Agreement or provide benefits to each current employee of the Company and the Company Subsidiaries that are not materially less favorable in the aggregate to such employees than those in effect on the date of this Agreement (other than equity or equity-based programs), except to the extent provided in Section 6.04.

(c) As soon as practicable following the date of this Agreement, the Company Board (or, if appropriate, any committee administering the 1986 ESPP) shall take or cause to be taken such actions as may be necessary to provide that (i) no options shall be granted and no payroll deductions accepted after the earlier of June 30, 2000 or the date in which falls the Effective Time; (ii) if the Effective Time falls on a date prior to June 30, 2000, the exercise date in respect of the offering (option) period under the 1986 ESPP that commenced January 1, 2000 shall be accelerated, and all unexercised rights granted in respect of such offering (option) period shall be exercised immediately prior to the Effective Time; (iii) all holding periods with respect to shares under the ESPP shall be waived; and (iv) the 1986 ESPP shall terminate as of the Effective Time.

(d) Six months following the Effective Time, Conopco shall make available to the Surviving Corporation the sum of $5 million to be distributed on a per capita basis to the then full-time employees of the Company below

the OCEO as a special bonus unless the Company Board determines in its sole discretion that all or a portion of such amount should be contributed to the Foundation (as defined in Section 6.14) in which case the balance shall be distributed on a per capita basis to the then full-time employees of the Company below the OCEO and the amount not so distributed shall be contributed to the Foundation.

SECTION 6.06. Indemnification. (a) Conopco and Sub agree that all rights to indemnification under the Company Charter, the Company By-laws, the Company's indemnification or other agreements or by Law for acts or omissions occurring prior to the Effective Time now existing in favor of the current or former directors or officers of the Company and its subsidiaries (the "Indemnified Parties") as provided in their respective articles of incorporation, by-laws or indemnification agreements shall survive the Merger and shall continue in full force and effect in accordance with their terms until the expiration of the applicable statute of limitations (provided, that in the event any claim or claims are asserted or made prior to the expiration of all applicable statutes of limitation, all rights to indemnification in respect of any such claim or claims shall continue until disposition of any and all such claims), and Conopco shall cause the Surviving Corporation to honor all such rights. Without limitation of the foregoing, in the event any such Indemnified Party is or becomes involved in any capacity in any action, proceeding or investigation in connection with any matter, including the transactions contemplated by this Agreement, occurring prior to, and including, the Effective Time, Conopco shall, or shall cause the Surviving Corporation to, pay as incurred such Indemnified Party's reasonable legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith (subject to receipt by the Surviving Corporation of an undertaking from such Indemnified Party to repay advances if it is subsequently determined that such Indemnified Party is not entitled to indemnification). Conopco shall pay all expenses, including reasonable attorneys' fees, that may be incurred by any Indemnified Party in successfully enforcing the indemnity and other obligations provided for in this Section 6.06(a).

(b) Conopco shall cause to be maintained for a period of not less than six years from the Effective Time the Company's current directors' and officers' insurance and indemnification policies to the extent that they provide coverage for events occurring prior to the Effective Time (the "D&O Insurance") for all persons who are directors and officers of the Company on the date of this Agreement, so long as the annual premium therefor would not be in excess

of 200% of the last annual premiums paid prior to the date of this Agreement (such 200% amount, the "Maximum Premium"). If the existing D&O Insurance expires, is terminated or canceled during such six-year period, Conopco shall use all reasonable efforts to cause to be obtained as much D&O Insurance as can be obtained for the remainder of such period for an annualized premium not in excess of the Maximum Premium, on terms and conditions no less advantageous than the existing D&O Insurance. The Company represents to Conopco that the Maximum Premium is $228,000.

SECTION 6.07. Fees and Expenses; Liquidated Damages. (a) Except as provided below, all fees and expenses incurred in connection with the Merger shall be paid by the party incurring such fees or expenses, whether or not the Merger is consummated.

(b) The Company shall pay to Conopco a fee of $11.4 million if: (i) this Agreement is terminated pursuant to Section 8.01(b)(iii) as a result of the failure of the condition set forth in paragraph (d) of Section 7.01; (ii) Conopco terminates this Agreement pursuant to Section 8.01(d) or the Company terminates this Agreement pursuant to Section 8.01(e); (iii) after the date of this Agreement any person makes or consummates a Company Takeover Proposal or amends a Company Takeover Proposal made prior to the date of this Agreement, and (A) the Offer remains open for at least five business days following the first public announcement of the making, consummation or amendment, as the case may be, of such Company Takeover Proposal, (B) the Minimum Tender Condition is not satisfied at such expiration date and (C) this Agreement is terminated pursuant to Section 8.01(b)(iii); or (iv) this Agreement is terminated (other than termination pursuant to Section 8.01(b)(iv) or 8.01(f)) and within 12 months of such termination the Company enters into a definitive agreement to consummate, or consummates, the transactions contemplated by a Company Takeover Proposal. Any fee due under this Section 6.07(b) shall be paid by wire transfer of same-day funds on the date of termination of this Agreement (except that in the case of termination pursuant to clause (iv) above such payment shall be made on the date of execution of such definitive agreement or, if earlier, consummation of such transactions). Conopco shall only be entitled to one fee under this Section 6.07(b).

(c) The parties acknowledge that Conopco's damages in the event that this Agreement is breached by the Company would be extremely costly and impractical to calculate. Conopco and the Company have expressly negotiated this provision, and have agreed that in light of

the circumstances existing at the time of execution of this Agreement, an amount equal to $11.9 million represents a reasonable estimate of the harm likely to be suffered by Conopco in the event this Agreement is terminated pursuant to Section 8.01(c) or pursuant to Section 8.01(b)(iii) as a result of the failure of a condition set forth in paragraph (e) or (f) of Section 7.01. Accordingly, in the event this Agreement is terminated under such circumstances, Conopco shall be entitled to receive $11.9 million from the Company as its sole remedy and as liquidated damages.

SECTION 6.08. <u>Public Announcements.</u> Each of Conopco and Sub, on the one hand, and the Company, on the other hand, shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or other public statements with respect to the Offer and the Merger and the other Transactions and shall not issue any such press release or make any such public statement prior to such consultation, except as may be required, as determined by outside counsel, by applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange.

SECTION 6.09. <u>Transfer Taxes.</u> All stock transfer, real estate transfer, documentary, stamp, recording and other similar Taxes (including interest, penalties and additions to any such Taxes) ("<u>Transfer Taxes</u>") incurred in connection with the Transactions shall be paid by either Sub or the Surviving Corporation, and the Company shall cooperate with Sub and Conopco in preparing, executing and filing any Tax Returns with respect to such Transfer Taxes.

SECTION 6.10. <u>Interim Directors.</u> Promptly upon the acceptance for payment of, and payment by Sub for, any shares of Class A Common Stock pursuant to the Offer, Sub shall be entitled to designate, for election by the Company Board, such number of directors on the Company Board as will give Sub, subject to compliance with Section 14(f) of the Exchange Act and the VBCA, majority representation on the Company Board; <u>provided</u>, <u>however</u>, that in the event that Sub's designees are appointed or elected to the Company Board, until the Effective Time the Company Board shall have at least three directors who are Directors on the date of this Agreement and who are not officers of the Company (the "<u>Independent Directors</u>"); <u>provided</u>, <u>further</u>, that, in such event, if the number of Independent Directors shall be reduced below three for any reason whatsoever, any remaining Independent Directors (or Independent Director, if there shall be only one remaining) shall be entitled to designate

persons to fill such vacancies who shall be deemed to be Independent Directors for purposes of this Agreement or, if no Independent Directors then remain, the other directors shall designate three persons to fill such vacancies who are not officers, shareholders or affiliates of the Company, Conopco or Sub, and such persons shall be deemed to be Independent Directors for purposes of this Agreement. Subject to applicable Law, the Company shall take all action requested by Conopco necessary to effect any such election, including mailing to its shareholders the Information Statement containing the information required by Section 14(f) of the Exchange Act and Rule 14f-1 promulgated thereunder, and the Company shall make such mailing with the mailing of the Schedule 14D-9 (provided that Sub shall have provided to the Company on a timely basis all information required to be included in the Information Statement with respect to Sub's designees). In connection with the foregoing, the Company shall promptly, at the option of Sub, either increase the size of the Company Board or obtain the resignation of such number of its current directors as is necessary to enable Sub's designees to be elected or appointed to the Company Board as provided above.

