**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| BEN & JERRY'S HOMEMADE, INC. and CLASS I DIRECTORS OF BEN & JERRY'S INDEPENDENT BOARD, | ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| UNILEVER PLC and CONOPCO, INC., | ) ) |
| *Defendants.* | ) ) |

Case No.: 24-cv-8641 (PKC)

_____

**MEMORANDUM OF LAW IN SUPPORT OF**
**UNILEVER PLC'S AND CONOPCO, INC.'S MOTION TO DISMISS PLAINTIFFS'**
**<u>SECOND AMENDED COMPLAINT</u>**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Defendants*
*Unilever PLC and Conopco, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS ....................................................................................5

A.    The Merger Agreement And Shareholders Agreement Memorialize Unilever's Acquisition Of Ben & Jerry's ...................................................................5

B.    The Parties Reach, Then Amend, A Settlement Agreement...............................8

C.    The Class I Directors Propose Controversial Organizations For Donations ...................10

D.    The Class I Directors Unilaterally Pursue A Reckless Public Relations Strategy............12

E.    The Class I Directors Reject Unilever's Efforts To Engage In Good Faith Consultation Related To B&J's CEO ................................................................14

PROCEDURAL HISTORY....................................................................................15

LEGAL STANDARD...........................................................................................15

ARGUMENT .....................................................................................................16

A.    The Class I Directors Lack Authority To Sue In The Name Of Ben & Jerry's................17

B.    Several of Plaintiffs' Claims Do Not Present Justiciable Controversies .........................19

    i.    Plaintiffs Claim Regarding the Payments to CFT is Moot .....................................19

    ii.    Claims Regarding the Removal of B&J's CEO Are Moot and Fail to State a Claim ...............................................................20

    iii.    Declaratory Relief Regarding the Contemplated Spin-Off Would Amount to an Advisory Opinion...............................................21

C.    The Breach Of Contract Claim Should Be Dismissed Because Plaintiffs Fail To Allege They Have Suffered Damages................................................................22

D.    In The Alternative, The Court Should Dismiss Count II As Duplicative Or Defective ......................................................................24

CONCLUSION..................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Admiral Ins. Co. v. Niagara Transformer Corp.*,
  57 F.4th 85 (2d Cir. 2023) .................................................................................25

*Aetna Life Ins. Co. v. Haworth*,
  300 U.S. 227 (1937).......................................................................................21

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013).........................................................................15, 19, 20, 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................16

*Ashcroft v. Mattis*,
  431 U.S. 171 (1977)....................................................................................21, 22

*Anthem, Inc. v. Express Scripts, Inc*,
  2024 WL 4635233 (2d Cir. Oct. 31, 2024)................................................21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................16

*Brokamp v. James*,
  66 F. 4th 374 (2d Cir. 2023) ......................................................................15

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)........................................................................7

*Charles Schwab & Co. v. Retrophin, Inc.*,
  2015 WL 5729498 (S.D.N.Y. Sept. 30, 2015).......................................10

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
  587 F. Supp. 3d 56 (S.D.N.Y. 2022) ........................................................8

*Dane v. UnitedHealthcare Ins. Co.*,
  974 F.3d 183 (2d Cir. 2020).......................................................................16

*Doyle v. Midland Credit Mgmt., Inc.*,
  722 F.3d 78 (2d Cir. 2013) ................................................................19, 20, 22

*Edwards v. Sequoia Fund, Inc.*,
  938 F.3d 8 (2d Cir. 2019) ...........................................................................22

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
  309 F. Supp. 3d 89 (S.D.N.Y. 2018)......................................................................24

*Farrakhan v. Anti-Defamation League*,
  2025 WL 24066 (2d Cir. Jan. 3, 2025) ................................................................25

*In re George Washington Bridge Bus Station Dev. Venture LLC*,
  65 F.4th 43 (2d Cir. 2023) ..................................................................................18

*Gordon v. Dino De Laurentiis Corp.*,
  529 N.Y.S.2d 777 (N.Y. App. Div. 1988) ......................................................23, 24

*Golden v. Zwickler*,
  394 U.S. 103 (1969).............................................................................................16

*House of Eur. Funding I, Ltd. v. Wells Fargo Bank, N.A.*,
  2014 WL 1383703 (S.D.N.Y. Mar. 31, 2014) .......................................................23

*Jujamcyn Theaters LLC v. Fed. Ins. Co.*,
  659 F. Supp. 3d 372 (S.D.N.Y. 2023)...................................................................24

*Keitt v. New York City*,
  882 F. Supp. 2d 412 (S.D.N.Y. 2011)...................................................................20

*Law Debenture Tr. Co. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010).................................................................................18

*Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*,
  651 N.Y.S.2d 490 (N.Y. App. Div 1996) ..............................................................22

*Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*,
  52 F. Supp. 3d 601 (S.D.N.Y. 2014).....................................................................22

*Murphy v. Hunt*,
  455 U.S. 478 (1982).............................................................................................19

*Palm Beach Strategic Income, LP v. Salzman*,
  457 F. App'x 40 (2d Cir. 2012) ............................................................................18

*Quadrant Structured Prods. Co. v. Vertin*,
  992 N.Y.S.2d 687 (2014) .....................................................................................18

*Russman v. Bd. of Educ.*,
  260 F.3d 114 (2d Cir. 2001).............................................................................19, 20

*Solutia Inc. v. FMC Corp.*,
  385 F. Supp. 2d 324 (S.D.N.Y. 2005)...................................................................18

*Sternkopf v. White Plains Hosp.*,
    2015 WL 5692183 (S.D.N.Y. Sept. 25, 2015)...........................................................................10

*Williams v. Hernandez*,
    2006 WL 156411 (S.D.N.Y. Jan. 18, 2006) ................................................................16, 22

*Zhang v. Schlatter*,
    2013 WL 12618757 (S.D.N.Y. Mar. 13, 2013), *aff'd* 557 F. App'x 9 (2d Cir.
    2014) ...........................................................................................................................18

**Statutes**

11A V.S.A. § 20.09............................................................................................................5, 17

N.Y. Bus. Corp. Law § 626(a) ...............................................................................................18

**Rules**

Fed. R. Civ. P. 12(b)(1)..............................................................................15, 16, 19, 20, 22, 25

Fed. R. Civ. P. 12(b)(6)......................................................................................................16, 25

**Other Authorities**

F. Hodge O'Neal et al., 1 Close Corp and LLCs: Law and Practice § 3:18 (Rev.
    3d ed.) (Nov. 2024) .........................................................................................................17

## PRELIMINARY STATEMENT

Unilever fully supports Ben & Jerry's ("**B&J**") social mission, which is an integral part of the B&J brand. It is one of the core reasons why, when Unilever[1] acquired the company, it agreed to preserve this unique character by creating a limited purpose board of directors (the "**Board**") with primary responsibility over the social mission and brand integrity of B&J. The Merger Agreement[2] makes clear that B&J's social mission is nonpartisan, and nothing in the Agreement gives the Board the unfettered right to advocate on any topic it wants on behalf of B&J or to embroil B&J and Unilever in highly controversial and divisive topics that put the businesses and their employees at risk.

