## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BEN & JERRY'S HOMEMADE, INC., | ) | |
| CLASS I DIRECTORS OF BEN & JERRY'S | ) | |
| INDEPENDENT BOARD | ) | Case No. 1:24-cv-08641-PKC |
| *Plaintiffs,* | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| UNILEVER PLC AND CONOPCO, INC. | ) | |
| *Defendants.* | ) | |

### PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO
### DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

AHMAD, ZAVITSANOS & MENSING, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone: (713) 655-1101

*Attorneys for Plaintiffs Ben & Jerry's
Homemade, Inc. and the Class I
Directors of the Ben & Jerry's Board*

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT    1

II.   FACTUAL & PROCEDURAL BACKGROUND ............................................................. 6

   A.  To separate itself from other bidders, as a prerequisite to acquiring the iconic brand,
       Unilever commits to protecting Ben & Jerry's social mission and brand integrity
       through an Independent Board. ...................................................................................... 6

   B.  The Independent Board advances the company's social mission, including making the
       decision to halt sales in the OPT.  Unilever fully supports the decision, then abruptly
       reverses course resulting in litigation and the parties' Settlement Agreement. ............ 7

   C.  Unilever bars the Independent Board's donations while simultaneously disbursing
       500,000 euros to an organization that acts as an auxiliary force for the Israeli military
       and whose chief rabbi is known as a "purveyor of hatred" towards Arabs. ................. 8

   D.  Unilever publicly condemns the Ukraine war as "a brutal and senseless act by the
       Russian state" and swiftly acts to remove its assets from Russia.  Unilever then
       alleges that the Independent Board's calling for "peace" and a "ceasefire" is too one-
       sided and threatens to eliminate the Independent Board and sue individual members
       for suggesting it ............................................................................................................. 9

   E.  Unilever bars Ben & Jerry's from criticizing the Trump administration's policies.
       Later the same day, Unilever's President of Ice Cream publicly boasts that Unilever
       board member Nelson Peltz played "matchmaker" between Elon Musk and Donald
       Trump .............................................................................................................................. 10

   F.  Unilever chastises Ben & Jerry's CEO for cooperating with the Independent Board,
       then attempts to remove him upon a week's notice.  The Independent Board seeks
       additional relief to protect the integrity of an American institution. .......................... 11

III.  ARGUMENT ...................................................................................................................... 13

   A.  The Independent Board—rather than Unilever—has authority to initiate suit on behalf
       of Ben & Jerry's in a dispute regarding Unilever's adherence to the Merger and
       Settlement Agreements. ................................................................................................. 13

       1.  Unilever's interpretation would subordinate the Independent Board's "primary"
           authority. ................................................................................................................. 13

       2.  Unilever's interpretation would negate the Independent Board's express charge to
           "safeguard" Ben & Jerry's brand integrity and to "preserve" its social mission.. 14

       3.  Unilever's interpretation ignores the Independent Board's status as "custodians"
           of Ben & Jerry's brand integrity. ........................................................................... 15

4. Unilever's interpretation would render the Independent Board's rights illusory, making them contingent upon Unilever's self-policing.........................................16

5. Unilever's suggestion that Ben & Jerry's CEO is a proper party to initiate litigation is undermined by Unilever's hasty attempt to remove Ben & Jerry's CEO last month........................................................................................................17

6. Unilever's interpretation also fails under the Settlement Agreement and Settlement Amendment because Unilever is expressly adverse to Ben & Jerry's and the Independent Board under both agreements...............................................18

7. Unilever's remaining arguments do not make its interpretation any less illusory.19

B. Unilever's reprisals, addition of extracontractual hurdles, and ongoing censorship establish that Ben & Jerry's declaratory relief claims are ripe. ..................................20

1. B&J's declaratory relief claim regarding the Settlement Amendment remains ripe because of Unilever's unilateral erection of extracontractual hurdles.................20

2. B&J's declaratory relief claim regarding the "Spin-Off" remains ripe because of Unilever's ongoing censorship and repeated threats. ...........................................21

3. Unilever should not be able to moot the declaratory relief claim regarding Ben & Jerry's CEO by intimidating Ben & Jerry's CEO..................................................22

C. Ben & Jerry's has adequately pleaded damages based on loss of goodwill, nonpayment to third-party beneficiaries, and (at a minimum) nominal damages in relation to diluting the social mission and usurping the Independent Board's authority. ........................................................................................................................................23

D. The declaratory relief sought under the Settlement Agreement is not duplicative: while Ben & Jerry's seeks breach-of-contract damages for Unilever's *past* acts of censorship, it seeks declaratory relief in terms of its *ongoing* censorship, including Unilever's ongoing ban on criticizing the Trump administration..............................25

## **TABLE OF AUTHORITIES**

**Cases**

*Bajan Grp., Inc. v. Consumers Interstate Corp.*,
    958 N.Y.S.2d 59 (Sup. Ct. 2010) ........................................................... 16

*Berger v. Heckler*,
    771 F.2d 1556 (2d Cir. 1985) .................................................................. 24

*Chiapparelli v. Baker, Kellogg & Co.*,
    169 N.E. 274 (N.Y. 1929) ....................................................................... 17

*Coronet Properties Co. v. Brychova*,
    469 N.Y.S.2d 911 (Civ. Ct. 1983) .......................................................... 14

*Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*,
    2015 WL 4486335 (S.D.N.Y. July 23, 2015) .......................................... 16

*Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*,
    18 F. Supp. 3d 375 (S.D.N.Y. 2014) ........................................................ 1

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
    309 F. Supp. 3d 89 (S.D.N.Y. 2018) ...................................................... 25

*Eletson Holdings, Inc. v. Levona Holdings Ltd.*,
    731 F. Supp. 3d 531 (S.D.N.Y. 2024) ..................................................... 25

*Ely-Cruikshank Co. v. Bank of Montreal*,
    615 N.E.2d 985 (N.Y. 1993) ................................................................... 25

*Fed. Hous. Fin. Agency for Fed. Home Loan Mortg. Corp. v. Morgan Stanley ABS Cap. I Inc.*,
    73 N.Y.S.3d 374 (Sup. Ct. 2018) ............................................................ 23

*Giamundo v. Dunn*,
    195 N.Y.S.3d 724 (App. Div. 2023) ....................................................... 24

*In re O.P.M. Leasing Servs., Inc.*,
    21 B.R. 993 (Bankr. S.D.N.Y. 1982) ...................................................... 24

*In re Unite Here Data Sec. Incident Litig.*,
    740 F. Supp. 3d 364 (S.D.N.Y. 2024) ..................................................... 25

*Jujamcyn Theaters LLC v. Fed. Ins. Co.*,
    659 F. Supp. 3d 372 (S.D.N.Y. 2023) ..................................................... 25

*Lexington 360 Assocs. v. First Union Nat. Bank of N. Carolina,*
    651 N.Y.S.2d 490 (App. Div. 1996)...................................................................... 25

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie,*
    784 F.3d 78 (2d Cir. 2015) ...................................................................................... 25

*Mariah Re Ltd. v. American Family Mutual Insurance Co.,*
    52 F. Supp. 3d 601 (S.D.N.Y. 2014) ...................................................................... 25

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007).................................................................................................. 21

*Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Cap., Inc.,*
    92 N.E.3d 743 (N.Y. 2017) ..................................................................................... 14

*Pers. Watercraft Prod. SARL v. Robinson,*
    2017 WL 4329790 (S.D.N.Y. Sept. 1, 2017) ......................................................... 25

*R.C. Bigelow, Inc. v. Unilever N.V.,*
    867 F.2d 102 (2d Cir. 1989) .............................................................................. 21, 22

*RIJ Pharm. Corp. v. Ivax Pharm., Inc.,*
    322 F. Supp. 2d 406 (S.D.N.Y. 2004) .................................................................... 23

