**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BEN & JERRY'S HOMEMADE, INC., | ) | |
| CLASS I DIRECTORS OF BEN & JERRY'S | ) | |
| INDEPENDENT BOARD, and | ) | Case No. 1:24-cv-08641-PKC |
| THE BEN & JERRY'S FOUNDATION, INC. | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNILEVER PLC, | ) | |
| CONOPCO, INC., | ) | |
| BEN & JERRY'S HOLDCO, LLC, and | ) | |
| THE MAGNUM ICE CREAM COMPANY | ) | |
| N.V. | ) | |
| | ) | |
| *Defendants*. | ) | |

**BEN & JERRY'S HOMEMADE, INC. AND CLASS I DIRECTORS OF BEN & JERRY'S INDEPENDENT BOARD'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND <u>PRELIMINARY INJUNCTION</u>**

TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   FACTUAL BACKGROUND ........................................................................ 1

    A.   The Merger Agreement Preserves the Independent Board's Independence and Explicitly Prohibits Magnum from Removing an Independent Director. ............... 1

    B.   For Twenty-Five Years, the Independent Directors Play a Pivotal Role as a Bulwark against Unilever's Efforts to Dilute Ben & Jerry's Autonomy and Authenticity. ..................................................................................... 3

    C.   Unilever's Latest Leadership Develops a Distaste for Ben & Jerry's Outspoken Values as well as the Merger Agreement's Constraints Preventing it from Controlling the Independent Board. ............................................................. 4

    D.   Following Their Ousting of Ben & Jerry's CEO, Unilever Launches its Scheme to Remove Each of the Independent Directors, Beginning with Chair Mittal. ........ 6

    E.   Defendants Target the Remaining Independent Directors Next. ............................ 9

    F.   Freeing Themselves of the Constraints of the Merger Agreement, Magnum Picks Off Each of the Independent Directors. ......................................................... 10

    G.   Having Replaced Ben & Jerry's CEO and Removed Each of the Independent Directors, Magnum Outlines the Final Step of its Demolition Plan to the *Wall Street Journal*. ..................................................................................... 12

III.  STANDARD FOR INJUNCTIVE RELIEF ................................................. 13

IV.   ARGUMENT .............................................................................................. 13

    A.   Plaintiffs are Likely to Succeed on the Merits of Their Claim Because Defendants' Removal Scheme Breaches both the Merger and Settlement Agreements. ........................................................................................ 13

        1.   Defendants' Removal Scheme Breaches Section 6.14(a) of the Merger Agreement. .................................................................................. 14

        2.   Defendants' Removal Scheme Breaches Section 2(b) of the Settlement Agreement. ................................................................................. 15

    B.   Defendants' Removal Scheme Constitutes Irreparable Harm Because it Destroys the Merger Agreement's One-Of-A-Kind Governance Structure. .......... 15

        1.   The Removal Scheme Upends the Merger Agreement's Unique Balance of Power. ............................................................................ 16

        2.   The Removal Scheme Eliminates the Independent Directors' Oversight Authority. ................................................................................ 18

3.      Magnum Has Conceded That a Breach of the Merger Agreement Constitutes Irreparable Harm. ................................................................. 19

C.      The Equities Tilt Heavily in Favor of Plaintiffs and Preserving the Independent Board in the Same Manner It Has Existed for the Last 25 Years. .......................... 19

D.      The Public Interest Lies in Preserving the Defining Characteristics of an American Institution and the One-Of-A-Kind Agreement Which Enshrined the Same. ........................................................................................................... 21

E.      Ordering Magnum to Allow the Independent Board to Function in the Same Structure it has for Over Two Decades Should Not Require a Bond. .................... 23

V.      CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*3M Co. v. Performance Supply, LLC*,

    458 F. Supp. 3d 181 (S.D.N.Y. 2020) .................................................................. 13

*Bionpharma Inc. v. CorRX, Inc.*,

    582 F.Supp.3d 167 (S.D.N.Y. 2022) ............................................................. 14, 20

*Broker Genius, Inc. v. Volpone*,

    313 F. Supp. 3d 484 (S.D.N.Y. 2018) .................................................................. 13

*CDC Group PLC v. Cogentrix Energy, Inc.*,

    354 F. Supp. 2d 387 (S.D.N.Y. 2005) .................................................................. 16

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,

    598 F.3d 30 (2d Cir. 2010) ................................................................................... 13

*Doctor's Associates, Inc. v. Stuart*,

    85 F.3d 975 (2d Cir. 1996) ................................................................................... 23

*Dong v. Miller*,

    2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) ..................................................... 13

*Eastman Kodak Co. v. Collins Ink Corp.*,

    821 F. Supp. 2d 582 (W.D.N.Y. 2011) ................................................................ 23

*Eng v. Smith*,

    849 F.2d 80 (2d Cir. 1988) ................................................................................... 13

*Iannucci v. Segal Co., Inc.*, No. 06 CIV. 4720 (PKL),

    2006 WL 8407380 (S.D.N.Y. June 27, 2006) ..................................................... 13

*Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*,

    No. 1:24-CV-9914-MKV, 2025 WL 304500 (S.D.N.Y. Jan. 27, 2025) .............. 21

*Mercer Health & Benefits LLC v. DiGregorio*,

    307 F. Supp. 3d 326 (S.D.N.Y. 2018) ............................................................ 19, 21

*Mountain W. Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc.*,

    No. CV 2019-0226-JTL, 2019 WL 2536104 (Del. Ch. June 20, 2019) .............. 21

*Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*,

    582 F. Supp. 2d 616 (S.D.N.Y. 2008) .................................................................. 17

*Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*,

    754 F. Supp. 2d 616 (S.D.N.Y. 2010) .................................................................. 23

iv

*Velez v. Prudential Health Care Plan of NY, Inc.*,
  943 F. Supp. 332 (S.D.N.Y. 1996)................................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................................... 13, 21

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co.*,
  339 F.3d 101 (2d Cir.2003) ............................................................................................. 16

*Woods v. Boston Scientific Corp.*,
  2006 WL 4495530 (S.D.N.Y. 2006)................................................................................. 15

**Rules**

Fed. R. Civ. P. 65........................................................................................................................ 14

