**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BEN & JERRY'S HOMEMADE, INC., CLASS I DIRECTORS OF BEN & JERRY'S INDEPENDENT BOARD, and THE BEN & JERRY'S FOUNDATION, INC. | ) ) ) ) | Case No. 1:24-cv-08641-PKC |
| | ) | |
| *Plaintiffs*, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | |
| | ) | |
| UNILEVER PLC, CONOPCO, INC., BEN & JERRY'S HOLDCO, LLC, and THE MAGNUM ICE CREAM COMPANY N.V. | ) ) ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOURTH AMENDED COMPLAINT AND MOTION TO SUBSTITUTE**

i

# TABLE OF CONTENTS

Introduction.................................................................................................................................. 1

Facts ........................................................................................................................................... 2

    A.   Unilever acquired Ben & Jerry's only after committing to protect its social
        mission and brand integrity.................................................................................... 2

    B.   The Independent Board's exercise of its social-mission authority led to the 2022
        litigation and Settlement Agreement. .................................................................... 3

    C.   Unilever attempts to usurp the Independent Board authority, blocking donations
        to nonprofits which advocate for Palestinian human rights and censoring
        statements concerning Gaza.................................................................................... 4

    D.   Unilever blocked Ben & Jerry's proposed ceasefire statement while taking public
        positions on other conflicts. .................................................................................. 5

    E.   Unilever blocked Ben & Jerry's criticism of the Trump administration despite the
        brand's history of social-mission advocacy. ......................................................... 5

    F.   Unilever pressured Ben & Jerry's CEO over his cooperation with the Independent
        Board, then hastily attempted to remove him. ...................................................... 6

    G.   Unilever launched a pretextual audit of the Ben & Jerry's Foundation mid-
        litigation. ............................................................................................................... 7

    H.   Unilever and Magnum escalated pressure on Chair Mittal through an "integrity"
        investigation. ......................................................................................................... 8

    I.   After the demerger, Magnum adopted governance changes that purported to
        eliminate the independent directors' authority. .................................................... 8

    J.   The amended pleadings track Defendants' evolving misconduct and the addition
        of necessary parties. ............................................................................................ 10

Legal standard.......................................................................................................................... 11

Argument & Authorities .......................................................................................................... 11

    I.   Plaintiffs have stated a viable claim for breach of Section 6.14(a) of the Merger
        Agreement. ........................................................................................................... 12

        A.   Defendants breached Section 6.14(a) when they purported to remove each of
            the independent directors from the Independent Board without a majority
            request.......................................................................................................... 12

        B.   Defendants breached Section 6.14(a) when they failed to appoint Chris
            Miller. .......................................................................................................... 15

    II.   Plaintiffs have pleaded viable claims for breach of contract for: (1) other terms of
        the Merger Agreement; and (2) the Settlement Agreement............................... 16

        A.   The Plaintiffs have standing to bring claims under Section 6.14(c), (e), (f),
            (h), and (i) of the Merger Agreement. ...................................................... 16

            1.   Unilever's interpretation would subordinate the Independent Board's
                "primary" authority. ............................................................................. 17

2.  Unilever's interpretation would negate the Independent Board's express charge to "safeguard" Ben & Jerry's brand integrity and to "preserve" its social mission. ................................................................................ 17

3.  Unilever's interpretation ignores the Independent Board's status as "custodians" of Ben & Jerry's brand integrity. ................................... 18

4.  Unilever's interpretation would render the Independent Board's rights illusory, making them contingent upon Unilever's self-policing. ........................ 19

5.  Unilever's interpretation also fails under the Settlement Agreement and Settlement Amendment because Unilever is expressly adverse to Ben & Jerry's and the Independent Board under both agreements. .............................. 20

6.  Unilever's remaining arguments do not make its interpretation any less illusory. .................................................................................... 21

7.  Unilever modified its interpretation mid-litigation. ........................... 21

B.  Defendants breached Section 6.14(c) when they failed to consult in good faith regarding the removal of Mr. Stever. ................................................... 23

C.  Defendants breached Sections 6.14(e), (f), and (i) when they interfered with Plaintiffs' rights under the Merger Agreement. ........................................ 24

D.  Defendants have breached their obligation to fund the Foundation under Section 6.14(h). .......................................................................... 25

E.  Defendants have breached Section 2(b) and 2(j) of the Settlement Agreement........ 26

F.  Plaintiffs' allegations regarding damages comply with New York law. ................... 27

III.  Plaintiffs pleaded viable declaratory judgment claims. ...................................... 29

A.  Plaintiffs pleaded existing disputes under the Merger Agreement requiring declaratory relief.......................................................................... 29

B.  Plaintiffs pleaded existing disputes under the Settlement Agreement requiring declaratory relief.......................................................................... 30

IV.  Plaintiffs pleaded viable claims for declaratory relief and breach of the implied covenant of good faith and fair dealing that are not duplicative...................................... 31

V.  The Court should not dismiss the Foundation's claims. ...................................... 32

A.  The Court previously granted the Foundation's request for permissive intervention as to Counts II and IV, thereby rejecting Defendants' standing argument. ................................................................................. 32

B.  The Complaint plausibly alleges breach of Section 6.14(h)...................................... 33

1.  Defendants' interpretation of Section 6.14(h) does not warrant dismissal. ........ 34

2.  The Complaint adequately alleges resulting injury............................................ 36

C.  The unjust-enrichment claim is properly pleaded in the alternative. ........................ 37

VI.  Unilever and Conopco should not be substituted out or dismissed at this stage. ............. 38

A.  Rule 25(c) does not require substitution.................................................................. 38

      B.   Unilever and Conopco remain proper defendants for pre-demerger conduct. .......... 39

      C.   Substitution would prejudice Plaintiffs and complicate discovery. ......................... 39

Conclusion ....................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009)........................................................................ 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................... 11

*Bajan Grp., Inc. v. Consumers Interstate Corp.*,
   958 N.Y.S.2d 59 (Sup. Ct. 2010)........................................................................... 21

*Berger v. Heckler*,
   771 F.2d 1556 (2d Cir. 1985)................................................................................ 30

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016).................................................................................... 17

*Contemp. Mission, Inc. v. Famous Music Corp.*,
   557 F.2d 918 (2d Cir. 1977).................................................................................. 33

*Coronet Properties Co. v. Brychova*,
   469 N.Y.S.2d 911 (Civ. Ct. 1983) ........................................................................ 18

*Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*,
   2015 WL 4486335 (S.D.N.Y. July 23, 2015) ......................................................... 21

*Dane v. UnitedHealthcare Ins. Co.*,
   974 F.3d 183 (2d Cir. 2020)....................................................................... 11, 14, 15

*De Souza v. New York*, No. 25-CV-1222 (RA),
   2026 WL 783732 (S.D.N.Y. Mar. 19, 2026) ...................................................... 12, 26

*Doe v. McDonald*,
   128 F.4th 379 (2d Cir. 2025) ................................................................................ 33

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   411 F.3d 384 (2d Cir. 2005)................................................................................. 31

*Evans v. Select Portfolio Servicing, Inc.*,
   No. 18-CV-5985 (PKC) (RML), 2026 WL 1154269 (E.D.N.Y. Mar. 31, 2026)..................... 34

*Fashion G5 LLC v. Anstalt*,
   No. 1:14-CV-5719-GHW, 2016 WL 7009043 (S.D.N.Y. Nov. 29, 2016).............................. 43

*Fed. Hous. Fin. Agency v. Morgan Stanley ABS Cap. I Inc.*,

73 N.Y.S.3d 374 (Sup. Ct. 2018)........................................................................... 29

*First Solar, Inc. v. Absolute Process Instruments, Inc.*,

No. 17-CV-8518 (JSR), 2018 WL 1166632 (S.D.N.Y. Feb. 8, 2018) ..................................... 36

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt.*,

*L.P.*, 7 N.Y.3d 96 (2006) ...................................................................................... 15

*Gerszberg v. Iconix Brand Grp., Inc.*,

No. 17-CV-8421 (KBF), 2018 WL 2108239 (S.D.N.Y. May 7, 2018)................................... 40

*Giamundo v. Dunn*,

195 N.Y.S.3d 724 (App. Div. 2023) ...................................................................... 29

*HK Kolmar USA, LLC v. Wormser Corp.*,

813 F. Supp. 3d 430 (S.D.N.Y. 2025)............................................................... 12, 26

*Icahn Sch. of Med. at Mount Sinai v. Neurocrine Biosciences, Inc.*,

191 F. Supp. 3d 322 (S.D.N.Y. 2016)................................................... 11, 13, 17, 28

*In re Chalasani*,

92 F.3d 1300 (2d Cir. 1996)................................................................................ 41

I*n re O.P.M. Leasing Servs., Inc.*,

21 B.R. 993 (Bankr. S.D.N.Y. 1982) ..................................................................... 30

*Kent v. Quicksilver Min. Co.*,

78 N.Y. 159, 182 (1879) ...................................................................................... 14

*Lehman Bros. Inc.*,

478 B.R. 570 (S.D.N.Y. 2012)............................................................................. 37

*Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*,

52 F. Supp. 3d 601 (S.D.N.Y. 2014)..................................................................... 39

*McSweeney v. Cohen*,

776 F. Supp. 3d 200 (S.D.N.Y. 2025).................................................................. 15

*Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*,

171 F. Supp. 3d 107 (S.D.N.Y. 2016).................................................................. 32

*New World Int'l, Inc. v. Ford Glob. Techs., LLC*,

No. 3:16-CV-1112-M, 2017 WL 1078525 (N.D. Tex. Mar. 22, 2017)................................... 42

*Next Commc'ns, Inc. v. Viber Media, Inc.*,

    2016 WL 1275659 (S.D.N.Y. Mar. 30, 2016) ........................................................................ 30

*Noakes v. Syracuse Univ.*,

    369 F. Supp. 3d 397 (N.D.N.Y. 2019) ................................................................................. 11

*Prickett v. N.Y. Life Ins. Co.*,

    896 F. Supp. 2d 236 (S.D.N.Y. 2012) ................................................................................. 37

*RIJ Pharm. Corp. v. Ivax Pharm., Inc.*,

    322 F. Supp. 2d 406 (S.D.N.Y. 2004) ................................................................................. 29

*Saeco Vending, S.P.A. v. Seaga Mfg., Inc.*,

    2016 WL 1659132 (S.D.N.Y. Jan. 28, 2016) ........................................................................ 29

*Spectrum Dynamics v. General Electric Company*,

    No. 18-CV-11386 (VSB) (KHP), 2023 WL 7135236 (S.D.N.Y. Oct. 30, 2023) ..................... 42

*Spencer-Smith v. Ehrlich*,

    347 F.R.D. 606 (S.D.N.Y. 2024) ........................................................................................ 34

*Tang Capital Partners, LP v. BRC Inc.*,

    661 F. Supp. 3d 48 (S.D.N.Y. 2023) ................................................................................... 31

*Tarantino v. Tarantino*,

    540 N.Y.S.2d 319 (App. Div. 1989) ................................................................................... 18

*Town of Chester,*

    *N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433 (2017) ...................................................................... 35

*U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.*,

    451 F. Supp. 3d 294 (S.D.N.Y. 2020) ........................................................................... 41, 43

*Violet Realty, Inc. v. Amigone, Sanchez & Mattrey, LLP*,

    123 N.Y.S.3d 384 (App. Div. 2020) ................................................................................... 19

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co.,*

    339 F.3d 101 (2d Cir.2003) ............................................................................................... 31

**INTRODUCTION**

Plaintiffs Ben & Jerry's Homemade, Inc. ("Ben & Jerry's") and the Class I Directors of Ben & Jerry's Independent Board (the "Independent Board") (and together, "Plaintiffs"), and Intervenor-Plaintiff The Ben & Jerry's Foundation, Inc. (the "Foundation,") oppose Defendants' motion to dismiss the Fourth Amended Complaint, ECF No. 110 ("Complaint"), and Unilever and Conopco's motion to substitute.