SECTION 6.11. <u>Company Capital Stock.</u>
(a)   Immediately following the consummation of the Offer, the Company Board shall authorize the Company to redeem all of the outstanding shares of Company Preferred Stock, at a price per share that would have been received by a holder of Company Preferred Stock if paid as Merger Consideration in the Merger, prior to the record date for the Company Shareholder Meeting and deliver to all holders of Company Preferred Stock the notice of redemption required by the Company Charter.  The Company shall redeem all outstanding shares of Company Preferred Stock prior to the Effective Time.

(b)   Upon receipt of a Qualified Notice (as defined below) from Conopco, and in accordance with the Company Charter, the Company shall mail a notice to all the holders of Class B Common Stock, which notice shall specify that all outstanding shares of Class B Common Stock will be automatically converted into shares of Class A Common Stock effective ten days from the date of such mailing.  The Company shall not take any action to rescind, revoke, retrieve or otherwise impair the effectiveness of such notice of conversion or prevent the automatic conversion of the outstanding shares of Class B Common Stock.  A "<u>Qualified Notice</u>" shall mean a written notice that (i) is delivered by Conopco to the Company not earlier than the business day immediately prior to the then scheduled expiration date of the Offer and not later than 2 p.m.

Eastern Time on the then scheduled expiration date of the Offer and (ii) states that, as of the time of such notice, Conopco has no reason to believe that any condition set forth in Section 7.01 will not be satisfied at the then scheduled expiration time of the Offer (assuming compliance by the Company with this Section 6.11(b)).

SECTION 6.12. <u>Rights Agreements; Consequences if Rights Triggered.</u> The Company Board shall take all further action (in addition to that referred to in Section 3.05(c)) requested in writing by Conopco in order to render the Company Rights inapplicable to the Offer, the Merger and the other Transactions. Except as approved in writing by Conopco, the Company Board shall not (i) amend either of the Company Rights Agreements, (ii) redeem the Company Rights or (iii) take any action with respect to, or make any determination under, the Company Rights Agreements.

SECTION 6.13. <u>Shareholder Litigation.</u> After the Closing Date, the Company shall give Conopco the opportunity to participate in the defense or settlement of any shareholder litigation against the Company or its directors relating to any Transaction.

SECTION 6.14. <u>Operations of the Surviving Corporation.</u> (a) The Company Board immediately following the Effective Time shall consist of: (i) the CEO; (ii) seven members to be composed of (A) such members of the Company Board (other than the current CEO and Ineligible Directors (as defined in Section 9.03)) as of the date hereof who wish to continue or rejoin as members of the Company Board following the Effective Time and (B) such other persons as may be necessary to fill any vacancies in the seven members as shall be designated for election by a majority of the persons specified in clause (A) (the "<u>Class I Directors</u>"); (iii) two members (the "<u>Class M Directors</u>") to be designated by Meadowbrook Lane, Inc. ("<u>Meadowbrook</u>"); and (iv) one member (together with any alternate that Conopco may from time to time designate, the "<u>Class U Director</u>") to be designated by Conopco. The size of the Company Board shall be fixed at 11. Directors shall be elected for one year terms (subject to earlier removal, death or resignation), and a majority of directors then in office in each Class shall designate the candidates for election to the Company Board in such Class each year, and Conopco shall cause the election of such candidates and the CEO to the Company Board. Vacancies on the Company Board shall be filled in a like manner. Conopco, as sole shareholder of the Surviving Corporation, shall remove any director of any Class at the written request of at least a majority of the directors of such Class then in office and shall not otherwise remove any

49

member of the Company Board after the Effective Time, other
than a Class U Director or the CEO following termination of
his or her employment.  No Ineligible Director shall be
permitted at any time to be elected to the Company Board.

(b)  Immediately following the Effective Time, the
Surviving Corporation shall delegate authority to the CEO to
manage the affairs of the Company, substantially in the form
of Exhibit B, appropriately adjusted for inflation and other
relevant factors.  The Surviving Corporation, with the
consent of Conopco, shall review on an annual basis the
proper scope of such delegation and shall make a new
delegation to the CEO as of January 1 of each year.  Within
the scope of the authority delegated by the Surviving
Corporation to the CEO, the CEO may act without obtaining
the prior approval of Conopco or the Company Board.  The
Company Board shall not alter or challenge in any way the
scope of any delegation of authority by the Surviving
Corporation to the CEO.

(c)  Decisions with respect to the appointment,
compensation and removal of the CEO shall be made by Conopco
after good faith consultation with, and the participation in
discussions of, an advisory committee of the Company Board
(the "Appointment Committee") consisting of Ben Cohen
("B.C.") and Jerry Greenfield ("J.G."); provided, however,
that, if from time to time one or both of B.C. or J.G. is
not a member of the Company Board, then a majority of the
Class I Directors then in office shall appoint one or two,
as the case may be, Class I Directors or Class M Directors
to the Appointment Committee.

(d)  Subject to Sections 6.14(e) and 6.14(f),
which place primary responsibility for Social Mission
Priorities and the Essential Integrity of the Brand (each as
defined below) with the Company Board, the Surviving
Corporation shall be managed by the CEO in accordance with
an annual business plan.  Each year the CEO shall present a
business plan for the following year to Conopco and the
Company Board.  Conopco and the Company Board, in good faith
consultation with each other, shall review the proposal and
Conopco, the Company Board and the CEO shall use good faith
efforts to reach agreement on the annual business plan.  If
such parties are unable to reach agreement on the annual
business plan, the ultimate determination of such plan shall
be by Conopco.  The annual business plan may be modified
following the principles set out in the previous two
sentences.

(e)  The Company Board shall have primary
responsibility for preserving and enhancing the objectives

of the historical social mission of the Company as they may evolve from time to time consistent therewith ("Social Mission Priorities"). The Company Board shall work together with the CEO to integrate Social Mission Priorities into the business of the Surviving Corporation. The Company Board shall have a committee (the "Social Venture Committee") that shall oversee the Social Venture Fund (as defined below) consisting of one Class M Director, appointed by a majority of the Class M Directors then in office, and B.C., or, if B.C. is not a member of the Company Board, J.G., or, if neither B.C. nor J.G. is a member of the Company Board, a Class I Director appointed by a majority of the Class I Directors. Schedule 6.14 contains an illustrative list of Social Mission Priorities of the Company as of the date hereof.

(f) The Company Board shall be the custodians of the Ben & Jerry's-brand image and shall have primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name (the "Essential Integrity of the Brand"). The Company Board shall work together with the CEO to provide that the business of the Surviving Corporation is conducted in a manner that preserves and enhances the Essential Integrity of the Brand. As part of this responsibility, the Company Board may prevent any action by the CEO in the areas of new product introduction, the changing of product standards and specifications, the approval of the content of marketing materials and the licensing or other use of the Ben & Jerry's trademark that, in each case, a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand.