For more than two decades, Unilever worked with the Class I Directors of the B&J Board of Directors (the "**Class I Directors**") to advance B&J's social mission by supporting causes such as LGBTQ+ rights, campaign finance reform, climate change, Black Lives Matter, and GMO labelling. In recent years, however, the Class I Directors have chosen to recklessly focus on the Israeli-Palestinian conflict, taking a staunchly pro-Palestinian, anti-Israel stance and thereby embroiling B&J and Unilever in one of the most polarizing issues of our time.

This change in course, driven by B&J Chair Anuradha Mittal, began in 2021, with the Board's decision to stop selling B&J ice cream in the West Bank. That decision came with severe consequences for both Unilever and B&J. Following the announcement, many states declared that Unilever was in violation of their anti-boycott, divestment, and sanctions ("**anti-BDS**") laws, leading to the divestment of hundreds of millions of dollars in Unilever's stock, accusations of antisemitism, disqualification from contracts, and severe sanctions. Unilever also became

---

[1] Conopco, Inc. ("**Conopco**") is the sole shareholder of B&J. Conopco is an indirect subsidiary of Unilever PLC. Together, Conopco and Unilever PLC will be referred to herein as "**Unilever**."

[2] The Merger Agreement is the agreement pursuant to which Conopco acquired B&J.

entangled in multiple lawsuits in the United States and Israel.[3] Faced with a legal and public relations crisis, Unilever ultimately sold its intellectual property rights to its Israeli distributor, who thereafter continued to sell B&J ice cream (under the Hebrew and Arabic languages) in Israel and the West Bank. This led to a lawsuit by the Class I Directors, and eventually a Settlement Agreement that resolved that suit and is at issue in this dispute. Unilever, however, continues to suffer the consequences of the Board's decision. As two examples, B&J and/or Unilever remain on at least nine states' anti-BDS black lists and Indonesia has issued a "fatwah" on Unilever.

The Class I Directors, on the other hand, face no consequences for their controversial decisions because they are self-appointed and self-perpetuating members of the Board. Their most recent decision to publicize the confidential discussions between Unilever and the Class I Directors regarding the future of B&J Chief Executive Officer David Stever is just one example of the Class I Directors advancing their own agendas notwithstanding the damage it may cause to others.

In the Second Amended Complaint ("**SAC**"), the Class I Directors repeat the same defective claims they asserted in their previous two complaints—that Unilever allegedly breached the terms of the Settlement Agreement by: (i) unreasonably withholding consent to donate funds to two controversial organizations, Jewish Voice for Peace and CAIR-SF; (ii) "muzzling" the Class I Directors when they sought to issue one-sided or partisan public statements about controversial political issues; and (iii) failing to make payments to an almond collective, Canaan Fair Trade ("**CFT**"), and report such payments to the Class I Directors. In its SAC, the Class I Directors add two new claims, neither of which fare any better: that Unilever allegedly (iv) threatened to remove former B&J's CEO Dave Stever for his support of the social mission and did so without consulting the Class I Directors in good faith; and (v) threatened to dismantle

---

[3] *See, e.g.*, Sarah Butler, *Unilever sells off Ben & Jerry's in Israel to avoid West Bank row*, Guardian (June 29, 2022), https://www.theguardian.com/business/2022/jun/29/unilever-sells-off-ben-jerrys-in-israel-to-avoid-west-bank-row.

and/or curb the rights and responsibilities of the Board during the planned separation of Unilever's ice cream business into a separate, publicly traded stand-alone company (the **"Spin-Off"**).

The Class I Directors' new allegations concerning Stever are demonstrably false and their claim about what might happen in the future in connection with the Spin-Off is clearly not ripe. As for Stever, Unilever advised the Class I Directors that it was reevaluating his future as CEO, along with the majority of leaders across its ice cream business, because of the Spin-Off, not social mission. In fact, Unilever offered Stever a more prominent role in the larger global ice cream business and a pay increase to go along with the expanded job scope. Stever, however, declined that role and elected to step down from B&J instead. The SAC also acknowledges that Unilever did—in fact—attempt to consult in good faith with the Board to discuss Stever's future. *See* SAC ¶¶ 44-45. And, rather than consulting with Unilever about Stever's future (which the Class I Directors declined to do for several weeks), Mittal went to the press with statements that Unilever had fired Stever even though she knew that to be false. Mittal used the press to air confidential employment discussions to further her own agenda rather than work with Unilever in good faith. Since the filing of the SAC, Mittal provided interviews to no fewer than three publications,[4] and her lawyer an additional three,[5] reiterating the same false narrative alleged in the SAC.[6]

---

[4] *See e.g.* Exhibit A, Mar. 18, 2025 Financial Times; Sarah Butler, *Ben & Jerry's claims Unilever ousted its CEO for his progressive stance,* Guardian (Mar. 19, 2025), https://www.theguardian.com/business/2025/mar/19/ben-jerrys-unilever-ceo-ince-cream-david-stever; Habib Sabet; *Ben & Jerry's claims parent company fired CEO over brand's progressive activism*, VT Digger (Mar.19, 2025), https://vtdigger.org/2025/03/19/ben-jerrys-claims-parent-company-fired-ceo-over-brands-progressive-activism/.

[5] *See e.g.* Yi-Jin Yu, *Ben & Jerry's says CEO ousted by parent company Unilever over political stances*, ABC News (Mar. 19, 2025), https://abcnews.go.com/GMA/News/ben-jerrys-ceo-ousted-parent-company-unilever-political/story?id=119952204; Jonathan Stempel & Jessica DiNapoli, *Ben & Jerry's says Unilever ousting ice cream maker's CEO over social activism*, Reuters (Mar. 19, 2025), https://www.reuters.com/business/retail-consumer/ben-jerrys-says-parent-unilever-decided-oust-ice-cream-makers-ceo-2025-03-18/; Natasha Khan, *Ben & Jerry's Co-Founder Calls on Unilever to 'Set Us Free'*, Wall St. J. (Apr. 2, 2025), https://www.wsj.com/business/ben-and-jerrys-unilever-social-activism-a08715b6.

[6] For example, Mittal was quoted in the Financial Times as saying: "What Dave hasn't done is what Unilever would like him to do, which is to oversee the dismantling of Ben & Jerry's mission, progressive values and the 2000 merger

The claims asserted in the SAC are defective and should be dismissed. ***First***, the Class I Directors serve on a Board with limited rights specifically allocated to them under the operative agreements. The Merger Agreement and the Shareholders Agreement, under which B&J affairs are managed, expressly limit the purview of the Class I Directors' to B&J's social mission and brand integrity and delegate *everything else*, including authority to bring lawsuits on behalf of B&J, to Conopco and the CEO. Likewise, nothing in the Settlement Agreement allows the Class I Directors to bring claims on behalf of B&J. Simply put, in this case by both law and contract, the Class I Directors are not B&J, do not control B&J, and cannot sue as if they are B&J. Accordingly, the claims brought in the name of B&J should be dismissed with prejudice.