*Ronnen v. Ajax Elec. Motor Corp.,*
    671 N.E.2d 534 (N.Y. 1996) ................................................................................... 14

*Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.,*
    523 F. Supp. 2d 376 (S.D.N.Y. 2007) ............................................................... 21, 22

*Saeco Vending, S.P.A. v. Seaga Mfg., Inc.,*
    2016 WL 1659132 (S.D.N.Y. Jan. 28, 2016) ..................................................... 24, 25

*Sternkopf v. White Plains Hosp.,*
    2015 WL 5692183 (S.D.N.Y. Sept. 25, 2015) ......................................................... 9

*Tarantino v. Tarantino,*
    540 N.Y.S.2d 319 (App. Div. 1989)......................................................................... 14

*Violet Realty, Inc. v. Amigone, Sanchez & Mattrey, LLP,*
    123 N.Y.S.3d 384 (App. Div. 2020)......................................................................... 14

## I.    <u>PRELIMINARY STATEMENT</u>[1]

In 1999, several potential buyers became interested in acquiring Ben & Jerry's, including industry rivals Dreyer's Ice Cream and Defendant Unilever.  Unilever instructed Ronald Soiefer (its Chief Counsel) that his "job was to collaborate with" Ben & Jerry's "to create a governance structure that would set [Unilever's] bid apart from any others."  Following the parties' merger in 2000, that final governance structure included Unilever's expressly agreeing that it **would not** hold "primary responsibility" over Ben & Jerry's social mission and brand integrity, instead acknowledging an Independent Board's control over the same.

As Richard Goldstein, Unilever's then-Chief Executive Officer of North America, described: "The only reason we were successful in the acquisition is because Ben and Jerry became convinced that Unilever would honor its word.  There was no point in buying the brand unless we could get the founders to agree that this is what they wanted."  Unilever's then-Chief Counsel, Soiefer, recognized: "Perpetuity is what really distinguishes this deal from other deals involving socially responsible businesses.  The board of Ben & Jerry's is not going away.  They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent.  It isn't like Unilever can run out the clock."  At the time it was courting Ben & Jerry's, Unilever prided itself on its values—including sustainability—and viewed Ben & Jerry's social mission—including its explicit commitment to human rights—as an asset, rather than a liability.

---

[1] The Preliminary Statement includes background addressed in the 2022 litigation cited in Unilever's brief and the Second Amended Complaint ("SAC").  *See, e.g.*, Dkt. No. 57 (Defs.' Mot. to Dismiss Pls.' Second Am. Compl.) at 9 ("Mot.") (citing Am. Compl. ¶ 102, *Ben & Jerry's Homemade, Inc. v. Conopco, Inc.*, No. 22-cv-5681 (S.D.N.Y. Sept. 30, 2022), Dkt. No. 58); *see also* SAC ¶¶ 10–12.  Additionally, other background is provided to: 1) contextualize and rebut Unilever's Rule 12(b)(1) assertions (in adjudicating a Rule 12(b)(1) challenge, a court "may consider evidence outside the pleadings, such as affidavits and exhibits." *Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*, 18 F. Supp. 3d 375, 382 (S.D.N.Y. 2014)) and 2) to address Unilever's factual inaccuracies.  The factual allegations Ben & Jerry's relies upon in responding to Unilever's 12(b)(6) challenges, however, are limited to the Second Amended Complaint ("SAC") (Dkt. No. 50), including:  ¶¶ 10–27, 39–58, 60, n.11 and Exhibits 1–6.

Twenty-five years later, Unilever's board has had significant reshuffles, including the addition of activist investor, Nelson Peltz. Mr. Peltz—an outspoken proponent of both Israel and the Trump administration (including nicknaming himself as the "matchmaker" between Mr. Trump and Elon Musk)—has had increasing influence over Unilever, including in the appointment of Unilever's last two CEOs. As Mr. Peltz told the *Financial Times* last March: "Ben & Jerry's job is to sell ice cream, not to make political statements. And these people use anything for a soapbox that they have no right to do." Mr. Peltz added: "What sense is being a billionaire if you're not a bully?"

Although Unilever's leadership (and its corresponding appetite for Ben & Jerry's outspoken, progressive social mission) may have changed, the Merger Agreement has not. At the core of this dispute is Unilever's regret that it did not retain "primary" authority over Ben & Jerry's social mission and brand integrity, which would have allowed it to unilaterally dilute Ben & Jerry's public stances and make them more vanilla in the manner Unilever's latest leadership now desires (coincidentally, Unilever's preferred edits to Ben & Jerry's posts mirror the political views of Mr. Peltz).

To divert attention from the actual issue in dispute—its efforts to censor Ben & Jerry's social mission—Unilever resorts to a series of head fakes. For example, Unilever attempts to portray Ben & Jerry's social mission as limited to topics "such as eco-friendly packaging and ingredients," going so far as to claim that the social mission was never meant to "extend to global conflicts (or conflicts generally), like the Israeli-Palestinian conflict." Unilever's revisionism conveniently omits: Ben & Jerry's 1988 launch of the "Peace Pop" to challenge Cold War spending policy as well as Ben & Jerry's 1990 full-page ad in the *New York Times* challenging the Gulf War as "an unnecessary war," and publicly proclaiming "[t]he price of gasoline should never be a reason to send our sons and daughters off to die in a foreign war." In fact, Unilever was fully

aware of the breadth of Ben & Jerry's social mission during the execution of the 2000 Merger Agreement because—in tandem with that agreement—it signed a Licensing Agreement which expressly barred Unilever from launching Ben & Jerry's products "in any country deemed by both Amnesty International and Freedom House to be engaged in significant human rights abuses" without Ben & Jerry's consent.  And, on the specific issue of the Palestinian-Israeli conflict, as Ben & Jerry's founders made clear in an editorial for the *Wall Street Journal*:  "In July 2021, Ben & Jerry's decided to stop selling ice cream in the occupied Palestinian territories. Like many decisions Ben & Jerry's has made over the past 44 years, this one was controversial but rooted in the company's concerns for human rights."

Nevertheless, Unilever attempts to portray the decision to halt sales in the Occupied Palestinian Territory ("OPT") as a "reckless[]" one "driven by" Chair Mittal.  Here again, Unilever conveniently omits that the decision to halt sales in the OPT was a ***unanimous*** one, with Unilever's own representative (Kevin Havlock: former President, Unilever North America; former Chairman, Unilever UK; Unilever France; and Unilever Arabia) affirmatively voting in favor of the resolution.  Unilever similarly ignores that the OPT decision was a not a hasty one; rather, it followed a years-long process that involved multiple site visits as well as discussions with dozens of stakeholders.  Unilever also fails to mention that ***for months*** prior to its announcement, the Independent Board repeatedly requested that Unilever reach an amicable financial resolution with its Israeli distributor (Avi Zinger) to avoid the backlash which Unilever now attempts to place at the Independent Board's feet.  Instead, as Unilever CEO Alan Jope explicitly wrote to Chair Mittal, Unilever's preferred strategy was to play "hardball" with Mr. Zinger.  Unilever's hardline negotiation tactics alienated Mr. Zinger to the point where he reached out to Chair Mittal complaining that he had been "played" by Unilever, resulting in his filing suit and initiating the publicity campaign Unilever now bemoans.  Unilever also chooses to ignore the public statement

3

it issued immediately following the OPT decision, exclaiming that it had "always recognised [sic] the right of the brand and its independent Board to take decisions about its social missions," a dramatic departure from its arguments before this Court regarding both the Independent Board's authority as well as the breadth of Ben & Jerry's social mission.