## I.    <u>INTRODUCTION</u>

Under a Merger Agreement that has controlled Ben & Jerry's governance for over two decades, Unilever/Magnum are only permitted to select two members of Ben & Jerry's Independent Board, with the majority of directors constituting *independent* directors, who have sole authority to select their successors. Nevertheless, after wrongfully removing each of the independent directors (six in total) in breach of the Merger Agreement, Magnum recently informed the *Wall Street Journal* that it will be appointing its own directors to replace the independent directors it unilaterally removed. Plaintiffs therefore seek a Temporary Restraining Order and Preliminary Injunction enjoining the Defendants—*mid-litigation*—from: (a) preventing the Class I Director Plaintiffs from exercising all rights held by Class I Directors of Ben & Jerry's Homemade, Inc. (including through the imposition or enforcement of term limits or eligibility requirements), thus preserving the status quo so the Class I Director Plaintiffs may exercise their oversight authority during Ben & Jerry's Independent Board meeting scheduled for April 15-16, 2026 and at subsequent meetings until trial; and, <u>alternatively</u>, b) barring Defendants from appointing their own replacement Class I Directors to Ben & Jerry's Independent Board as they have outlined to *The Wall Street Journal*.[1]

## II.    <u>FACTUAL BACKGROUND</u>

**A.    The Merger Agreement Preserves the Independent Board's Independence and Explicitly Prohibits Magnum from Removing an Independent Director.**

Since its founding in 1978, Ben & Jerry's has distinguished itself as a company with a backbone: one that is outspoken on—and often on the vanguard of—a variety of social issues. In 1999, as the company had become a household name, several industry rivals vied to acquire Ben & Jerry's. To distinguish itself from its competition, Unilever instructed its Chief Counsel, Ronald

---

[1] For purposes of this motion, "Plaintiffs" refers to all plaintiffs except Plaintiff The Ben & Jerry's Foundation, Inc. The Ben & Jerry's Foundation is not a movant.

1

Soiefer, that his "job was to collaborate with" Ben & Jerry's "to create a governance structure that would set [Unilever's] bid apart from any others."[2]

Following over a year of negotiations, the resulting Merger Agreement contractually preserved Ben & Jerry's authenticity and autonomy via the creation of an Independent Board. Specifically, Section 6.14 of the Merger Agreement granted the Independent Board oversight authority over Ben & Jerry's social mission and brand integrity, providing the Independent Board—rather than Unilever—with "primary responsibility" over the same.[3]  The Independent Board was also explicitly empowered with the authority to "prevent *any action* by the [Ben & Jerry's] CEO in the areas of new product introduction, the changing of product standards and specifications, the approval of the content of marketing materials and the licensing or other use of Ben & Jerry's trademark . . ."[4]

To preserve the Independent Board's independence—and protect the directors from Unilever's intimidation and undue influence—Section 6.14(a) of the Merger Agreement forbade Unilever from "removing" any independent directors ("Class I Directors") without a "written request of at least a majority" of the remaining independent directors.[5]  Moreover, while Unilever would be able to designate one "Class U" director to the Independent Board, the majority of Ben & Jerry's board would be compromised of the Class I Directors, who would have the *sole authority* to choose their successors.[6]

As Richard Goldstein, Unilever's then-Chief Executive Officer of North America, described: "The *only* reason we were successful in the acquisition is because Ben and Jerry became

---

[2] "Ice Cream Social" at 170, Ex. 1 to Declaration of Shahmeer Halepota filed herewith ("Halepota Decl.").
[3] Merger Agreement at §§ 6.14(e) & (f) (hereafter "Merger Agreement"), Ex. 2 to Halepota Decl.
[4] *Id.* at § 6.14(f). As an additional oversight mechanism, the Independent Board determines a "significant" portion of the Ben & Jerry's CEO's bonus based on fidelity to the social mission. *Id*. at § 6.16(d).
[5] *Id.* at 6.14(a).
[6] *Id.* (emphasis added).

2

convinced that Unilever would honor its word. . . . There was no point in buying the brand unless we could get the founders to agree that this is what they wanted."[7] Unilever's then-Chief Counsel, Ronald Soiefer, confirmed: "Perpetuity is what really distinguishes this deal from other deals involving socially responsible businesses. The board of Ben & Jerry's is not going away. They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent. *It isn't like Unilever can run out the clock*."[8]  That is precisely, however, what Unilever/Mangum are attempting to do.

**B.     For Twenty-Five Years, the Independent Directors Play a Pivotal Role as a Bulwark against Unilever's Efforts to Dilute Ben & Jerry's Autonomy and Authenticity.**

Since the Merger Agreement's execution in 2000, the Independent Board has played a critical role in fighting back against Unilever's attempts to dilute Ben & Jerry's authenticity, social mission, and brand integrity.  For instance, in 2008, Unilever sought to shut down the Ben & Jerry's plant in Waterbury, Vermont, which was the company's first factory, built in 1985.  The closure of that plant would have devastated the local economy.  The Independent Board determined that such closure was inconsistent with the company's social mission and brand integrity, informing Unilever of their decision.[9]  Following months of back and forth, in a letter dated March 14, 2009, Michael B. Polk (Unilever's President of Americas & Global Customer Development) concluded: "Unilever respects the Board's concerns about the community of Waterbury and *of course will abide by the final decision of the Board*."[10]

The Independent Board's other oversight achievements include preventing Unilever from degrading the quality of Ben & Jerry's products and continuing Ben & Jerry's principled stances

---

[7] Ex. 1 to Halepota Decl., Ice Cream Social, at 159.
[8] *Id.* at 170.
[9] Declaration of Anuradha Mittal at ¶ 18(a) filed herewith ("Mittal Decl.")
[10] *Id.*; *see also* Ex. 2 to Mittal Decl. (3/14/2009 Letter from M. Polk).

on social justice issues.[11]  For example, in June 2022, Unilever sold Ben & Jerry's trademark rights in the Occupied Palestinian Territories ("OPT") without the Independent Board's approval and in the face of rampant accounts of human rights abuses.  The Independent Board—expressly empowered under the Merger Agreement with authority over the "licensing or other use of the Ben & Jerry's trademark"—initiated litigation on behalf of itself and the company against Unilever.[12]