This is a breach-of-contract and declaratory judgment case. Defendants committed to protect the Independent Board's authority over Ben & Jerry's social mission, brand integrity, CEO oversight, Foundation funding, and board composition.

The Complaint alleges that Defendants broke those promises. Defendants censored the social mission. They pressured and removed the CEO for cooperating with the Independent Board. They withheld contractually required funds due to a nonprofit. They engineered governance changes to purge the Independent Board. Those allegations state claims under the Merger Agreement, the Settlement Agreement, Settlement Amendment, and the implied covenant of good faith and fair dealing. The motion to dismiss and supporting memorandum, ECF No. 118 ("Mem. Dismiss"), ask the Court to disregard these allegations, adopt competing assertions advanced by the Defendants, and ignore Plaintiffs' reasonable (and correct) interpretations of the contracts Defendants breached. Rule 12(b)(6) forbids that.

The substitution motion and supporting memorandum, ECF No. 120 ("Mem. Subst."), fare no better. Unilever and Conopco negotiated, performed, and then breached the governing agreements prior to their mid-litigation whitewash. Now they have assigned their liabilities to Magnum and HoldCo shortly before trial. Substituting them out would conceal Unilever's and Conopco's misconduct from the jury, confuse the presentation of facts, and complicate remaining discovery. The Court should deny both motions.

1

## FACTS

**A.    Unilever acquired Ben & Jerry's only after committing to protect its social mission and brand integrity.**

Ben & Jerry's has been an activist brand since 1978. Compl. ¶¶ 16–17. Before its merger with Unilever, it advocated publicly on Cold War spending, the Gulf War, LGBTQ+ rights, and corporate responsibility. *Id*. at ¶ 16.

Unilever acquired Ben & Jerry's in 2000. *Id*. at ¶¶ 18–19.  Unilever's counsel was tasked with creating a governance structure that would set its bid apart. *Id*. at ¶¶ 18, 21–22. In the parties' resulting Merger Agreement, Unilever committed to preserve the brand's social mission and brand integrity through a bespoke governance balance. *Id*. at ¶¶ 18–20. Specifically, Section 6.14 of the Merger Agreement granted an *independent* board of directors oversight authority over Ben & Jerry's social mission and brand integrity, providing the Independent Board—*rather than Unilever*—with "primary responsibility" over the same. *Id*. at ¶¶ 18–20. The Independent Board was also explicitly empowered with the authority to "***prevent any action*** by the [Ben & Jerry's] CEO in the areas of new product introduction, the changing of product standards and specifications,  the approval of the content of marketing materials and the licensing or other use of Ben & Jerry's trademark . . . ." Merger Agrmt § 6.14(f) (emphasis added).

To preserve the Independent Board's independence—and protect the directors from Unilever's intimidation and undue influence—Section 6.14(a) of the Merger Agreement forbade Unilever from "removing" any independent directors without a "written request of at least a majority" of the remaining independent directors. Compl. ¶ 20.  Moreover, Unilever could only appoint a single director to the board ("Class U Director"), with the majority of the board consisting of independent directors, who would have the exclusive right to appoint their successors. *Id.* at ¶ 19.

2

These protections were a condition of Unilever's winning bid for Ben & Jerry's. *Id*. at ¶¶ 18, 21–22. Unilever executives later acknowledged that the Independent Board's perpetual authority made the acquisition possible. *Id*. at ¶¶ 21–22.  As Unilever's then-Chief Counsel, Ronald Soiefer, made clear: "Perpetuity is what really ***distinguishes*** this deal from other deals involving socially responsible businesses. The board of Ben & Jerry's is not going away. They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent. ***It isn't like Unilever can run out the clock.***" Compl. ¶ 21 (emphasis added).

**B.** **The Independent Board's exercise of its social-mission authority led to the 2022 litigation and Settlement Agreement.**

For decades, the Independent Board exercised its authority. *Id*. at ¶¶ 23–24. They prevented closure of the Waterbury, Vermont plant. *Id*. at ¶ 23. They resisted efforts to cheapen ingredients. *Id*. at ¶24. They adopted GMO-free product standards. *Id*. They regulated certain licensing and trademark uses due to human rights implications. *Id*.

Then, the Independent Board voted to stop sales in Israeli-only settlements in the Occupied Palestinian Territory. Compl. ¶ 24; *see also* ECF No. 1 in 1:22-cv-05681 (SDNY) at ¶¶ 4, 40-44. Unilever initially supported that decision. *Id.*  Unilever later sold Ben & Jerry's intellectual-property rights in the Occupied Palestinian Territory without the Independent Board's consent. *Id*. at ¶ 24. The Class I Directors sued in July 2022 on behalf of themselves and Ben & Jerry's. *Id*. at ¶ 24.

The parties settled in December 2022. *Id*. at ¶¶ 24–25. The Settlement Agreement required Unilever to "respect" and "acknowledge" the Independent Board's authority and to work in good faith to ensure the social mission is "***protected and furthered***." *Id*. at ¶ 24 (emphasis added).  The Settlement Agreement included additional protections for the Independent Board's authority that

3

should be construed as preventing Unilever's attempts to alter the bylaws mid-litigation. *Id.* at ¶ 25. It addressed how the CEO and Unilever executives were to interact with the Independent Board moving forward ("any decisions implicating Ben & Jerry's Essential Brand Integrity and Social Mission should be made after consultation and approval of the Independent Board"); erected CEO evaluation metrics reflecting adherence to the Merger Agreement and cooperation with the Independent Board; and, reaffirmed that the Independent Board held authority over the public statements the company would issue in relation to the social mission. *Id.* at ¶ 25.

The Settlement Agreement also required charitable and human-rights payments, including $5 million to organizations designated by Ben & Jerry's Chairwoman and $20 million to Canaan Fair Trade (a group supporting indigenous Palestinian farmers) through a Settlement Amendment. *Id.* at ¶¶ 43–54.

## C.    Unilever attempts to usurp the Independent Board authority, blocking donations to nonprofits which advocate for Palestinian human rights and censoring statements concerning Gaza.

Per the Settlement Agreement, Chair Mittal was to designate donation recipients and Unilever could not unreasonably withhold consent to said donation. *Id.* at ¶¶ 43–46, 166. Chair Mittal identified the donation recipients, including Human Rights Watch. *Id.* at ¶¶ 45–50. Unilever blocked them, labeling the groups as anti-Israel. *Id.* Unilever also failed to comply with the Settlement Amendment. *Id.* at ¶¶ 51–56. That amendment required $2 million in annual payments for at least ten years to Canaan Fair Trade, a group which supports indigenous Palestinian farmers and whom Ben & Jerry's had worked with for nearly a decade. *Id.* at ¶¶ 51–54. Unilever failed to provide quarterly confirmations, failed to make payments as required, and imposed extracontractual hurdles. *Id.* at ¶¶ 51–56, 179, 185. Surprisingly, Unilever's President of Ice Cream, Mr. Peter ter Kulve wrote to the Ben & Jerry's Chair that he "[h]ad not been briefed on this yet and will investigate what the status of this agreement is. Who is this Canaan group could

not find when I googled?" The first hit when one Googles "Canaan Fair Trade" is Canaan Fair Trade. *Id*. at ¶ 53.

**D.     Unilever blocked Ben & Jerry's proposed ceasefire statement while taking public positions on other conflicts.**

In December 2023, the Independent Board and Ben & Jerry's management proposed a statement calling for "peace and a permanent and immediate ceasefire" in Gaza. *Id*. at ¶¶ 29–30. Unilever threatened to dismantle the Independent Board and sue individual directors should they proceed with the statement. *Id*. at ¶ 30. Unilever then blocked three more Gaza-related statements within six months. *Id*. at ¶¶ 31–37.  Nelson Peltz, a proponent of Israel, is a prominent member of Unilever's board of directors, and has had considerable influence over the company's decision making, including the selection of the company's last two CEOs. *Id*. at ¶ 27. At the same time Unilever was censoring the Independent Board's posts over Gaza, Mr. Peltz told the *Financial Times*: "Ben & Jerry's job is to sell ice cream, not to make political statements. And these people use anything for a soapbox that they have no right to do." *Id*. He added: "What sense is being a billionaire if you're not a bully?"  *Id.* Mr. Peltz is a close ally of Mr. ter Kulve. *Id.* In 2024, Mr. ter Kulve was appointed as Unilever's President of Ice Cream (he is now Magnum's CEO).  *Id.* In January 2024, in one of Mr. ter Kulve's very first correspondence with Chair Mittal, he referred to her as "manic" and suggested she resign from her position (foreshadowing) in response to the Independent Board's proposed post calling for "peace" and a "permanent and immediate ceasefire" regarding the humanitarian catastrophe in Gaza.  *Id.*

**E.     Unilever blocked Ben & Jerry's criticism of the Trump administration despite the brand's history of social-mission advocacy.**

Unilever also interfered with other advocacy in violation of the Merger Agreement and Settlement Agreement. *Id*. at ¶¶ 38–42, 171–176. Ben & Jerry's had long criticized presidential policies as part of its social mission. *Id*. at ¶¶ 38–40. And in January 2025, management and the

5

Independent Board prepared an Inauguration Day post addressing minimum wage, healthcare, abortion, and climate change. *Id*. at ¶ 38. Mr. ter Kulve barred the post because it mentioned Donald Trump. *Id*. ¶¶ 38–40. Within twenty-four hours of Mr. ter Kulve blocking the Inauguration Day post, he hosted an Ice Cream Townhall, where he publicly touted that Mr. Peltz had been the one to introduce Elon Musk to Donald Trump. *Id*. at ¶ 40. Along with Unilever's "ongoing objection to mentioning "Trump," Unilever later muzzled additional posts, including one promoting free speech. *Id*. at ¶ 41.

**F.    Unilever pressured Ben & Jerry's CEO over his cooperation with the Independent Board, then hastily attempted to remove him.**

Ben & Jerry's CEO, Dave Stever, a thirty-plus year employee who began his career as a Ben & Jerry's tour guide, attempted to defend the social mission and work cooperatively with the Independent Board.  *Id*. at ¶¶ 59, 64, 123.  Multiple Unilever executives threatened him, including Peter ter Kulve, who in February 2024 told Mr. Stever: "You need to fix your board. I will get rid of them or fire you if they don't change." *Id*. at ¶ 123. These threats were also reflected in Mr. Stever's annual performance review, where Unilever chastised him for "repeatedly acquiesc[ing] to the demands of the Independent Social Mission Board." *Id*. at ¶ 64. In February 2025, Jostein Solheim, Unilever's CEO of Health & Wellbeing, threatened Mr. Stever: "You need to limit the board access to management to show you are controlling them. As we go to a public listing, the board's behavior will make that more difficult. If they don't get in line, Peter's [ter Kulve] only move now that Miller [Ben & Jerry's former Global Social Mission Director] is gone is to fire you." *Id*. at ¶ 123.