(g) The Company and Conopco shall work together to develop and mutually agree to a set of measures of the social performance of the Surviving Corporation ("Social Metrics"). The Surviving Corporation, under the direction of the Company Board, shall seek to have the Social Metrics of the Surviving Corporation increase at a rate in excess of the rate of sales increases of the Surviving Corporation.

(h) The Surviving Corporation shall continue the Company's practice of making charitable contributions by making contributions, for a minimum of ten years, of $1.1 million per year adjusted annually (i) by multiplying such amount by the ratio of the U.S. Producer Price Index for the month of December of the year in which the determination is made to the U.S. Producer Price Index for December 1999 and (ii) by multiplying the product of such calculation by the ratio of the equivalent gallon sales of Products bearing the Principal Licensed Mark (each as

defined in the License Agreement) sold by any person in such
year to the equivalent gallon sales of Products sold in
1999; provided, however, that such ratio shall never be less
than one. To the extent that a material portion of the
Company's business consists of activities other than the
manufacture and sale of Products, Conopco and the Surviving
Corporation shall agree on an appropriate equivalent measure
of sales volume for clause (ii) with respect to such
non-Product activities. The Company Board shall have the
responsibility for allocating annual contributions among The
Ben & Jerry's Foundation, Inc. (the "Foundation"), local
community charitable initiatives with the support and
oversight of employee Community Action Teams and charitable
institutions selected by the OCEO. The Company Board may
allocate a portion of such contributions to the Foundation
so long as (i) the Foundation does not significantly change
its charitable purpose, (ii) none of the trustees of the
Foundation disparages the Surviving Corporation, its
products or its management and (iii) any replacement or
additional trustee of the Foundation is reasonably
satisfactory to Conopco. After such ten year period, the
Surviving Corporation shall continue to make contributions
as calculated in accordance with the first sentence of this
Section 6.14(h) unless the activities and performance of the
Foundation cease to be reasonably acceptable to Unilever,
and provided that the Foundation meets the other
requirements set out in the previous sentence. The Company
Board shall also be responsible for making the determination
referred to in Section 6.05(d).

(i)   Conopco shall not prevent the Surviving
Corporation from fulfilling its obligations under this
Section 6.14.

(j)   Conopco shall have primary responsibility for
the financial and operational aspects of the Surviving
Corporation and the other aspects of the Surviving
Corporation not allocated to the Company Board pursuant to
this Section 6.14. Each member of the Company Board after
the Effective Time and all employees of the Surviving
Corporation shall agree to abide by the Unilever Code of
Business Conduct, and all employees of the Surviving
Corporation shall agree to abide by Unilever's financial,
accounting and legal procedures.

(k)   Following the Effective Time, the Surviving
Corporation shall establish a new product development unit
responsible for special projects to be headed by B.C., for
so long as B.C. is a member of the Company Board and an
employee of the Surviving Corporation. The role of such
unit shall include the test-marketing of new products to a

reasonable extent, provided that such test-marketing is performed in conjunction with the Surviving Corporation's marketing department to ensure that proper measures are utilized to determine the success or failure of such test-marketing.

(l)    The parties agree that the Company Charter and the Company By-laws shall be amended after the Effective Time to the extent necessary to implement the provisions contained in this Section 6.14, including if necessary the Surviving Corporation electing to become a close corporation in accordance with the provisions of the VBCA.

SECTION 6.15.    The Foundation.    Immediately prior to the Effective Time, the Surviving Corporation shall, and Conopco shall cause the Surviving Corporation to, make a one-time contribution of not less than $5 million to the Foundation so long as (i) the Foundation does not significantly change its charitable purpose, (ii) none of the trustees of the Foundation disparages the Surviving Corporation, its products or its management and (iii) any replacement or additional trustee of the Foundation appointed before the date of payment is reasonably satisfactory to Conopco.

SECTION 6.16.    Certain Employee Matters.    (a)    The Surviving Corporation shall not, for a period of at least two years following the Effective Time, initiate any material headcount reduction of the employees of the Company, such headcount to be measured on a seasonal basis taking into account past employment practice by the Company.

(b)    The Surviving Corporation shall maintain for a period of at least five years following the Effective Time its corporate presence and substantial operations in Vermont.

(c)    The Surviving Corporation shall maintain the Company's current "liveable wage" policy in respect of employees of the Surviving Corporation.

(d)    Following the Effective Time, a significant amount of the incentive-based compensation of the OCEO shall be based on the social performance of the Surviving Corporation, and the Company Board shall be primarily responsible for the award of such social performance based amounts.

SECTION 6.17.    Social Milestones.    Following the Effective Time, Conopco shall cause the Parents to, and the Company shall, appoint John Elkington (or such other person

as the parties may agree from time to time) (the "Social Advisor") to work with the Parents and the Company to develop a program of social milestones for the assessment of the Parents' efforts to incorporate socially responsible practices into their businesses, based on the Parents' social audit to be completed in the year 2000 (the "Parents Social Audit"), which will set out five-year performance goals with interim annual targets (the "Social Milestones"), each of the Social Milestones to be agreed between the Parents and the Company. The Social Advisor shall carry out an annual audit of the Parents' performance in relation to the Social Milestones, such audit to be publicly disseminated to the extent consistent with the dissemination of the Parents Social Audit, or, if the Parents Social Audit is not publicly disseminated, on a time frame and in a manner reasonably acceptable to the Parents and the Company Board, which manner shall include publication on the Parents' website. The reasonable fees of John Elkington shall be borne by Conopco or its affiliates.

SECTION 6.18. The Social Venture Fund. Following the Effective Time, the Surviving Corporation shall establish a fund (the "Social Venture Fund"), to be administered by the Social Venture Committee, to provide venture financing to (a) vendors owned by women, minorities or indigenous people, (b) vendors which give priority to a social change mission, and (c) such other third-party entrepreneurial businesses within the scope of the Company's Social Mission Priorities. The Surviving Corporation shall fund such entity pursuant to an agreement to be made between the Surviving Corporation and the Social Venture Fund after the Effective Time on such terms and conditions as they and the Social Venture Committee shall approve. The Surviving Corporation shall make available to the Social Venture Fund an aggregate amount of $5 million. The terms of all venture financings approved by the Social Venture Committee to be made by the Social Venture Fund shall limit the financial responsibility of the Surviving Corporation in the aggregate to the foregoing cash contribution.

ARTICLE VII

SECTION 7.01. Conditions to the Offer. Notwithstanding any other term of the Offer or this Agreement, Sub shall not be required to accept for payment or, subject to any applicable rules and regulations of the SEC, including Rule 14e-1(c) under the Exchange Act (relating to Sub's obligation to pay for or return tendered shares of Company Common Stock promptly after the

termination or withdrawal of the Offer), to pay for any shares of Company Common Stock tendered pursuant to the Offer unless (i) there shall have been validly tendered and not withdrawn prior to the expiration of the Offer such number of shares of Company Common Stock that, taking into account the conversion of the Class B Common Stock to Class A Common Stock, would constitute a majority of the combined voting power of the Company Common Stock (determined on a fully diluted basis, after giving effect to the exercise or conversion of all options, rights and securities exercisable or convertible into voting securities) (the "<u>Minimum Tender Condition</u>"), (ii) the waiting period (and any extension thereof) under the HSR Act applicable to the purchase of shares of Company Common Stock pursuant to the Offer shall have expired or been terminated and (iii) the Company shall have mailed the notice of conversion described in Section 6.11(b) to all holders of Class B Common Stock following receipt of the notice specified in Section 6.11(b) and shall not have taken any action in violation of Section 6.11(b). Furthermore, notwithstanding any other term of the Offer or this Agreement, Sub shall not be required to accept for payment or, subject as aforesaid, to pay for any shares of Company Common Stock not theretofore accepted for payment or paid for, and may terminate or amend the Offer, with the consent of the Company, or if, at any time on or after the date of this Agreement and before the acceptance of such shares for payment or the payment therefor, any of the following conditions exists:

(a) there shall be threatened by any Governmental Entity, or there shall be initiated or pending any suit, action, proceeding, application or counterclaims by any Governmental Entity or any other person, or before any court or governmental authority, agency or tribunal, domestic or foreign in each case that has a reasonable likelihood of success, (i) challenging the acquisition by Conopco or Sub of any Class A Common Stock, seeking to restrain or prohibit the making or consummation of the Offer or the Merger or any other Transaction, or seeking to obtain from the Company, Conopco or Sub any damages that are material in relation to the Company and its subsidiaries taken as whole, (ii) seeking to prohibit or limit the ownership or operation by the Company, Conopco or any of their respective subsidiaries of any material portion of the business or assets of the Company, Conopco or any of their respective subsidiaries, or to compel the Company, Conopco or any of their respective subsidiaries to dispose of or hold separate any material portion of the business or assets of the

Company, Conopco or any of their respective
subsidiaries, as a result of the Offer, the Merger or
any other Transaction, (iii) seeking to impose
limitations on the ability of Conopco or Sub to acquire
or hold, or exercise full rights of ownership of, any
shares of Company Common Stock, including the right to
vote the Company Common Stock purchased by it on all
matters properly presented to the shareholders of the
Company, (iv) seeking to prohibit or limit Conopco or
any of its subsidiaries from effectively controlling in
any material respect the business or operations of the
Company and the Company Subsidiaries, or (v) which
otherwise, individually or in the aggregate, would
reasonably be expected to have a Company Material
Adverse Effect;

(b) any Law shall be threatened, proposed, sought,
or any Law or Judgment shall be enacted, entered,
enforced, promulgated, amended or issued with respect
to, or deemed applicable to, or any Consent withheld
with respect to (i) Conopco, the Company or any of
their respective subsidiaries or (ii) the Offer, the
Merger or any other Transaction, by any Governmental
Entity that would reasonably be expected to result
directly or indirectly, in any of the consequences
referred to in paragraph (a) above;

(c) since the date of this Agreement, there shall
have occurred (i) any material damage to any material
property in which the Company or any Company Subsidiary
has any interest, (ii) any suit, action or proceeding
threatened against or affecting the Company or any
Company Subsidiary or any significant development in
any existing suit, action or proceeding involving or
affecting the Company or any Company Subsidiary,
(iii) any challenge to the use by the Company of any
material intellectual property rights used in its
business at the date hereof or (iv) any event, change,
effect or development adversely affecting the integrity
of the trademarks or trade names under which the
Company conducts its business, that, in any case under
each of clause (i), (ii), (iii) and (iv), individually
or in the aggregate, have had or would reasonably be
expected to have, a Company Material Adverse Effect;

(d)(i) it shall have been publicly disclosed or
Conopco shall have otherwise learned that beneficial
ownership (determined for the purposes of this
paragraph as set forth in Rule 13d-3 promulgated under
the Exchange Act) of more than 50% of the outstanding
shares of the Company Common Stock has been acquired by

another person or (ii) the Company Board or any committee thereof shall have withdrawn or modified in a manner adverse to Conopco or Sub, its approval or recommendation of this Agreement, the Offer or the Merger, failed to recommend to the Company's shareholders that they accept the Offer and give the Company Shareholder Approval or approved or recommended any Company Takeover Proposal;

(e)(i) any representation and warranty of the Company in this Agreement that is qualified as to Company Material Adverse Effect shall not be true and correct as of the date of this Agreement, except to the extent such representation and warranty expressly relates to an earlier date (in which case on and as of such earlier date), and (ii) the representations and warranties of the Company that are not so qualified as to Company Material Adverse Effect shall not be true or correct in all respects as of the date of this Agreement, except to the extent such representations and warranties expressly relate to an earlier date (in which case on and as of such earlier date), unless the failure of all such representations and warranties in this clause (ii) to be true and correct in aggregate, has had or would reasonably be expected to have a Company Material Adverse Effect;

(f) the Company shall have failed to perform in any material respect any obligation or to comply in any material respect with any agreement or covenant of the Company to be performed or complied with by it under this Agreement; or

(g) this Agreement shall have been terminated in accordance with its terms;

which, in any such case, and regardless of the circumstances giving rise to any such condition (including any action or inaction by Conopco or any of its affiliates), makes it inadvisable, in the sole judgment of Sub or Conopco, to proceed with such acceptance for payment or payment.

The foregoing conditions are for the sole benefit of Sub and Conopco and, subject to Section 1.01(a), may be asserted by Sub or Conopco regardless of the circumstances giving rise to such conditions or may be waived by Sub and Conopco in whole or in part at any time and from time to time in their sole discretion. The failure by Conopco, Sub or any other affiliate of Conopco at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right, the waiver of any such right with respect to

particular facts and circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.

SECTION 7.02. <u>Conditions to the Merger.</u>  The respective obligation of each party to effect the Merger is subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(a)  <u>Shareholder Approval.</u>  The Company shall have obtained the Company Shareholder Approval.

(b)  <u>Antitrust.</u>  The waiting period (and any extension thereof) applicable to the Merger under the HSR Act shall have been terminated or shall have expired.

(c)  <u>No Injunctions or Restraints.</u>  No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Merger shall be in effect; <u>provided</u>, <u>however</u>, that prior to asserting this condition each of the parties shall have used its best efforts to prevent the entry of any such injunction or other order and to appeal as promptly as possible any such injunction or other order that may be entered.

## ARTICLE VIII

### Termination, Amendment and Waiver

SECTION 8.01.  <u>Termination.</u>  This Agreement may be terminated at any time prior to the Effective Time, whether before or after receipt of Company Shareholder Approval:

(a) by mutual written consent of Conopco, Sub and the Company;

(b) by either Conopco or the Company:

(i) if the Merger is not consummated on or before September 30, 2000, unless the failure to consummate the Merger is the result of a material breach of any Transaction Agreement by the party seeking to terminate this Agreement; <u>provided</u>, <u>however</u>, that (A) the passage of such period shall be tolled for any part thereof during which any party shall be subject to a nonfinal order, decree, ruling or action restraining, enjoining or

otherwise prohibiting the consummation of the Merger, (B) this Agreement may not be terminated pursuant to this clause (i) after Sub accepts shares of Company Common Stock for payment pursuant to the Offer and (C) such September 30, 2000 date may be extended to a date not later than November 30, 2000, by Conopco or the Company prior to termination of this Agreement, by notice in writing to the other, if on September 30, 2000, the Offer has not been consummated because of the failure of the condition in clause (ii) of the lead-in paragraph in Section 7.01 or the condition in paragraph (a) in Section 7.01;

(ii) if any Governmental Entity issues an order, decree or ruling or takes any other action permanently enjoining, restraining or otherwise prohibiting the Offer or the Merger and such order, decree, ruling or other action shall have become final and nonappealable;

(iii) if as the result of the failure of any of the conditions set forth in Section 7.01 to this Agreement, the Offer shall have terminated or expired in accordance with its terms without Conopco having purchased any shares of Company Common Stock pursuant to the Offer; or

(iv) if, upon a vote at a duly held meeting to obtain the Company Shareholder Approval, the Company Shareholder Approval is not obtained; provided, however, that Conopco may not terminate this Agreement under this Section 8.01(b)(iv) if the Company Common Stock owned by Sub, Conopco or any affiliate of Conopco shall not have been voted in favor of obtaining the Company Shareholder Approval;