***Second***, Plaintiffs fail to plead damages from Unilever's alleged breaches. While Plaintiffs make the conclusory assertion that they suffered harm, they fail to allege any facts explaining *how* they have been harmed. Thus, Plaintiffs' breach of contract claim should be dismissed. If the breach of contract claim survives, Plaintiffs' declaratory judgment claim as it relates to the charitable donations and purported censorship should be dismissed as duplicative of the breach of contract claim. And, irrespective of whether the breach of contract claim survives, Plaintiffs' declaratory judgment claim as it pertains to censorship should be dismissed because the Board is not empowered to embroil B&J in any issue it wishes, nor would a declaratory judgement serve any useful purpose as it relates to past statements that Plaintiffs made public in the press in any event.

***Third***, Unilever has, to date, fully complied with its obligations under the Settlement Agreement to purchase almonds from CFT. Accordingly, Plaintiffs' declaratory judgment claim as to Unilever's obligations to purchase almonds from CFT should be dismissed as moot.

---

agreement that has protected Ben & Jerry's position as a wholly owned autonomous subsidiary." Ex. A, Mar. 18, 2025 Financial Times Article.

**Fourth,** the Class I Directors' claim for a declaratory judgment that Unilever may not remove B&J's CEO for his support of the social mission and must consult with the Class I Directors in good faith prior to his removal is moot because Stever voluntarily resigned from B&J on March 31, 2025. In any event, the Class I Directors fail to state a claim because Unilever tried repeatedly to consult in good faith with the Class I Directors as required by the Merger Agreement prior to Stever's resignation, but the Class I Directors refused to engage and instead revealed a confidential personnel discussion to the media.

**Fifth,** Plaintiffs' claim for a declaratory judgment precluding Unilever from altering the Board or its responsibilities in connection with the Spin-Off seeks an extra-judicial advisory opinion and must be dismissed.

In sum, it is clear that this lawsuit was just a vehicle for Mittal to go to the press with a false narrative to further her own agenda and denigrate Unilever, not to assert legitimate claims. The SAC should be dismissed in its entirety with one narrow exception – Plaintiffs' declaratory judgment claim as to whether Unilever unreasonably withheld its consent to donating money to Jewish Voice for Peace and CAIR-SF under the parties' Settlement Agreement. The parties litigated this same issue just last year in connection with two other controversial organizations proposed by Mittal, and the Plaintiffs lost. Unilever is confident that based on the principles set forth in that decision it will prevail on this claim again, rendering the entire SAC without merit.

## STATEMENT OF FACTS

### A.     The Merger Agreement And Shareholders Agreement Memorialize Unilever's Acquisition Of Ben & Jerry's

B&J is a close corporation incorporated under Vermont law, which allows the shareholder of B&J to restrict the discretion or powers of the Board or to eliminate the Board entirely. *See* 11A V.S.A. § 20.09. Under the Merger Agreement and Shareholders Agreement, Conopco, the sole

shareholder of B&J, explicitly limited the Board's powers to social mission and brand integrity issues.

Specifically, pursuant to the Merger Agreement between Conopco, B&J, and Vermont All Natural Expansion Company (a Conopco holding company), dated July 5, 2000 (the "**Merger Agreement**"), Conopco delegated to the Board:

> primary responsibility for preserving and enhancing the objectives of the historical social mission of the Company as they may evolve from time to time consistent therewith ('Social Mission Priorities') . . . [and] safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name (the 'Essential Integrity of the Brand').

*See* ECF No. 50-7 (Merger Agreement) § 6.14(e), (f); *see also id.* at Schedule 6.14.[7] Conopco otherwise retained, and delegated to the CEO, the responsibility to "manage the affairs of the Company," and Conopco retained "primary responsibility for the financial and operational aspects of [B&J] and the other aspects of [B&J] not allocated to the Company Board." *Id.* §§ 6.14(b), (j).

The Merger Agreement also provides that "[d]ecisions with respect to the appointment, compensation and removal of [B&J's] CEO **shall be made by Conopco** after good faith consultation with" an "Appointment Committee" comprised of two Board members. *Id* § 6.14(c) (emphasis added). While Conopco is required to consult in good faith with the Class I Directors, it retains sole discretion under the Merger Agreement to appoint, compensate, and remove the B&J's CEO.

The Class I Directors are not a party to the Merger Agreement, which expressly limits when third parties have the right to enforce certain of its provisions. The Merger Agreement gives the Board certain limited rights only to enforce one subsection of particular section not at issue here,

---

[7] Schedule 6.14 of the Merger Agreement lists B&J Social Mission Priorities, which include, among other aims: a sustainable "footprint" for the business; opposing the use of certain chemicals in its products; and pursuing and maintaining relationships with local social services nonprofits. Notably, none of these priorities extend to global conflicts (or conflicts generally), like the Israeli-Palestinian conflict.

Section 6.14(a), which pertains to the removal and appointment of directors. *See id.* § 9.07. Otherwise, the Merger Agreement makes clear that it is "not intended to confer upon any person other than the parties any rights or remedies." *Id*. It does not confer on the Board the right to enforce the provisions relating to Social Mission Priorities or Essential Integrity of the Brand, or the provisions relating to the appointment, compensation, or removal of B&J's CEO. *See id.*

Conopco and B&J also executed a Shareholders Agreement that prescribed the division of responsibilities among B&J, the Board, and Conopco. *See* Ex. B, Shareholders Agreement, dated August 3, 2000 ("**Shareholders Agreement**").[8] The Class I Directors are not a party to the Shareholders Agreement, either. Like the Merger Agreement, the Shareholders Agreement delegated to the Board the primary responsibility for "preserving and enhancing the objectives of the historical social mission of the Company as they may evolve from time to time consistent therewith" and "safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name." *Id.* §§ 1(e), (f). The Shareholders Agreement also makes clear that, "[i]n the exercise of powers and the management of the business and affairs of the Company, the Company Board shall have ***only*** those powers and functions expressly granted to it in this Agreement. All other powers and functions are reserved to the Shareholder." *Id.* § 1(a) (emphasis added); *see also id.* § 1(l). Like the Merger Agreement, the Shareholders Agreement provides limited rights to the Board to enforce certain provisions in the Articles of Incorporation relating to the removal and appointment of directors, not social mission, brand integrity, or the removal or appointment of B&J's CEO. *Id.* §§ 1(c), 4.

---

[8] The SAC explicitly refers to the Shareholders Agreement and Merger Agreement and includes the Merger Agreement as an attachment. *See, e.g.*, SAC ¶¶ 11, 54; ECF No. 50-7. Accordingly, each is properly considered in deciding a motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (a district court may consider documents attached to or incorporated by reference in a complaint).