And, as a final distraction, Unilever attempts to besmirch Chair Mittal's donation designees, despite acknowledging that the Independent Board's declaratory relief claim regarding the donations recipients will survive its Motion.[2]  Yet here again, Unilever conveniently omits that despite expressly agreeing to donate to "human rights organizations" in the Settlement Agreement (organizations which inherently weigh in on "controversial" issues), Unilever rejected a proposed donation to Human Rights Watch, alleging the group was "too controversial."  Perhaps worse, Unilever threatened to eliminate the Independent Board and sue board members individually if they did not withdraw another donation designee from consideration, Medical Aid for Palestinians ("MAP").  MAP—a British-based charity, which provides healthcare services to Palestinians, such as physical rehabilitation for Palestinian children with disabilities—is headed by Baroness Morris of Bolton, the former Deputy Speaker of the House of Lords (its prior president, Lord Patten, is the former Chancellor of the University of Oxford and the former Chairman of the British Conservative Party). Ben & Jerry's had previously donated to MAP in 2020 with Unilever's knowledge.

Despite both MAP's pedigree and Ben & Jerry's previous donation, Unilever prevented Ben & Jerry's from disbursing the allocated settlement funds to MAP, claiming the organization was "unapologetically anti-Israel" and that a donation to MAP would "endanger" Ben & Jerry's and Unilever, including potential sanctions that had allegedly been "confirmed with outside sanctions counsel."  After dragging their feet for several more months as the humanitarian crisis

---

[2] Mot. at 5.

in Gaza reached catastrophic proportions, Unilever only relented after its assessment of MAP was thoroughly discredited, including: the Mayor of London visiting MAP's offices, praising their "essential work" and encouraging donations to the group **on the same day** Unilever wrote to Chair Mittal arguing a donation to MAP would "endanger" Ben & Jerry's and Unilever; King Charles hosting MAP at Buckingham Palace less than two weeks later; Baroness Morris executing a declaration confirming that Unilever's objections were "unreasonable and unconscionable"; and, the Independent Board making clear they would not be intimidated. While Unilever was erecting hurdles to donating to MAP, it publicly made a 500,000-euro donation to Magen David Adom, an Israeli organization which acts as an auxiliary service to the Israeli Defense Forces. The head of Magen David Adom's rabbinical committee is Rabbi Schmuel Eliyahu, who is known as a "purveyor of hatred towards Arabs" and has repeatedly promoted dropping a nuclear bomb on Gaza. While Unilever had no qualms with its *public* donation to Magen David Adom, it concurrently prevented Ben & Jerry's from disbursing settlement funds, despite the Independent Board agreeing to Unilever's request to make such donations *anonymously*.

When one returns to the actual issue in dispute, it becomes clear why Unilever prefers to engage in detours. As suggested with its preferred editorializing of the Independent Board's "ceasefire" statement to make it as diplomatic as the Pope's,[3] Unilever seeks to dictate—and dilute—Ben & Jerry's social mission. However, it expressly forwent that right 25 years ago when it contractually agreed in the Merger Agreement that the Independent Board—not Unilever—would have "primary" authority over Ben & Jerry's social mission and brand integrity, including serving as "custodians" of the same. Unilever reaffirmed this lack of control in the parties' Settlement Agreement in December 2022, where it committed to "[r]espect and acknowledge" the Independent Board's "primary" authority, including specifically agreeing to "[r]efrain from

---

[3] *Id.* at 12.

making any statement on behalf of Ben & Jerry's regarding the Social Mission that is inconsistent with the Social Mission of Ben & Jerry's as previously stated by Ben & Jerry's or approved by the Independent Board."[4]

Unilever's Motion should be denied for three reasons. ***First***, the Independent Board is the "custodian" of Ben & Jerry's brand integrity and has "primary" authority over the same as well as Ben & Jerry's social mission. The Independent Board is therefore the appropriate party to bring suit on behalf of Ben & Jerry's against Unilever in an action alleging Unilever's breach of its contractual commitments in relation to Ben & Jerry's social mission and brand integrity. Unilever's alternative suggestion that Unilever is the more appropriate party to sue itself would render the Independent Board's rights illusory and contingent upon Unilever's self-policing. ***Second***, as Unilever itself acknowledges, B&J's social mission is "an integral part of the B&J brand" and a "unique character" of the company. It is therefore more than "plausible" that an attempt to dictate and dilute the same would damage both Ben & Jerry's goodwill and reputation, as well as the "custodians" of the company's brand image. ***Third***, Ben & Jerry's claims of declaratory relief are ripe given Unilever's threats and reprisals, unilateral addition of extracontractual hurdles, and ongoing censorship.

## II.    FACTUAL & PROCEDURAL BACKGROUND

**A.    To separate itself from other bidders, as a prerequisite to acquiring the iconic brand, Unilever commits to protecting Ben & Jerry's social mission and brand integrity through an Independent Board.**

Since its founding in 1978, Ben & Jerry's has unabashedly embraced social activism, from opposing militaristic spending during the Cold War to becoming early and consistent supporters of migrant rights.[5] This authentic dedication to progressive causes has resonated with customers,

---

[4] Dkt. No. 50-2, SAC Ex. 2 ("Settlement Agreement") at 1(§2(b)), 3(§2(j)).
[5] SAC ¶¶ 10, 16–17.

with Ben & Jerry's routinely leading industry-rankings regarding brand recognition and authenticity.[6]

In 1999, several potential buyers became interested in acquiring Ben & Jerry's. To distinguish itself from its competition, Unilever agreed to a contractual structure which was designed specifically to protect Ben & Jerry's unique social mission through the creation of an autonomous, independent board of directors. Specifically, under the parties' resulting Merger Agreement, Ben & Jerry's Independent Board—rather than Unilever—retains "primary responsibility" over the company's social mission and brand integrity and is to serve as "custodians" for the same.[7] Moreover, Unilever is expressly barred from taking any action that may prevent the Independent Board from "fulfilling its obligations."[8]

**B.    The Independent Board advances the company's social mission, including making the decision to halt sales in the OPT. Unilever fully supports the decision, then abruptly reverses course resulting in litigation and the parties' Settlement Agreement.**

Since 2000, the Independent Board has ensured that Ben & Jerry's continues to remain at the vanguard of social issues, often years ahead of others. For example, in 2009, Ben & Jerry's initiated a five-year plan to ensure that its ingredients would be free of genetically modified organisms (GMOs), a goal it accomplished in 2014. Later, the Independent Board decided against distributing its products in China due to human rights concerns and potential ramifications regarding the company's social mission and brand integrity.

Similarly, in 2020, following years of complaints regarding human rights implications, the Independent Board unanimously voted to stop selling Ben & Jerry's products in Israeli-only settlements in the Occupied Palestinian Territory. Kevin Havlock (Unilever's former President of

---

[6] SAC ¶ 47.
[7] Dkt. No. 50-7, SAC Ex. 7 ("Merger Agreement") at §§ 6.14(e) and (f).
[8] *Id.* at § 6.14(i).

North America) voted in favor of the resolution.[9]  The Independent Board did not make its decision hastily, even engaging with Avi Zinger—Ben & Jerry's Israeli distributor—to ensure a smooth transition and potential amicable buyout.  Alan Jope (Unilever's then CEO), however, decided to play "hardball" with Mr. Zinger, resulting in Mr. Zinger's complaining that he had been "played" by Unilever and initiating litigation soon thereafter.  To appease Mr. Zinger, on June 29, 2022, Unilever sold Ben & Jerry's intellectual property rights in the OPT—without the Independent Board's consent, despite the Merger Agreement expressly providing the Independent Board authority over the "licensing" of Ben & Jerry's trademark—to Mr. Zinger for "peanuts," as reported by a leading Israeli newspaper.