The parties ultimately settled their dispute in December 2022, with the Independent Board seeking to further reaffirm both their independence and autonomy.  Under Section 2(b) of the resulting Settlement Agreement, Unilever is contractually obligated to "[r]espect and acknowledge" the Independent Board's "primary" authority over the social mission and brand integrity and to work "in good faith with the Independent Board to ensure that both are protected and furthered."[13]

**C.      Unilever's Latest Leadership Develops a Distaste for Ben & Jerry's Outspoken Values as well as the Merger Agreement's Constraints Preventing it from Controlling the Independent Board.**

For the last seven years, Ben & Jerry's Independent Board has been led by Chair Anuradha Mittal, who was nominated to the board in 2008 given her experience with food, agriculture, and human right issues.[14]  Under the stewardship of Chair Mittal and the Independent Board, Ben & Jerry's has been praised as the "gold standard" for corporate activism, with the brand's authenticity resonating with consumers.[15]  This "gold standard" has translated into commercial success, with Ben & Jerry's becoming one of Unilever's few billion Euro brands.[16]

---

[11] Mittal Decl. at ¶ 18(a) – (j); Declaration of Chris Miller at ¶¶ 2 - 21 filed herewith ("Miller Decl.").
[12] Case No. 1:22-cv-05681, *Ben & Jerry's Homemade, Inc. v. Conopco, Inc.*, SDNY, filed 7/5/22.
[13] December 13, 2022 Settlement Agreement at § 2(b), Ex. 3 to Halepota Decl.
[14] Mittal Decl. at ¶ 1.
[15] Ex. 4 to Halepota Decl., Solis, M. (2020, July 31).
[16] Ex. 5 to Halepota Decl., Jefferson, M. (2022, February 10).

While the Independent Board has remained steadfast in protecting Ben & Jerry's social mission and brand integrity, Unilever's leadership has had significant reshuffles, with its latest executives developing a distaste for Ben & Jerry's outspoken values and the Merger Agreement's governance structure. For example, in January 2024, Peter ter Kulve—weeks into his appointment as Unilever's President of Ice Cream—wrote to the Independent Board Chair, Anuradha Mittal, referring to her as "manic" and suggesting she resign from her position in response to a proposed post calling for "peace" and a "ceasefire" in Gaza.[17] Mr. ter Kulve—who is now Magnum's CEO—is a close ally of Nelson Peltz, a prominent member of Unilever's Board of Directors. In March 2024, Mr. Peltz told the *Financial Times*: "Ben & Jerry's job is to sell ice cream, not to make political statements. And these people use anything for a soapbox that they have no right to do."[18] He added: "What sense is being a billionaire if you're not a bully?"[19]

On cue, Unilever threatened the Independent Board with dissolution, lawsuits, and penalties if Ben & Jerry's used its voice to support Palestinian human rights, including calling for the safe passage of refugees from Gaza.[20] Given Unilever's censorship and repeated intimidation tactics, the Independent Board filed this lawsuit on November 13, 2024 to protect the social mission and the Merger Agreement's one-of-a-kind governance structure. Unilever's intimidation efforts, however, only escalated thereafter, broadening to Ben & Jerry's CEO, Dave Stever, a lifelong Ben & Jerry's employee who Unilever considered friendly with the Independent Board.

Specifically, in January 2025, Unilever's President of Ice Cream for North America (Gerardo Rozanski) and Unilever's Chief Human Resources Officer (Ronald Schellekens) chastised Mr. Stever in his written annual performance review for "repeatedly acquiesce[ing] to

---

[17] Mittal Decl. at ¶ 3; Ex. 1 to Mittal Decl.
[18] Ex. 6 to Halepota Decl., Agnew, H. (2024, March 22).
[19] *Id*.
[20] Mittal Decl. at ¶ 3.

the demands of the Independent Social Mission Board."[21] The subpar performance review was issued despite Ben & Jerry's having outperformed Unilever's ice cream portfolio and being ranked #2 on the Brand 500 Authenticity Index in 2024 under Mr. Stever's tenure.[22] Less than two months after their written threat towards Mr. Stever, on March 3, 2025, Unilever informed the Independent Board that they would be replacing Mr. Stever (a *thirty-plus year employee* who had begun his career as a tour guide at the Ben & Jerry's Waterbury plant) upon four-days' notice.[23] The Independent Board filed its Second Amended Complaint on April 4, 2025, challenging Unilever's ongoing censorship, continued attempts to usurp the Independent Boards' authority, and threats towards and attempt to hastily replace Ben & Jerry's CEO.[24] Meanwhile, with the CEO neutralized, Unilever turned to the Independent Board next.

**D.    Following Their Ousting of Ben & Jerry's CEO, Unilever Launches its Scheme to Remove Each of the Independent Directors, Beginning with Chair Mittal.**

*Five days* after the Independent Board filed its Second Amended Complaint, while Unilever's Motion to Dismiss was pending, Abhijit Bhattacharya (Magnum's CFO, second in command to Mr. ter Kulve) wrote to The Ben & Jerry's Foundation, for which Chair Mittal serves as a trustee. Mr. Bhattacharya demanded an unprecedented, mid-litigation, out-of-the-blue, "expedited" audit of the Foundation.[25] The Foundation—which celebrated its fortieth anniversary this year—has never been accused of any wrongdoing or the subject of IRS or other regulatory scrutiny.[26] Between 2000 to 2024, Unilever disbursed over $68 million to the Foundation per a formula in the Merger Agreement.[27] At no point during this over two-decade span did Unilever

---

[21] Mittal Decl. at ¶ 2.
[22] Ex. 7 to Halepota Decl., Authenticity Index.; *see also* Ex. 5 to Halepota Decl., Jefferson, M. (2022, February 10).
[23] Mittal Decl. at ¶ 2.
[24] Dkt. No. 50 filed in this matter (Case No. 1:24-cv-08641-PKC).
[25] Declaration of Liz Bankowski at ¶¶ 2-3 filed herewith ("Bankowski Decl."); Ex. 1 to Bankowski Decl.
[26] Bankowski Decl. at ¶ 4.
[27] *Id.* at ¶ 3.

request an audit, challenge the Foundation's governance, or object to any donation recipients.[28] Either Unilever had been asleep at the wheel for *over two decades*, or there was an ulterior motive behind its actions.