Mere weeks later, on March 3, 2025, Unilever informed the Independent Board that it intended to remove and replace Mr. Stever—a thirty-plus year employee—within days. *Id*. at ¶ 60. Unilever announced that decision before the required advisory committee was even appointed, in

violation of Section 6.14(c) of the Merger Agreement. *Id*. at ¶¶ 58, 60–62.  It imposed a four-day response deadline despite considering removal for months. *Id*. at ¶ 61. It refused materials needed for meaningful participation in the consultation process. *Id*. at ¶ 62.

**G.      Unilever launched a pretextual audit of the Ben & Jerry's Foundation mid-litigation.**

The Independent Board approves annual disbursements to the Ben & Jerry's Foundation under the Merger Agreement. *Id*. at ¶¶ 67–73, 84–85. In fact, the Foundation received over $68 million from Unilever over the course of a twenty-four-year span.  *Id*. at ¶ 73.  Never in this two-plus-decade history had Unilever accused the Foundation of wrongdoing or hastily demanded an expeditious audit. *Id*. at ¶¶ 71-73. Nonetheless, after the Class I Directors filed their Second Amended Complaint in the above-captioned litigation, Unilever demanded the first audit of the Foundation in twenty-four years. *Id*. at ¶¶ 66, 84.

Unilever then withheld most of the 2024 funds scheduled for May 2025 until after the audit concluded. *Id*. at ¶ 90. The audit found no wrongdoing. *Id*. at ¶¶ 92, 96–97. And the audit's structure reinforced that it was pretextual. *Id*. at ¶¶ 91–93. The ***first document*** in the "independent" auditor's inventory list was authored by Unilever's litigation counsel and the law firm later tasked to develop allegations against Chair Mittal personally, who Unilever tried to subsequently label as an "independent" investigator. *Id*. at ¶¶ 99, 123; ECF No. 84 at ¶ 4. Despite repeated requests, Unilever to this day has refused to provide the auditor's scope of work or the audit report. *Id*. at ¶¶ 92, 96–97. It then directed an audit that targeted Chair Mittal rather than the Foundation's finances or national grants. *Id*. at ¶¶ 91–93. In fact, Unilever threatened future funding unless Chair Mittal was removed as a Foundation trustee. *Id*. at ¶ 97.

**H.**    **Unilever and Magnum escalated pressure on Chair Mittal through an "integrity" investigation.**

Shortly after the audit ended, Unilever launched an "integrity" investigation of Chair Mittal. *Id*. at ¶¶ 98–99. Unilever unilaterally appointed one of the law firms that had co-orchestrated the audit to act as an "independent investigator." *Id*. The same process later supplied the allegations Magnum used in its public filings and removal campaign. *Id*. at ¶¶ 106–109. Unilever's General Counsel told Chair Mittal that Unilever would give her a prominent position in a Unilever-funded, multi-million-dollar nonprofit if she resigned and the independent directors dropped the litigation. *Id*. at ¶ 100. It would publicize allegations against her if she refused. *Id*. Magnum's General Counsel later barred certain independent directors from a meeting about those allegations, abruptly ended the meeting, and sent a letter threatening the remaining independent directors' positions. *Id*. at ¶¶ 102–103. Significantly, in targeting Chair Mittal, Unilever advanced arguments that it itself had previously "denounced" as "extreme personal slander" necessitating "unprecedented" security for Chair Mittal. Compl. ¶¶ 104, 106, 108. When Plaintiffs pointed out this about face in extreme detail in a 26-page single-spaced letter addressing Unilever's allegations, Unilever could not be bothered to try to justify its hypocrisy. *See id.* at ¶¶108-109.  It instead chose never to reply. *Id*. at ¶ 109.

**I.**    **After the demerger, Magnum adopted governance changes that purported to eliminate the independent directors' authority.**

Magnum demerged from Unilever on December 6, 2025. *Id*. at ¶ 109. Magnum had told investors that Ben & Jerry's bespoke governance "will not change as a result of the Demerger." *Id*. at ¶ 110. But within days, Magnum threatened to cut off Foundation funding unless the Foundation accepted new conditions, including trustee term limits and restrictions on trustees' criticism of Magnum.  *Id*. at ¶¶ 113–116.

8

In the same period, Magnum purported to adopt new governance documents and eligibility rules. *Id*. at ¶ 117. Those rules were designed to disqualify every independent director, including through a retroactive nine-year term limit without the required written request or vote provided in Merger Agreement Section 6.14. *Id*. at ¶¶ 20, 117, 126. Between December 12 and 15, 2025, Magnum used the changes to remove Chair Mittal immediately, remove Class I Directors Jennifer Henderson and Daryn Dodson by year-end unless they resigned, and set up removal of the remaining independent directors, including requiring the signing of a new Code of Conduct which would give Magnum control over the independent directors' ***personal*** cell phones and social media devices. *Id*. at ¶ 117; ECF No. 82-15 at 26.

Magnum also blocked Chris Miller's appointment as a Class I Director, despite its obligation under the Merger Agreement to accept him. *Id*. at ¶ 119. The Class I Directors nominated Miller, a seventeen-year Ben & Jerry's employee and former Global Social Mission Director. *Id*. On the same day of his appointment, Magnum's CEO welcomed Mr. Miller as a Class I Director, calling his appointment "excellent news." *Id*. Days later, Magnum flip-flopped, citing amended bylaws enacted after Miller's appointment and made retroactively effective to remove him from the position he had just been welcomed to. *Id*.

Magnum and Unilever shifted authority from the independent directors to Magnum's preferred CEO. *Id*. at ¶¶ 120–122. They restricted management's communications with the Independent Board, pushed products forward without the Independent Board's approval, altered board minutes, misled the Independent Board about a Gaza-related flavor, amended quorum rules so meetings could occur without independent directors, and told the *Wall Street Journal* it would be appointing each of the *independent* directors moving forward. *Id*. at ¶¶ 120–123.

9

In sum, Unilever and Magnum coordinated to erode the Independent Board's authority over Ben & Jerry's social mission, the company's brand integrity, donations to human rights groups, funding for indigenous Palestinian farmers during a humanitarian crisis, oversight over the CEO, allocation to the forty-year-old Ben & Jerry's Foundation, and appointment of independent directors. *Id*. at ¶¶ 2, 123–124.

## J.    The amended pleadings track Defendants' evolving misconduct and the addition of necessary parties.

The Class I Directors filed this action in November 2024 to enforce their contractual rights and protect the social mission and brand integrity.  *Id*. at ¶ 123.  At that time, Unilever claimed Plaintiffs' concerns about Unilever utilizing the demerger to usurp the Independent Board's authority were "not ripe." ECF No. 40 at 20-22 & n.25.

Plaintiffs later amended to address post-filing developments. *See id*. at ¶¶ 41–42, 65, 84–90. Those developments included additional censorship, the attempted removal of Mr. Stever, the pretextual Foundation audit, and refusal to provide funding to Canaan. *Id*. at ¶¶ 41–42, 56, 65, 84–90. The operative Complaint was filed on May 7, 2026. ECF No. 110. Plaintiffs added allegations and claims as the conduct unfolded and added parties as the relief implicated their rights or obligations. *Id*. at ¶¶ 1, 3–9. The Foundation was added because the funding dispute concerned money the Independent Board had allocated to it and conditions Defendants tried to impose on its governance. *Id*. at ¶¶ 84–97, 112–116, 137–147, 155-159. HoldCo and Magnum were added after the demerger because Defendants contend HoldCo became Ben & Jerry's sole shareholder and Magnum its ultimate parent and successor, and because Magnum used that position to impose new Foundation conditions, adopt governance documents and eligibility rules, disqualify Class I Directors, and block Chris Miller's appointment. *Id*. at ¶¶ 8–9, 109–119.

10

**LEGAL STANDARD**

To defeat a motion to dismiss, the Complaint need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). The Court must accept the Complaint's factual allegations as true. *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020) (cleaned up). It must draw all reasonable inferences in Plaintiffs' favor. *Id.* It may not credit Defendants' contrary inferences or resolve factual disputes against Plaintiffs. *Id.*

A breach-of-contract plaintiff need only identify the agreement, the relevant terms, and how the defendant breached them. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 183 (S.D.N.Y. 2009); *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 418 (N.D.N.Y. 2019). "[W]here questions exist as to whether a party has performed or breached the agreement . . . , dismissal prior to fact discovery is inappropriate." *Icahn Sch. of Med. at Mount Sinai v. Neurocrine Biosciences, Inc.*, 191 F. Supp. 3d 322, 329 (S.D.N.Y. 2016) (cleaned up).

Contractual ambiguities are resolved in the plaintiff's favor at this stage. *De Souza v. New York*, No. 25-CV-1222 (RA), 2026 WL 783732, at *6 (S.D.N.Y. Mar. 19, 2026) (cleaned up). "[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim." *HK Kolmar USA, LLC v. Wormser Corp.*, 813 F. Supp. 3d 430, 446 (S.D.N.Y. 2025) (cleaned up).

**ARGUMENT & AUTHORITIES**

Defendants' motion to dismiss fails because every argument depends on ignoring well-pleaded facts in the operative complaint, or disregarding Ben & Jerry's, the Independent Board's and the Foundation's reasonable (and correct) contract interpretations, in violation of Rule 12(b)(6). FED. R. CIV. P. 12(B)(6). Defendants' motion to substitute should be denied because it

11

would not fairly expedite and simplify this matter to conceal from the jury years of Unilever's and Conopco's misconduct. To the contrary, a substitution would only achieve Defendants' desired effect of confusing the factfinder of the ways in which Unilever and Conopco failed to follow through on their promises. Rule 25 forbids such gamesmanship. FED. R. CIV. P. 25.

I.    **Plaintiffs have stated a viable claim for breach of Section 6.14(a) of the Merger Agreement.**

Section 6.14(a) provides that Conopco and its successors "shall remove any director of any Class at the written request of at least a majority of the directors of such Class then in office **and shall not** otherwise remove any member of the Company Board." Merger Agrmt § 6.14(a) (emphasis added). Section 6.14(a) also provides that the Class I Directors designate the candidates for election to the Independent Board. *Id.* The Complaint plausibly alleges two breaches. Defendants removed Class I Directors without the required majority request or vote. Compl. ¶ 117. Defendants refused to appoint Chris Miller. *Id.* at ¶ 119. In response, Defendants' motion raises factual and contractual disputes that cannot be resolved on a motion to dismiss. *Icahn Sch. of Med. at Mount Sinai*, 191 F. Supp. 3d at 329.

A.    **Defendants breached Section 6.14(a) when they purported to remove each of the independent directors from the Independent Board without a majority request.**

The Complaint alleges removal in substance, whatever label Defendants use. After months of telegraphing a desire to remove and punish the independent directors for their advocacy, Defendants adopted post-demerger eligibility requirements, including a retroactive term limit and a new code-certification requirement. *Id.* at ¶¶ 107–117. Those requirements disqualified the very directors Defendants had repeatedly threatened: "You need to fix your board. I will get rid of them or fire you if they don't change." *Id.* at ¶ 117, 123. In three days, Magnum enacted governance documents and attempted to remove every independent director. *Id.* at ¶ 117.