(c) by Conopco, if the Company breaches or fails to perform in any material respect any of its representations, warranties or covenants contained in any Transaction Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.01, and (ii) has not been cured within 30 days after the giving of written notice to the Company of such breach (provided that Conopco is not then in wilful and material breach of any representation, warranty or covenant contained in any Transaction Agreement);

(d) by Conopco:

(i) if the Company Board or any committee thereof withdraws or modifies, or publicly proposes to withdraw or modify, in a manner adverse to Conopco, its approval or recommendation of this Agreement, the Offer or the Merger, fails to recommend to the Company's shareholders that they accept the Offer and give the Company Shareholder Approval or approves or recommends, or publicly proposes to approve or recommend, any Company Takeover Proposal; provided, however, that any public statement by the Company that (A) it has received a Company Takeover Proposal, (B) it has given Conopco the notice required by Section 5.02(b) in connection with the withdrawal of its recommendation or (C) otherwise only describes the technical operation of Sections 5.02, 6.07 and 7.01(d)(ii) and this Section 8.01 shall not be deemed to be a public proposal to withdraw or modify the Company Board's recommendation for the purposes of this clause (i) or Section 7.01(d)(ii); or

(ii) if the Company or any of its officers, directors, employees, representatives or agents takes any of the actions that are proscribed by Section 5.02;

(e) by the Company if the Company Board withdraws its recommendation of the Offer in accordance with Section 5.02(b); and

(f) by the Company, if Conopco breaches or fails to perform in any material respect any of its representations, warranties or covenants contained in any Transaction Agreement, which breach or failure to perform cannot be or has not been cured within 30 days after the giving of written notice to Conopco of such breach (provided that the Company is not then in wilful and material breach of any representation, warranty or covenant contained in any Transaction Agreement).

SECTION 8.02. Effect of Termination. In the event of termination of this Agreement by either the Company or Conopco as provided in Section 8.01, this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of Conopco, Sub or the Company, other than Section 3.21, Section 4.06, Section 6.02(c), Section 6.07, this Section 8.02 and Article IX, which provisions shall survive such termination,

and except to the extent that such termination results from the wilful and material breach by a party of any representation, warranty or covenant set forth in any Transaction Agreement.

SECTION 8.03. <u>Amendment.</u> This Agreement may be amended by the parties at any time before or after receipt of the Company Shareholder Approval; <u>provided</u>, <u>however</u>, that after receipt of the Company Shareholder Approval, there shall be made no amendment that by Law requires further approval by the shareholders of the Company without the further approval of such shareholders. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties and, where any amendment relates to a provision of this Agreement in respect of which any third party beneficiary is entitled to an enforcement right pursuant to Section 9.07, an instrument in writing must be signed by the person entitled to such enforcement right.

SECTION 8.04. <u>Extension; Waiver.</u> At any time prior to the Effective Time, the parties may (a) extend the time for the performance of any of the obligations or other acts of the other parties, (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant to this Agreement or (c) subject to the proviso of Section 8.03, waive compliance with any of the agreements or conditions contained in this Agreement. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party and, where any waiver relates to a provision of this Agreement in respect of which any third party beneficiary is entitled to an enforcement right pursuant to Section 9.07, an instrument in writing must be signed by the person entitled to such enforcement right. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

SECTION 8.05. <u>Procedure for Termination, Amendment, Extension or Waiver.</u> A termination of this Agreement pursuant to Section 8.01, an amendment of this Agreement pursuant to Section 8.03 or an extension or waiver pursuant to Section 8.04 shall, in order to be effective, require (a) in the case of Conopco, Sub or the Company, action by its Board of Directors or the duly authorized designee of its Board of Directors and (b) in the case of the Company, action by a majority of the members of the Company Board who were members thereof on the date of this Agreement and remain as such hereafter or the duly authorized designee of such members; <u>provided</u>, <u>however</u>, that in the event that

Sub's designees are appointed or elected to the Company Board as provided in Section 6.10, after the acceptance for payment of Company Common Stock pursuant to the Offer and prior to the Effective Time, the affirmative vote of the majority of the Independent Directors, in lieu of the vote required pursuant to clause (a) above, shall be required by the Company to (i) amend or terminate this Agreement, (ii) exercise or waive any of the Company's rights or remedies under this Agreement or (iii) extend the time for performance of Conopco's or Sub's respective obligations under this Agreement.

## ARTICLE IX

### General Provisions

SECTION 9.01.  <u>Nonsurvival of Representations and Warranties.</u>  None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Effective Time.  This Section 9.01 shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time.

SECTION 9.02.  <u>Notices.</u>  All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be deemed given upon receipt by the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(a) if to Conopco or Sub, to

Conopco, Inc.
390 Park Avenue, 21st Floor
New York, NY 10022
Attention:  Ronald Soiefer
Facsimile:  (212) 688-3411

with a copy to:

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Richard Hall
Facsimile:  (212) 474-3700

(b) if to the Company, to

Ben & Jerry's Homemade, Inc.
30 Community Drive
South Burlington, VT    05403
Attention:   Chief Executive Officer
Facsimile (508) 230-5579


with a copy to:

Ropes & Gray
One International Place
Boston, MA    02110
Attention:    Howard K. Fuguet
Facsimile:    (617) 951-7050

and:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York    10036
Attention:    Randall H. Doud
Facsimile:    (917) 777-2524

SECTION 9.03.   Definitions.   For purposes of this Agreement:

"affiliate" and "associate", when used with reference to any person, shall have the respective meanings ascribed to such terms in Rule 12b-2 of the Exchange Act, as in effect on the date of this Agreement.   In the case of Conopco, "affiliate" shall include, without limitation, either Parent, and any entity a majority of the voting control of which is owned, directly or indirectly, by either Parent or both of them together.

A "material adverse effect" means, when used in connection with the Company or Conopco, any change or effect that is materially adverse to the business, properties, assets, condition (financial or otherwise), or results of operations of such party and its subsidiaries, taken as a whole, except (in the case of the Company) as expressly set forth in the Company Disclosure Letter.

An "Ineligible Director" means any member of the Company Board at the date hereof who (a) fails to tender his or her shares of Company Common Stock pursuant to the Offer, (b) makes any public statement disparaging either Parent, Conopco, the Company, any Transaction Agreement or any Transaction, (c) takes any action that, but for

Section 9.11, would constitute a breach of this Agreement by the Company or (d) takes any other action which is intended to cause any of the Transactions to fail to be completed.

"Parent" means either of Unilever N.V. or Unilever PLC and "Parents" shall mean both of them.

A "person" means any individual, firm, corporation, partnership, company, limited liability company, trust, joint venture, association, Governmental Entity or other entity.

A "subsidiary" of any person means another person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its Board of Directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first person.

SECTION 9.04. Interpretation; Disclosure Letters. When a reference is made in this Agreement to a Section, Exhibit or Schedule such reference shall be to a Section of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". Any matter disclosed in any section of the Company Disclosure Letter shall be deemed disclosed only for the purposes of the specific Sections of this Agreement to which such section relates.