**B.**     **The Parties Reach, Then Amend, A Settlement Agreement**

The Merger Agreement does not give the Class I Directors the right to make any public statement it wants in the name of B&J. Schedule 6.14 of the Agreement lists B&J's Social Mission Priorities and identifies initiatives that are relevant to B&J and its business, such as eco-friendly packaging and ingredients. *See* Merger Agreement, Schedule 6.14. Schedule 6.14 also sets forth certain social mission causes of B&J, which are external-facing and subject to economic viability, *i.e.*, "continued advocation of positive social changes **on packaging**." *Id.* (emphasis added). But nothing in Schedule 6.14 permits the Class I Directors to engage in social advocacy and issue public statements—on social media or otherwise—on any topic it chooses regardless of the consequences to B&J or Unilever. Nor did the Merger Agreement contemplate such an arrangement. The current dispute is the direct result of the Class I Directors' decision to wade into highly controversial topics, including the Israeli-Palestinian conflict, which has prompted protests, boycotts, and political unrest across the globe,[9] without any regard to the negative impact on both B&J and Unilever, a global brand sold in more than 190 countries.[10]

In July 2021, the Class I Directors announced that B&J would stop selling ice cream in the West Bank, allegedly to take a stance against Israeli settlements in the West Bank. *See* SAC ¶ 10. The Class I Directors claimed that it was "inconsistent with [B&J's] values for [B&J] product to be present within an internationally recognised illegal occupation."[11] The backlash was immediate.[12] The application of anti-BDS laws was one of many forms of nationwide and

---

[9] "A court may properly take judicial notice of the fact of press coverage on a motion to dismiss." *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 84 (S.D.N.Y. 2022) (Castel, J.).

[10] *See We are Unilever*, Unilever, https://www.unilever.com/our-company/#:~:text=We%20are%20Unilever, company%20with%20a%20global%20purpose (last visited Apr. 25, 2025).

[11] *Ben & Jerry's Will End Sales of Our Ice Cream in the Occupied Palestinian Territory*, Ben & Jerry's, https://www.benjerry.com/about-us/media-center/opt-statement (last visited Apr. 25, 2025).

[12] Luke Triess, *Ben & Jerry's Israel, parent company Unilever reach deal to end settlement boycott*, Times of Israel (June 29, 2022), https://www.timesofisrael.com/ben-jerrys-israel-parent-company-unilever-reach-deal-to-end-

international fallout.[13] To this day, Unilever and B&J remain on several states' anti-BDS lists, which has resulted in divestments from Unilever stock and embargos on contracting with state agencies and local governments.[14]

To manage the legal and public relations crisis that resulted from the Board's decision, in June 2022, Unilever sold B&J's intellectual property rights to its Israeli distributor, who agreed to continue sales of B&J ice cream in the West Bank. *See* SAC ¶ 11. Notwithstanding the turmoil and Unilever's efforts to ameliorate the backlash, the Class I Directors sued Unilever on July 5, 2022, alleging that this sale usurped their role as custodians of the B&J social mission and brand integrity. *See id.*; *see also* Amended Complaint ¶ 102, *Ben & Jerry's Homemade, Inc. v. Conopco, Inc. et al.,* Case No. 22-cv-05681-ALC (S.D.N.Y. Sept. 30, 2022), ECF No. 58.

Unilever and the Class I Directors resolved the 2022 lawsuit, agreeing to settle all claims in a Confidential Settlement and Release Agreement on December 13, 2022. *See* ECF No. 50-2 (as later amended, the "**Settlement Agreement**"). The Settlement Agreement provides that Unilever agrees to "[r]espect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity and agree[s] to work in good faith with the Independent Board to ensure that both are protected and furthered." *Id.* § 2(b). Unilever also agreed to source a portion of its non-dairy mix from CFT, an almonds collective in Palestine, subject to availability of supply, consumer safety, or quality concerns. *See*

---

settlement-boycott/; *see also* Gina Gambetta, *US States with BDS ban respond to Unilever's sale of Ben & Jerry's Israel*, Responsible Investor (June 30, 2022), https://responsible-investor.com/us-states-with-bds-bans-respond-to-unilevers-sale-of-ben-jerrys-israel/ (noting over 30 states discouraged support for the pro-Palestinian Boycott, Divestment and Sanctions Initiative).

[13] *See, e.g., City of St. Clair Shores Police & Fire Ret. Sys. v. Unilever Plc et al*, Case No. 22-05011 (S.D.N.Y. June 15, 2022);.*Paxton Joins Coalition to Stop Ben & Jerry's Boycott of Israel*, Attorney General of Texas (Nov. 22, 2021), https://www.texasattorneygeneral.gov/news/releases/paxton-joins-coalition-stop-ben-jerrys-boycott-israel.

[14] *See* Peter Castango, *NC prohibits investments in Ben & Jerry's for position on Israel*, Port City Daily (Dec. 27, 2023), https://portcitydaily.com/latest-news/2023/12/27/nc-prohibits-investments-in-ben-jerrys-for-position-on-israel/.

SAC ¶ 35; *see also* Settlement Agreement § 2(f). Finally, Unilever agreed to make two payments of $2.5 million to B&J—one each in 2023 and 2024—for subsequent disbursement to "humanitarian and human rights organizations" selected by the Chair of the Board, Anuradha Mittal, after good faith consultation with Unilever, with consent not to be "unreasonably withheld" by Unilever. Settlement Agreement § 2(g).

On August 30, 2023, Unilever and the Class I Directors agreed to amend the Settlement Agreement, under which Unilever agreed that it would directly, or through a third party, pay $2 million annually to CFT for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers) for at least ten years and confirm such payments with Mittal each quarter. *See* SAC ¶ 35.[15] In 2024, Unilever made the required payments to CFT and notified Mittal of those payments. *See* Ex. C, Jan. 2, 2025 Email Thread. Unilever has continued to provide Mittal with quarterly updates.

**C.**     **The Class I Directors Propose Controversial Organizations For Donations**

In 2023, Mittal designated the Institute for Middle East Understanding ("**IMEU**") and the United Nations Special Rapporteur on the Palestinian Territories Occupied Since 1967 (the "**Special Rapporteur**") as the organizations to receive Unilever's charitable donations under the Settlement Agreement. *See* Ex. D, Confidential Arbitration by Agreement Award, dated Mar. 27, 2024 ("**Arbitration Award**") at 3.[16] To avert further backlash and in an effort to avoid again becoming embroiled in controversy surrounding the Israeli-Palestinian conflict, Unilever exercised its discretion to withhold consent to donate the funds to the IMEU and the Special

---

[15] The evidence will show that the Board refused to allow B&J to adopt a new consumer-preferred, non-dairy mix that did not use almonds, unless Unilever agreed to make these payments to CFT.

[16] The Court may take judicial notice of the arbitration award "because it is an opinion issued in a prior proceeding." *Sternkopf v. White Plains Hosp.*, 2015 WL 5692183, at *5 (S.D.N.Y. Sept. 25, 2015); *see also Charles Schwab & Co. v. Retrophin, Inc.*, 2015 WL 5729498, at *6-7 (S.D.N.Y. Sept. 30, 2015) (same).