The Independent Board filed suit against Unilever on July 5, 2022, to protect Ben & Jerry's social mission and brand integrity.  The parties settled in December 2022, with the resulting Settlement Agreement requiring Unilever to "respect" and "acknowledge" the Independent Board's authority over Ben & Jerry's social mission and brand integrity, as well as obligating Unilever to work in good faith to ensure the social mission is "protected and furthered."[10]  Unilever was also obligated to donate $5 million to human rights groups designated by the Independent Board's Chair and $20 million to Canaan Fair Trade via a Settlement Amendment.[11]  Within a few weeks, however, Unilever began to retreat from its contractual commitments.

## C.    Unilever bars the Independent Board's donations while simultaneously disbursing 500,000 euros to an organization that acts as an auxiliary force for the Israeli military and whose chief rabbi is known as a "purveyor of hatred" towards Arabs.

Following the settlement, the Independent Board sent Unilever its initial set of donation recipients, including groups such as Human Rights Watch.  Unilever blocked the donations accusing the organizations of being "anti-Israel."  At the same time Unilever demanded "steadfast

---

[9] *Id.* ¶ 10.
[10] *Id.* ¶ 12; Settlement Agreement at 1(§2(b)).
[11] SAC ¶¶ 28, 35; Settlement Agreement at 2; Dkt. No. 50-6, SAC Ex. 6 ("Settlement Amendment") at 1.

neutrality" while blocking Ben & Jerry's donations, it publicly made a 500,000 euro donation to Magen David Adom, an Israeli organization which acts as an auxiliary service to the Israeli Defense Forces.[12]   Magen David Adom's rabbinical committee is headed by Rabbi Schmuel Eliyahu, an infamous "purveyor of hatred towards Arabs," who has repeatedly suggested dropping an atomic bomb on Gaza.[13]   On its social media, Magen David Adom posts pictures of Israeli soldiers in front of Gaza rubble with captions such as "[g]ood luck with the mission."   Although Unilever had no issue publicly linking itself with Magen David Adom despite the group's posts or its association with Rabbi Eliyahu, it vehemently objected to Ben & Jerry's calling for "peace" and a "ceasefire."

**D.    Unilever publicly condemns the Ukraine war as "a brutal and senseless act by the Russian state" and swiftly removes its assets from Russia.  Unilever then alleges that the Independent Board's calling for "peace" and a "ceasefire" is too one-sided and threatens to eliminate the Independent Board and sue individual members for suggesting it.**

In December 2023, approximately two months into the humanitarian crisis in Gaza, the Independent Board alongside Ben & Jerry's management informed Unilever that Ben & Jerry's would be issuing the following statement: "Ben & Jerry's calls for peace and a permanent and immediate ceasefire."   By this time, over 140 countries around the world (including England, France, and Canada) had also called for a ceasefire.  In response, Unilever threatened to dismantle the Independent Board and sue the board members individually if Ben & Jerry's—with its decades-long motto of "peace, love, & ice cream"—issued the statement supporting "peace" and a "ceasefire."[14]   These threats were coupled with personal calls from Peter ter Kulve and Jeff Eglash (Unilever's President of Ice Cream and Global Head of Litigation), who attempted to intimidate

---

[12] SAC ¶ 32. Although Unilever omits critical context in relation to its Exhibit D; at this stage, Exhibit D may only be used "to establish the existence of the opinion, not for the truth of the facts asserted in the opinion." *Sternkopf v. White Plains Hosp.*, 2015 WL 5692183, at *5 (S.D.N.Y. Sept. 25, 2015) (citation omitted).

[13] SAC ¶ 32; Dkt. No. 50-3 (SAC Ex. 3) at 2; Dkt. No. 50-4 (SAC Ex. 4) at 2.

[14] SAC ¶ 15.

Ben & Jerry's personnel with professional reprisals if the company issued the ceasefire statement.[15]  Unilever subsequently blocked three other posts promoting Palestinian human rights, including one calling for the safe passage of Palestinian refugees, resulting in the Independent Board's initiating this litigation in November 2024.[16]

At the same time Unilever was threatening to eliminate Ben & Jerry's Independent Board for not remaining "steadfastly neutral," its website showcased the following position regarding the Ukraine war:  Unilever "continue[s] to condemn the war in Ukraine as a ***brutal and senseless act*** by the Russian state."[17]  In support of this position, Unilever had "ceased all imports and exports of [its] products into and out of Russia . . . stopped all media and advertising spend . . . [and] ceased all capital flows into and out of the country,"[18] eerily similar to the Independent Board's decision to stop selling in the OPT.  Unilever's double standard, however, was not limited to Gaza.

**E.    Unilever bars Ben & Jerry's from criticizing the Trump administration's policies. Later the same day, Unilever's President of Ice Cream publicly boasts that Unilever board member Nelson Peltz played "matchmaker" between Elon Musk and Donald Trump.**

Rather than "furthering" the social mission as it is contractually obligated under the Settlement Agreement,[19] Unilever has repeatedly attempted to dilute it.  For example, following the November 2024 election, Ben & Jerry's management worked collaboratively with the Independent Board to release a post on Inauguration Day that identified several issues Ben & Jerry's believed would be challenged during the Trump administration, including minimum wage, universal healthcare, and climate change.  Despite weeks of working on the statement, on January 18, 2024, Peter ter Kulve (Unilever's President of Ice Cream) unilaterally barred Ben & Jerry's

---

[15] *Id.*
[16] *Id.* ¶¶ 16–23.
[17] SAC ¶ 33; Dkt. No. 50-5 (SAC Ex. 5) at 1 (emphasis added).
[18] SAC ¶ 33; Dkt. No. 50-5 (SAC Ex. 5) at 2.
[19] Settlement Agreement at 1 (§2(b)).

from issuing the post because it mentioned "Donald Trump"[20] Mr. ter Kulve's objection ignored Ben & Jerry's consistent history of challenging incumbent presidents (both Democrats and Republicans), including in 2018 under the first Trump administration, when it launched the flavor "Pecan Resist" alongside the following public statement:  "The company **cannot be silent** in the face of President Trump's policies that attack and attempt to roll back decades of progress on racial and gender equity, climate change, LGBTQ rights and refugee and immigrant rights – **all issues that have been at the core of the company's social mission for 40 years**."[21]

Within 24 hours of Mr. ter Kulve's blocking the Inauguration Post, he hosted an Ice Cream Townhall, where he publicly boasted that Unilever board member Nelson Peltz had been the one to facilitate the relationship between Elon Musk and Donald Trump.[22]  Shortly thereafter, the Independent Board was informed that any post that could even be tangentially regarded as criticizing the Trump Administration would be barred pending Unilever's review.  On January 24, 2025, Ben & Jerry's filed its First Amended Complaint challenging Unilever's bar prohibiting Ben & Jerry's from criticizing the Trump administration's policies.

**F.    Unilever chastises Ben & Jerry's CEO for cooperating with the Independent Board, then attempts to remove him upon a week's notice.  The Independent Board seeks additional relief to protect the integrity of an American institution**.

In the face of Unilever's double standards, Ben & Jerry's CEO Dave Stever (a 35-year employee who began his career as a tour guide) sought to defend the company's social mission. Mr. Stever was subject to a variety of threats and harassment as a result;[23] the following examples are illustrative:

- **February 2024:** Mr. ter Kulve threatened: "You need to fix your board. I will get rid of them or fire you if they don't change."

---

[20] SAC ¶ 24.
[21] *Id.* ¶ 25.
[22] *Id.* ¶ 26.
[23] *Id.* ¶¶ 43–49.

- **April 2024:** Mr. ter Kulve threatened: "This almond contract (the Settlement Amendment) is crazy. Matt was fired for this. This needs to be fixed or I will take it out on you. ***You will bleed for this***." The "Matt" Mr. ter Kulve was referencing is Matt Close, Unilever's former head of Ice Cream and ter Kulve's predecessor.[24]

- **December 2024:** Jostein Solheim (Unilever's CEO of Health & Wellbeing) was tasked by Unilever and Mr. ter Kulve with attempting to sway Ben & Jerry's founders to take Unilever's side against the Independent Board. Mr. Solheim threatened: "If the founders keep supporting Anuradha (Ben & Jerry's Chair), Unilever will start taking it out on the management team."