That question was answered on April 22, 2025, when Unilever's plot was laid bare in a press article.  Less than two weeks after Mr. Bhattacharya's letter, an article appeared in *Semafor* stating that the media outlet had been provided a copy of the private letter and affirming that "Unilever is probing the finances of Ben & Jerry's charitable foundation with a focus on its grants to progressive and pro-Palestinian groups . . . .  ***Unilever executives*** have privately identified a series of grants to the Oakland Institute [where Chair Mittal serves as executive director], a nonprofit that promotes global aid and is critical of the World Bank and Israel . . . ."[29]  Consistent with the *Semafor* article, Unilever selected Forensic Risk Alliance—a firm that operates "purely in the forensic space" and provides expert-witness services in litigation—as their auditor, negating Unilever's repeated public representations of a "routine" audit.[30]

Given Unilever's threats to withhold millions in charitable funds that had already been allocated to various nonprofits, the audit was initiated—but only after the Foundation secured a commitment that Unilever would share the final audit report.[31]  Unilever agreed, proclaiming that disclosure would promote "transparency for all involved."[32]  What followed, however, bore no resemblance to a neutral review, as the Foundation trustees quickly recognized the unprecedented, expeditious "audit"—ultimately conducted by a forensics team at E&Y—for what it was: a pretextual fishing expedition aimed at drumming up allegations against Chair Mittal.

---

[28] *Id.*
[29] Ex. 8 to Halepota Decl., Hoffman, L. (2025, April 22) (emphasis added).
[30] Ex. 9 to Halepota Decl., website of Forensic Risk Alliance.
[31] Bankowski Decl. at ¶ 6.
[32] *Id.*; *see also* Ex. 2 to Bankowski Decl.

The trustees raised several concerns throughout the course of the audit, including that: (i) by sheer volume and magnitude, both the questions asked and documents requested during the "audit" had one intended target: Chair Mittal; (ii) EY refused to allow trustees to respond to certain questions in writing; and, (iii) EY refused to provide its written scope of work (i.e., the directions Unilever provided it)—despite Unilever's public representations that the audit was "routine" and "independent."[33]  In fact, the use of EY seemed to be merely a cover, as the very first entry on an EY document list confirmed that the mid-litigation, unprecedented, expedited audit was being driven by Unilever's litigation counsel:[34]

| Document File Name | Document Title Name | Comments |
|---|---|---|
| Background for EY_Privileged & Confidential_Attorney Work Product.pdf | Background Overview | Background overview of the situation, similar to our meeting notes with Skadden and Weil but have more depth on the grants in question. |

Unsurprisingly, when EY completed its report on September 2, 2025, Unilever reneged on its transparency commitments, refusing to share the audit report with the Foundation.[35]  Unilever's refusal to disclose the audit report had one obvious explanation: the audit had not uncovered the dirt against Chair Mittal Unilever had hoped for.  Public reporting later confirmed as much, noting that while the audit criticized certain controls processes, sources stated the audit did not find wrongdoing, ethical malpractice, or violations.[36]  Rather than accept those exculpatory results and inspired to find a means to remove Chair Mittal—as Plaintiffs foreshadowed in their SAC— Unilever utilized the audit report it refused to disclose to launch an internal "investigation."

In September 2025, Unilever weaponized the Foundation "audit" by calling for an "integrity investigation" against Chair Mittal based on the audit report Unilever was *simultaneously concealing*.  Unilever initiated the investigation by self-selecting a law firm—that

---

[33] Bankowski Decl. at ¶¶ 7-8; Mittal Decl. at ¶ 5.
[34] Mittal Decl. at ¶ 4.
[35] Bankowski Decl. at ¶ 8; Mittal Decl. at ¶ 5.
[36] Ex. 18 to Halepota Decl., DiNapoli, J. (2025, Dec. 3).

had co-orchestrated the underlying audit, had deep financial ties with Unilever, and was *concurrently advising* Unilever on its demerger efforts—to serve as the "independent" investigator.[37]  The disinterested Class I Directors were not even consulted during this selection process.[38]

Despite her well-founded concerns regarding the pretextual nature of Unilever's efforts, Chair Mittal offered to provide information to the "investigator" if it simply confirmed its independence and lack of involvement in the underlying audit.[39]  The law firm refused.  Faced with the Merger Agreement's bar prohibiting their removal of a Class I Director, Unilever and its "independent" investigator strung together a series of "allegations" to reach their desired conclusion that Chair Mittal should be removed and then leveraged their tainted allegations against Chair Mittal and the Independent Board.  Specifically, on October 23, 2025, Defendants—while concurrently continuing to conceal the audit report—presented their "findings" to the disinterested Class I Directors, coupled with the threat that they would face repercussions if they disagreed with Unilever's allegations against Chair Mittal.[40]

**E.    Defendants Target the Remaining Independent Directors Next.**

On October 24, 2025, the independent directors put forward a series of questions highlighting the weaknesses of Unilever's assertions and again demanded a copy of the audit report and the scope of work.[41]  Unilever dodged the questions and refused to provide the critical documents.[42]  Instead, Unilever continued full steam ahead with their removal scheme.  While the independent directors were preparing a robust response to Unilever's allegations, Unilever's

---

[37] Mittal Decl. at ¶ 4-5.
[38] Mittal Decl. at ¶ 6.
[39] *Id.*
[40] *Id.*
[41] Mittal Decl. at ¶ 7.
[42] *Id.*

appointed CEO for Ben & Jerry's, Mr. Jochanan Senf, told Ben & Jerry's personnel that the January 2026 Independent Board meeting would not occur, canceled check-ins with the Independent Board Chair and planned onboarding with the independent directors, and ignored correspondence from the independent directors.[43]

On December 3, 2025, the Class I Directors responded to Magnum's allegations against Chair Mittal with a detailed 26-page rebuttal highlighting the severe deficiencies of the "investigation" and its purported findings, including that they had been orchestrated by Unilever's litigation and demerger counsel.[44]  The Merger Agreement requires "a written request of at least a majority of the independent directors" to remove an independent director.[45]  After reviewing Unilever's allegations, ***none*** of the independent directors—which include the CEO of a nine-figure company, the Managing Director of a nine-figure private equity impact fund, and a Columbia PhD/post-doctoral Yale Law Fellow/Dartmouth College professor—voted for removal.[46] Undeterred, Unilever/Magnum proceeded with their removal plot.