12

This procedure did not comply with the plain terms of the Merger Agreement. The Merger Agreement permits removal of a Class I Director only "at the written request of at least a majority of the directors of such Class then in office[.]" Merger Agrmt § 6.14(a). It is undisputed there was no such written request. *See* Compl. ¶¶ 117–19, 132. Nor does the Merger Agreement include term limits for Class I Directors, unlike other provisions. *See generally* Merger Agrmt. Defendants nonetheless treated the Class I Directors as removed by declaring them ineligible. Compl. ¶ 117. A disqualification that achieves removal without the required approval of a majority of the Directors breaches Section 6.14(a). Defendants cannot avoid that provision at the pleading stage by relabeling removal a "disqualif[ication]." *Id.*

Defendants' argument that they lawfully amended the bylaws is beside the point. Mem. Dismiss at 15–18. Defendants promised in the Merger Agreement not to remove any Class I Director without the majority's written approval. Merger Agrmt § 6.14(a). Nothing in that promise carves out exceptions for amendments to eligibility requirements. *See id.* Defendants otherwise have no authority that they may amend bylaws to nullify bargained-for protections for Class I Director composition and removal. Mem. Dismiss at 15–18. In fact, the assertion that post hoc amendments to bylaws can override existing contractual obligations is inconsistent with over a century of commonsense caselaw. *See, e.g.*, *Kent v. Quicksilver Min. Co.*, 78 N.Y. 159, 182 (1879) ("[N]o alteration [of bylaws] could be made which would infringe a right already given and secured by the contract of the corporation."). In fact, Section 6.14(a) recognizes Unilever's role as "sole shareholder" in the very sentence it bars Unilever from unilateral removals.

Moreover, Defendants mischaracterize the Complaint when they assert that the 2025 amendments merely "codified" existing requirements. Mem. Dismiss at 16. The Complaint alleges the opposite. Before 2025, the Class I Directors were not subject to term limits. Compl. ¶¶ 117,

13

123. Section 6.14(a) sets one-year terms "subject to earlier removal, death or resignation" and bars election of an "Ineligible Director," *a defined term*, but it imposes no maximum tenure and no retroactive nine-year term limit. Merger Agrmt § 6.14(a). Defendants' own brief calls the eligibility requirements "new." Mem. Dismiss at 17. At this stage, the Court cannot accept as true Defendants contrary (and inaccurate) assertions. *Dane*, 974 F.3d at 188.

Defendants also assert that they amended the bylaws in accordance with corporate requirements. Mem. Dismiss at 15–17. The Complaint contains no such allegation. *See generally* Compl. The Court cannot accept that assertion now, because doing so would apply the wrong standard on a motion to dismiss. *Dane*, 974 F.3d at 188. The Court must instead accept the Complaint's allegation that the 2025 amendments displaced sitting directors without the contractually-required majority request. Compl. ¶¶ 117, 123.  Civil procedure aside, this argument is also absurd on the merits. First, Unilever—a United Kingdom company—at no point in 25 years claimed that the Independent Board was subject to purported European-based board term regulations. Compl. ¶ 123. Second, Ben & Jerry's is a Vermont company. Compl. ¶ 3. Third, and perhaps most on point, the majority of the independent directors Magnum removed had served less than nine years. Compl. ¶ 117.

Defendants' waiver argument fails too. Mem. Dismiss at 17–18. Waiver requires intent to relinquish a known right, which is ordinarily a question of fact. *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006). A court should not resolve a fact-intensive affirmative defense unless it appears on the face of the pleading. *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 232 (S.D.N.Y. 2025). The Complaint contains no allegation that Plaintiffs waived their right to challenge the 2025 amendments. *See generally* Compl.[1]  Moreover, the

---

[1] For good measure, Defendants will lose this argument at a later stage of this proceeding as well. The 2025 amendments changed eligibility requirements through term limits; the 2022 amendments did not. Compl. ¶¶ 117, 123.

14

Settlement Agreement's various protections against the 2022 bylaws affirmatively negate Unilever's waiver arguments (appearing nowhere in its prior briefing).[2] *See e.g.,* Settlement Agreement Sections 2(a) (Defendants are obligated to "[r]espect and acknowledge" the "Independent Board's primary responsibility over" the social mission and brand integrity and are further obligated "to work in good faith with the Independent Board to ensure that both are protected and furthered."); 2(h) ("any decisions implicating Ben & Jerry's Essential Brand Integrity and Social Mission should be made after consultation with and approval of the Independent Board").

### B.    Defendants breached Section 6.14(a) when they failed to appoint Chris Miller.

Defendants overlook well-pleaded allegations in the Complaint when they contend Chris Miller was never properly appointed. Mem. Dismiss at 18–19. The Class I Directors nominated Miller, a seventeen-year Ben & Jerry's employee and former Global Social Mission Director. Compl. ¶ 119. Under Section 6.14(a), Conopco was then required to cause him to be elected to the

---

Plaintiffs could not have waived in 2022 a challenge to amendments that did not yet exist. Moreover, as part of the Settlement Agreement, the Class I Directors signed the ***2000 Code of Conduct***. Settlement Agreement, ECF No. 108-2 at § 2(b). The Class I Directors did not sign a new Code of Conduct that would require Board Members to relinquish control of their cell phones to Magnum and cede social media editorializations to Magnum. *See* ECF No. 82-15 at 26 ("Understanding that devices used for TMICC business are subject to review and collection in internal and government reviews, subject to applicable laws."). And there was no prior term—in the Merger Agreement or the Settlement Agreement—that required Class I Directors to adhere to any Code of Conduct other than 2000 Code of Conduct. *See* Merger Agrmt at § 6.14(j) and Settlement Agrmt at § 2(b). Therefore, there was no right that Plaintiffs could have waived.

[2] The Merger Agreement's provision discussing adherence to the "Code of Conduct" is still subject to Section 6.14(a)'s bar only allowing removal of an independent director upon written request of a majority of the other independent directors. Thus, had Unilever genuinely believed that there was a code violation, it should have raised those concerns with the disinterested Class I Directors, mutually chosen an independent investigator, presented evidence to the directors, and allowed them to vote on removal. Here, Unilever instead chose to: repeatedly threaten the entire Independent Board for their advocacy efforts; launch a mid-litigation, pretextual audit through their litigation counsel; self-select the auditor; actively conceal the scope of work and audit report; launch an investigation despite news reports that the audit found no wrongdoing; regurgitate allegations that Unilever had itself previously denounced as "extreme personal slander" necessitating "unprecedented security" for Chair Mittal; threatened the remaining Class I Directors should they refuse to go along with Unilever's litigation counsel's mid-litigation gameplan for removal; ignore the Class I Directors 26-page thorough rebuttal; and then remove each of the independent directors. Compl. ¶¶ 104, 108, 123, 132.

Independent Board. Merger Agrmt § 6.14(a). Defendants did not do so. Compl. ¶ 119. That refusal is an independent breach of Section 6.14(a).

Defendants' contrary account cannot be credited now. The Complaint alleges that Magnum's CEO first welcomed Miller as a Class I Director and called his appointment "excellent news," then reversed course days later and claimed he had not been properly appointed under bylaws enacted after his appointment and made retroactively effective. Compl. ¶ 119. Defendants' own acknowledgment and congratulations make their omission of the well-pleaded nomination all the more striking. Accepted as true, Plaintiffs' allegations establish that Mr. Miller should have been appointed as a Director but was not. At the motion to dismiss stage, this means that there are plausible claims of breach of Section 6.14(a). *Icahn Sch. of Med. at Mount Sinai*, 191 F. Supp. 3d at 329.

## II.    Plaintiffs have pleaded viable claims for breach of contract for: (1) other terms of the Merger Agreement; and (2) the Settlement Agreement.

Ben & Jerry's and the Class I Directors also seek to enforce Unilever's other commitments in the Merger Agreement and the Settlement Agreement. They have standing and authority to do so. The Complaint plausibly alleges breaches of Sections 6.14(c), (e), (f), (h), and (i) of the Merger Agreement, and of various provisions of the Settlement Agreement. Defendants' contrary arguments either apply the wrong legal standard to consideration of the facts in the complaint, overlook the allegations, or mischaracterize them.

### A.    The Plaintiffs have standing to bring claims under Section 6.14(c), (e), (f), (h), and (i) of the Merger Agreement.

As an initial matter, Defendants' standing challenge for breach of Section 6.14(c), (e), (f), (h), and (i) fails. A complaint must "allege[] facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (cleaned up). Here, the Complaint does. It alleges that the plain language of the Merger Agreement

gives Ben & Jerry's and the Independent Board substantive rights, that Defendants' conduct invaded those rights, and that the invasion caused concrete injury. Compl. ¶¶ 19–20, 117, 123. Defendants' contrary position rests on their disputed reading of the contract, not on any failure of pleading. Mem. Dismiss at 21–23.  And, that reading is flawed for several reasons.

1.    **Unilever's interpretation would subordinate the Independent Board's "primary" authority.**

Under Sections 6.14(e) and (f) of the Merger Agreement, the Independent Board—rather than Unilever—has "primary" responsibility over Ben & Jerry's social mission and brand integrity. Terms in a contract should be given their plain meaning unless the contract mandates a different interpretation, *Tarantino v. Tarantino*, 540 N.Y.S.2d 319, 321 (App. Div. 1989), and the "ordinary meaning of the word 'primary' is 'first in rank or importance; chief or principal.'" *Coronet Properties Co. v. Brychova*, 469 N.Y.S.2d 911, 912 (Civ. Ct. 1983) (quoting Webster's Third International Dictionary), *aff'd*, 488 N.Y.S.2d 1020 (App. Term. 1984). Consequently, "primary responsibility" within the context of the Merger Agreement means that the Independent Board's authority regarding Ben & Jerry's social mission and brand integrity is "first in rank," "chief," and not subordinate to Unilever's or the CEO's.  Unilever's claim that it—rather than the Independent Board—is the appropriate entity to sue Unilever regarding a dispute over the social mission would subordinate the Independent Board's authority (including allowing Unilever to override the Independent Board's decision to initiate suit as it attempts to do here) in a fashion antithetical to the plain meaning of "primary."

2.    **Unilever's interpretation would negate the Independent Board's express charge to "safeguard" Ben & Jerry's brand integrity and to "preserve" its social mission.**

Sections 6.14(e) and (f) of the Merger Agreement also charge the Independent Board—rather than Unilever—with "preserving" Ben & Jerry's social mission and "safeguarding" its brand

17

integrity. To "safeguard" means "to protect someone or something so that they are not harmed, damaged, or lost,"[3] and to "preserve" means "to keep safe from injury, harm, or destruction: PROTECT."[4] The Independent Board has initiated this suit on behalf of Ben & Jerry's precisely to "protect" Ben & Jerry's social mission and to keep it "safe" from "harm," including Unilever's unilateral censorship.

### 3. Unilever's interpretation ignores the Independent Board's status as "custodians" of Ben & Jerry's brand integrity.