SECTION 9.05. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

SECTION 9.06. Counterparts. This Agreement may be executed in one or more counterparts, all of which shall

be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

SECTION 9.07.   Entire Agreement; No Third-Party Beneficiaries.   The Transaction Agreements, taken together with the Company Disclosure Letter and the Conopco Disclosure Letter, (a) constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the Transactions, and (b) except for the provisions of Article II and Sections 6.04(a), 6.05, 6.06, 6.15, 6.16 and 6.18 are not intended to confer upon any person other than the parties any rights or remedies.  The provisions of Section 6.04(a) are enforceable by the holders of the Company Stock Options.  The provisions of Section 6.05(a) are enforceable by the parties to those agreements referred to in Section 6.05(a).   The provisions of Sections 6.05(b), 6.05(c), 6.05(d), 6.16 and 6.18 are enforceable by Henry Morgan and Jeffrey Furman acting jointly.  Conopco shall reimburse the reasonable legal fees and expenses of Henry Morgan and Jeff Furman in bringing any litigation, or taking any other action, in good faith to enforce the third-party beneficiary rights granted to them under this Section 9.07. The provisions of Section 6.06 are enforceable by the directors and officers referred to in Section 6.06.  Until such time as the Company Board is constituted in accordance with Section 6.14(a), the provisions of Section 6.14(a) are enforceable by any individual who is a member of the Company Board at the date of this Agreement.  Thereafter, (i) the provisions of Section 6.14(a) relating to the removal of directors may be enforced by any individual who was a member of the Company Board immediately prior to the alleged breach of Section 6.14(a) and (ii) the provisions of Section 6.14(a) relating to the appointment of a director may be enforced by any individual who was a member of the Company Board immediately prior to the alleged breach of Section 6.14(a) or by any individual nominated for appointment in accordance with the provisions of Section 6.14(a) but not so appointed by the Surviving Corporation.  The provisions of Section 6.15 are enforceable by the Foundation.

SECTION 9.08.  **GOVERNING LAW.  THIS AGREEMENT AND ANY DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS THEREOF, EXCEPT TO THE EXTENT THE LAWS OF THE STATE OF VERMONT ARE MANDATORILY APPLICABLE TO THE MERGER.**

SECTION 9.09. <u>Assignment.</u> Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by opera- tion of law or otherwise by any of the parties without the prior written consent of the other parties except that Sub may assign, in its sole discretion, any of or all its rights, interests and obligations under this Agreement to Conopco or to any direct or indirect wholly owned subsidiary of Conopco, but no such assignment shall relieve Sub of any of its obligations under this Agreement. Any purported assignment without such consent shall be void. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

SECTION 9.10. <u>Enforcement.</u> The parties agree that irreparable damage would occur in the event that any of the provisions of any Transaction Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of any Transaction Agreement and to enforce specifically the terms and provisions of each Transaction Agreement in any New York state court or any Federal court located in the State of New York, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any New York state court or any Federal court located in the State of New York in the event any dispute arises out of any Transaction Agreement or any Transaction, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that it will not bring any action relating to any Transaction Agreement or any Transaction in any court other than any New York state court or any Federal court sitting in the State of New York and (d) waives any right to trial by jury with respect to any action related to or arising out of any Transaction Agreement or any Transaction.

SECTION 9.11. <u>Separate Parties.</u> Each of the parties to this Agreement acknowledges and agrees that each party is responsible for its own performance of its obligations hereunder and that no other party shall be liable for a failure of another party to perform its obligations. Without limiting the foregoing, it is acknowledged by Conopco that no Ineligible Director is acting as a representative of the Company in connection with the Transaction Agreements or the Transactions and that any action or failure to act on the part of any Ineligible

66

Director shall not be deemed to be an action or failure to
act on the part of the Company, including under
Section 5.02, 6.07 or 8.01, except to the extent that such
Ineligible Director's action or failure to act is taken
under the instruction of, or with the cooperation or the
concurrence of, the Company Board.

IN WITNESS WHEREOF, Conopco, Sub and the Company
have duly executed this Agreement, all as of the date first
written above.

CONOPCO, INC.,

by

Name: Mart Laius
Title: Vice President

VERMONT ALL NATURAL EXPANSION
COMPANY,

by

Name: Mart Laius
Title: Vice President

BEN & JERRY'S HOMEMADE, INC.,

by

Name:
Title:

The undersigned, jointly entitled to enforce
Section 6.18 hereof, consent to the amendment of such
section, as required by Section 8.03 hereof.

_____        _____
Jeffrey Furman                               Henry Morgan

[NYCORP;1697238.1:4336D:07/04/00-12:23p]

Director shall not be deemed to be an action or failure to act on the part of the Company, including under Section 5.02, 6.07 or 8.01, except to the extent that such Ineligible Director's action or failure to act is taken under the instruction of, or with the cooperation or the concurrence of, the Company Board.

IN WITNESS WHEREOF, Conopco, Sub and the Company have duly executed this Agreement, all as of the date first written above.

CONOPCO, INC.,

by _____

Name:
Title:

VERMONT ALL NATURAL EXPANSION COMPANY,

by _____

Name:
Title:

BEN & JERRY'S HOMEMADE, INC.,

by _____

Name:
Title:   CEO

The undersigned, jointly entitled to enforce Section 6.18 hereof, consent to the amendment of such section, as required by Section 8.03 hereof.

_____          _____

Jeffrey Furman                       Henry Morgan

Director shall not be deemed to be an action or failure to act on the part of the Company, including under Section 5.02, 6.07 or 8.01, except to the extent that such Ineligible Director's action or failure to act is taken under the instruction of, or with the cooperation or the concurrence of, the Company Board.

IN WITNESS WHEREOF, Conopco, Sub and the Company have duly executed this Agreement, all as of the date first written above.

CONOPCO, INC.,

by _____

Name:
Title:

VERMONT ALL NATURAL EXPANSION COMPANY,

by _____

Name:
Title:

BEN & JERRY'S HOMEMADE, INC.,

by _____

Name:
Title:

The undersigned, jointly entitled to enforce Section 6.18 hereof, consent to the amendment of such section, as required by Section 8.03 hereof.

_____          _____
Jeffrey Furman                        Henry Morgan

{NYCORP;1097339.1:4536D:07/04/00-11:13p)

Director shall not be deemed to be an action or failure to act on the part of the Company, including under Section 5.02, 6.07 or 8.01, except to the extent that such Ineligible Director's action or failure to act is taken under the instruction of, or with the cooperation or the concurrence of, the Company Board.

IN WITNESS WHEREOF, Conopco, Sub and the Company have duly executed this Agreement, all as of the date first written above.

CONOPCO, INC.,

by _____
Name:
Title:

VERMONT ALL NATURAL EXPANSION COMPANY,

by _____
Name:
Title:

BEN & JERRY'S HOMEMADE, INC.,

by _____
Name:
Title:

The undersigned, jointly entitled to enforce Section 6.18 hereof, consent to the amendment of such section, as required by Section 8.03 hereof.

_____        _____
Jeffrey Furman                          Henry Morgan

[NYCORP;1097338.1:4336D:07/04/00-12:33p]

## ARTICLES OF INCORPORATION

### OF

### SURVIVING CORPORATION

### ARTICLE I

The name of the corporation (hereinafter called the "Corporation") is BEN & JERRY'S HOMEMADE, INC.

### ARTICLE II

The address of the Corporation's registered office in the State of Vermont is 148 College Street, Burlington, Vermont. The name of the registered agent at such address is The Corporation Trust Company.

### ARTICLE III

The Corporation has the following Mission Statement: We have a progressive, nonpartisan, social mission that seeks to meet human needs and eliminate injustices in our local, national and international communities by integrating these concerns into our business activities. Our focus is on children and families, and the environment.

- The gap between the rich and the poor is wide. We strive to create economic opportunities for those who have been denied them.

- Capitalism and the wealth it produces does not create opportunity for everyone equally. We practice caring capitalism by integrating concern for the disadvantaged in our day-to-day business activities, and by advancing new models of economic justice that can become sustainable and replicable.

- Manufacturing by definition creates waste. We strive to minimize our negative impact on the environment.

- The growing of food sometimes uses toxic chemicals. We support socially and environmentally sustainable methods of food production and family farming.

The U.S. continues to spend significantly more on its military each year than the combined spending on: child health, welfare, education, nutrition, housing, job training and environment. We seek and support nonviolent ways to achieve peace and justice.