Rapporteur because the organizations had publicly accused Israel of genocide and are high-profile supporters of the movement to boycott, divest from, and sanction Israel (the "**BDS Movement**"). *Id.* at 3-6. After trying, but failing, to reach agreement, Unilever and the Class I Directors submitted the issue of whether Unilever reasonably withheld consent to the donations to an arbitrator pursuant to the terms of Section 2(g) of the Settlement Agreement. *See id.* On March 27, 2024, following a two-day hearing, the Honorable Christopher Droney, serving as the arbitrator, concluded that withholding consent to contribute money to the IMEU and the Special Rapporteur was a "reasonable decision[] by Unilever, based on objective evidence" such as concerns that Unilever would be perceived as "taking the side of the Palestinians" and "supporting the BDS movement against Israel," which would likely have a negative impact on business given its prior experience with the West Bank and the controversial and polarizing nature of the conflict. *Id.*

On June 7, 2024, Mittal notified Unilever that she selected Jewish Voice for Peace ("**JVP**") and the San Francisco-Bay Area chapter of the Council on American-Islamic Relations ("**CAIR-SF**") to receive Unilever's 2024 donations. *See* SAC ¶ 30. Unilever conducted diligence on the two organizations and, as it had with the IMEU and the Special Rapporteur, found that both JVP and CAIR-SF had made inflammatory comments about Israel and the Israeli-Palestinian conflict following Hamas's October 2023 attack on Israel, and have been highly critical of the United States Government's approach to the conflict. *See id.* ¶ 31.

On August 16, 2024, following the principles set forth in the prior arbitration ruling, Unilever responded with detailed objections to JVP and CAIR-SF and exercised its right to withhold consent to donate to the two organizations. *Id.* Unilever did not want to again be perceived as taking sides on the conflict in Gaza and/or associating itself with organizations that

made divisive comments about Israel or supported Hamas's attack on Israel and its abduction of hostages and thereby risk reigniting the backlash it had suffered through previously. *See id.*

**D.    The Class I Directors Unilaterally Pursue A Reckless Public Relations Strategy**

Plaintiffs also allege that Unilever has "silenced" the Class I Directors' efforts to maintain B&J's social mission and brand integrity by failing to approve the posting of certain one-sided and partisan public statements. *See* SAC ¶¶ 14-27. But the Class I Directors have hardly been silent.

**1. Ceasefire Statement:** Following the October 2023 Hamas attack, in December 2023, Unilever received a proposed public statement for B&J to issue, calling for "a permanent and immediate ceasefire" in Gaza. SAC ¶ 15. Unilever was willing to issue a statement, but reasonably insisted on a balanced post that not only called for a ceasefire but also condemned terrorism and called for the release of hostages—which would align with the position articulated by Pope Francis.[17] Although in the SAC the Class I Directors assert that their proposed ceasefire statement paralleled the Pope's, the Board refused to either condemn terrorism or call for the release of hostages in its statement calling for a ceasefire in Gaza, as the Pope had. Unilever indicated that without these points, it would not support issuance of the post. Nevertheless, on January 16, 2024, Mittal submitted a statement to the Financial Times for publication. *See* Ex. E, Jan. 16, 2025 Financial Times Article. No mention was made calling for hostages to be released or condemning terrorism. *See id.*

**2. Palestinian Refugees:** In May 2024, B&J social activism managers sought to issue a public statement calling for specific actions it wanted the British government to take regarding the resettlement of Palestinian refugees. *See* SAC ¶¶ 16-17. After Mittal inquired, Unilever's President of Ice Cream Peter ter Kulve responded on July 1, 2024, that Unilever was sensitive about issuing

---

[17] *See* Joseph Tulloch, *Pope renews appeal for immediate Gaza ceasefire*, Vatican News (Dec. 13, 2023), https://www.vaticannews.va/en/pope/news/2023-12/pope-francis-israel-palestine-no-to-weapons-yes-to-peace.html.

a statement at that time because Iranian forces had recently attacked Israel and because of the continued perception that anti-Israeli statements promoted antisemitism. *See id*. ¶ 19.

**3. Campus Protests:** Also in May 2024, B&J wanted to publish a social media post in support of students protesting the war in Gaza. *See id.* ¶ 20. Unilever raised reasonable concerns about the need to condemn the violence associated with the protests and support the rights of Jewish students as well. Less than one week later, the Class I Directors released a statement in support of campus protests, via Reuters, without addressing the primary concerns raised by Unilever.[18]

**4. Bernie Sanders Statement:** In September 2024, Mittal advised B&J's CEO Dave Stever that the Class I Directors intended to issue a statement in the name of B&J in support of Senator Bernie Sanders's proposed legislation blocking American aid to Israel. *See* SAC ¶¶ 21-22. After Unilever raised concerns, Mittal instead took to social media via the Oakland Institute, of which she is a founder and executive director, to support Senator Sanders's proposal.[19]

**5. President Trump:** Shortly before President Trump's inauguration in January 2025, the Class I Directors advised Unilever of a public statement that B&J intended to issue about President Trump. *See* SAC ¶¶ 24-25. Because of the partisan nature of the proposed statement, Unilever offered to work with the Board to craft an appropriate statement focused on substantive issues without personal attacks on President Trump. *See id.* ¶ 24. The Board declined.

**6. Mahmoud Khalil.** After a student activist from Columbia University was detained by U.S. Immigration and Customs Enforcement officials on March 8, 2025, in relation to certain pro-

---

[18] *See* Jessica DiNapoli, *Ben & Jerry's board say pro-Palestinian campus protests are 'essential' to democracy*, Reuters (May 13, 2024), https://www.reuters.com/business/ben-jerrys-board-says-pro-palestinian-campus-protests-are-essential-democracy-2024-05-13/.

[19] Oakland Institute, Facebook, (Nov. 19, 2024) https://www.Facebook.com/story.php?story_fbid=973875221439945&id=100064524288452&rdid=HPLVoeCWW966bchH; Oakland Institute, X (Sept. 24, 2024), https://x.com/oak_institute/status/1838622104666939657.

Palestinian protests that he had engaged in, the Class I Directors sought to issue a statement supporting the First Amendment right to free speech and peaceful protests and denouncing the student's detention. *See* SAC ¶ 50. Like with previous posts, Unilever did not block the post, but rather sought to work with the Board to issue a balanced statement in support of First Amendment rights while not appearing to take sides in the Israeli-Palestinian conflict.

The above episodes, which represent a tiny slice of the thousands of posts by the Board over the past number of years, reveal that the Class I Directors, far from being "silenced" in their pursuit of B&J's social mission as alleged, have issued public statements about the Israeli-Palestinian conflict notwithstanding Unilever's reasonable and prudent calls for balance. Unilever does not make these decisions lightly, as they consider a myriad of factors such as: geopolitical tensions, country-specific election advocacy laws, employee and customer safety, and public reception. Unilever's efforts, especially when circumvented by the Class I Directors, cannot serve as any grounds for relief.