- **January 2025:** In Mr. Stever's annual performance review authored by Gerardo Rozanski (Unilever's President of Ice Cream for North America) and Ronald Schellekens (Unilever's Chief Human Resources Officer), Unilever chastised Stever for "repeatedly acquiesce[ing] to the demands of the Independent Social Mission Board" by allowing Ben & Jerry's to post statements the Independent Board had collaboratively worked on with Ben & Jerry's management.[25]

- **February 2025:** Mr. Solheim threatened: "You need to limit the board's access to management to show you are controlling them. As we go to a public listing, the board's behavior will make that more difficult. If they don't get in line, Peter's only move now that Miller (Ben & Jerry's former Head of Global Activism Strategy) is gone is to fire you."

Less than a month after Mr. Solheim's threat, on March 3, 2025, Unilever informed the Independent Board that they were removing and replacing Mr. Stever as Ben & Jerry's CEO.[26] Despite the Merger Agreement's obligation that any decision regarding the CEO's removal "shall" only occur "***after*** good faith consultation with, and the participation in the discussion of, an advisory committee of the Company Board,"[27] Unilever announced their decision before the committee had even been appointed and attempted to force the Independent Board into rubberstamping the decision by unilaterally dictating a four-day deadline for feedback.[28] The Independent Board sought leave to file its Second Amended Complaint on March 18, 2025.

---

[24] *Id.* ¶ 39.
[25] *Id.* ¶ 48.
[26] *Id.* ¶ 44.
[27] Merger Agreement at § 6.14(c).
[28] SAC ¶¶ 44–45.

Unilever's claims of innocently offering Mr. Stever a "more prominent role" with "a pay increase" are inconsistent with the subpar performance review—explicitly tied to his cooperating with the Independent Board—Unilever provided Mr. Stever just two months ago.[29]  Unilever's attempt to replace the CEO of a billion-dollar business upon four days' notice does however coincide with its argument to this Court on March 19, 2025 that Ben & Jerry's CEO (at that time, Mr. Stever) had authority to initiate litigation on behalf of Ben & Jerry's against Unilever.[30]

### III.    ARGUMENT

**A.    The Independent Board—rather than Unilever—has authority to initiate suit on behalf of Ben & Jerry's in a dispute regarding Unilever's adherence to the Merger and Settlement Agreements.**

The parties agree that there are only 3 potential candidates for who can initiate litigation on behalf of Ben & Jerry's against Unilever: Unilever, the CEO Unilever appoints for B&J, or the Independent Board.  Unilever claims that it (or the CEO it appoints for B&J) is the proper party.[31]  The Independent Board—the "custodians" of B&J's brand integrity with "primary responsibility" over the same as well as B&J's social mission—disagree.  Unilever's interpretation is both inconsistent with the Independent Board's "primary" authority and is illusory because it would require Unilever to sue itself.  Unilever's proposed interpretation should therefore be rejected.

**1.    Unilever's interpretation would subordinate the Independent Board's "primary" authority.**

Under Sections 6.14(e) and (f) of the Merger Agreement, the Independent Board—rather than Unilever—has "primary" responsibility over Ben & Jerry's social mission and brand integrity. Terms in a contract should be given their plain and ordinary meaning unless the contract mandates

---

[29] *Compare* Mot. at 3 *with* SAC ¶ 48.
[30] *Compare* Dkt. No. 40 (Defs.' Mot. to Dismiss Pls.' First Am. Compl.) at 16 *with* Dkt. No. 33 (Feb. 7, 2025 Pre-Motion Letter) at 3 (arguing only Unilever—rather than Unilever *and the Ben & Jerry's CEO*—had the right to bring suit in the name of Ben & Jerry's).
[31] Mot. at 18.

a different interpretation, *Tarantino v. Tarantino*, 540 N.Y.S.2d 319, 321 (App. Div. 1989), and the "ordinary meaning of the word 'primary' is 'first in rank or importance; chief or principal.'" *Coronet Properties Co. v. Brychova*, 469 N.Y.S.2d 911, 912 (Civ. Ct. 1983) (quoting Webster's Third International Dictionary), *aff'd*, 488 N.Y.S.2d 1020 (App. Term. 1984). Consequently, "primary responsibility" within the context of the Merger Agreement means that the Independent Board's authority regarding Ben & Jerry's social mission and brand integrity is "first in rank," "chief," and not subordinate to Unilever's or the CEO's. Unilever's claim that it—rather than the Independent Board—is the appropriate entity to sue Unilever regarding a dispute over the social mission would subordinate the Independent Board's authority (including allowing Unilever to override the Independent Board's decision to initiate suit as it attempts to do here) in a fashion antithetical to the plain meaning of "primary." *See Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017) ("[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" (quoting *Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996))).

  **2.**   **Unilever's interpretation would negate the Independent Board's express charge to "safeguard" Ben & Jerry's brand integrity and to "preserve" its social mission.**

  Sections 6.14(e) and (f) of the Merger Agreement also charge the Independent Board—rather than Unilever—with "preserving" Ben & Jerry's social mission and "safeguarding" its brand integrity. To "safeguard" means "to protect someone or something so that they are not harmed, damaged, or lost,"[32] and to "preserve" means "to keep safe from injury, harm, or destruction:

---

[32] *Safeguard*, Cambridge Business English Dictionary, https://dictionary.cambridge.org/dictionary/english/safeguard (last visited May 1, 2025); *see also Violet Realty, Inc. v. Amigone, Sanchez & Mattrey, LLP*, 123 N.Y.S.3d 384, 387 (App. Div. 2020) ("[I]t is a common practice of New York courts to refer to dictionaries to determine the plain and ordinary meaning of the words in a contract.").

PROTECT."[33]  The Independent Board has initiated this suit on behalf of Ben & Jerry's precisely to "protect" Ben & Jerry's social mission and to keep it "safe" from "harm," including Unilever's unilateral censorship.  Barring the Independent Board from doing so (as Unilever suggests) would rob the Independent Board of its responsibility to "safeguard[]" Ben & Jerry's brand integrity and "preserv[e]" the social mission, improperly shifting that contractually defined role to Unilever.

### 3.    Unilever's interpretation ignores the Independent Board's status as "custodians" of Ben & Jerry's brand integrity.

Section 6.14(f) of the Merger Agreement also cements the Independent Board—rather than Unilever—as the "custodians" of B&J's brand image.  "Custody" is "the care *and control* of a thing or person for inspection, preservation, or security,"[34] as well as "the *legal right* or *duty* to take care of or keep somebody/something."[35]  Again, the plain meaning of the term "custodians" supports the Independent Board's "legal right" to initiate litigation on behalf of Ben & Jerry's to "preserve" its brand integrity.  Other portions of the Merger Agreement confirm the same.  For example, Section 6.14(j) of the Merger Agreement carves the Independent Board's responsibilities out of Unilever's: "Conopco shall have primary responsibility for . . . aspects of [B&J] *not allocated to the [Independent] Board* pursuant to this Section 6.14." (emphasis added).  Section 6.14(d) similarly makes the CEO's management of B&J subject to the Independent Board's responsibilities: "*Subject to Sections 6.14(e) and 6.14(f)*, which place primary responsibility for Social Mission Priorities and the Essential Integrity of the Brand (each as defined below) with the [Independent Board], [B&J] shall be managed by the CEO . . . ."  (emphasis added). And, as a further failsafe, Section 6.14(i) mandates that "Conopco shall not prevent [B&J] from fulfilling its obligations under *this Section 6.14*," with Section 6.14 specifying the Independent Board's status

---

[33] *Preserve*, Merriam-Webster, https://www.merriam-webster.com/dictionary/preserve (last visited May 1, 2025).
[34] *Custody*, *Black's Law Dictionary* (12th ed. 2024) (emphasis added).
[35] *See Custody*, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/definition/english/custody (last visited May 1, 2025) (emphasis added).

as "custodians" with "primary" authority over the social mission and brand integrity. (emphasis added).