On December 6, 2025, Magnum demerged from Unilever.  Two days later, on December 8, 2025, Ms. Villar—now Magnum's General Counsel—stated Magnum would respond to the Independent Board's letter in "due course."[47]  Magnum never responded.  Instead, it launched the final step in its removal scheme.

**F.    Freeing Themselves of the Constraints of the Merger Agreement, Magnum Picks Off Each of the Independent Directors.**

On December 15, 2025, Magnum purported to remove Chair Mittal from the Independent Board "effective immediately"; remove independent directors Jennifer Henderson and Daryn

---

[43] Mittal Decl. at ¶ 6.
[44] Mittal Decl. at ¶ 7; Ex. 3 to Mittal Decl.
[45] Merger Agreement at § 6.14(a).
[46] Mittal Decl. at ¶ 7.
[47] Mittal Decl. at ¶ 8.

Dodson "effective December 31, 2025," should they not resign; and set up the removal of the remaining Class I Directors through an entirely new, extracontractual removal mechanism— labeled an "eligibility" standard—that was adopted late Friday, December 12, 2025, purportedly added to the Ben & Jerry's articles of incorporation on Sunday, December 14, 2025, and executed for the first time on Monday, December 15, 2025.[48]

In a series of same-day letters, Defendants informed the independent directors that they had allegedly violated the new code of conduct and term limit provisions rendering all Class I Directors either ineligible or potentially ineligible, thereby triggering their automatic removal from the Independent Board, while stating that they were also under "investigation" for refusing to remove Chair Mittal.[49] Overnight, Magnum unilaterally removed six *independent* directors, leaving *none* left on the Independent Board.

Magnum has not been particularly clandestine in hiding its intentions.  Specifically, in its midnight amendments, Magnum attempted to enact two-decades-after the fact quorum changes which now purportedly allow Ben & Jerry's Independent Board meetings to occur ***without the presence of any independent directors***.[50] Within forty-eight hours of receiving Magnum's removal notices and midnight bylaws amendments, on December 17, 2025, the independent directors sought relief to prevent Magnum's decimation of the Independent Board, including adding Magnum as a defendant in order to seek injunctive relief.  (Dkt. No. 64).  On December 23, 2025, the Court set a briefing schedule regarding Plaintiffs request to file a Third Amended Complaint ("TAC"). (Dkt. Nos. 69 & 70).

---

[48] Exs. 12 - 17 to Halepota Decl., December 15, 2025 letters.
[49] *Id*.
[50] *See e.g.* 2nd Am. and Restated Bylaws at § 3.5, attached to Ex. 13 to Halepota Decl.

11

**G.** **Having Replaced Ben & Jerry's CEO and Removed Each of the Independent Directors, Magnum Outlines the Final Step of its Demolition Plan to the *Wall Street Journal*.**

On January 11, 2026, Plaintiffs filed their motion for leave to file the TAC, alleging that Defendants' efforts to hijack the Independent Board breached the Merger Agreement and Settlement Agreement. (Dkt. No. 72). In their January 20, 2026, response, Defendants argued any such challenge is futile, alleging they had merely made an innocent "governance" update, while claiming the "Merger Agreement remains unchanged." (Dkt. No. 73 at 8, 16).

Within thirty-six hours of that representation to this Court, on January 22, 2026, Magnum informed *The Wall Street Journal*—in further contravention of the Merger Agreement's appointment process and antithetical to the term "independent"—that Magnum "would appoint an independent chair who would then appoint new independent directors to the *new* Ben & Jerry's board."[51]

On March 20, 2026, the Court granted Plaintiffs' motion for leave to file the TAC, setting March 27, 2026 as the date for Plaintiffs to propound an interrogatory regarding the citizenship of Ben & Jerry's HoldCo LLC and April 3, 2026 as the date for Ben & Jerry's HoldCo LLC to respond. (Dkt. No. 77). Plaintiffs filed their TAC on April 10, 2026—days after receiving the interrogatory—seeking injunctive relief following Magnum and Ben & Jerry's HoldCo LLC addition as Defendants.  Ben & Jerry's next Independent Board meeting is set to occur on April 15-16, 2026.  Plaintiffs seek a Temporary Restraining Order and Preliminary Injunction enjoining Defendants from preventing the Class I Director Plaintiffs from exercising their rights at that meeting and subsequent meetings, and, alternatively, barring Magnum from appointing any independent directors as they have outlined to *The Wall Street Journal*.

---

[51] Ex. 10 to Halepota Decl., Look, A (2026, Jan. 22) (emphasis added).

### III.    STANDARD FOR INJUNCTIVE RELIEF

Pursuant to Federal Rule of Civil Procedure 65(b), a party may seek a temporary restraining order if faced with immediate and irreparable injury. *See* Fed. R. Civ. P. 65(b); *Iannucci v. Segal Co., Inc.*, No. 06 CIV. 4720 (PKL), 2006 WL 8407380, at *3 (S.D.N.Y. June 27, 2006). The standards for granting a temporary restraining order and a preliminary injunction are the same. *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020).

Federal Rule of Civil Procedure 65 authorizes a preliminary injunction where a plaintiff "establish[es] [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit view these requirements holistically. Thus, "[i]n the Second Circuit, a movant may obtain a preliminary injunction" even if its likelihood of success on the merits is unclear, if it demonstrates "the existence of 'serious questions going to the merits to make them a fair ground for litigation'" and "'a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Dong v. Miller*, 2018 WL 1445573, at *5 (E.D.N.Y. Mar. 23, 2018) (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).

### IV.    ARGUMENT

**A.    Plaintiffs are Likely to Succeed on the Merits of Their Claim Because Defendants' Removal Scheme Breaches both the Merger and Settlement Agreements.**

"To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent.'" *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). A party demonstrates a likelihood of success

on the merits in a breach of contract case when it shows that Defendants likely breached the agreement. *See Bionpharma Inc. v. CorRX, Inc.*, 582 F.Supp.3d 167, 177 (S.D.N.Y. 2022).

> **1.    Defendants' Removal Scheme Breaches Section 6.14(a) of the Merger Agreement.**

Section 6.14(a) preserves the Independent Board's independence by: a) expressly prohibiting Defendants from removing an independent director; b) mandating that a majority of the Independent Board will constitute independent directors; and c) only allowing independent directors to select their successors. Defendants have breached Section 6.14(a) in at least three ways.