Section 6.14(f) of the Merger Agreement also cements the Independent Board—rather than Unilever—as the "custodians" of Ben & Jerry's brand image. "Custody" is "the care *and control* of a thing or person for inspection, preservation, or security,"[5] as well as "the *legal right* or *duty* to take care of or keep somebody/something."[6] Again, the plain meaning of the term "custodians" supports the Independent Board's "legal right" to initiate litigation on behalf of Ben & Jerry's to "preserve" its brand integrity. Other portions of the Merger Agreement confirm the same. For example, Section 6.14(j) of the Merger Agreement carves the Independent Board's responsibilities out of Unilever's: "Conopco shall have primary responsibility for . . . aspects of [Ben & Jerry's] *not allocated to the [Independent] Board* pursuant to this Section 6.14." (emphasis added). Section 6.14(d) similarly makes the CEO's management of Ben & Jerry's subject to the Independent Board's responsibilities: "*Subject to Sections 6.14(e) and 6.14(f)*, which place primary responsibility for Social Mission Priorities and the Essential Integrity of the Brand (each

---

[3] *Safeguard*, CAMBRIDGE BUSINESS ENGLISH DICTIONARY, https://dictionary.cambridge.org/dictionary/english/safeguard (last visited June 30, 2026); *see also Violet Realty, Inc. v. Amigone, Sanchez & Mattrey, LLP*, 123 N.Y.S.3d 384, 387 (App. Div. 2020) ("[I]t is a common practice of New York courts to refer to dictionaries to determine the plain and ordinary meaning of the words in a contract.").

[4] *Preserve*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/preserve (last visited May 1, 2025).

[5] *Custody*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added).

[6] *See Custody*, OXFORD LEARNER'S DICTIONARY, https://www.oxfordlearnersdictionaries.com/definition/english/custody (last visited June 30, 2026) (emphasis added).

18

as defined below) with the [Independent Board], [Ben & Jerry's] shall be managed by the CEO . . . ." (emphasis added). And, as a further failsafe, Section 6.14(i) mandates that "Conopco shall not prevent [Ben & Jerry's] from fulfilling its obligations under *this Section 6.14*," with Section 6.14 specifying the Independent Board's status as "custodians" with "primary" authority over the social mission and brand integrity. (emphasis added).

Because the Independent Board is not a party to the Merger Agreement, the only method for it to enforce its "primary responsibility" is to do so on behalf of Ben & Jerry's.  Otherwise, the Independent Board would have no legal right to protect Ben & Jerry's brand image except by appealing to Unilever, no control over Unilever's decision, and no recourse if Unilever refused to protect the brand image on Ben & Jerry's behalf.  Such a scenario would be inconsistent with the plain meaning of the Independent Board's status as "custodians" of Ben & Jerry's brand integrity, including the specific charge to "preserv[e]" the same and "safeguard[]" the social mission. Merger Agrmt § 6.14(f).

> **4.** Unilever's interpretation would render the Independent Board's rights illusory, making them contingent upon Unilever's self-policing**.**

Unilever's peculiar interpretation of the Independent Board's rights under the Merger Agreement—that they can only be enforced if Unilever sues itself—turns the Independent Board's role on its head, robbing it of any authority to act at critical junctures when Ben & Jerry's social mission and brand integrity are subject to harm. Such an interpretation would render the Independent Board's rights illusory and must be avoided.  *See Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*, 2015 WL 4486335, at *4 (S.D.N.Y. July 23, 2015) ("New York courts avoid an interpretation that renders a contract illusory . . . ." (cleaned up)).  According to Unilever, if Unilever violates the Merger Agreement, Ben & Jerry's can seek relief only if Unilever (or the CEO it appoints) decides to sue itself.  Put another way, Unilever argues its compliance

with the Merger Agreement is contingent upon its self-evaluation. When compliance with a contract is optional, it is illusory. *See Bajan Grp., Inc. v. Consumers Interstate Corp.*, 958 N.Y.S.2d 59, at *4 (Sup. Ct. 2010) ("Where a promisor retains an unlimited right to decide later the nature or extent of his performance . . . [t]he unlimited choice in effect destroys the promise and makes it merely illusory.") (cleaned up).  If the Independent Board is barred from initiating suit on behalf of Ben & Jerry's to protect its social mission, regulation of the social mission would be left at the hands of Unilever, the company who has dismantled the Independent Board and who has an ongoing bar on criticism of an incumbent president.

> **5.**    **Unilever's interpretation also fails under the Settlement Agreement and Settlement Amendment because Unilever is expressly adverse to Ben & Jerry's and the Independent Board under both agreements.**

Both the Settlement Agreement and the Settlement Amendment align Ben & Jerry's with the Independent Board, and ***not*** with Unilever and Conopco.  *See* Settlement Agrmt at 1 (noting the agreement "is entered into by Conopco, Inc. … and Unilever PLC (collectively "Unilever"), *on the one hand*, and Ben & Jerry's Homemade, Inc. and the Class I Directors of the Ben & Jerry's Board of Directors ("Ben & Jerry's" or "Plaintiff"), *on the other hand*") (emphasis added); Settlement Amendment at 1 (same).  As with the Merger Agreement, Ben & Jerry's rights under these contracts are meaningless and illusory if they can only be vindicated in the unlikely event Unilever (or the CEO it appoints) decides to sue itself.  The more reasonable interpretation is that the party whose rights are aligned with Ben & Jerry's under the agreements can sue Unilever to enforce them—especially since, at the time the parties negotiated the Settlement Agreement, the Independent Board was actively litigating and negotiating on Ben & Jerry's behalf.[7]

---

[7] Defendants' attempt to cite a caption from an arbitration unreferenced in the Complaint (Mem. Dismiss at 22) to bolster their standing argument both: 1) demonstrates why their interpretation requires extraneous materials and should not be resolved at this stage of the litigation and 2) mischaracterizes the arbitration, which in fact, underscored that the Class I Directors were representing Ben & Jerry's per the parties' arbitration agreement

**6.**    **Unilever's remaining arguments do not make its interpretation any less illusory.**

Unilever's arguments regarding the Shareholders Agreement and third-party beneficiary status fare no better. Ben & Jerry's did not sue under the Shareholders Agreement; the Shareholders Agreement is not a contract between the relevant parties; and the Shareholders Agreement, in fact, replicates the Merger Agreement's language regarding the Independent Board's "primary" authority, including charge as "custodians."

Unilever also argues the Independent Board does not have third-party beneficiary status; however, the Independent Board is not seeking to enforce the rights of a third party, it is seeking to enforce the rights of *Ben & Jerry's* (a party to the Merger Agreement) in an area where the Independent Board explicitly holds "primary responsibility." Merger Agrmt § 6.14(f). The Independent Board's argument is no different than Unilever suggesting Ben & Jerry's CEO (a nonparty) may sue on Ben & Jerry's behalf. The question is therefore *who is the appropriate party* to sue on Ben & Jerry's behalf in a dispute alleging that Unilever has breached its obligations vis-à-vis Ben & Jerry's in relation to the Merger Agreement? The parties agree that there are only 3 potential candidates: Unilever; the CEO Unilever appoints for Ben & Jerry's; or the Independent Board. Unilever claims that it (or the CEO it appoints for Ben & Jerry's) is the proper party to sue itself. The Independent Board—the "custodians" of Ben & Jerry's brand integrity with "primary responsibility" over the same as well as Ben & Jerry's social mission—offer the more plausible interpretation. Merger Agrmt § 6.14(f).

**7.**    **Unilever modified its interpretation mid-litigation.**

Unilever originally argued that only Unilever had the authority to enforce Ben & Jerry's and the Independent Board's rights under the Merger Agreement. ECF No. 33 (Feb. 7, 2025 Pre-Motion Letter) at 3 (arguing only Unilever—rather than Unilever and the Ben & Jerry's CEO—

21

had the right to bring suit in the name of Ben & Jerry's).  ***Only after removing Mr. Stever as CEO***, did Unilever change its interpretation to now argue that both itself and the CEO it appoints for Ben & Jerry's have standing to sue under the Merger Agreement. Compl. ¶ 60. Unilever's flip-flop further underscores the flaws in its interpretation for two reasons.

*First*, it shows how Unilever constantly interprets the Merger Agreement in ways that make their promises illusory. According to Unilever, when Mr. Stever "repeatedly acquiesced" to the Independent Board, he had no authority to sue on behalf of Ben & Jerry's. *Compare* Compl. ¶ 64, *with* ECF No. 33 at 3. Now that Mr. Stever has been pushed out and a CEO loyal to Unilever brought in, only that CEO can bring suit on behalf of Ben & Jerry's. The only consistency is Unilever avoiding accountability for its promises under Section 6.14 of the Merger Agreement.

*Second*, Unilever's new CEO-exclusive interpretation is patently inconsistent with other provisions of the Merger Agreement. For example, under Section 6.14(c) of the Merger Agreement, Unilever must consult with the Independent Board in good faith prior to removing Ben & Jerry's CEO. If the Independent Board is powerless to enforce Section 6.14(c) on Ben & Jerry's behalf—and has no standing to enforce the section in its own capacity, as Unilever has argued—then Unilever can simply remove any CEO who tries to enforce Ben & Jerry's rights under the Merger Agreement, and Ben and Jerry's will be powerless to stop them. This scenario is not hypothetical—it is precisely what Unilever did with Mr. Stever after a parade of threats.

Perhaps an even clearer example, Section 6.14(f) of the Merger Agreement explicitly provides the Independent Board the authority to "***prevent any action*** by the [Ben & Jerry's] CEO in the areas of new product introduction, the changing of product standards and specifications, the approval of the content of marketing materials and the licensing or other use of Ben & Jerry's trademark . . ." (emphasis added).  How could the Independent Board enforce its rights under the

Merger Agreement to "prevent" "any action" by the Ben & Jerry's CEO in various broad areas including "new product introduction" if it did not have standing to enforce those rights under the Merger Agreement? Here again, Unilever's interpretation would require the CEO to sue himself.

Unilever's interpretation is also inconsistent with Exhibit B to the Merger Agreement, which reserves authority to "Conopco and the Company Board" over matters including the "selection of . . . Corporate Counsel" and "all matters not covered by the delegation" to the CEO alone. Merger Agrmt Ex. B § A(2)(a), (12). Such authority is to be split per Section 6.14, meaning the "selection of . . . Corporate Counsel" on matters relating to the Independent Board's "primary authority" are within the Independent Board's purview. In this litigation, Unilever has attempted to unilaterally amend the definition of "Ineligible Director" under the Merger Agreement and now argues that the only parties who have standing to stop it are itself and the CEO it appoints for Ben & Jerry's (who it has now attempted to empower to run board meetings without the presence of any independent director). Unilever's interpretation renders the Merger Agreement toothless.

**B.      Defendants breached Section 6.14(c) when they failed to consult in good faith regarding the removal of Mr. Stever.**

Defendants mischaracterize the Complaint's allegations about good-faith consultation regarding the removal of Mr. Stever. Mem. Dismiss at 23–24. Defendants claim they tried to consult and that the Class I Directors refused to engage. The Complaint alleges the opposite. Behind closed doors, Unilever threatened Mr. Stever for months ("You need to limit the board access to management to show you are controlling them. As we go to a public listing, the board's behavior will make that more difficult. If they don't get in line, Peter's [ter Kelve] only move now that Miller [Ben & Jerry's former Global Social Mission Director] is gone is to fire you."). Compl. ¶ 123. Unilever announced its decision to remove Mr. Stever before the independent-board led advisory committee specificized in the Merger Agreement was even appointed. Compl. ¶¶ 60–62;

23

Merger Agrmt § 6.14(c). Unilever imposed a four-day deadline despite considering removal for months. *Id.* It refused the minutes, notes, and materials needed for meaningful participation. *Id.* These are not good faith actions, particularly when viewed in the light most favorable to Plaintiffs.