We strive to manifest a deep respect for human beings inside and outside our Corporation and for the communities of which they live.

## ARTICLE IV

The total number of shares of all classes of stock that the Corporation shall have authority to issue is 10,000,000 shares of Common Stock having the par value of $0.01 per share.

## ARTICLE V

The number of directors of the Corporation shall be fixed from time to time by the Board of Directors of the Corporation.

## ARTICLE VI

In furtherance and not in limitation of the powers conferred upon it by law, the Board of Directors of the Corporation is expressly authorized to adopt, amend or repeal the By-laws of the Corporation.

## ARTICLE VII

Unless and except to the extent that the By-laws of the Corporation so require, the election of directors of the Corporation need not be by written ballot.

## ARTICLE VIII

To the fullest extent from time to time permitted by law, no director of the Corporation shall be personally liable to any extent to the Corporation or its shareholders

for monetary damages for breach of his fiduciary duty as a director.

## ARTICLE IX

Each person who is or was or had agreed to become a director or officer of the Corporation, and each such person who is or was serving or who had agreed to serve at the request of the Corporation as a director, officer, partner, member, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise (including the heirs, executor, administrators or estate of such person), shall be indemnified by the Corporation to the fullest extent permitted from time to time by applicable law.

## ARTICLE X

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Vermont Business Corporation Act.

## Form of Delegation of Authority

A.  Conopco and the Company Board retain authority with
    regard to the following matters, among others; as
    between Conopco and the Company Board the allocation of
    responsibility between them shall be as provided in
    Section 6.14:

    1.  Approval on an annual basis for the upcoming year
        of:

        a.  the Company's Strategic and Operating Plan to
            include: Marketing, Sales and Social Mission
        b.  the Financial Plan/Budget to include:
            Statement of Income, Balance Sheet and
            Statements of Cash Flows (including an
            Operating Budget, Statement of Projected
            Financial Positions, Balance Sheet and Flow
            of Funds Forecasts)
        c.  the Capital Expenditure Budget and Operating
            Lease Budget
        d.  the Company's draft and final audited
            financial statements
        e.  Trade Credit Policy: Conopco approval for
            Trade Credit extended to any customer in
            excess of $1 million

    2.  Selection of

        a.  Corporate Counsel
        b.  Independent Auditors

    2.1.  Approval of

        a.  the principal Banking Institution(s) with
            which the Company maintains deposit,
            borrowing or other relationships
        c.  any Investment Banking Institution
        d.  Public Relations and Advertising Agencies
        e.  Consultants with a contract value in excess
            of $175,000 or to whom payments are expected
            to exceed $175,000 in the aggregate
        f.  any insurance agent, broker or similar party

    3.  Any transaction involving

        a.  the sale or encumbrance of assets with a book
            value over $100,000
        b.  the sale of stock or assets of a subsidiary
        c.  the acquisition of stock or assets of another
            company

d. loans in excess of $30,000 made outside the ordinary course of business not to exceed $150,000 outstanding at any time

e. a single purchase of Inventory in excess of $5 million or any opening of Letters of Credit in excess of $2 million (in the aggregate of excess over and above $2 million or singular opening of Letter of Credit above $2 million)

f. transactions with any parties related to any officer of the Company

g. the sale or purchase of the Company's capital stock

h. the declaration and payment of dividends

i. the approval of any other contract (including all real property leases, joint venture, partnership or similar contracts with vendors) with a value in excess of $250,000 per year with terms not to exceed five years or any other non-ordinary course payment or purchase orders (including the settlement of litigation claims involving payments by the Company) in excess of $250,000

4. Total compensation (including Bonuses) of any employees at or above the level of Officer and/or any other employees exceeding $200,000 annually.

5. Employment termination or appointments of any employee with a base salary at or above $200,000.

6. Any change in employee benefit plans with an annual aggregate cost increase in excess of $300,000.

7. Any amendments of the By-laws of the Company.

8. Any amendment or alteration of the borrowing authority of the Company or renegotiation, prepayment of or amendment to any lending arrangement.

9. Approval of authorized signatures and signing authorities on all bank accounts for check signing, money transfer authorities, etc.

10. The delegation of authority to individuals other than officers (e.g., buyers) of the Company to execute contracts or other agreements on behalf of the Company.

11. Any amendment or new collective bargaining or other labor agreements.

12. all matters not covered by the delegation in B and any matters requiring, as a matter of law, a specific vote of the Board of Directors in addition to the votes establishing the below delegation.

B. The Surviving Corporation delegates to the Chief Executive Officer the authority to set upon the following matters with the required written concurrence of the Chief Financial Officer:

1. Capital Expenditures within the Capital Budget up to $700,000 per project; provided, that the total value of capital expenditures does not exceed the amount authorized in the Budget.

2. Capital Expenditures not in the Capital Budget up to $350,000 per project, but not over $750,000 in the aggregate. In no event will total capital expenditures exceed the total value of capital expenditures authorized in the Capital Budget.

3. Disposal or encumbrance of assets with a book or fair market value of no more than $150,000 per transaction.

4. Operating Leases within Operating Lease Budget up to a total commitment of $500,000 per transaction.

5. Operating Leases not in Operating Lease Budget, with a total commitment of $150,000 per year in total commitment per lease with a term not to exceed five years, but not over $450,000 annually in the aggregate.

6. Administration of the details of the Company's Compensation Program (applying its general compensation philosophy as previously developed) for all employees (other than those covered in A.3 above).

7. Administration of the Employees Benefit Program, including approval of changes with an aggregate annual cost up to $300,000.

8. a. Execution of contracts within the ordinary course with an individual value of up to

$500,000 that do not require special approval by A.3 above.

b.   Other non-ordinary payments in an amount up to $150,000 that also do not require special approval by A.3 above.

C.   Conopco and the Surviving Corporation will be provided with a comprehensive review of the following matters by the Chief Executive Officer, or other members of the management on a regular basis, or more often if issues create the need:

1.   As soon as practical:

a.   Status of material tax matters as they arise.
b.   Status of material legal matters as they arise.
c.   Any material change in vendor relations.
d.   Any material change in the operating or financial performance of the Company.
e.   Any contact made by potential buyers who may be interested in purchasing the Company and/or its assets.
f.   Notices of default or acceleration under loan agreements, notes or significant contract.

2.   Monthly:

a.   Financial and operating results, including managements analysis in writing
b.   Update/reconciliation of actual vs. budgeted Capital expenditures.

3.   Quarterly:

a.   Status of legal matters
b.   Competition update
c.   Information systems
d.   Report on all banking relationships
e.   Product Quality

4.   Annually:

a.   Independent accountant management letters
b.   Other tax matters
c.   Officers salary, bonus and wages adjustment recommendations
d.   Property/Casualty and employee benefit insurance programs
e.   Advertising and Public Relations programs

f.   Officer performance appraisals
g.   Union relationships

## Schedule 6.14

### Ben & Jerry's Social Mission Priorities

The following list contains certain Social Mission
Priorities of the Company as of the date hereof.  Following
each priority is an example of the Company's current
activities and views.

1.  *Continue packaging improvement efforts with the*
    *ultimate objective of achieving a compostable pint.*

    Early in 1999 the Company launched the eco-pint.  The
    Company has transitioned one-third of its pint
    packaging to "unbleached" kraft paper with a nontoxic
    coating on the outside.  With paper bleaching being one
    of the largest causes of dioxins and toxic water
    pollution in the United States this initiative is a
    step in the right direction.  The packaging, which is
    brown inside has been well received.  The Company will
    continue to seek to create the economic and market
    conditions for suppliers to cost effectively produce
    this packaging.  Efforts will also continue to research
    other technologies to achieve a fully compostable
    package (e.g., starch based packaging, alterative glues
    and inks).