**E.    The Class I Directors Reject Unilever's Efforts To Engage In Good Faith Consultation Related To B&J's CEO**

On March 3, 2025, Unilever contacted the Board to discuss the future of B&J's CEO and initiate the consultation process required under the Merger Agreement. *See* SAC ¶ 44. As Unilever advised the Board, Unilever was evaluating its entire leadership team across the ice cream business in preparation for the Spin-Off, and sought to consult with the Board regarding the future of Stever. The Class I Directors, however, refused to engage on a timely basis even after multiple requests and extensions by Unilever. Rather than consult in good faith, the Class I Directors filed their SAC and simultaneously went to the press falsely claiming that Unilever had removed Stever for his support of the social mission and collaboration with the Board. On March 31, 2025, three and half weeks after Unilever first initiated the consultation process with the Board, Stever voluntarily

resigned as CEO from B&J. *See* Ex. F, March 31 Email from Dave Stever. Stever, who had been offered a prominent role in the larger ice cream business following the Spin-Off, decided to leave B&J and pursue new opportunities. *See id.*

## PROCEDURAL HISTORY

Plaintiffs filed their original complaint in the name of B&J on November 14, 2024, asserting a single cause of action for breach of contract. *See* ECF No. 5 (Complaint). After an exchange of pre-motion letters, *see* ECF Nos. 28, 29, the Court issued an order granting B&J leave to amend the complaint. *See* ECF No. 30. On January 27, 2025, Plaintiffs filed their First Amended Complaint (**"FAC"**) adding the Class I Directors as additional Plaintiffs. *See* FAC, ECF No. 32. In addition to the breach of contract claim, Plaintiffs asserted two claims for declaratory judgment for Unilever's alleged breaches of the Settlement Agreement. *See id.* ¶¶ 46-54.

The night before Unilever was to file its Motion to Dismiss the FAC, Plaintiffs filed a Notice of Motion for Leave to File a Second Amended Complaint, *see* ECF No. 37, and a Proposed Second Amended Complaint, *see* ECF No. 38-1. Plaintiffs' Memorandum of Law in support of the Motion for Leave was filed a week later. ECF No. 45. The Court issued an order on March 31, 2025, permitting Plaintiffs to file their Proposed Second Amended Complaint but prohibiting further amendment. *See* ECF No. 49. On April 4, 2025, Plaintiffs filed the SAC. *See* SAC.

## LEGAL STANDARD

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it." *Brokamp v. James*, 66 F. 4th 374, 386 (2d Cir. 2023) (internal quotations and citations omitted). If "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," the case is rendered moot because it is "no longer a 'Case' or 'Controversy'" sufficient to maintain the Court's Article III jurisdiction. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

Dismissal is also appropriate where an issue is not "ripe for adjudication." *Williams v. Hernandez*, 2006 WL 156411, at *3 (S.D.N.Y. Jan. 18, 2006) (Castel, J.) (citation omitted). Requests for advisory opinions must similarly be dismissed as "[t]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969).

Under Rule 12(b)(6), a complaint should be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To state a plausible claim for relief, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When evaluating the sufficiency of a claim for relief, the Court must "accept as true all factual allegations and draw from them all reasonable inferences," but is "not required to credit conclusory allegations or legal conclusions couched as factual . . . allegations." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020) (citation omitted).

## ARGUMENT

The claims brought in the name of B&J should be dismissed in their entirety because the Class I Directors have no standing to bring claims on behalf of B&J. Plaintiffs' breach of contract claim—which alleges that Unilever unreasonably withheld consent to donate to JVP and CAIR-SF and muzzled the Class I Directors—fails because Plaintiffs do not plead any facts showing that the Class I Directors (or even B&J) suffered *any* damages as a result of Unilever's alleged breaches. The declaratory judgment claims are also deficient: each count for declaratory judgment presents at least one non-justiciable issue that requires dismissal under Rule 12(b)(1). What remains of the claims for declaratory relief should be dismissed either because they are duplicative of the breach of contract claim or fail to state a claim.

16

**A.**    **<u>The Class I Directors Lack Authority To Sue In The Name Of Ben & Jerry's</u>**

The Class I Directors brought this action on behalf of and in the name of B&J, but the Class I Directors have no standing to bring claims on behalf of B&J for disputes arising under the Settlement Agreement or the Merger Agreement. Accordingly, all claims alleged in the name of B&J should be dismissed.

B&J is a close corporation under Vermont law with a single shareholder, Conopco. *See* Ex. B, Shareholders Agreement, at 1. Pursuant to 11A V.S.A. § 20.09, Conopco elected to "regulate the corporate powers and the management of the business of [B&J]," including by creating and delegating to the Board "primary responsibility for preserving and enhancing the objectives of the historical social mission of the Company," and "primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name" as "custodians of the Ben & Jerry's-brand image." *Id.* at preamble, §§ 1(e), (f). The Class I Directors' rights are expressly limited to those rights delineated under the Merger Agreement and Shareholders Agreement. *See* Merger Agreement §§ 6.14(e), (f); *see also* Ex. B, Shareholders Agreement § 1(a) ("The Company Board shall have only those powers and functions expressly granted to it under this [Shareholders] Agreement. ***All other powers and functions are reserved to the Shareholder.***") (emphasis added). The Class I Directors, therefore, do not have the power or responsibilities of a typical board of directors. *See* Merger Agreement §§ 6.14(b)-(j) (outlining the responsibilities of the Board and Conopco); Ex. B, Shareholders Agreement § 1(a); *see also* F. Hodge O'Neal et al., 1 Close Corp and LLCs: Law and Practice § 3:18 (Rev. 3d ed. Nov. 2024) ("In many closely held enterprises, there is really no need for a board of directors."). The Class I Directors have no authority or responsibility over B&J's finances or operations, nor do they have the ability or standing to commence lawsuits in the name of B&J.

Rather, the Merger Agreement and Shareholders Agreement delegate authority to bring lawsuits in the name of B&J to the CEO of B&J or to Conopco.[20] *See* Merger Agreement § 6.14(b) (delegating authority "to manage the affairs of the Company, substantially in the form of Exhibit B," to the B&J's CEO); *id.* § 6.14(j) ("Conopco shall have primary responsibility for the financial and operational aspects of [B&J] and the other aspects of [B&J] not allocated to the Company Board pursuant to this Section 6.14.").[21] Moreover, the Merger Agreement explicitly disclaims third-party beneficiary claims, except for limited circumstances not applicable here. *See* Merger Agreement § 9.07; *see also In re George Washington Bridge Bus Station Dev. Venture LLC*, 65 F.4th 43, 55 (2d Cir. 2023) (holding a contract provision naming specific third-party beneficiaries indicated the intentional omission of others) (citing *Quadrant Structured Prods. Co. v. Vertin*, 992 N.Y.S.2d 687, 694 (2014)). In other words, to the extent that the Class I Directors allege that the Merger Agreement allows them to bring claims on behalf of B&J, the Merger Agreement expressly disclaims those rights. To hold otherwise would require the Court to read in a term that is notably absent in an extensively negotiated, 90-page agreement. The Court should decline to do so. *See Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) ("[T]he courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (cleaned up).