Because the Independent Board is not a party to the Merger Agreement, the only method for it to enforce its "primary responsibility" is to do so on behalf of Ben & Jerry's. Otherwise, the Independent Board would have no legal right to protect B&J's brand image except by appealing to Unilever, no control over Unilever's decision, and no recourse if Unilever refused to protect the brand image on B&J's behalf. Such a scenario would be inconsistent with the plain meaning of the Independent Board's status as "custodians" of Ben & Jerry's brand integrity, including the specific charge to "preserv[e]" the same and "safeguard[]" the social mission.

### 4. Unilever's interpretation would render the Independent Board's rights illusory, making them contingent upon Unilever's self-policing.

Unilever's peculiar interpretation of the Independent Board's rights under the Merger Agreement—that they can only be enforced if Unilever sues itself—turns the Independent Board's role on its head, robbing it of any authority to act at critical junctures when B&J's social mission and brand integrity are subject to harm. Such an interpretation would render the Independent Board's rights illusory and must be avoided. *See Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*, 2015 WL 4486335, at *4 (S.D.N.Y. July 23, 2015) ("New York 'courts avoid an interpretation that renders a contract illusory . . . .'" (citation omitted)). According to Unilever, if Unilever violates the Merger Agreement, Ben & Jerry's can seek relief only if Unilever (or the CEO it appoints) decides to sue itself.[36] Put another way, Unilever argues its compliance with the Merger Agreement is contingent upon its self-evaluation. When compliance with a contract is optional, it is illusory. *See Bajan Grp., Inc. v. Consumers Interstate Corp.*, 958 N.Y.S.2d 59 (Sup. Ct. 2010) ("Where a promisor retains an unlimited right to decide later the nature or extent of his

---

[36] Mot. at 18.

performance . . . [t]he unlimited choice in effect destroys the promise and makes it merely illusory." (quoting *Chiapparelli v. Baker, Kellogg & Co.*, 169 N.E. 274 (N.Y. 1929)) (internal quotation marks omitted)).  If the Independent Board is barred from initiating suit on behalf of Ben & Jerry's to protect its social mission, regulation of the social mission would be left at the hands of Unilever, the company who has repeatedly threatened to dismantle the Independent Board and who has an ongoing bar on criticism of an incumbent president.

5.    **Unilever's suggestion that Ben & Jerry's CEO is a proper party to initiate litigation is undermined by Unilever's hasty attempt to remove Ben & Jerry's CEO last month.**

Unilever argues that Ben & Jerry's CEO is a proper party to sue Unilever.[37]  At the same time Unilever makes that suggestion, it contends that it has "sole discretion under the Merger Agreement to appoint, compensate, and remove the B&J's CEO"[38] and that it may do so hastily (as it did with Mr. Stever):  "The SAC complains about the length of time the Board purportedly was given to consult, but nothing in the Merger Agreement requires a set period of time to consult and good-faith negotiations do not require a particular outcome or process."[39] Unilever's own representations regarding its broad authority over Ben & Jerry's CEO as well as its threats against Mr. Stever; its explicit reprisals for "repeatedly acquiesce[ing]" to the Independent Board[40]; and,

---

[37] While Merger Agreement Section 6.14(b) does provide that Ben & Jerry's "shall delegate authority to the CEO to manage the affairs of the Company," it also states that such delegation must be "substantially in the form of Exhibit B" to the Merger Agreement.  Merger Agreement Exhibit B § A expressly states that "Conopco *and the Company Board* retain authority with regard to" a laundry list of managerial matters, including the "selection of . . . Corporate Counsel." (Merger Agreement, Ex B. at §A(2)(a)) (emphasis added).  Regarding how responsibility for this list of managerial affairs is allocated between Conopco and the Independent Board, Exhibit B provides that "the allocation of responsibility between them shall be *as provided in Section 6.14*." (*Id.* at § A) (emphasis added).  Further, § A(12) states that Conopco and the Company Board "retain authority with regard to . . . *all matters* not covered by the delegation in [Section] B." Section B contains a *separate list* of managerial affairs delegated *solely* to the CEO. (*Id.* at § B).  Filing suit in the name of B&J is nowhere to be found within the laundry list of authorities delegated *solely* to the CEO.  Accordingly, when Section 6.14(b) is read as a whole, including its express reference to and incorporation of Exhibit B, the Independent Board has authority to select corporate counsel and file suit in Ben & Jerry's name if the suit concerns a "primary responsibility" allocated to it in Section 6.14, which this suit does.
[38] Mot. at 6.
[39] *Id.* at 21.
[40] SAC ¶ 48.

its attempt to replace him upon four-days' notice, underscore the illusory nature of having a CEO appointed by Unilever sue Unilever to enforce the Independent Board's rights.

Moreover, under Section 6.14(c) of the Merger Agreement, Unilever must consult with the Independent Board in good faith prior to removing Ben & Jerry's CEO.[41]  If the Independent Board is powerless to enforce Section 6.14(c) on B&J's behalf—and has no standing to enforce the section in its own capacity, as Unilever has argued—then Unilever can simply remove any CEO who tries to enforce B&J's rights under the Merger Agreement, and Ben and Jerry's will be powerless to stop them. This scenario is not hypothetical—it is precisely what Unilever has attempted to do here.[42]  Thus, the entire structure of the Merger Agreement is illusory unless the Independent Board can sue on behalf of B&J where, as here, Unilever has breached its obligations.

Finally, the Merger Agreement expressly provides the Independent Board the authority to "prevent" the CEO from taking actions inconsistent with Ben and Jerry's brand integrity, Merger Agreement § 6.14(f), a meaningless right if the CEO has the final veto in any matter involving litigation, even if related to the social mission.

### 6. Unilever's interpretation also fails under the Settlement Agreement and Settlement Amendment because Unilever is expressly adverse to Ben & Jerry's and the Independent Board under both agreements.

Both the Settlement Agreement and the Settlement Amendment align Ben & Jerry's with the Independent Board, and ***not*** with Unilever and Conopco.  *See* Settlement Agreement at 1 (noting the agreement "is entered into by Conopco, Inc. … and Unilever PLC (collectively "Unilever"), *on the one hand*, and Ben & Jerry's Homemade, Inc. and the Class I Directors of the Ben & Jerry's Board of Directors ("Ben & Jerry's" or "Plaintiff"), *on the other hand . . .*") (emphasis added); Settlement Amendment at 1 (same).  As with the Merger Agreement, B&J's

---

[41] *Id.* ¶ 44; Merger Agreement at § 6.14(c).
[42] SAC ¶¶ 43–49.

rights under these contracts are meaningless and illusory if they can only be vindicated in the unlikely event Unilever (or the CEO it appoints) decides to sue itself.  The more reasonable interpretation is that the party whose rights are aligned with Ben and Jerry's under the agreements can sue Unilever to enforce them—especially since, at the time the parties negotiated the Settlement Agreement, the Independent Board was actively litigating on Ben & Jerry's behalf.[43]

### 7.    Unilever's remaining arguments do not make its interpretation any less illusory.

Unilever's arguments regarding the Shareholders Agreement and third-party beneficiary status fare no better.  Ben & Jerry's did not sue under the Shareholders Agreement; the Shareholders Agreement is not a contract between the relevant parties; and to the extent that Unilever claims anything in the Shareholders Agreement would curtail the Independent Board's explicit authority, such a contradiction would in itself be a violation of the Merger Agreement.[44] Unilever also argues the Independent Board does not have third-party beneficiary status; however, the Independent Board is not seeking to enforce the rights of a third party, it is seeking to enforce the rights of Ben & Jerry's (a party to the Merger Agreement) in an area where the Independent Board explicitly holds "primary responsibility."  The Independent Board's argument is no different than Unilever suggesting Ben & Jerry's CEO (a nonparty) may sue on Ben & Jerry's behalf.