*First*, Section 6.14(a) of the Merger Agreement establishes that Magnum may only remove an independent director "at the written request of at least a majority of" the independent directors "and shall not otherwise remove any member of the" Independent Board. Magnum received no such "written request" for *any* of the independent directors, yet unilaterally removed *all* of them.[52]

*Second*, Section 6.14(a) mandates that a majority of the independent board will consist of independent directors.  Defendants readily admit that, due to their removal efforts, "as of January 1, 2026, the Board consists only of the Class U Director and B&J's CEO," both Magnum appointees.[53]

*Third*, Section 6.14(a) mandates that only the independent directors shall be permitted to select their successors.  Per its own statements to *The Wall Street Journal*, Magnum now has total control over the entire Independent Board and is presently moving to appoint *each* director, including the Class I or "independent" directors.[54]

---

[52] Exs. 12 – 17 to Halepota Decl.; Mittal Decl. at ¶ 7.
[53] Dkt. No. 73 at 9.
[54] Ex. 10 to Halepota Decl., Look, A (2026, Jan. 22).

Moreover, Defendants' pretextual defense—that they are allegedly acting in accordance with United Kingdom and Dutch protocols—does not pass facial muster.  First, Unilever—a United Kingdom company—at no point in 25 years claimed that the Independent Board was subject to purported European-based board term regulations.  Second, Ben & Jerry's is a Vermont company.  Third, and perhaps most on point, the majority of the independent directors Magnum removed had served less than nine years.

2.      **Defendants' Removal Scheme Breaches Section 2(b) of the Settlement Agreement.**

Section 2(b) of the Settlement Agreement requires Defendants to "[r]espect" the Independent Board's authority and work with them in "good faith."[55]  Purging each of the independent directors, unilaterally amending bylaws so Independent Board meetings may occur without the presence of a single independent director, and hijacking the Independent Board so that all directors will now be Magnum's appointees is the antithesis of Magnum's "respect[ing]" the Independent Board's authority and working with them in good faith.

B.      **Defendants' Removal Scheme Constitutes Irreparable Harm Because it Destroys the Merger Agreement's One-Of-A-Kind Governance Structure.**

The Second Circuit has recognized that loss of "'bargained-for minority rights' may constitute irreparable harm when those rights 'are central to preserving an agreed-upon balance of power in corporate management," including when loss of said rights would constitute loss of 'voice' in the management of a company." *Woods v. Boston Scientific Corp.*, 2006 WL 4495530, at \*22 (S.D.N.Y. 2006), adopted, 2007 WL 1847435 (S.D.N.Y. 2007), *aff'd in relevant part, vacated in part on other grounds*, 2007 WL 2471744 (2d Cir. 2007) (summary order). Further, as this Court has previously held, the loss of corporate veto rights constitutes irreparable harm. *CDC*

---

[55] Settlement Agreement at § 2(b), Ex. 3 to Halepota Decl.

15

*Group PLC v. Cogentrix Energy, Inc*., 354 F. Supp. 2d 387, 394 (S.D.N.Y. 2005) *quoting Wisdom*

*Import Sales Co., LLC v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir.2003) ("The only way to

render the provision [granting the right to veto certain transactions with which a party disagreed]

truly viable is to enforce it.").

  **1.  The Removal Scheme Upends the Merger Agreement's Unique Balance of Power.**

Under the Merger Agreement's "agreed-upon balance of power," Unilever is forbidden

from removing the independent directors, who shall constitute a majority of the Independent Board

and *solely be responsible for selecting their successors*.[56] The Removal Scheme constitutes

irreparable harm because Defendants have eliminated that contractually-agreed-upon balance of

power by removing each of the Independent Directors and instead are attempting to replace them

with Magnum appointees.

That irreparable harm is heighted due to what both parties agree is the one-of-a-kind nature

of the Merger Agreement's governance structure. Indeed, Ronald Soiefer (former General Counsel

of Unilever USA and Chief Counsel in 2000) was instructed that his "job was to collaborate with"

Ben & Jerry's "to create a governance structure that would set [Unilever's] bid apart from any

others."[57] The eventual 2000 Merger Agreement was described by Richard Goldstein (former

Chief Executive Officer of Unilever North America) as the "most unique" deal he had ever been

involved in: "I never did another deal that was remotely like it."[58] And, as Ben & Jerry's co-

founder, Ben Cohen, underscored: the Merger Agreement would not have been executed without

---

[56] Merger Agreement at § 6.14(a).
[57] Ex. 1 to Halepota Decl., Ice Cream Social at 170.
[58] *Id.* at 156, 172.

16

the safeguards regarding the Independent Board and the contractual prohibition on Unilever removing board members.[59]

Likewise, a critical component of the parties' subsequent 2022 Settlement Agreement was further codifying the Independent Board's authority and rights. As part of the Settlement Agreement, Unilever is expressly obligated to "[r]espect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity" and to "work in good faith with the Independent Board to ensure that both are protected and furthered."[60]

Therefore, Defendant's efforts to remove and replace each of the independent directors constitutes loss of bargained-for governance rights—including the right to select their replacements—under both the Merger and Settlement Agreements, an irreparable injury "difficult if not impossible to value." *Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 626 (S.D.N.Y. 2008) (citing *Wisdom* and holding loss of "a bargained-for right to corporate control" that was "difficult if not impossible to value" and which "could be meaningless or substantially diminished in value by the end of litigation absent injunctive relief" constituted irreparable harm).[61] The resulting irreparable harm is magnified given the one-of-a-kind, heavily negotiated governance structure of the Merger Agreement, or as Unilever's former CEO of North America described, the "most unique" deal he had "ever been involved in."[62]

---

[59] Declaration of Ben Cohen at ¶ 5, filed herewith ("Cohen Decl.").

[60] Settlement Agreement at § 2(b), Ex. 3 to Halepota Decl.

[61] The difficulties, if not impossibilities, associated with valuing the damage to the Independent Board and Ben & Jerry's social mission and brand integrity if the Class I Directors are removed are further explained in the Declarations filed herewith. Cohen Decl. at ¶¶ 2 - 4, 6 - 10; Miller Decl. at ¶¶ 3 - 21; Mittal Decl. at ¶¶ 9 - 18.