In short, Section 6.14(c) requires that decisions on the appointment, compensation, and removal of the CEO "be made by Conopco ***after good faith consultation*** with, and the participation in discussions of," an advisory committee of the Company Board. Merger Agrmt § 6.14(c) (emphasis added). The Complaint alleges that Defendants decided first and consulted later. Compl. ¶¶ 58, 60–62. That states a breach. At a minimum, whether the consultation was made in good faith is a fact question necessitating discovery. *Dane*, 974 F.3d at 188.

**C.    Defendants breached Sections 6.14(e), (f), and (i) when they interfered with Plaintiffs' rights under the Merger Agreement.**

Defendants overlook and mischaracterize the well-pleaded allegations of interference. Mem. Dismiss at 21–25. Section 6.14 provides the Independent Board "primary responsibility" over the social mission and makes it "custodian[]" of Ben & Jerry's brand image. Merger Agrmt § 6.14(e)–(f). Defendants' assertion that this role was limited and non-exclusive raises a merits dispute over scope. It is not a basis for dismissal. *HK Kolmar USA*, 813 F. Supp. 3d at 446; *De Souza*, 2026 WL 783732, at *6.

Whether the proposed statements fell within Ben & Jerry's social mission is, at minimum, a fact question. The brand's history of advocacy is not disputed. Compl. ¶¶ 16–17, 30–42. In 1988, Ben & Jerry's launched the "Peace Pop" to challenge Cold War spending. Compl. ¶ 16. In 2018, it launched "Pecan Resist" to oppose the first Trump administration's policies, along with the following public statement: "The company cannot be silent in the face of President Trump's policies that attack and attempt to roll back decades of progress on racial and gender equity, climate change, LGBTQ rights and refugee and immigrant rights — all issues that have been at the core

24

of the company's social mission for 40 years." Compl. ¶ 39. The Licensing Agreement barred the launching of Ben & Jerry's products "in any country deemed . . . to be engaged in significant human rights abuses" without the Independent Board's consent. Compl. ¶ 20. The parties thus understood that the social mission included international human rights.

Defendants' characterization of the statements as "undisputedly partisan" is a disputed fact, not a ground for dismissal. Mem. Dismiss at 24–25. Ben & Jerry's has challenged administrations of both parties for over four decades. Compl. ¶¶ 16–17, 38–42. At the pleading stage, Plaintiffs need only allege a reasonable inference that Defendants interfered with authority protected by Section 6.14. The Complaint does. Compl. ¶¶ 30–42, 120–122.

### D.    Defendants have breached their obligation to fund the Foundation under Section 6.14(h).

The Complaint plausibly alleges that Defendants have not funded the Foundation as it was required to do. Defendants erroneously respond that funding became discretionary after ten years and that the audit revealed deficiencies. Mem. Dismiss at 25–26, 31–32. Defendants' audit defense asks the Court to accept counterfactual statements outside the Complaint and to read language into Section 6.14(h) that is not there. There is no allegation in the Complaint that Defendants' audit complied with the Merger Agreement, because audits of Plaintiffs are not within the scope of the Merger Agreement. The Court cannot credit Defendants' contrary assertion now. *Dane*, 974 F.3d at 188.

Indeed, the Complaint alleges that Unilever had no audit right, refused to provide the audit scope, targeted Chair Mittal rather than the Foundation's finances, withheld most 2024 funds until the audit concluded, threatened future funding even after the audit found no wrongdoing, and was orchestrated by Unilever's litigation counsel, mid-litigation. Compl. ¶¶ 84, 90–97. In addition to each of these irregularities, that the Defendants demanded the first audit in twenty-four years only

25

after the Second Amended Complaint (and despite having paid more than $68 million without audit requests, governance challenges, or objections to recipients) shows the audit for what it is: a pretextual exercise targeting the Foundation's independence. Compl. ¶¶ 66–73, 84. In any event, there are no competent allegations the Court can rely on that Defendants had the right to audit and performed an audit consistent with such rights that could justify a dismissal of the claim for breach of Section 6.14(h).

**E.     Defendants have breached Section 2(b) and 2(j) of the Settlement Agreement.**

Defendants offer no authority that the promises in the Settlement Agreement are unenforceable. *See generally* Mem. Dismiss. The Settlement Agreement imposed distinct obligations: concrete payment obligations and good-faith commitments to respect, protect, and *further* the social mission. Compl. ¶¶ 25, 162–166. Defendants cannot defeat those claims by calling them duplicative of the Merger Agreement claims. Mem. Dismiss at 26, 30–31. The same conduct can breach both the original protections and the later settlement commitments that reinforced them.

The Complaint pleads payment breaches. It alleges that Unilever failed to make the remaining $2.5 million payment for humanitarian and human-rights organizations and failed to make the Canaan Fair Trade payments. Compl. ¶¶ 43–56, 166, 179, 185. It alleges that Unilever objected to recipients tied to Palestinian human-rights advocacy, failed to provide quarterly confirmations, and imposed extracontractual hurdles. Compl. ¶¶ 45–56, 179, 185. Defendants' own motion concedes that factual disputes remain over the 2025 almonds payment and the remaining $2.5 million payment. Mem. Dismiss at 1–2, 26. Those disputes alone preclude dismissal.

The Complaint also pleads good-faith breaches. The Settlement Agreement required Defendants to respect the Independent Board's authority and work in good faith with them to

protect and further the social mission; the Complaint alleges that a pretextual audit; muzzling of the social mission; and dismantling of the Independent Board neither respect the board's authority nor further the social mission. Compl. ¶¶ 30–42, 59–66, 84–106, 163. Whether Defendants performed is a merits question barring dismissal. *Icahn Sch. of Med. at Mount Sinai*, 191 F. Supp. 3d at 329.

Finally, Defendants' argument that the Class I Directors do not have standing because Unilever's litigation counsel orchestrated a mid-litigation pretextual audit which Unilever used to unilaterally declare them ineligible contradicts the well-pleaded facts of the Complaint and further underscores why a party other than Unilever must be responsible for enforcing the independent board's rights under the Merger Agreement.

### F.       Plaintiffs' allegations regarding damages comply with New York law.

Defendants are wrong on the law about breach-of-contract damages. Mem. Dismiss at 26–28. Their argument assumes Plaintiffs must allege actual damages. In New York, "actual damages are not an essential element of a breach of contract cause of action." *Giamundo v. Dunn*, 195 N.Y.S.3d 724, 728 (App. Div. 2023). Nominal damages are "always available" in breach-of-contract actions. *Saeco Vending, S.P.A. v. Seaga Mfg., Inc.*, 2016 WL 1659132, at *7 (S.D.N.Y. Jan. 28, 2016) (citing multiple cases). A breach-of-contract claim therefore cannot be dismissed for failure to plead damages. *Id.*

Further, the Complaint does plead concrete injury. Despite describing Ben & Jerry's social mission as "an integral part of the B&J brand" and a "unique character" of the company, Unilever nevertheless attempts to argue that Ben & Jerry's and the Independent Board have not plausibly alleged damages. The loss of bargained-for governance rights, Class I Director authority, and appointment rights is a significantly precise cognizable injury at the pleading stage. *Fed. Hous. Fin. Agency v. Morgan Stanley ABS Cap. I Inc.*, 73 N.Y.S.3d 374, 397 (Sup. Ct. 2018). Breach-

of-contract damages can include lost goodwill and harm to business reputation. *RIJ Pharm. Corp. v. Ivax Pharm., Inc.*, 322 F. Supp. 2d 406, 414 (S.D.N.Y. 2004). A plaintiff need not specify a dollar amount so long as the complaint supports the claim of harm. *Next Commc'ns, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *8 (S.D.N.Y. Mar. 30, 2016).[8]

Moreover, Unilever is wrong that Ben & Jerry's is unharmed by Unilever's failure to disburse funds to its donation designees. It is "well-settled" under New York law that a promisee "may sue the promisor to enforce [a] contract" for non-payment to a third-party beneficiary. I*n re O.P.M. Leasing Servs., Inc.*, 21 B.R. 993, 1005 (Bankr. S.D.N.Y. 1982); *see also Berger v. Heckler*, 771 F.2d 1556, 1564 (2d Cir. 1985) ("[I]n New York a promisee for the benefit of third parties may enforce the promise on behalf of the third parties."). As a party who contracted for benefits to its designated donation recipients, Ben & Jerry's can enforce Unilever's promise to pay even if Ben & Jerry's will not be the one to receive the money. Moreover, Ben & Jerry's will receive the funds—the Settlement Agreement provides that "Unilever will make two $2,500,000 payments to Ben & Jerry's Homemade Inc." That Ben & Jerry's will then use this $2.5 million to make donations does not change the fact Unilever owes this money to Ben & Jerry's. Moreover, Unilever's continued withholding of these funds from Ben & Jerry's underscores why a party other than Unilever (or someone it controls) must pursue relief on Ben & Jerry's behalf.

Additionally, the Class I Director Plaintiffs alleged that they suffered distinct harm, including loss of compensation, reputational damages, loss of goodwill, nominal damages, loss of the opportunity to manage aspects of Ben & Jerry's social mission and brand integrity (including their roles as "custodians" of the same), including oversight authority over Ben & Jerry's CEO.

---

[8] The Merger Agreement confirms the injury. The parties agreed that a breach would cause "irreparable damage" and that the nonbreaching party could seek injunctions and specific performance. Merger Agrmt § 9.10. The Complaint alleges that Defendants' censorship, governance disruptions, and funding withholding injured Ben & Jerry's goodwill and reputation. Compl. ¶¶ 30–42, 84–97, 117. Those allegations suffice.

Compl. ¶¶ 134, 145, 168, 181. Further, the loss of corporate veto rights constitutes harm. *Wisdom Import Sales Co., LLC v. Labatt Brewing Co.,* 339 F.3d 101, 113-14 (2d Cir.2003).

### III.    Plaintiffs pleaded viable declaratory judgment claims.

Defendants attack the declaratory judgment claims as duplicative, nonjusticiable, and moot. Mem. Dismiss at 28–30. Each attack mischaracterizes the Complaint. But the requested declarations serve a practical, forward-looking purpose distinct from damages. Compl. ¶¶ 149–159, 171–176, 184–186. A court entertains a declaratory action where the judgment will "serve a useful purpose in clarifying or settling the legal issues" and "finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). Declaratory judgments may provide relief from uncertainty when directed toward prospective relief. *Tang Capital Partners, LP v. BRC Inc.*, 661 F. Supp. 3d 48, 78 (S.D.N.Y. 2023).

### A.    Plaintiffs pleaded existing disputes under the Merger Agreement requiring declaratory relief.

Defendants mischaracterize the allegations supporting the Merger Agreement declarations. Mem. Dismiss at 28–30. The Complaint alleges present disputes over who may govern Ben & Jerry's, who may speak for its social mission, and how Defendants must perform ongoing obligations. Compl. ¶¶ 149–159. The Merger Agreement declarations seek governance relief. They would determine whether Defendants may use eligibility rules or quorum amendments to operate Ben & Jerry's without the bargained-for Class I Director structure. Compl. ¶¶ 149–153.

The requested declarations are concrete. Plaintiffs seek declarations that Defendants must consult the Independent Board's Appointment Committee in good faith before removing or appointing a CEO; may not remove any Class I Director without the required written request; must recognize Chris Miller as a duly elected Class I Director; must preserve the Independent Board's custodial role in any restructuring; and may not prevent Ben & Jerry's from fulfilling its Section

29

6.14 obligations. Compl. ¶ 154(a)–(f). That relief defines the governing structure going forward. It does not merely compensate for the December 2025 purge.