2.  *Continue the ongoing compliance with CERES principles*
    *and efforts toward creation of a sustainability*
    *"footprint" for the business.*

    The Company was the first public company to adopt the
    CERES principles ("Coalition for Environmentally
    Responsible Economies").  It has filed an annual,
    public environmental report with CERES.  At the present
    time the Company is reviewing CERES compliance with our
    manufacturing operations in Canada and Israel.

    The Company is engaged in a process of documenting its
    environmental "footprint".  Simply stated, this is a
    process of analyzing hat we take, what we make, and
    what we waste.  We have a strong environmental ethic
    across the Company that will continue to be encouraged
    and supported.  Specific and continual improvement
    goals in wastewater, solid waste and energy use
    reduction are a regular part of our annual planning
    process.  We compost dairy waste, recycle shrink wrap
    and cardboard and recently initiated an innovative
    program with a few of our suppliers to receive
    ingredients in returnable totes.

## 3.   *Continue sustainable agriculture efforts.*

We define sustainable agriculture as a continuum of
agricultural production practices that meet the
objectives of reducing environmental degradation,
maintaining the productivity of the land over time and
promoting economic viability for the farm and rural
communities.

We have determined that as a food business, reliant on
dairy farming, our priority must be to reduce adverse
impacts on water from farm run-off.  Struck by the
polar debate between outmoded, traditional farming
methods on one end and organic farming on the other, we
have launched an innovative project to provide greater
sustainability gains at the farm level, especially
through reduced phosphorous and nitrogen run-off,
through a Whole Farm Nutrient Management Program.  We
are using a model developed at Cornell University that
has proven to yield both environmental and economic
gains.  Planning for a pilot project with the
St. Albans Cooperative, Cornell University, the
University of Vermont and the State Agriculture
Department is underway.

## 4.   *Continue the long-term relationship with the St. Albans Cooperative.*

All our milk and cream is provided by the 500+ family
farm members of the St. Albans Cooperative.  Vermont
has been losing dairy farms at an alarming rate.
Farming is a cornerstone of the Vermont economy.  Many
of the farms of the St. Albans Cooperative surround
St. Albans Bay, an environmentally fragile part of Lake
Champlain.

## 5.   *Continue the brand's position of opposing the use of rBGH and continue the "We oppose rBGH" pledge and premium.*

The Company opposes the use of rBGH (recombinant bovine
growth hormone) which is injected in cows to increase
milk production.  With no shortage in the milk supply,
rBGH is in our view a biotechnological solution to a
problem that does not exist.  In addition, as the
manufacturer's production information notes rBGH causes
increased mastitis and other health problems for cows.

When the FDA approved rBGH they allowed voluntary
labeling but left the issue of a labeling standard and
decision to the states.  Our label says:  "We oppose

recombinant bovine growth hormone. The family farmers who supply our milk and cream pledge not to treat their cows with rBGH. The FDA has said no significant difference has been shown and no test can distinguish between milk from rBGH treated and untreated cows." Despite our use of the FDA disclaimer, four states refused our label (Illinois, Nevada, Hawaii and Oklahoma). Because we felt strongly that our customers had a right to know how our products are produced and because we were making a truthful statement on our label, we brought a First Amendment commercial free speech lawsuit against the State of Illinois. This suit was eventually settled in our favor, and we have carried the above-noted label on our products since 1997.

6. **Support the brand's position to have GMO free products available.**

We believe being GMO free is consistent with our brand image and values. We have been following the backlash against GMO food that is occurring around the world and view this as much as a political movement as a scientific one. We believe there should be more public input into GMO food policy issues, and impacts on ecosystems need to be more fully studied. We also recognize that biotechnology could be used to help feed desolate parts of the world. We are working on reformulating an alternative sourcing for potential GMO corn or soy ingredients in our products starting with products for international markets. Consistent with our activities around rBGH, we support labeling and consumers right to know how their food is produced.

7. **Continue to expand and support the Company's unique PartnerShop Program.**

We have eight existing PartnerShops. We intend to greatly expand this program under which Ben & Jerry's ScoopShops are owned and operated by nonprofits. In general, the model works best with programs that serve youth. The most celebrated of our stores is the PartnerShop in Times Square. It is owned and operated by Common Ground, a New York City nonprofit organization focused on housing and training for people without homes or needing support. The store played a role in the renovation of Times Square to a more family friendly neighborhood and has been featured on "60 Minutes" and in numerous other media outlets. In the PartnerShop Program the Company waives the

franchise fee and allocates more staffing and resources.

**8.   *Continuation of innovative purchasing relationships as well as consideration of further development of sourcing relationships consistent with our social mission and goals.***

We have used procurement and licensing agreements to further social and environmental goals.  Since 1988, the Greyston Bakery in Yonkers, New York, has been a supplier of brownies.  The bakery is owned by the Greyston Foundation, a provider of numerous social services in Yonkers, New York.  These include housing for homeless people and for people with AIDS, day care and work programs.  We are consulting with the bakery in the relocation and expansion of its operating facility and in developing additional customers for its products.  Aztec Harvest Cooperative, a worker-owned cooperative, provides our coffee extract.  In conjunction with our vanilla supplier, the Virginia Dare Company, we use a blended vanilla extract that includes vanilla beans from a Costa Rican organization that works on rain forest renewal.  In addition to other social and environmental usefulness, these relationships usually create stories that enhance the brand image of the Company.

We also see licensing as an opportunity to fulfill a social purpose.  For example, we pay a licensing fee to the band Phish for Phish Food with the fee directed to a foundation that supports projects to cleanup Lake Champlain.  We seek to source both licensed and other products that we sell in our stores in a socially responsible manner.

**9.   *Provide ongoing support for Partnerships with Non-profits.***

In the past we have worked with The Children's Defense Fund and Greenpeace.  We tend to work with groups that are not likely corporate partners whose focus is on issues of environmental degradation or social injustice and poverty.

**10.   *Continue ongoing contribution for philanthropy and support for site community projects.***

The Company currently donates a portion of its pre-tax profits through employee-led philanthropy to non-profit organizations committed to positive social change.

This contribution was $1.1 million in the aggregate in 1999.

11. *Continue the Social Audit/Assessment and Reporting.*

The Company sets annual social mission goals as part of the annual planning process and conducts a social audit around its performance. The audit is completed internally with an outside auditor retained to review and report on results. The complete social performance assessment is published in our annual report. We have for the past 11 years conducted social performance assessments.

**Addendum**

The following list contains certain further aims. It is the current intention of Conopco, subject to economic viability, to conduct the business of the Surviving Corporation in a manner consistent with the following aims. Economic viability shall be as mutually agreed in good faith by the Company Board and Conopco.

(i) significant women and minority representation on the Company Board;

(ii) affirmative programs to identify and provide technical assistance to vendors owned by minorities and indigenous peoples;

(iii) affirmative programs to identify and to provide financial and technical assistance to vendors which give priority to a social change mission;

(iv) the expansion of the number of PartnerShops and franchises owned by women, minorities and indigenous peoples;

(v) the Company's headquarters and primary production facilities remaining in Vermont;

(vi) the purchase of non-RBGH milk and cream primarily from Vermont farms;

(vii) the use of unbleached and recyclable packaging, to the extent available at commercially reasonable prices;

(viii) the purchase of key commodities (such as vanilla, coffee and cocoa) according to fair trade

practices, to the extent available at commercially reasonable prices; and

(ix)    the continued advocation of positive social changes on packaging, such as non-partisan campaign finance reform, national budget priorities, sustainable energy etc.