Likewise, the Settlement Agreement does not give the Class I Directors authority to sue on behalf of B&J. The Class I Directors are a party to the Settlement Agreement and can sue in their

---

[20] Any claims under the Merger Agreement (including Count IV) must also fail because the Class I Directors are not a party to the Merger Agreement and therefore do not have standing to sue under that Agreement. *See Zhang v. Schlatter*, 2013 WL 12618757, at *7 (S.D.N.Y. Mar. 13, 2013) (dismissing claim because plaintiff was not a party to the allegedly breached agreement), *aff'd* 557 F. App'x 9 (2d Cir. 2014); *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 44 (2d Cir. 2012) (affirming dismissal for lack of standing to sue for breach of an agreement to which the plaintiff was not a party).

[21] As the sole shareholder, Conopco is the only entity that may bring a derivative action on behalf of B&J. *See Solutia Inc. v. FMC Corp.,* 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) ("a shareholder always has standing to sue for harm to the corporation") (citing N.Y. Bus. Corp. Law § 626(a)).

own name. No provision in the Settlement Agreement gives the Class I Directors the right to sue in the name of B&J or on behalf of B&J.

Because the Class I Directors have no standing to bring claims on behalf of B&J under any relevant agreement, all claims alleged in the name of B&J should be dismissed.

**B.**    **Several of Plaintiffs' Claims Do Not Present Justiciable Controversies**

The declaratory relief Plaintiffs seek in Counts II-IV are not based on justiciable controversies and should be dismissed. Article III's "Cases and Controversies" requirement allows federal courts to only exercise jurisdiction over "actual controvers[ies] [that] exist not only at the time the complaint is filed, but through all stages of the litigation." *Already*, 568 U.S. at 90-91 (internal quotation marks and citations omitted). Therefore, "the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001). Further, "[a] case becomes moot . . . when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already*, 568 U.S. at 91 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)) (*per curiam*). Dismissal under Rule 12(b)(1) is therefore proper when a case presents no justiciable controversy. *See Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (*per curiam*). Plaintiffs' request for relief regarding: (i) CFT payments, (ii) B&J's CEO, and (iii) the Spin-Off must be dismissed because they present no justiciable controversies.

### i.    Plaintiffs Claim Regarding the Payments to CFT is Moot

Count III, which seeks a declaration that Unilever must make annual payments to CFT, send Mittal confirmation of such payments, and not "erect extracontractual barriers to such payment," is moot and should be dismissed. SAC ¶ 71.

Unilever has made all payments to CFT required to date and sent confirmation of such payments to Mittal. *See* Ex. C, Jan. 2, 2025 Email Thread. Unilever notified Mittal at the interim

Board call on December 18, 2024, that it had made all 2024 payments to CFT required by the Settlement Agreement and confirmed the same via email to Mittal on January 2, 2025. *See id.* Because Unilever satisfied all past and pending payment obligations to CFT under the Settlement Agreement and has notified the Class I Directors of such payment, there is no live controversy underpinning any potential or alleged breach of the Settlement Agreement. *See Russman*, 260 F.3d at 118. Count III is therefore moot and requires dismissal under Rule 12(b)(1). *See Already*, 568 U.S. at 91; *Doyle*, 722 F.3d at 80.

### ii.    Claims Regarding the Removal of B&J's CEO Are Moot and Fail to State a Claim

Plaintiffs' claims regarding Unilever's alleged decision to remove Stever as B&J's CEO are moot because Stever voluntarily departed from the company on March 31, 2025. Plaintiffs' requests in Counts II and IV for declarations regarding how and when Unilever may (or may not) remove or appoint B&J's CEO should therefore be dismissed because such counts do not present a live "case or controversy" sufficient to sustain this Court's subject matter jurisdiction. *See Already*, 568 U.S. at 90-91; *Keitt v. New York City*, 882 F. Supp. 2d 412, 425 (S.D.N.Y. 2011) (holding an inmate's claims for injunctive relief against corrections officers were moot as the inmate and officers were no longer at the same facility).

Separately, the Class I Directors fail to adequately allege that Unilever's conduct breached the Merger Agreement. Under the Merger Agreement, "[d]ecisions with respect to the appointment, compensation and removal of the CEO ***shall be made by Conopco*.**" *See* Merger Agreement § 6.14(c) (emphasis added). Before Conopco may exercise this discretion, Conopco must ***consult*** in good faith with an "Appointment Committee" consisting of two members of the B&J Board. *See id.* The SAC alleges that Unilever breached the Merger Agreement by removing B&J's CEO without consultation. SAC ¶¶ 42-49, 74-75. But Unilever sought to consult in good

faith with the Board; it was the Board that delayed consultation and refused to engage with Unilever. The SAC admits that on March 3, 2025, Unilever emailed the Board requesting to consult with the Board. *See* SAC ¶¶ 44-45. The SAC complains about the length of time the Board purportedly was given to consult, but nothing in the Merger Agreement requires a set period of time to consult and good-faith negotiations do not require a particular outcome or process. *See Anthem, Inc. v. Express Scripts, Inc.*, 2024 WL 4635233, at *2 (2d Cir. Oct. 31, 2024) (a contract which "ensure[d]" that parties negotiate in good faith did not guarantee a specific outcome). Plaintiffs also know their allegations are false, since Unilever extended the period to consult to several weeks. Accordingly, Plaintiffs fail to state a claim.

### iii. Declaratory Relief Regarding the Contemplated Spin-Off Would Amount to an Advisory Opinion

There similarly is no justiciable controversy concerning Plaintiffs' requests in Counts II and IV for declarations relating to Unilever's impending Spin-Off. SAC ¶¶ 67(e), 76(c). "For a declaratory judgment to issue, there must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.'" *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242 (1937)).

Plaintiffs' claim is premised on hypotheticals, none of which may come to pass. Plaintiffs seek a declaratory judgment that "[a]ny attempt to eliminate the Independent Board or its members," or to substantially alter or diminish the Board's responsibilities in the Spin-Off would necessarily breach the Settlement Agreement and the Merger Agreement. But to issue such relief, the Court will necessarily need to assume (i) the form of the Spin-Off, (ii) the successful completion of the Spin-Off, (iii) the emergence of a new ice cream business that will fail to "preserve the rights, duties, and obligations specified in the parties' agreements," by

21

(iv) eliminating or substantially curtailing the Board and its rights and responsibilities. *See* SAC ¶¶ 51, 73. The Class I Directors do not allege any specific facts detailing how the Spin-Off, which has not yet occurred, would affect B&J's social mission and brand integrity or whether Unilever has indicated that the Spin-Off would compromise the Class I Directors' rights. Because this claim is rooted in hypotheticals, there is no live dispute for the Court to adjudicate. *See Mattis* 431 U.S. at 172.

Because Plaintiffs fail to allege a justiciable controversy sufficient to confer jurisdiction on this Court, Plaintiffs' request for declaratory relief in Counts II-IV should be dismissed. *See Already*, 568 U.S. at 90-91, 100; *Doyle.*, 722 F.3d at 80; *see also Williams*, 2006 WL 156411, at *3-5 (dismissing complaint pursuant to Rule 12(b)(1) where no justiciable controversy existed).