In sum, the Merger Agreement empowers the Independent Board to bring actions on behalf of Ben & Jerry's when it comes to matters that fall within the Independent Board's "primary" authority.  This lawsuit is such an action.

---

[43] SAC ¶¶ 11–12.
[44] Merger Agreement at § 6.14(i) (Unilever "shall not prevent [B&J] from fulfilling its obligations under this Section 6.14").

**B.    Unilever's reprisals, addition of extracontractual hurdles, and ongoing censorship establish that Ben & Jerry's declaratory relief claims are ripe.**

    **1.    B&J's declaratory relief claim regarding the Settlement Amendment remains ripe because of Unilever's unilateral erection of extracontractual hurdles.**

Under the Settlement Amendment, Unilever has a continuing obligation to donate $2 million annually to Canaan Fair Trade for at least 10 years—full stop.[45]  As alleged in the SAC, however, "Unilever has unilaterally added hurdles to [Canaan]'s receipt of the funds, conditions which do not appear in the Settlement Amendment."[46]  As an example of these hurdles, Unilever has fired or attempted to replace personnel who negotiated or attempted to enforce the Settlement Amendment, such as Matt Close.[47]

Unilever has also continually attempted to exit or renegotiate the Settlement Amendment, with Unilever missing the first reporting deadline (which it concedes) and Mr. ter Kulve proclaiming the Settlement Amendment was "forced," constituted "so many breeches of normal business protocol," and potentially amounted to a breach of Unilever's fiduciary duties.[48]  And, as noted in the SAC, Unilever's "*imminent*" restructuring of its ice-cream business underscores the question of whether the new entity will adhere to Unilever's contractual commitments, a "ripe" concern given Unilever's reprisals and Mr. ter Kulve's allegations of coercion.[49]  Here, considering Unilever's attempts to renege on or alter the Settlement Amendment, its threats and reprisals related to those who attempt to enforce the agreement, and its "imminent" restructuring of its ice cream business, declaratory judgment serves a useful purpose in clarifying the Parties' rights and obligations.[50]

---

[45] Settlement Amendment at 1.

[46] SAC ¶ 40.

[47] *Id.* ¶ 39.

[48] *Id.* ¶ 37; *see also* Declaration of Angela Peterson ("Peterson Decl.") Ex. A (April 9, 2024 Email from Peter ter Kulve).

[49] SAC ¶¶ 37, 39, 51–52; *see also* Peterson Decl. Ex. A (April 9, 2024 Email from Peter ter Kulve).

[50] SAC ¶¶ 36–40, 43, 51–52.

2.    **B&J's declaratory relief claim regarding the "Spin-Off" remains ripe because of Unilever's ongoing censorship and repeated threats.**

Unilever's argument to this Court that the "Spin-Off" claim is not "ripe" is contradicted by its public announcement made **the day before** its filing, that the Spin-Off is "well on track"[51] and set to be "complete[d]" by 1 July, 2025, when the new business ("The Magnum Ice Cream Company") will "operate on a standalone basis."[52]  As Unilever is well aware, such an imminent transaction suffices for a justiciable controversy.  *Cf. R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 106 (2d Cir. 1989) (holding that a contemplated merger between Lipton, a Unilever subsidiary, and its competitor, Celestial, presented a live controversy even **after** the transaction had been abandoned because "there [was] more than a 'mere' or 'abstract' possibility that Lipton will again seek to acquire Celestial"); *see also Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 383 (S.D.N.Y. 2007) (explaining that it is clear from the U.S. Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), that "future conduct may be sufficiently imminent to comprise an 'actual controversy'").

Ben & Jerry's requests a declaration that Unilever cannot truncate the Independent Board's rights by wrapping it into a new company via a transaction that Unilever itself refers to as "imminent" and nearly "complete[d]"[53]: a "ripe" concern given Unilever's explicit threats to dismantle the Independent Board, ongoing censorship of Ben & Jerrys, concurrent attempts to diminish the Independent Board's authority, and hasty efforts to remove Ben & Jerry's CEO.[54] The Court need not assume anything about the form, completion, or outcome of the Spin-Off to

---

[51] Peterson Decl. Ex. C (Unilever: Q1 2025 Trading Statement (Webcast & Q&A)) at 21:14.

[52] *See* Peterson Decl. Ex. B (Unilever, *Resilient performance, full year outlook recommended* at 3 "Ice Cream separation" (April 24, 2025)).

[53] SAC ¶ 52; *See* Peterson Decl. Ex. B (Unilever, *Resilient performance, full year outlook recommended* at 3 "Ice Cream separation" (April 24, 2025)).

[54] *See e.g.,* SAC ¶¶ 15, 24–27, 39, 43–52.

do this,[55] contrary to Unilever's claims; rather, the Court can grant Ben & Jerry's requested relief simply by clarifying the parties' present rights regarding a threatened violation, as it plainly has the power to do.  *See Russian Standard Vodka (USA), Inc.*, 523 F. Supp. 2d at 383.

### 3. Unilever should not be able to moot the declaratory relief claim regarding Ben & Jerry's CEO by intimidating Ben & Jerry's CEO.

Unilever alleges that Mr. Stever "voluntarily" departed from a company where he worked for more than three decades, after only being CEO for a year, and despite being offered "more pay" and a "bigger role," without any inappropriate intervention on its part.  Putting aside the plausibility of Unilever's narrative, Unilever ignores Ben & Jerry's allegations that it "repeatedly threatened" Mr. Stever for cooperating with the Independent Board (including explicitly in his January 2025 performance review) prior to Unilever's swift attempt to remove him.[56]  Because Unilever has made clear that it will punish a CEO whom it deems to have "repeatedly acquiesced to the demands of the Independent Social Mission Board,"[57] and given its representation that *four-days*' notice to the Independent Board constituted good faith consultation prior to a CEO's removal,[58] Unilever's conduct is "capable of repetition, yet evading review." *See R.C. Bigelow, Inc.*, 867 F.2d at 105–06.

Even if the declaratory relief claim regarding Mr. Stever's removal is deemed moot, however, Unilever has failed to challenge that the threats it made towards Mr. Stever before attempting to remove him in and of themselves constitute a breach of its obligations under the Settlement Agreement and therefore survive as a breach of contract claim.[59]

---

[55] Many of the questions Unilever posed regarding its own Spin-Off in its April 25, 2025, Motion—including "form" and "completion"—were directly addressed by Srinivas Phatak (Unilever's acting Chief Financial Officer) *the day before* (April 24, 2025) between minute mark 21:14-22:08 on Unilever's webcast titled: "Unilever: Q1 2025 Trading Statement (Webcast & Q&A).  *See* Peterson Decl. Ex C.

[56] SAC ¶¶ 43, 48.

[57] *Id.* ¶ 48.

[58] *Id.* ¶ 45; Mot. at 21.

[59] *See e.g.*, SAC ¶¶ 49, 51, 55 ("intimidate Ben & Jerry's personnel"); Settlement Agreement at 1.