[62] Ice Cream Social, at 172.

17

2.      **The Removal Scheme Eliminates the Independent Directors' Oversight Authority.**

The Merger Agreement provides the Independent Board with a "voice" in Ben & Jerry's governance, including oversight authority over Ben & Jerry's social mission and brand integrity, expressly designating the Independent Board as having "primary" authority in these areas vis a vis Magnum.[63] The Independent Board's oversight authority in these areas also extends to Ben & Jerry's CEO, with the Independent Board determining a "significant" portion of the CEO's bonus based on fidelity to the social mission and expressly having the power to "prevent *any action* by the CEO in the areas of new product introduction, the changing of product standards and specifications, the approval of the content of marketing materials and the licensing or other use of Ben & Jerry's trademark . . ."[64]

The Independent Board has repeatedly exercised this oversight authority, including vetoing Unilever's attempt to close the Waterbury factory and repeatedly blocking efforts to degrade product quality.[65] Defendants' removal scheme thus constitutes irreparable harm because it destroys the independent directors' ability to exercise this independent oversight authority, constituting a loss of their voice in Ben & Jerry's governance. Magnum's midnight bylaws amendments exacerbate this harm by attempting to codify Magnum's ability to hold Independent Board meetings, *without the presence of a single independent director*.[66]

These board meetings have consistently been a critical forum for the Independent Board to exercise their oversight authority, including scrutinizing the launching of new products, an area over which they are expressly empowered to "prevent *any action* by the CEO."[67]   The next

---

[63] Merger Agreement at §§ 6.14(e) & (f).
[64] *Id.* at §§ 6.14(f), 6.16(d).
[65] Mittal Decl. at ¶ 18(a); Miller Decl. at ¶ 4.
[66] *See e.g.* Second Am. and Restated Bylaws at § 3.5, attached to Halepota Ex. 13.
[67] Merger Agreement at §§ 6.14(e) & (f) (emphasis added); Mittal Decl. at ¶¶ 9 - 18.

18

Independent Board meeting is set to occur on April 15-16, 2026, during which the Independent Board intends to engage in their oversight authority over product integrity and the social mission, particularly given the plethora of issues currently springing during the Trump administration.[68] Without the relief requested, Magnum will be permitted to simply sidestep the Independent Board's oversight, the lynchpin of the Merger Agreement.

> **3.    Magnum Has Conceded That a Breach of the Merger Agreement Constitutes Irreparable Harm.**

Finally, Magnum has already conceded that a breach of the Merger Agreement constitutes irreparable harm, agreeing that "irreparable damage would occur" in the event of a breach in the Merger Agreement itself.[69] While such clauses are not dispositive, they strongly reinforce that money damages are inadequate for the type of harm at issue here and support the Court's exercise of equitable power to preserve the bargained-for governance structure pending adjudication, particularly one as unique as the Merger Agreement. *See Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 348 (S.D.N.Y. 2018).

**C.    The Equities Tilt Heavily in Favor of Plaintiffs and Preserving the Independent Board in the Same Manner It Has Existed for the Last 25 Years.**

The Independent Board have served as "custodians" over Ben & Jerry's social mission and brand integrity for the past 25 years, stewarding the company as it has become the "gold standard" for corporate activism and flourishing as one of Unilever's few billion-Euro brands.[70] The Removal Scheme fundamentally alters that status quo by removing each of the independent directors. The corresponding harm to plaintiffs is severe, including: 1) the elimination of the Merger Agreement's one-of-a-kind, bargained-for governance structure; 2) the loss of oversight

---

[68] Mittal Decl. at ¶ 18(j).
[69] Merger Agreement at § 9.10, Ex. 2 to Halepota Decl.
[70] Ex. 5 to Halepota Decl., Jefferson, M. (2022, Feb. 10).

authority over Ben & Jerry's CEO; 3) the loss of "primary responsibility" vis-à-vis Magnum in relation to the social mission and brand integrity—the defining characteristics of Ben & Jerry's; and, 4) allowing Magnum to unilaterally alter its obligations under the Merger Agreement, forever hijacking the Independent Board.  Consequently, granting injunctive relief here "would 'maintain[] the situation that would prevail if the contract were properly performed.'" *Bionpharma*, 582 F.Supp. 3d at 174 (quoting *Velez v. Prudential Health Care Plan of NY, Inc.*, 943 F. Supp. 332, 338 (S.D.N.Y. 1996)).

Allowing the Independent Board to function in the same manner it has for the past *two decades* would cause *de minimis* harm to Magnum. In fact, Defendants' own executives have acknowledged the benefit—rather than the harm—of the Board's independence. As Unilever's Chief Counsel during the Merger Agreement, Ronald Soiefer, recognized: "They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent. It isn't like Unilever can run out the clock."[71]

More than a decade later, Jochanan Senf—a career Unilever executive who was then the Managing Director Europe for Ben & Jerry's—reaffirmed the importance of the independent board: "I think there was one unique thing in that whole acquisition deal and that was that Ben & Jerry's still would keep an Independent Board of Directors. [It] would basically be responsible for the integrity of the brand and the social mission. It's been a unique clause in that acquisition agreement, and *I don't think it has ever been repeated in, you know, in the world of business today*. But I think it's been a very fertile and a good relationship and has led us to, you know, many new paths and many new, you know, scalable opportunities to run this business across multiple

---

[71] Ex. 1 to Halepota Decl., Ice Cream Social at 170.

countries in the world and to do more with more impact when it comes to our sourcing, when it comes to our people etc., etc."[72]

Mr. Senf—who is now Unilever's handpicked Ben & Jerry's CEO following their hasty ousting of Dave Stever—also acknowledged: "It's just a great board by the way. Can you imagine we've got quarterly board meetings with a real bunch of social activists, you know, people, you know, that work for Greenpeace, people that work for foods and civil rights movement, people that actually run, run, NGOs. That board is there for, you know, to **approve our plans as a management team**."[73]

**D.**   **The Public Interest Lies in Preserving the Defining Characteristics of an American Institution and the One-Of-A-Kind Agreement Which Enshrined the Same.**

The final factor for the Court to consider is whether an injunction is in the public interest. *Winter*, 555 U.S. at 20. As with the other factors, the public interest weighs in Plaintiffs' favor for two reasons. *First*, consistent with this Court's precedents, "the public interest would be advanced by such an injunction" because it encourages parties to abide by their agreements. *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, No. 1:24-CV-9914-MKV, 2025 WL 304500, at \*9 (S.D.N.Y. Jan. 27, 2025) (*quoting Mercer*, 307 F. Supp. 3d at 351). Concomitantly, public interest favors discouraging Defendants from engaging in behavior that violates their contractual obligations. *Id.* ("[T]he public interest favors discouraging [defendant] from underwriting 'underhanded behavior in violation of contractual obligations and [other] legal requirements.'") (*quoting Mountain W. Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc.*, No. CV 2019-0226-JTL, 2019 WL 2536104, at \*22 (Del. Ch. June 20, 2019))).