A live controversy exists. "An actual controversy is one where the []facts . . .  show . . . a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" declaratory relief. *Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 122 (S.D.N.Y. 2016). Defendants say there is no controversy because Mr. Stever resigned, the former Class I Directors became ineligible, and Mr. Miller was never nominated. Mem. Dismiss at 28–30. But those are the very governance actions Plaintiffs allege were wrongful and for which remedy would be a broader recognition of control of the company. Compl. ¶¶ 117–123.

Nor are the claims moot. The requested declarations determine what Defendants may do next: whether they may continue enforcing the unilateral "eligibility" edicts, must recognize the independent directors' appointment rights, and may keep restricting social-mission communications. Compl. ¶¶ 117–123, 149–159. A claim is not moot in its entirety merely because one component of relief has been overtaken by events. And the challenged conduct is "capable of repetition, yet evading review" for future CEOs or board members whose advocacy Unilever dislikes.  *Doe v. McDonald*, 128 F.4th 379, 386 (2d Cir. 2025). Defendants could reuse the same eligibility, appointment, and speech-control positions absent declaratory relief.

**B.      Plaintiffs pleaded existing disputes under the Settlement Agreement requiring declaratory relief.**

Defendants also mischaracterize the allegations supporting the Settlement Agreement declarations. Mem. Dismiss at 29–30. The Settlement Agreement and Settlement Amendment declarations seek payment-and-compliance relief. Plaintiffs seek declarations that Defendants must honor the Chair's humanitarian and human-rights designees, stop conditioning Foundation

and Canaan payments on extracontractual requirements, provide the required quarterly payment confirmations, and refrain from using the alleged director purge to extinguish Settlement Agreement rights. Compl. ¶¶ 171–176, 184–186.

The Foundation declarations likewise seek prospective relief under Section 6.14(h): that Defendants are improperly withholding allocated funds, must disburse them, may not condition funding on extracontractual terms such as trustee term limits, and must honor the Independent Board's future allocation decisions. Compl. ¶ 159(a)–(e).[9] Those declarations tell the parties—including Unilever—how to perform going forward.

## IV.    Plaintiffs pleaded viable claims for declaratory relief and breach of the implied covenant of good faith and fair dealing that are not duplicative.

The implied-covenant claim is not duplicative of the express contract claims. *Contra* Mem. Dismiss at 30–31. It is pleaded in the alternative. The parties dispute the scope of the Merger Agreement's express removal protections, and Plaintiffs do not seek double recovery. Both points preserve the alternative theory. "A plaintiff can plead a claim for breach of the covenant of good faith and fair dealing where there is a dispute over the existence, scope, or enforceability of the putative contract." *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 627 (S.D.N.Y. 2024) (cleaned up). The claim addresses a gap that Unilever claims exists. If the Court concludes that Defendants' disqualification scheme is not "removal" under Section 6.14(a), it could still conclude that

---

[9] The fact that Unilever assigned its obligations in the Settlement Agreement to Magnum is of no moment. *See generally* Mem. Subst. An assignor of a contractual liability is not automatically released from liability; they share liability with the assignee, unless all parties to the original contract sign a novation. "[M]ost obligations can be delegated as long as performance by the delegate will not vary materially from performance by the delegant," but, "[i]f the delegate fails to perform, the delegant remains liable." *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir. 1977). Thus, while a contracting party may ordinarily transfer their obligations under the contract to another entity, they cannot use this as a device to escape liability should those obligations be breached. "No one can assign his liabilities under a contract without the consent of the party to whom he is liable." *Id.* (quoting J. Calamari & J. Perillo, Contracts s 254 (1970)). The Class I Directors are parties to the Settlement Agreement and Settlement Amendment and have never consented to any assignment.

31

Defendants intentionally circumvented that provision's protections and breached the implied covenant. Compl. ¶¶ 117, 189–90. Alternative pleading is proper. Federal procedure permits breach-of-contract and implied-covenant theories in the alternative. *Evans v. Select Portfolio Servicing, Inc.*, No. 18-CV-5985 (PKC) (RML), 2026 WL 1154269, at 15 (E.D.N.Y. Mar. 31, 2026) (quoting FED. R. CIV. P. 8(d)(2)). Because Plaintiffs do not seek duplicative recovery, there is "little practical difference" between pleading the implied-covenant claim separately or as part of the contract claim. *Id.* The Class I Directors plead each breach in the alternative as either an express or implied-covenant breach. Compl. ¶¶ 189–90.

## V.    The Court should not dismiss the Foundation's claims.

Defendants separately move to dismiss the Foundation's claims (Counts II, IV, and X) for lack of standing and failure to state a claim. Mem. Dismiss at 31–32. The Foundation responds to each argument below.

### A.    The Court previously granted the Foundation's request for permissive intervention as to Counts II and IV, thereby rejecting Defendants' standing argument.

When the Court allowed permissive intervention for the Foundation (ECF No. 77), it rejected Defendants' argument that the Foundation lacks standing. Defendants recycle that same, failed argument in their motion to dismiss. Mem. Dismiss at 31. There is no reason for the Court to reach a different result now.

In granting the Foundation's motion for permissive intervention, the Court has already recognized the Foundation's direct stake in this litigation. The Court concluded that the Foundation "has an interest in the outcome of this action" and that its participation would "contribute to the full development of the underlying factual issues and the just and equitable adjudication of the legal questions presented." ECF No. 77 at 3–4. The Court further found that permitting the

32

Foundation to participate would not unduly delay or prejudice the adjudication of any party's rights. *Id.* at 3.

Moreover, the Foundation seeks the same declaratory and injunctive relief as the other Plaintiffs: a declaration construing Section 6.14(h), an order requiring Defendants to comply with the Merger Agreement, and relief protecting the Foundation's continued funding, independence, and charitable mission. Compl. ¶¶137-147, 155-159. When an intervenor seeks the same relief as an existing plaintiff, as the Foundation does here, it need not independently establish Article III standing. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (an intervenor must demonstrate standing only when it seeks "relief beyond that which the plaintiff requests"). Therefore, the Court should reject Defendants' rehashed standing arguments and allow the Foundation's Counts II and IV to proceed.[10]

### B. The Complaint plausibly alleges breach of Section 6.14(h).

Contrary to Defendants' assertions, the Complaint plausibly alleges that Defendants' conduct, including its withholding of funds from the Foundation, breached Section 6.14(h) (Counts II, IV). Defendants cannot short-circuit resolution of these claims on their merits by re-writing the terms of the Merger Agreement.

---

[10] The Foundation also has standing to bring Counts II and IV independent of the other Plaintiffs' claims. At the pleading stage, Plaintiffs need only plausibly allege that the Merger Agreement reflects the parties' intent to confer enforceable rights on the Foundation under Section 6.14(h). *See First Solar, Inc. v. Absolute Process Instruments, Inc.*, No. 17-CV-8518 (JSR), 2018 WL 1166632, at *4 (S.D.N.Y. Feb. 8, 2018) ("Breach of contract claims fall under Rule 8(a), and thus require only a short and plain statement of the claim, so long as the facts alleged and any reasonable inferences that can be drawn in plaintiff's favor give rise to a plausible claim for relief." (cleaned up)). The Complaint plausibly alleges that Section 6.14(h) was intended to benefit the Foundation; in particular, Section 6.14(h) exists to govern the Foundation's continued funding following the merger. Compl. ¶ 70. Also, as alleged, Defendants invoked Section 6.14(h) to conduct the Foundation's first audit in nearly twenty-five years, evaluate the Foundation's activities and performance, withhold contributions already allocated by the Independent Board, and condition future funding on governance concessions. Compl. ¶¶ 66–97. These allegations, in addition to the parties' course of performance under the Merger Agreement over almost 25 years, reinforce Plaintiffs' interpretation that Section 6.14(h) establishes enforceable rights and obligations running directly to the Foundation.

### 1.  Defendants' interpretation of Section 6.14(h) does not warrant dismissal.

Section 6.14(h) does not give Defendants untrammeled discretion to discontinue funding for the Foundation. It prescribes an objective standard: that the Surviving Corporation "shall continue" making contributions unless the Foundation's activities and performance cease to be "reasonably acceptable" to Conopco. Merger Agrmt § 6.14(h). Further, under Section 6.14(h), it is the Independent Board that has authority to allocate funding to the Foundation. Merger Agrmt § 6.14(h). And Section 6.14(i) expressly provides that "Conopco shall not prevent the Surviving Corporation from fulfilling its obligations under this Section 6.14." Merger Agrmt § 6.14(i). Defendants' assertion that 6.14(h) gives "TMICC discretion to discontinue funding after 10 years" (Mem. Dismiss at 32) is a clear distortion of the plain text. In fact, TMICC can withhold funding allocated to the Foundation by the Independent Board only on specific and objective grounds specified in Section 6.14(h). Compl. ¶ 70.

Likely realizing that application of the standards actually set forth in Section 6.14(h) necessarily requires a factual inquiry, Defendants invent a different standard, claiming that they had "discretion" to withhold funding.  *See* Mem. Dismiss at 4. Although Defendants use the term "discretion" at least a half-dozen times in describing Section 6.14(h), Mem. Dismiss at 4, 25, 26, 32, that term is not used in Section 6.14(h). *See* Merger Agrmt § 6.14(h).[11] Section 6.14(h) does not give Defendants discretion to withhold funding allocated to the Foundation by the Independent Board. Rather, it provides that the Surviving Corporation "*shall* continue" making annual contributions unless the Foundation's activities and performance cease to be "reasonably

---

[11] Defendants' reliance on *Prickett v. N.Y. Life Ins. Co.* in support of this supposed "discretion" is likewise misplaced. 896 F. Supp. 2d 236 (S.D.N.Y. 2012). *Prickett* construed a materially different agreement that provided that the defendant "may" take certain actions and vested it with discretion to do so, but imposed no obligation to exercise that discretion. *Id.* at 251. The *Prickett* defendant's failure to act could not constitute a breach because the contract did not require it to act in the first place. *Id.* at 251–52.

acceptable" to Defendants (or other specified standards are not met). Merger Agrmt § 6.14(h) (emphasis added). If Defendants could discontinue funding whenever they chose, the parties would not have used the term "reasonably" in Section 6.14(h). They did use that term, and courts interpreting New York contracts must give effect to every word rather than adopt constructions that render contractual language surplusage. *In re Lehman Bros. Inc.*, 478 B.R. 570, 594 (S.D.N.Y. 2012), *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 761 F.3d 303 (2d Cir. 2014), and *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 590 F. App'x 92 (2d Cir. 2015).

Defendants' dismissal arguments are predicated entirely on their misreading of Section 6.14(h) as giving them unreviewable discretion. Mem. Dismiss 25, 32. They do not explain how, at the pleadings stage and based on allegations the Court must accept as true, the Court could find as a matter of law that Defendants acted *reasonably* in withholding funding. Further, their suggestion that the Independent Board "concede[d] . . . [that] TMICC exercised its discretion to withhold funding" is unmoored from the Complaint. Mem. Dismiss 25. The Complaint alleges precisely the opposite—that the audit was pretextual and Defendants improperly sought to condition funding to the Foundation on "unreasonable conditions" that "are inconsistent with past practice" and "would substantially undermine the Foundation's independence." Compl. ¶¶ 123, 142.