## C.    The Breach Of Contract Claim Should Be Dismissed Because Plaintiffs Fail To Allege They Have Suffered Damages

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (internal quotations and citation omitted). Pleading sufficient "factual allegations showing damages [is] essential" to survive a motion to dismiss. *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014), *aff'd*, 607 F. App'x 123 (2d Cir. 2015). Without "any allegations *of fact* showing damage" to the plaintiffs, "mere allegations of breach of contract are not sufficient to sustain a complaint." *Id.* (emphasis added) (quoting *Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*, 651 N.Y.S.2d 490, 492 (App. Div 1996)).

Plaintiffs allege no facts to support their claim in Count I that they have been damaged by Unilever's purported breaches of the Settlement Agreement. Plaintiffs allege—in conclusory form—that Unilever (i) "encroached on the Independent Board's authority" and (ii) "undermined

the Independent Board." SAC ¶¶ 56, 58. But other than saying it, Plaintiffs include no allegation of fact demonstrating *how* the Class I Directors have suffered any harm. Plaintiffs' conclusory allegations of damage are insufficient to sustain a claim for breach of contract. *See Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777, 779 (App. Div. 1988); *see also House of Eur. Funding I, Ltd. v. Wells Fargo Bank, N.A.*, 2014 WL 1383703, at *11 (S.D.N.Y. Mar. 31, 2014).

To the extent Plaintiffs may pursue Count I in the name of B&J—which they cannot under the relevant agreements—the claim likewise fails because it includes only conclusory allegations about damages to B&J. Plaintiffs allege only that (i) "Defendants' actions (including their censorship) have damaged Ben & Jerry's Social Mission and brand integrity," (ii) "injur[ed] [B&J's] reputation and goodwill with customers," and thus (iii) "cause[d] real, calculable, and significant financial and reputational harm to Ben & Jerry's." SAC ¶¶ 56, 58. However, because Plaintiffs do not allege that B&J lost revenue, saw its customers flee, or otherwise suffered harm due to Unilever's alleged breaches, they have not alleged facts sufficient to show damages to B&J. *See House of Eur. Funding I, Ltd.*, 2014 WL 1383703, at *11; *Gordon*, 529 N.Y.S.2d at 779.

Plaintiffs' allegation that the Class I Directors—or B&J—suffered "damage[] through its non-receipt of" donations also fails to sustain Count I. SAC ¶ 57. By the plain terms of the Settlement Agreement, Plaintiffs were never the intended recipients of the donations: Unilever would make a $2.5 million payment intended for "disbursement to human rights and humanitarian organizations." *Id.* ¶ 28. Disappointment that donations were not made to their preferred organizations is not a legally cognizable loss to *Plaintiffs*. Without any "facts showing that [Plaintiffs] bore any of the loss" from Unilever's alleged non-payment of donations to JVP and CAIR-SF, Plaintiffs have failed to plausibly plead that they have suffered damages due to Unilever's alleged breach. *House of Eur. Funding I*, 2014 WL 1383703, at *11 (dismissing one

plaintiff's breach of contract claim where the complaint failed to allege that plaintiff was affected by its co-plaintiff's financial loss). Without factual allegations explaining the nature of Plaintiffs' injury, "[t]hese vague and conclusory allegations are insufficient to sustain a breach of contract cause of action." *Gordon*, 529 N.Y.S.2d at 779.

### D.    In The Alternative, The Court Should Dismiss Count II As Duplicative Or Defective

When "contract claims will necessarily settle the issues for which the declaratory judgment is sought," a declaratory judgment "will serve no useful purpose and will not serve to offer relief from uncertainty." *EFG Bank AG v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 100 (S.D.N.Y. 2018) (internal quotations marks and citations omitted). Where declaratory relief would not "offer relief from uncertainty," district courts regularly dismiss a "declaratory judgment cause of action [as] clearly duplicative of Plaintiff[s'] cause of action for breach of contract." *Jujamcyn Theaters LLC v. Fed. Ins. Co.*, 659 F. Supp. 3d 372, 383 (S.D.N.Y. 2023).

The remaining requests for relief in Count II rest on allegations identical to those underpinning the breach of contract claim—*i.e.*, that Unilever allegedly breached the Settlement Agreement by "preventing Ben & Jerry's from donating to" JVP and CAIR-SF, *compare* SAC ¶ 63 *with id.* ¶ 57, and that Unilever allegedly breached the agreement by "silencing [] Ben & Jerry's Social Mission," *compare* SAC ¶ 60 *with id.* ¶ 55. Because the declaratory judgment would "serve no useful purpose" in resolving the legal issues that the breach of contract claim will "necessarily settle," the Court should dismiss this claim as duplicative if the breach of contract claim is allowed to proceed. *EFG Bank AG*, 309 F. Supp. 3d at 100.

However, irrespective of whether the breach of contract claim survives, the declaratory judgment claim as it pertains to Unilever's alleged "silencing" of the Board should be dismissed. Unilever has tried to work with the Board to issue more balanced statements concerning the handful of posts at issue and each post involves various considerations and concerns. Yet, despite

Unilever raising concerns, Mittal often just issued her own statement anyways. Here, a declaration about a past post would serve no useful purpose since it doesn't resolve any legal issue as each post needs to be analyzed individually. It would provide no guidance over a future post that the Board may want to make next week. Accordingly, the Court should exercise its discretion and decline to issue the declaratory judgment because it would "serve [no] useful purpose in clarifying or settling the legal issues involved." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99 (2d Cir. 2023); *Farrakhan v. Anti-Defamation League*, 2025 WL 24066, at *3 (2d Cir. Jan. 3, 2025) (district court properly declined to exercise jurisdiction over a "requested declaratory judgment[]" that "would not serve a useful purpose" because the plaintiffs "failed to . . . state a plausible claim").

## CONCLUSION

For the reasons set forth above, the Court should (a) dismiss the SAC in its entirety as brought in the name of B&J; (b) dismiss the breach of contract claim (Count I) pursuant to Rule 12(b)(6), or, if Count I is not dismissed, dismiss the declaratory judgment claim (Count II) as duplicative of the breach of contract claim; (c) dismiss the declaratory judgment (Count II) as it relates to censorship of past posts because such a claim serves no useful purpose; (d) dismiss the second declaratory judgment claim regarding payments to CFT (Count III) pursuant to Rule 12(b)(1); and (e) dismiss the third declaratory judgment claim regarding B&J's Spin-Off and CEO removal (Count IV) pursuant to Rule 12(b)(1) or Rule 12(b)(6).

Respectfully submitted,

Dated: New York, New York          WEIL, GOTSHAL & MANGES LLP
     April 25, 2025

*/s/ Davd J. Lender*                      
David J. Lender
Luna N. Barrington
Alexandra Rose
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
david.lender@weil.com
luna.barrington@weil.com
alexandra.rose@weil.com

*Attorneys for Defendants Unilever PLC and*
*Conopco, Inc.*

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Local Rule 7.1(c), I hereby certify that the total number of words in this memorandum, excluding the caption, table of contents, table of authorities, signature block, and word count certification is 8,529.

*/s/ David J. Lender*
David J. Lender