**C.    Ben & Jerry's has adequately pleaded damages based on loss of goodwill, nonpayment to third-party beneficiaries, and (at a minimum) nominal damages in relation to diluting the social mission and usurping the Independent Board's authority.**

Despite describing Ben & Jerry's social mission as "an integral part of the B&J brand" and a "unique character" of the company, Unilever nevertheless attempts to argue that Ben & Jerry's and the Independent Board have not plausibly alleged damages. Unilever's damages challenge, however, ignores the allegations in the SAC, which support reasonable inferences that (1) Ben & Jerry's suffered at least two forms of injury through loss of goodwill and nonpayment of donation funds and (2) the Independent Board itself has suffered injury through Unilever's usurpation of its authority and its failure to adhere to its contractual commitments. Any of these allegations are sufficient to state a claim for damages at the pleading stage. *Fed. Hous. Fin. Agency for Fed. Home Loan Mortg. Corp. v. Morgan Stanley ABS Cap. I Inc.*, 73 N.Y.S.3d 374, 784 (Sup. Ct. 2018) ("At the pleading stage . . . it is not necessary for the plaintiff to plead the precise measure of damages. The complaint need only allege facts from which damages may reasonably be inferred.").

First, the SAC adequately alleges damages for loss of goodwill.  Under New York law, breach-of-contract damages "can include loss of goodwill," including "harm to business reputation." *RIJ Pharm. Corp. v. Ivax Pharm., Inc.*, 322 F. Supp. 2d 406, 414 (S.D.N.Y. 2004) (citation omitted). The Complaint alleges numerous facts showing that Unilever's breaches caused harm to Ben & Jerry's goodwill and reputation, including that: (a) Ben & Jerry's has spent decades establishing its social mission and brand integrity; (b) Ben & Jerry's reputation and goodwill with customers are dependent on continued commitment to such activism; (c) customers choose Ben & Jerry's over other brands because of this commitment, as demonstrated by numerous actual customer statements; (d) muzzling, suppressing, or publicly undermining Ben & Jerry's social

activism injures its reputation and goodwill with these same customers; and (e) Unilever has breached its obligations by censoring Ben & Jerry's social activism.[60]

Second, Unilever is wrong that Ben & Jerry's is unharmed by Unilever's failure to disburse funds to its donation designees. It is "well-settled" under New York law that a promisee "may sue the promisor to enforce [a] contract" for non-payment to a third-party beneficiary. *In re O.P.M. Leasing Servs., Inc.*, 21 B.R. 993, 1005 (Bankr. S.D.N.Y. 1982); *see also Berger v. Heckler*, 771 F.2d 1556, 1564 (2d Cir. 1985) ("[I]n New York a promisee for the benefit of third parties may enforce the promise on behalf of the third parties."). As a party who contracted for benefits to its designated donation recipients, Ben & Jerry's can enforce Unilever's promise to pay even if Ben & Jerry's will not be the one to receive the money. Moreover, Ben & Jerry's **will** receive the funds—the Settlement Agreement provides that "Unilever will make two $2,500,000 payments **to Ben & Jerry's Homemade Inc**."[61] That Ben & Jerry's will then use this $2.5 million to make donations does not change the fact that the company is contractually entitled to the payment. Moreover, Unilever's continued withholding of these funds from Ben & Jerry's underscores why a party other than Unilever (or someone it controls) must pursue relief on Ben & Jerry's behalf.

Finally, both Ben & Jerry's and the Independent Board have alleged nominal damages, at a minimum, in relation to Unilever's failure to adhere to its contractual obligations, including its efforts to dilute the social mission, threaten personnel, and usurp the Independent Board's authority.[62] In New York, "actual damages **are not an essential element** of a breach of contract cause of action." *Giamundo v. Dunn*, 195 N.Y.S.3d 724, 728 (App. Div. 2023) (emphasis added). Applying this principle, the Second Circuit has held that claims for breach of contract under New York law cannot "be dismissed for failure to plausibly allege damages" because "nominal damages

---

[60] *See e.g.*, SAC ¶¶ 10, 14–27, 47, 50, 58 & n.11.
[61] Settlement Agreement at 2 (§2(g)) (emphasis added).
[62] SAC at 23 (Prayer for Relief); *id.* ¶¶ 55–56, 58.

are ***always available*** in breach of contract actions." *Saeco Vending, S.P.A. v. Seaga Mfg., Inc*., 2016 WL 1659132, at *7 (S.D.N.Y. Jan. 28, 2016) (first citing *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (emphasis added); and then quoting *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 987 (N.Y. 1993)). Significantly, the *Saeco* opinion issued more than a year after the 2014 decision in *Mariah Re Ltd. v. American Family Mutual Insurance Co.*,[63] the case on which Unilever relies.[64]

**D.    The declaratory relief sought under the Settlement Agreement is not duplicative: while Ben & Jerry's seeks breach-of-contract damages for Unilever's *past* acts of censorship, it seeks declaratory relief in terms of its *ongoing* censorship, including Unilever's present ban on criticizing the Trump administration.**

Unilever's claims of duplication fail because Ben and Jerry's has pleaded a breach-of-contract claim for Unilever's prior acts of censorship (including barring a post supporting the safe passage of refugees), while seeking declaratory relief regarding Unilever's ongoing censorship of any posts criticizing the Trump administration's policies. Even where there is "some overlap between the two claims," a claim for declaratory judgment is not duplicative of a breach of contract claim if it "'seeks distinct relief.'"  *Pers. Watercraft Prod. SARL v. Robinson*, 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017) (citation omitted).  Here, while Count I seeks retrospective relief for breach of contract, Count II's declaratory judgment claim seeks distinct, ***forward-looking*** relief.[65] *Cf. In re Unite Here Data Sec. Incident Litig.*, 740 F. Supp. 3d 364, 387–88 (S.D.N.Y. 2024) (agreeing that declaratory judgment claim was not duplicative because it was "forward looking, and would preserve plaintiffs' rights in the future").

---

[63] 52 F. Supp. 3d 601 (S.D.N.Y. 2014), *aff'd sub nom. Maria Re Ltd. ex rel. Varga v. Am. Fam. Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015).

[64] *See* Mot. at 17–18. In *Saeco*, the court considered the same argument that Unilever makes as well as the exact cases considered in *Mariah Re Ltd*. *See Saeco Vending, S.P.A.*, 2016 WL 1659132, at *7 (analyzing *Lexington 360 Assocs. v. First Union Nat. Bank of N. Carolina*, 651 N.Y.S.2d 490 (App. Div. 1996), among other cases).  *See also Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 571 (S.D.N.Y. 2024) ("For two centuries, courts have recognized that a party who suffers only nominal damages from a material breach may still seek relief in court against the breaching party.").

[65] SAC ¶¶ 60, 67.

Dated: May 2, 2025

Respectfully submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

<u>/s/ *Shahmeer Halepota*</u>
Shahmeer Halepota
Joseph Y. Ahmad
John Zavitsanos (admitted *pro hac vice*)
Daryl Moore (admitted *pro hac vice*)
Kelsi White (admitted *pro hac vice*)
Weining Bai (admitted *pro hac vice*)
Angela M. Peterson (admitted *pro hac vice*)
Thomas Frashier (admitted *pro hac vice*)
Sean Healey (admitted *pro hac vice*)
Sara Fatima Dhanji (*pro hac vice pending*)
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone: (713) 655-1101

*Attorneys for Plaintiffs Ben & Jerry's Homemade, Inc. and the Class I Directors of the Ben & Jerry's Board*

### <u>WORD COUNT CERTIFICATION</u>

The undersigned hereby certifies pursuant to Local Civil Rule 7.1(c) that, excluding the caption, table of contents, table of authorities, signature block, and required certificates, the total number of words in this memorandum is 8,631.

<u>/s/ *Shahmeer Halepota*</u>
Shahmeer Halepota

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically on May 2, 2025. As such, this document was served on all counsel of record pursuant to the Federal Rules of Civil Procedure.

<u>/s/ *Shahmeer Halepota*</u>
Shahmeer Halepota