---

[72] B Inspired | Jochanan Senf from Ben & Jerry's at 10:52–11:37, B Corp Europe (May 26, 2015), https://www.youtube.com/watch?v=meVVuTfghzA (emphasis added).
[73] *Id.* at 11:40–12:06.

*Second*, the public interest lies in preserving Ben & Jerry's authenticity, independence, social mission, and brand integrity—the company's defining characteristics—all of which are enshrined in the bespoke Merger Agreement.  If Defendants can unilaterally purge the Independent Board notwithstanding the plain language of the Merger and Settlement Agreements, the message to every other mission-driven company is clear: protections for social missions are only as strong as the Goliath's willingness to honor them. As Mr. Jostein Solheim (Ben & Jerry's former CEO and Unilever's current CEO of Health & Wellbeing) stated in a Podcast with Katherine Klein (the Edward H. Bowman Professor of Management at Wharton) titled: "How Ben & Jerry's Got Bought Out Without Selling Out":

> **Jostein Solheim:** Ben & Jerry's is now 36 years old as a mission-led company. I think the key thing in the whole transition to one shareholder from multiple shareholders was a governance structure that was put in place. Unilever was very visionary in recognizing that it says "Ben & Jerry" on the packaging. If Ben and Jerry go out and say, "Well, this is all not really true anymore and [social justice is] not a mission of the company anymore," that would really undermine the value of the acquisition.
>
> **Klein:** So Unilever acquired Ben & Jerry's in 2000, and this was a company where the social mission was baked into the brand.
>
> **Solheim:** That is integral to how we do business.
>
> **Klein:** And Unilever saw this and its investors saw this from the beginning, and saw value?
>
> **Solheim:** Yes. That's why they and the then-sitting board together agreed to set up an independent board of directors that acts basically like our benefit corporation director. They are responsible for the social mission, for the integrity of the Ben & Jerry's brand, our policies. They even get involved in basic things like wage-setting in the factories, where we have a livable wage policy that is overseen by the board of directors. And the directors are self-selecting. Unilever appoints just two seats out of 11 board members.
>
> **Klein:** Fascinating. And so unusual.
>
> **Solheim:** Very.[74]

---

[74] Ex. 11 to Halepota Decl., Klein, K. (2016, January 15). How Ben & Jerry's Got Bought Out Without Selling Out. *Knowledge at Wharton*. https://knowledge.wharton.upenn.edu/article/ben-jerrys-got-bought-without-selling/.

The public interest therefore lies in preserving the "very" "[f]ascinating" and "so unusual" Merger Agreement, where the Independent Board "responsible" for the "integral" social mission is "self-selecting."

**E.      Ordering Magnum to Allow the Independent Board to Function in the Same Structure it has for Over Two Decades Should Not Require a Bond.**

Rule 65(c) vests the Court with wide discretion to set the amount of a bond, and even to dispense with the bond requirement "where there has been no proof of likelihood of harm, or where the injunctive order was issued 'to aid and preserve the court's jurisdiction over the subject matter.'" *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (quotation omitted) (affirming district court's requiring no bond). Similarly, here, the Court should dispense with the bond requirement or set a nominal bond because requiring a party simply to continue to perform its contractual obligations in the same manner it has done *for decades* is not a cognizable harm, much less a compensable one. *Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("[a]ll that this injunction does is require [the enjoined party] to continue to perform under the contract, as it has been doing for years. That hardly constitutes a cognizable 'harm' to [the enjoined party]") (citation omitted); *see also Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010) ("the 'damage' to [defendant] is nonexistent, because being forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of 'damage' that is compensable at law").

**V.     CONCLUSION**

Magnum's mid-litigation efforts to hijack the Independent Board—including replacing ***each*** independent director with a Magnum appointee and amending bylaws overnight to shift control to Magnum—breach Section 6.14 of the Merger Agreement; irreparably damage what Unilever's own executives have repeatedly affirmed are the Merger Agreement's one-of-a-kind

23

governance structure (including the independent directors' possessing the sole authority to select their replacements); and undermine the public's interest in preserving the authenticity of an American institution.  Accordingly, the Court should enter a Temporary Restraining Order and Preliminary Injunction preserving the last peaceable status quo, which is the continued operation of the Independent Board without threat of removal of any directors in violation of the Merger Agreement and Settlement Agreement.

As Unilever former Chief Counsel responsible for negotiating the Merger Agreement confirmed: "Perpetuity is what really distinguishes this deal from other deals involving socially responsible businesses. The board of Ben & Jerry's is not going away."

24

Dated: April 10, 2026

Respectfully submitted,

**AHMAD, ZAVITSANOS & MENSING PLLC**

/s/ *Shahmeer Halepota*
Shahmeer Halepota
Joseph Y. Ahmad
John Zavitsanos (admitted *pro hac vice*)
Daryl Moore (admitted *pro hac vice*)
Kelsi White (admitted *pro hac vice*)
Weining Bai (admitted *pro hac vice*)
Thomas Frashier (admitted *pro hac vice*)
Sean Healey (admitted *pro hac vice*)
Sara Fatima Dhanji (admitted *pro hac vice)*
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone: (713) 655-1101

*Attorneys for Plaintiffs Ben & Jerry's Homemade, Inc. and the Class I Directors of Ben & Jerry's Independent Board*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically on April 10, 2026.  As such, this document was served on all counsel of record pursuant to the Federal Rules of Civil Procedure.

/s/ *Shahmeer Halepota*
Shahmeer Halepota

25