In sum, the Complaint plausibly alleges that Defendants had no basis to withhold funding under Section 6.14(h). Rather than determining that the Foundation's charitable activities or performance had ceased to be "reasonably acceptable," the Complaint alleges that Defendants demanded the first audit in the Foundation's twenty-four-year history only after this litigation expanded, despite having previously disbursed more than $68 million without objection and despite the Merger Agreement containing no audit right. Compl. ¶¶ 66–90. The Complaint further

35

alleges that the audit itself was a pretext: Defendants allegedly targeted Chair Mittal rather than the Foundation's finances, refused to disclose the audit's scope of work, switched auditors after questions arose about the original auditor, and used the audit process to justify withholding millions of dollars in previously approved Foundation funding. Compl. ¶¶ 91–97. Although Defendants promised to share the audit report in the interest of "transparency," they reneged on that commitment after the audit concluded and refused to provide the report to the Foundation. Compl. ¶¶ 89, 95–97. Instead, Defendants relied on the undisclosed audit to withhold funding and demand trustee term limits, eligibility restrictions, and other governance concessions that appear nowhere in Section 6.14(h). Compl. ¶¶ 95–97, 113-16. Accepting those allegations as true, Plaintiffs and the Foundation have plausibly alleged that Defendants invoked Section 6.14(h) as a pretext to pressure the Foundation into governance changes—not because they concluded that the Foundation's activities or performance were no longer "reasonably acceptable." These issues cannot be resolved against the Foundation on a motion to dismiss.

### 2.    The Complaint adequately alleges resulting injury.

Defendants wrongly contend that the Foundation damages allegations are insufficient. Mem. Dismiss at 32. The Complaint specifically alleges that Defendants "refus[ed] to provide the allocated contribution to the Foundation," Compl. ¶ 140, and that the Foundation's damages "include the loss of funding required by the Merger Agreement, reputational injury, and damage to its goodwill." Compl. ¶ 144. The losses alleged are concrete and supported by factual allegations, which is all that is required.[12] Whether Plaintiffs ultimately prove those injuries is a question for summary judgment or trial, not dismissal.

---

[12] Citing *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014), Defendants label the Complaint's allegations "boilerplate" and "conclusory" and assert that the Foundation's damages allegations are unsupported. Mem. Dismiss at 32. Defendants do not explain how a specific allegation that Defendants withheld funding that should have been paid to the Foundation is "boilerplate" or otherwise insufficient.

36

### C.     The unjust-enrichment claim is properly pleaded in the alternative.

Defendants do not dispute that the Foundation has standing to assert its unjust enrichment claim based on Defendants' withholding of allocated funding. Instead, Defendants argue—in direct conflict with their position that the Merger Agreement does not grant the Foundation contractual rights—that the Merger Agreement bars the Foundation's equitable claim. Defendants cannot have it both ways: if the Merger Agreement governs Defendants' obligations to fund the Foundation (Mem. Dismiss at 32), then the Court should decide Counts II and IV on the merits and address Defendants' breach of Section 6.14(h). In the alternative, the Court should decide the Foundation's unjust enrichment claim on the merits. Defendants cannot simultaneously argue that the Foundation lacks contractual rights and that those same contractual rights foreclose any equitable remedy. Rule 8 permits Plaintiffs to plead alternative theories of recovery precisely for this circumstance. FED. R. CIV. P. 8.

At this stage, Plaintiffs are thus entitled to plead unjust enrichment in the alternative. *Gerszberg v. Iconix Brand Grp., Inc.*, No. 17-CV-8421 (KBF), 2018 WL 2108239, at *5 (S.D.N.Y. May 7, 2018). If the Court concludes that Section 6.14(h) does not provide an enforceable contractual remedy, the Complaint plausibly alleges that Defendants accepted and retained the benefits of the Foundation's charitable work, reputation, and public goodwill while withholding the funding associated with those benefits. Compl. ¶¶ 191–196. Defendants' conclusory assertion that the Foundation lacks a "possessory" interest in the funds (Mem. Dismiss at 32) is a question of fact that cannot be decided on a motion to dismiss. The Complaint alleges that the Independent Board "fulfilled its responsibility under Section 6.14(h) of the Merger Agreement by allocating the 2025 charitable contribution to the Foundation," Compl. ¶ 139, and that Defendants "refus[ed] to provide the allocated contribution to the Foundation." *Id*. ¶ 140. While Defendants may believe that the funds "belong to TMICC," (Mem. Dismiss at 32 n.25) that is a merits question, not grounds

37

for dismissal. And the fact that the Foundation uses its funding to make grants to charities does not undermine the Foundation's equitable interest in the funds allocated to it.[13]

## VI.   Unilever and Conopco should not be substituted out or dismissed at this stage.

### A.   Rule 25(c) does not require substitution.

Defendants assert that Magnum and HoldCo are the "only appropriate Defendants." Mem. Subst. at 5. Rule 25(c) holds otherwise. When an interest is transferred during litigation, "the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted." FED. R. CIV. P. 25(c). The default favors continuation against the original party. The rule "permits automatic continuation of [the] lawsuit against [the] original" party. *In re Chalasani*, 92 F.3d 1300, 1312 (2d Cir. 1996) (cleaned up). There is nothing here that would warrant a departure from the default. Plaintiffs do not dispute that Magnum and HoldCo are successors-in-interest, but that fact alone does not compel substitution. The question is whether substitution would "expedite and simplify the action." *U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 451 F. Supp. 3d 294, 298 (S.D.N.Y. 2020) (cleaned up). It would not. Removing the entities that negotiated, executed, performed, and allegedly breached the agreements would obscure responsibility, not simplify it. Compl. ¶¶ 18–25, 123.

Defendants' lead authority does not help them. In *Spectrum Dynamics v. General Electric Company*, the substitute defendants stipulated to accept liability, and the transferred assets there were the patents at the core of the dispute. No. 18-CV-11386 (VSB) (KHP), 2023 WL 7135236, at *5 (S.D.N.Y. Oct. 30, 2023). This case is different. Plaintiffs' claims arise from a long-running contractual relationship and alleged breaches by Unilever and Conopco themselves. Compl. ¶¶ 18–

---

[13] Defendants' assertion that Section 6.14(h) does not specify an amount that must be allocated to the Foundation, Mem. Dismiss at 32 n.25, is irrelevant. The Foundation's unjust enrichment claim is premised on the Independent Board's decision to allocate funds to the Foundation. Compl. ¶ 192.

25, 123. Section 9.09 bars assignment without consent, voids unauthorized assignments, and provides that permitted assignments do not relieve the assignor of its obligations. Merger Agrmt § 9.09. At most, that supports keeping the successors alongside the original obligors.

### B.　　Unilever and Conopco remain proper defendants for pre-demerger conduct.

Defendants' mootness argument confuses assignment with absolution. Even if Magnum and HoldCo assumed certain post-demerger obligations, that does not eliminate the controversy over Unilever's and Conopco's own breaches. The assignments occurred after many of the alleged breaches accrued. Compl. ¶¶ 30–42, 59–66, 84–106. Moreover, Magnum's *own discovery requests* demand documents from 2022 onwards. The Complaint alleges that Unilever and Conopco themselves censored social-mission communications, withheld Settlement Agreement and Settlement Amendment payments, attempted to remove Mr. Stever, launched the Foundation audit, withheld Foundation funding, and pursued the Chair Mittal "integrity" investigation before the demerger. Compl. ¶¶ 30–42, 59–66, 84–106. The assignment documents may affect how Defendants allocate responsibility among themselves, but they do not deprive the Court of power to grant relief against the entities that committed the alleged breaches.[14]

### C.　　Substitution would prejudice Plaintiffs and complicate discovery.

Substitution would prejudice Plaintiffs and complicate discovery. A court asks "whether substitution will expedite and simplify the action." *U.S. Sec. & Exch. Comm'n*, 451 F. Supp. 3d at 298 (cleaned up). Substitution is inappropriate where it "would serve only to add duration, costs, and complexity to an action." *Fashion G5 LLC v. Anstalt*, No. 1:14-CV-5719-GHW, 2016 WL

---

[14] Defendants' contrary rule stretches *New World* beyond its holding. *New World Int'l, Inc. v. Ford Glob. Techs., LLC*, No. 3:16-CV-1112-M, 2017 WL 1078525, at *9 (N.D. Tex. Mar. 22, 2017). That case concerns the absence of an effective declaratory judgment against a former patent owner after transfer. Mem. Subst. at 7. It is not authority for dismissing original contracting parties from accrued breach claims based on their own pre-transfer conduct. Plaintiffs seek damages and injunctive relief for conduct Unilever and Conopco committed before the transfer. Compl. ¶¶ 30–42, 84–106.

7009043, at *2 (S.D.N.Y. Nov. 29, 2016) (cleaned up). Defendants concede that Unilever and Conopco hold relevant documents and employees and offer only to accept service of Rule 45 subpoenas. Mem. Subst. at 6. Defendants' own Initial Disclosures identified multiple Unilever executives as witnesses. Relegating the entities that controlled and allegedly breached the contracts for decades to third-party status would add cost and delay, not simplify anything.

## CONCLUSION

Both motions should be denied. The motion to dismiss asks the Court to credit Defendants' disputed facts and contractual readings over the Complaint's well-pleaded allegations. Rule 12(b)(6) forbids that. The Complaint identifies the agreements, the operative terms, and how Defendants breached them: by removing Class I Directors without the written approval, blocking Chris Miller's appointment, censoring social-mission communications, hollowing out CEO consultation, withholding Foundation and Settlement funds, and engineering governance changes to eliminate the Class I Directors' role. Compl. ¶¶ 30–42, 60–64, 90–97, 117, 119. The damages allegations satisfy New York law. The declaratory counts present live disputes.

The motion to substitute should also be denied. Unilever and Conopco remain proper defendants for their own pre-demerger conduct, and substitution would prejudice Plaintiffs and complicate discovery.  Plaintiffs therefore ask that the Court deny both motions.

Dated: June 30, 2026

Respectfully submitted,

**AHMAD, ZAVITSANOS & MENSING PLLC**

/s/ *Shahmeer Halepota*
Shahmeer Halepota
Joseph Y. Ahmad
John Zavitsanos (admitted *pro hac vice*)
Daryl Moore (admitted *pro hac vice*)
Kelsi White (admitted *pro hac vice*)
Weining Bai (admitted *pro hac vice*)
Thomas Frashier (admitted *pro hac vice*)
Sean Healey (admitted *pro hac vice*)
Sara Fatima Dhanji (admitted *pro hac vice)*
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone: (713) 655-1101

*Attorneys for Plaintiffs Ben & Jerry's*
*Homemade, Inc. and the Class I Directors of*
*Ben & Jerry's Independent Board*

**STRIS & MAHER LLP**

/s/ Bridget Asay
Bridget Asay
Nikolas P. Kerest (admitted *pro hac vice*)
15 East State St., Suite 2
Montpelier, VT 05602
(802) 858-4285
(802) 858-4473
basay@stris.com
nkerest@stris.com

*Counsel for Plaintiff*
*The Ben & Jerry's Foundation, Inc.*

41

**WORD COUNT CERTIFICATION**

The undersigned hereby certifies pursuant to Local Civil Rule 7.1(c) that, excluding the caption, table of contents, table of authorities, signature block, and required certificates, the total number of words in this memorandum is 13,216.

/s/ *Shahmeer Halepota*
Shahmeer Halepota

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically on June 30, 2026.  As such, this document was served on all counsel of record pursuant to the Federal Rules of Civil Procedure.

/s/ *Shahmeer Halepota*
Shahmeer Halepota

42