**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

*VIA ECF*

July 24, 2026

**David J. Lender**
+1 (212) 310-8153
david.lender@weil.com

The Honorable P. Kevin Castel
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:  *Ben & Jerry's Homemade, Inc. et al. v. Unilever PLC et al.*, Case No. 24-cv-8641-PKC (S.D.N.Y.)**

Dear Judge Castel:

Pursuant to the Court's Individual Practices, Defendants Unilever PLC ("**Unilever**"), Conopco, Inc. ("**Conopco**"), The Magnum Ice Cream Company N.V. ("**TMICC**"), and Ben & Jerry's HoldCo, LLC ("**HoldCo**") (collectively, "**Defendants**") write in response to Plaintiffs Ben & Jerry's Homemade, Inc. and the former Class I Directors (collectively, "**Plaintiffs**") letter-motion of July 20, 2026. For the reasons detailed herein, to the extent that Plaintiffs seek specific relief, Defendants respectfully submit that such relief should be denied. Defendants are available for a conference at the Court's convenience.

At the outset, in contravention of Rule 3.B of the Court's Individual Practices, Plaintiffs' 18-page letter-motion fails to "include a certification that the movant has in good faith conferred or attempted to confer" with Defendants. Fed. R. Civ. P. 37(a)(1). Plaintiffs have made no such effort, provided no advance warning of their intent to seek judicial intervention, and, instead, have engaged in a months-long pattern of delay, refusing to commit to producing basic discovery such as emails to Defendants, while also precluding  agreement on a Protective Order and ESI Protocol to govern discovery in this action.[1] Given the commercially-sensitive and highly-publicized nature of this action, that delay has significantly limited discovery in this case.

Defendants take each of Plaintiffs' arguments in turn. To begin, the Business Integrity Investigation related to Anuradha Mittal's conduct (the "BI Investigation") was conducted not only by outside counsel and in anticipation of litigation, but also against the evolving backdrop of this very litigation. Plaintiffs have no basis upon which to assert that the work product and attorney communications generated in the course of the BI Investigation are not insulated by applicable privileges. Despite Plaintiffs' repeated efforts to inject the findings of the BI Investigation into this litigation, Defendants have not, and will not, rely on privileged materials generated during the course of the BI Investigation to mount a legal defense. Rather,

---

[1] Defendants will be filing shortly a motion concerning Plaintiffs' discovery failings.

**Weil, Gotshal & Manges LLP**

July 24, 2026
Page 2

as Defendants' prior briefing and discovery requests and responses make clear, Defendants' legal defense rests solely on the underlying facts.

Further, Plaintiffs' challenges to Defendants' responses to RFP Nos. 36, 86, and 91 are unfounded, as each request is overbroad, unduly burdensome, disproportionate to the needs of this case, or seeks material shielded by applicable privileges. Moreover, as to at least one of these requests, Plaintiffs' complaint would have been readily resolved had Plaintiffs engaged in the good-faith meet-and-confer process required by this Court's Individual Practices and Federal Rule of Civil Procedure 37(a)(1)—rather than prematurely resorting to the instant letter-motion.

Finally, Plaintiffs' requests for three further depositions lack merit. They request a deposition of Unilever Board member and Trian CEO Nelson Peltz, a prototypical apex witness, whose deposition appears designed to harass a member of the Unilever Board. As a Director on the Board of Unilever—B&J's former ultimate parent company—Mr. Peltz had no involvement in the day-to-day operations of B&J, and possesses no unique knowledge of this case. This request is particularly inappropriate before the substantial exchange of documents and while Unilever's motion to dismiss or substitute is still pending. Plaintiffs also request depositions of Vanessa Vilar, Chief Legal Officer of TMICC, and Jeff Eglash, Global Head of Litigation and Business Integrity for Unilever and former General Counsel of B&J, who serve as two of Defendants' most senior in-house counsel with primary responsibility over this litigation. Plaintiffs' stated reason for these depositions is to "determine whether Defendants are properly asserting privilege" because "Plaintiffs do not believe that Defendants are properly asserting a privilege over the investigations relevant to this case." This is an entirely inappropriate subject for a deposition, which is not supposed to be about trying to circumvent Defendants' privilege or induce a waiver by repeatedly questioning counsel about the privileged Business Integrity Investigation.

I. **Plaintiffs' effort to discover the work product and privileged communications relevant to the BI Investigation fails.**

A. **The attorney-client privilege and work product protections shield materials generated during the BI Investigation.**

Plaintiffs argue that outside counsel's investigation into the alleged misconduct of the Ben & Jerry's then-Board Chair, Anuradha Mittal—the same former Chair who was then, and remains, a named Plaintiff in this litigation—was conducted in the ordinary course of business and without an eye towards the then-pending and still ongoing litigation. Pls.' Ltr. at 3. Plaintiffs likewise press a strawman argument that Defendants' discovery responses reflect a "blanket" privilege objection shielding them from any discoverable information. But Plaintiffs' effort to strip the BI Investigation of privilege protections is belied by the facts and controlling law.

As Plaintiffs detail in their Fourth Amended Complaint ("FAC"), in September 2025, Unilever retained outside counsel to conduct a Business Integrity Investigation ("BI Investigation") into multiple allegations of misconduct by Anuradha Mittal. *See* FAC ¶ 98. At the time the BI Investigation was commenced, the

**Weil, Gotshal & Manges LLP**

July 24, 2026
Page 3

instant litigation was ongoing. Mittal is not only a named Plaintiff in this case, but her conduct is among the central issues. The threat of related litigation loomed—a threat made repeatedly by Mittal herself. And a range of legal hurdles tied to an ongoing corporate demerger remained. Accordingly, communications and work product generated in the course of the BI investigation enjoy a dual insulation under both the attorney-client privilege and work product protections. And yet, Plaintiffs' letter-motion effectively asks the Court to provide them with the unfettered opportunity to rummage through attorney files and confidential attorney-client communications.

Plaintiffs try to reframe the breadth of Defendants' assertions, suggesting Defendants have cast a "blanket" privilege assertion over the entirety of the BI Investigation. Ltr. at 4. That assertion—leveled before the parties have even exchanged documents, much less taken depositions, or logged privilege assertions—is belied by responses and objections that Plaintiffs append to their own letter-motion. *Id*. at 15–18. Defendants have already explained that they will produce responsive and non-privileged materials generated during the course of the BI Investigation. *See* Defs.' RFP R&Os 41, 42, 44, 50, 51–59. And, as further detailed below, Defendants have agreed to produce documents "sufficient to show" the legal positions—including Mittal's ineligibility to serve on the Board—relevant to their defense. *See* Defs.' RFP R&Os Nos. 41, 42, 44, 50–59. Plaintiffs have failed to justify their demands to go further.

Turning to the attorney-client privilege, there can be little dispute that outside counsel's investigation—and thus, related communications—into the alleged *contractual breach* of Defendants' code of conduct "had a 'primary purpose' of enabling [outside counsel] to provide [defendant] with legal advice. *In re General Motors LLC Ignition Switch Litigation*, 80 F. Supp. 3d 521, 523-24 (S.D.N.Y. 2015). Plaintiffs posture that the investigators' "mere status as an attorney" does not singularly render their communications privileged. But other than to suggest that certain of their communications may have been "logistical," Plaintiffs have no answer for the unequivocally legal nature of outside counsel's work and related communications. Ltr. at 4 (citation omitted). And to the extent Plaintiffs' position is that the BI Investigation was merely an "ordinary course" business investigation, courts within this District have routinely recognized that internal investigations serve "multiple and often-overlapping purposes." *E.g.*, *In re General Motors LLC Ignition Switch Litigation*, 80 F. Supp. 3d 521, 523-24 (S.D.N.Y. 2015). Mindful of that duality, courts have underscored that a failure to apply privilege protections over such investigatory materials "'threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law.'" *Id*. (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)); *see also Felder v. Warner Bros. Discovery, Inc.*, 2025 WL 1718098 (S.D.N.Y. June 20, 2025) ("the fact that a company may have had 'multiple motivations' for conducting an internal investigation, some business-related, does not defeat the privilege").

Here, communications and material generated by outside counsel's investigation into alleged misconduct that not only related to "anticipated civil litigation," but to *ongoing* litigation commenced by *Plaintiffs*, reflects a paradigmatic application of the attorney-client privilege. *Cicel (Beijing) Sci. & Tech. Co. v. Misonix, Inc.*, 331 F.R.D. 218, 223, 231 (E.D.N.Y. 2019). Courts in this District are quick to recognize that "the first step in the resolution of any legal problem"—here, the scope of Anuradha Mittal's alleged

July 24, 2026
Page 4

misconduct—"is ascertaining the factual problem." *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 493 (S.D.N.Y. 2019) (citations omitted). To that end, "[i]nterviews of a corporation's employees by its attorneys," among other investigatory materials and communications, "have been repeatedly found to be protected by the attorney-client privilege." *Id*. These protections apply here with full force.

Plaintiffs' effort to curtail the scope of the applicable work product protections is equally unfounded. Plaintiffs argue that because Defendants followed their "normal governance procedures" for carrying out the BI Investigation, that investigation cannot have been conducted in anticipation of litigation. Pls.' Ltr. at 4. In support, they note that the underlying allegations were "raised pursuant to Unilever's Code of Business Principles and Code Policies." *Id*.[2] They further contend that Defendants' reasonable request to exclude the Class I Directors' litigation counsel from a B&J Board meeting on the findings of the investigation somehow further supports their argument. *Id*. But adherence to guardrails, including efforts to present relevant *factual* findings of the BI Investigation to the Board without outside counsel present, only underscores the privileged nature of the investigation. *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (applying work product protection where a "document can fairly be said to have been prepared or obtained because of the prospect of litigation"). Again, "[r]are is the case that a troubled corporation will initiate an internal investigation solely for legal, rather than business, purposes," but investigation materials prepared "in light of [ongoing litigation] and [in] anticipation of civil litigation" are "also protected by the attorney work product." *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 532 (S.D.N.Y. 2015).[3] In short, a dual purpose does not defeat application of the work product protections—it is in many respects a hallmark of its application.

### B. Defendants have not waived any applicable privileges related to the BI Investigation.

---

[2] In their continuing effort to inject the BI Investigation into this litigation and manufacture a waiver argument, Plaintiffs' letter-motion introduces the October 23, 2025 letter to the Board for the first time. To begin, this unauthorized disclosure of Board materials *by Plaintiffs* presses firmly against the former Class I Directors' fiduciary obligations of good faith and reasonable care. *See* 11A V.S.A. § 8.30. Further yet, this disclosure is just the latest illustration of why discovery in this case cannot meaningfully proceed absent a protective order. *See e.g.*, Dkt. No. 128 at 1 – 2 (describing "Plaintiffs' penchant for disregarding the Court's sealing practices and placing Defendants' commercially sensitive information in the public realm"). And perhaps most relevant, it only further underscores *Plaintiffs'* repeated efforts to inject the BI Investigation into this litigation to manufacture a privilege tripwire.

[3] Plaintiffs' reliance on *Cruz v. Coach Stores, Inc.*, only underscores the defects in their position. 196 F.R.D. 228 (S.D.N.Y. 2000). The defendant in *Cruz* not only sought to invent a "so called 'self-critical analysis privilege,'" the court explained that the internal investigation at issue was initiated by non-legal personnel, that interviews were "conducted indiscriminately" with internal and external personnel, and that no internal personnel received requisite *Upjohn* warnings. *Cruz*, 196 F.R.D. at 231. None of those considerations holds here.

July 24, 2026
Page 5

Having failed to preemptively undermine the protections shielding the attorney communications and work product generated during the course of the BI Investigation, Plaintiffs alternatively argue waiver to try to obtain the fruits of that investigation. Before Defendants had produced a single document—much less relied upon one—Plaintiffs contend that Defendants have waived all applicable privilege protections in their entirety. *See* Pls.' Ltr. at 5. But here again, Plaintiffs' argument misconstrues both the facts and the governing law.

To begin, an "extrajudicial disclosure" of privileged information—*i.e.*, a disclosure made *outside* of a federal proceeding—"does not waive the privilege as to *undisclosed* portions of the communication." *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987) (emphasis added) (noting that even a "selective" extrajudicial disclosure does not trigger "legal prejudice"). Rather, to place privileged information at issue, "a party must *rely*"—in court—"on privileged advice from his counsel to make his claim or defense." *In re Cty. of Erie*, 546 F.3d 222, 229–230 (2d Cir. 2008) (emphasis added). Such a waiver only occurs in "unusual and rare circumstances." *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 534 (S.D.N.Y. 2015); *see also N.Y. Times Co. v. Dep't of Just.*, 939 F.3d 479, 496 (2d Cir. 2019) (implied subject-matter waiver of privilege "is not nearly so broad"). As relevant here, there is "no basis" to find waiver where a defendant has neither "offensively used" nor made a "selective or misleading presentation" of privileged information. *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 534.

Notwithstanding Plaintiffs' repeated efforts to inject the BI Investigation into this litigation, Plaintiffs' waiver arguments fail at every step:

*First*, Plaintiffs contend that the reference made to the BI Investigation in Defendants' Motion to Dismiss—which Plaintiffs reference throughout their Fourth Amended Complaint—triggers a waiver of all work product and privileged communications that undergird it. *See* Ltr. at 5. But Plaintiffs misconstrue Defendants' statements. Defendants explained that "the findings of the integrity investigation" were relevant to Defendants' conclusion that Mittal had "violated the then-applicable Unilever code of conduct" and was "ineligible for re-election." ECF No. 118 at 13. That is a statement of fact relevant to past conduct (and responsive to Plaintiffs' affirmative references to the BI Investigation), not a legal defense. Defendants have not, *and will not*, assert an "affirmative defense" of reliance on the BI Investigation. *Compare Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 502 (S.D.N.Y. 2019) (finding no waiver where "Barnes & Noble is not asserting an affirmative defense" of reliance on privileged material), *with United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) (finding waiver where defendant planned to testify as to his "good faith" reliance on legal advice). Rather, Defendants will continue to mount a legal defense "exclusively through objective proof" of the relevant facts. *Parneros*, 332 F.R.D. at 502.

*Second*, Plaintiffs suggest that Defendants' discovery requests *to Plaintiffs* and third parties have placed the BI Investigation at issue. *See* Ltr. at 6. But Defendants' requests demonstrate exactly the opposite. Defendants seek "objective proof"—not legal conclusions or work product generated by an outside law firm—relevant to the challenged governance and funding decisions. *Parneros*, 332 F.R.D. at 502.

**Weil, Gotshal & Manges LLP**

July 24, 2026
Page 6

*Third*, Plaintiffs argue that Defendants have waived privilege by advising investors in a publicly filed Form 20-F registration statement that Mittal was removed from her post as Chairwoman "following investigations by the Group and conducted by external advisors." *See* Ltr. at 6 (citation omitted). Notwithstanding that TMICC is a publicly traded company with fiduciary reporting obligations to its shareholders, Defendants did not divulge privileged information in merely representing that Chairwoman Mittal was removed following an internal investigation into alleged misconduct. Even had they, the considerations of "legal prejudice" relevant to "court-imposed subject matter waiver" do not hold with public disclosures. *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987). Plaintiffs attempt to shoehorn this dispute into the court's decision in *In re Leslie Fay Companies, Inc. Securities Litigation* by noting that defendant disclosed an audit report to the SEC. Ltr. at 6 (citing 161 F.R.D. 274, 282 (S.D.N.Y. 1995)). But "[m]ore importantly," in that case, the court explained that the defendants later used that same report to "urg[e] this Court to award it damages *in reliance*, at least in part, on the [auditors] conclusions]." *Id*. at 284 (emphasis added). Precisely the opposite holds here. In mounting a legal defense, Defendants have not, *and will not*, rely on privileged information relating to the BI Investigation.

Because Plaintiffs cannot show that Defendants have *relied* on any privileged information, their assertion that Defendants engaged in a "textbook selective disclosure" is without merit. Plaintiffs point to a letter Defendants sent to then-Chairwoman Mittal, copying her attorney, providing a factual explanation of the bases for her removal. Ltr. at 6 (citing Dkt. No. 74-8). For one, when Defendants later appended that letter to their opposition to Plaintiffs' motion for leave to file a third amended complaint, there was no privilege to waive—the letter had already been shared with Mittal and her counsel.[4] Indeed, the Second Circuit has explained that "the scope of waiver [is] limited" where a disclosure is "made to opposing counsel rather than to the court." *In re von Bulow,* 828 F.2d at 103. But more fundamentally, a required (and confidential) disclosure to the Chair of the Board is entirely distinct from *relying* on such information in Court to mount a legal defense. Indeed, as underscored by the discovery responses that Plaintiffs now brandish, Defendants will produce (and rely on) "*non-privileged* documents sufficient to show" that Mittal is ineligible to serve on the Board. *See* Defs.' RFP R&Os Nos. 41, 42, 44, 50–59. Concurrently, Defendants seek further evidence of the same in their offensive discovery. *See* Ltr. at 7 (citing Defs.' RFP No. 21).[5]

Plaintiffs' last-ditch waiver argument, centered on their "substantial need" for *privileged* materials, is equally defective. *See* Ltr. at 7. Most central, given the suite of discovery tools available to them, Plaintiffs have "failed to demonstrate the requisite substantial need and inability to obtain a substantial equivalent" of the attorney work product they seek. *Horn & Hardart Co. v. Pillsbury Co*., 888 F.2d 8, 12 (2d Cir. 1989) (citing Fed. R. Civ. P. 26(b)(3)). In rejecting an argument analogous to Plaintiffs', the Court in *In*

---

[4]  Notwithstanding that the third amended complaint is no longer operative, defendants did not rely upon that letter in their supporting memorandum of law. *See* Dkt. No. 72.

[5] Plaintiffs' case law gets them no further. *See Trib. Co. v. Purcigliotti*, No. 93 CIV. 7222 LAP THK, 1997 WL 10924, at *9 (S.D.N.Y. Jan. 10, 1997) (finding limited-scope waiver where the "thought processes" of a "claims adjuster employed by plaintiffs' attorneys" were placed at issue).

July 24, 2026
Page 7

*re General Motors* noted "the vast amount of materials" that defendant "will be producing," and that plaintiffs have the full suite of discovery tools available to them. *See* 80 F.Supp.3d at 532; *see also Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 80 (S.D.N.Y.2010) ("No substantial need exists where a party can obtain the information it seeks through discovery devices such as interrogatories or deposition testimony."). Plaintiffs' argument that they cannot "reconstruct[]" the BI Investigation is insufficient. *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (the purpose of the doctrine is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries"). If the inability to "reconstruct[]" a privileged investigation were the standard for waiver, the work product protection would cease to exist.

## II.    Plaintiffs' Grievances With Individual Discovery Responses Are Unfounded

### Defendants' Canaan Fair Trade Analyses for Unilever or TMICC RFP No. 36

With regard to RFP No. 36, which seeks "[a]ll documents and communications regarding any analyses performed regarding the use of Canaan Fair Trade products in Unilever or Magnum products[,]" Defendants object to this request as it is overbroad, disproportionate to the needs of this case, and not relevant to any claim or defense at issue. As Defendants have previously explained, the Settlement Amendment's obligation to purchase Canaan Fair Trade almonds applies exclusively to Ben & Jerry's products; accordingly, analyses related to the use of such almonds in other Unilever or TMICC product lines bear no relevance to Plaintiffs' breach claim. Moreover, the breach alleged is not that Defendants failed to pay because they could not use the almonds, but rather that Canaan Fair Trade did not have almonds available to sell and subsequently failed to provide documentation verifying that the funds would be used to benefit Palestinian almond farmers. Even so, Defendants have recognized an ongoing obligation to pay under the Settlement Amendment, subject to negotiation of an amendment that would allow Defendants to work with other suppliers or to purchase other products. Furthermore, the request is unduly burdensome insofar as it demands "[a]ll documents and communications" without any limiting principle as to custodian, time period, or product category. Defendants further note that, had Plaintiffs engaged in a meaningful meet-and-confer process in good faith—rather than prematurely declaring an impasse and filing the instant letter-motion—Plaintiffs would have learned that Defendants, as a show of good faith, are willing to produce non-privileged documents relating to Defendants' analyses of the use of Canaan Fair Trade products in other Unilever or TMICC products. Defendants' offer still stands.

### RFP No. 86 Is Vastly Overbroad and Disproportionate to the Needs of the Case

RFP No. 86 seeks "[a]ll documents and communications from the period between October 7, 2023 and present, relating to the selection, approval, rejection, or redirection of donations, grants or contributions by Defendants to Magen David Adom or to any other Israeli entity, organization, initiative or undertaking—including but not limited to those affiliated with, supporting, or working in indirect or direct coordination with Magen David Adom, the Israeli Army, any Israeli governmental agency, or any Israeli corporation or non-governmental organization." Defendants object to this request as it is vastly overbroad,

July 24, 2026
Page 8

unduly burdensome, disproportionate to the needs of this case under Federal Rule of Civil Procedure 26(b)(1), and not relevant to any claim or defense. The fact that Defendants chose to donate funds to Magen David Adom does not render it unreasonable for Defendants to decline to direct funds to the organizations selected by Ms. Mittal, particularly in light of the arbitrator's prior decision upholding Defendants' discretion to decline proposed donations. As to the request as written, on its face, it sweeps in all documents and communications regarding the approval or rejection of a donation to any entity with any affiliation—however attenuated—with any Israeli organization or governmental body. This scope is effectively limitless—it could encompass multinational corporations, academic institutions, or international humanitarian organizations that maintain even incidental contact with an Israeli governmental agency and would necessarily capture entities with no connection whatsoever to the donation-consent dispute at issue under Section 2(g) of the Settlement Agreement. The burden of reviewing and producing documents across such an expansive universe of entities far outweighs any marginal relevance.

Moreover, the dispute here is about whether Unilever acted reasonably in declining to give donations to two controversial organizations selected by Ms. Mittal, particularly given the arbitration decision between the parties upholding Unilever's decision to decline to donate monies to other organizations proposed by Ms. Mittal.

Defendants respectfully submit that application of Rule 26(b)(1)'s proportionality factors—including the importance of the requested discovery, the amount in controversy, and the burden of compliance—demonstrates that the request, as drafted, exceeds the permissible scope of discovery.

## Documents Concerning the Retention of Investigative Counsel Are Protected by Privilege (RFP No. 91)

RFP No. 91 seeks "[a]ll documents and communications regarding identifying a firm or third party other than Skadden to lead the investigation into the allegations against Chair Mittal." Defendants object to this request as it calls for documents that are not relevant to any claim or defense of any party and is not proportionate to the needs of this case. Defendants further object as this request, as framed, necessarily implicates documents protected by the attorney-client privilege, the work product doctrine, and other applicable privileges or protections. The process by which counsel was selected to conduct an investigation—including internal deliberations regarding the engagement, evaluation, and retention of outside counsel—falls squarely within the scope of attorney-client communications and litigation-related work product. Plaintiffs' assertion that these documents relate to the independence of the investigation does not override the privilege protections that attach to communications made for the predominant purpose of obtaining or providing legal advice. *See In re County of Erie*, 473 F.3d 413, 419–20 (2d Cir. 2007); *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 528–30 (S.D.N.Y. 2015) (holding that attorney-client privilege communications were protected, and that privilege applies "[s]o long as obtaining or providing legal advice was one of the significant purposes of the internal investigation ... even if there were also other purposes").

July 24, 2026
Page 9

### III.    Plaintiffs' Request to Compel Depositions Is Unsupported and Premature

Finally, Plaintiffs challenge Defendants' "refus[al]" to presently agree to depositions of Unilever Director Nelson Peltz, TMICC Chief Legal Officer Vanessa Vilar, and Unilever Global Head of Litigation and Business Integrity Jeff Eglash.

### A.  Mr. Nelson Peltz

The apex doctrine counsels against disrupting Unilever's business by requiring the deposition of Mr. Peltz because he lacks unique knowledge regarding the underlying facts of the case, and because there are less burdensome ways for Plaintiffs to seek the information they want.[6] Mr. Peltz has had virtually no involvement in B&J's daily operations. Given the availability of any relevant evidence from other deponents with scheduled depositions, and the lack of any indication that Mr. Peltz has unique knowledge of the case—which Plaintiffs concede, *see* Letter at 12 ("Even if the extent to which Mr. Peltz possesses unique knowledge is unclear…")—Plaintiffs' insistence on nonetheless taking his duplicative deposition could only be designed to harass a non-executive member of Unilever's Board of Directors.

Under the apex doctrine, courts apply special scrutiny to deposition requests of high-ranking corporate executives, *Frasers Grp. PLC v. Gorman*, No. 23 MISC. 348 (PAE), 2023 WL 6938284, at *3 (S.D.N.Y. Oct. 19, 2023), *aff'd sub nom. Frasers Grp. PLC v. Morgan Stanley*, 95 F.4th 54 (2d Cir. 2024), because "unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation." *In re Terrorist Attacks on Sept. 11, 2001*, No. 03MD01570GBDSN, 2023 WL 4447869, at *12 (S.D.N.Y. July 11, 2023) (quotations and citations omitted), *objections overruled*, No. 03MDL1570GBDSN, 2023 WL 5432199 (S.D.N.Y. Aug. 23, 2023). Courts in this District "disfavor requiring the depositions of senior executives unless they have personal knowledge of relevant facts or some unique knowledge that is relevant to the action." *In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, 2006 WL 1328259, at *10 (S.D.N.Y. May 16, 2006); *Shiber v. Centerview Partners LLC*, 2023 WL 3071554, at *3 (S.D.N.Y. Apr. 25, 2023) (denying motion to compel deposition of CEO where he lacked "personal and *unique* knowledge" of plaintiff's termination) (emphasis added). Plaintiffs have failed to make that showing for Mr. Peltz.

Plaintiffs erroneously state that "Defendants do not dispute" that Mr. Peltz possesses relevant knowledge. Defendants do indeed dispute this, but more to the point, this is simply not the standard. Courts in this district are clear that relevant information is not enough; courts disfavor such depositions unless the executive's knowledge is *unique*. *Id.* Even setting aside the apex doctrine, Rule 26 does not make every snippet of potentially relevant information discoverable. A party's entitlement to relevant information is weighed against the burden of producing such information. Any limited and tangential knowledge Mr.

---

[6] In fact, Unilever and Conopco have sought to be dismissed or substituted out of these proceedings because all interest in these proceedings has transferred to TMICC and HoldCo. [Dkt. No. 119].

July 24, 2026
Page 10

Peltz may have is outweighed by the time and expense of requiring him to sit for a deposition, particularly when other discovery mechanisms exist to inquire as to any limited knowledge he may have but which Plaintiffs have yet to even allege.

Plaintiffs claim they have "provided examples of what Plaintiffs believe are unique areas of knowledge" for Mr. Peltz, but they failed to allege any such knowledge in any of their four complaints. Instead, Plaintiffs claim Mr. Peltz "is a close ally" of Peter ter Kulve, the CEO of TMICC, and that he had "significant input" in the "censorship of Ben & Jerry's." FAC ¶ 27. However, they fail to identify any knowledge Mr. Peltz allegedly has of this case or even of those issues that Mr. ter Kulve does not possess. Plaintiffs also include a selective excerpt from an interview that Mr. Peltz gave to the Financial Times, in which he reportedly urged against Ben & Jerry's making political statements, consistent with Ben & Jerry's social mission, which advocates for progressive, non-partisan statements. This is not evidence of relevant knowledge about the case, much less unique knowledge. Nor is their allegation that Mr. Peltz "supported" Mr. Trump sufficient to justify his deposition. Political affiliation alone is not a sufficient reason to subject an individual to the expense and burden of a deposition. Plaintiffs point to not a single conversation, email, decision, or meeting relevant to this case that Mr. Peltz could testify to but other deponents could not. To the extent Plaintiffs allege that Mr. Peltz is a "close ally" of Mr. ter Kulve, Plaintiffs may inquire about that relationship with Mr. ter Kulve, who is scheduled to be deposed in this case. In short, Mr. Peltz possesses no unique knowledge as to this matter, and as a Director on the Board of Unilever—B&J's former ultimate parent company—he had little involvement in the day-to-day operations of B&J. *See In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, 2006 WL 1328259, at *10 (S.D.N.Y. May 16, 2006) (applying apex doctrine to former CEO/current Chairman of the Supervisory Board and Chief Personnel Officer/member of the managing Board).

Plaintiffs' insistence on nonetheless deposing Mr. Peltz could only be intended to harass a Director on Unilever's Board. Plaintiffs' own letter-motion, replete with irrelevant references to Mr. Peltz's political affiliation and implications that this is sufficient to justify deposing Mr. Peltz, strongly suggests that Plaintiffs seek to harass him because they disagree with Mr. Peltz's politics, and not to seek relevant and unique knowledge. This is simply an improper use of a deposition. Plaintiffs' own citation to *Oakley* supports Defendants' position. In that case, the court based its finding of no harassment "particularly" on the fact that the deponent obviously had relevant and unique knowledge as an eyewitness to the event at issue. However, the opposite is true here, where Plaintiffs are unable to point to any unique specific information they seek from Mr. Peltz. Plaintiffs assert that this is not their burden. But under *Oakley*, it certainly bears on their motivations for seeking the deposition. *See also Chevron Corp. v. Donziger*, No. 11 CIV. 0691 LAK JCF, 2013 WL 1896932, at *1 (S.D.N.Y. May 7, 2013).

Plaintiffs' statement that "harassment or business disruption" are "the most important barriers" to conducting an apex deposition is at odds with decades of case law illustrating that the primary factor courts consider in deciding whether to compel an apex deposition is whether (or not) an executive has unique knowledge. *See infra*. Plaintiffs' *Oakley* citation is inapposite. There, the court reasoned the deponent was "a far cry from the prototypical apex witness, who sits removed from the key facts of the dispute," and

July 24, 2026
Page 11

that instead he "had a courtside seat to the action." *Oakley v. MSG Networks, Inc.*, No. 17-CV-6903 (RJS), 2024 WL 4134903, at *3 (S.D.N.Y. Sept. 10, 2024), *reconsideration denied*, No. 17-CV-6903 (RJS), 2024 WL 4859024 (S.D.N.Y. Nov. 21, 2024). Given the obvious extent of relevant, unique knowledge possessed by the deponent, defendants' failure in *Oakley* to allege harassment or business disruption left the court with no reason but to grant the deposition.

Finally, Plaintiffs' insistence that Defendants must demonstrate with specificity which other source could provide identical evidence is inappropriate given the early stages of discovery of this matter, in which extremely limited documents have been produced and no depositions have yet been taken. However, Plaintiffs have scheduled seven other depositions of Defendants, including a number of highly placed individuals within TMICC and B&J, including Peter ter Kulve (CEO of TMICC), Abhijit Bhattacharya (CFO of TMICC), and Jochanan Senf (CEO of B&J). *See Consolidated Rail Corp. v. Primary Indus. Corp.*, 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10, 1993) (granting protective order, reasoning that "where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly placed executive."). Plaintiffs have also sought extensive document discovery, including a combined 148 Requests for Production thus far. Their request to depose Mr. Peltz is premature before such discovery has reached substantial completion. Plaintiffs' citation to *Chevron*, in which discovery was near completion, does not support Plaintiffs' position that a request for an apex deposition is appropriate before the parties have begun the bulk of discovery production. To Defendants' knowledge, any relevant topics pertaining to this case could instead be raised with other witnesses. At a minimum, any potential deposition of Mr. Peltz should be held after all other depositions and document production have been completed, when any need for Mr. Peltz's deposition could be better assessed. *See CM Sys.*, 2023 WL 3335892, at *1. Until that time, the apex doctrine should preclude Plaintiffs from taking Mr. Peltz's deposition.

### B.  Mr. Eglash and Ms. Vilar

Mr. Eglash, Global Head of Litigation and Business Integrity for Unilever and former General Counsel of B&J, and Ms. Vilar, the Chief Legal Officer of TMICC, are two of Defendants' most senior in-house counsel and have primary oversight responsibilities for this litigation. Putting aside for the moment the highly unusual effort to depose opposing counsel, to avoid either deposition being used as a vehicle to elicit clearly privileged information and because of waiver concerns, Defendants offered to make them available for depositions if Plaintiffs provided, in line with this District's cases concerning the depositions of counsel, a list of topics in advance (to ensure that they all involved non-privileged, relevant topics) and agreed to depose them at the end of discovery to ensure their depositions were necessary. Plaintiffs refused to even consider this offer, raising further concern as to the purpose of these depositions. Indeed, in their letter-motion, Plaintiffs openly admit that they seek these depositions "in the context of evaluating whether Defendants are properly asserting privilege protections" because "Plaintiffs do not believe that Defendants are properly asserting privilege over the investigations relevant to this case" —a wholly inappropriate justification for deposing Defendants' counsel. A party may not depose opposing counsel simply to test the validity of privilege assertions. Plaintiffs' own words make clear that these depositions are designed

**Weil, Gotshal & Manges LLP**

July 24, 2026
Page 12

to do precisely that, ensuring that privileged communications and attorney work product will not merely be implicated, but will be the principal focus of the questioning.[7] Essentially, Plaintiffs admit they are hoping that, over the course of a lengthy deposition, they might trip opposing in-house counsel into failing to fully assert privilege in response to a question. *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 209 F.R.D. 361, 362 (S.D.N.Y. 2002) ("[i]n a nutshell, depositions … are designed to discover facts, not contentions or legal theories").

Rule 26(c) protects against depositions of counsel because "even a deposition of counsel limited to relevant and non-privileged information risks disrupting the attorney-client relationship and impeding the litigation." *Madanes v. Madanes*, 199 F.R.D. 135, 151 (S.D.N.Y. 2001). This embargo exists because "[t]he difficulty in parsing out the limited factual information that [an attorney] may have acquired" when acting as a non-attorney, "which may well be based upon legal strategies discussed or considered" while acting as an attorney, "would make any deposition … a procedural nightmare, and ultimately of limited use." *Id.* And "because of the potential chilling effect on attorney-client communications," "[t]he Second Circuit generally disfavors depositions of opposing counsel." *Caro v. Weintraub*, 2011 WL 13233934, at *5 (D. Conn. Mar. 4, 2011) (citing *In re subpoena issued to Dennis Friedman*, 350 F.3d 65, 71-72 (2d Cir. 2003)); *see also* Robles v. Deutsch Advert., Inc., No. 96 CIV. 3480 (JFK), 1997 WL 86386, at *1 (S.D.N.Y. Feb. 28, 1997) (similar).

In assessing attorney depositions, courts consider "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted," *In re Hoosick Falls*, 2023 WL 1858081, at *2 (quoting *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2d Cir. 2003)), and, ultimately "whether the proposed deposition would entail an inappropriate burden or hardship." *Id.* "These factors may, in some circumstances, be especially appropriate to consider in determining whether interrogatories should be used at least initially and sometimes in lieu of a deposition." *Id.* (quoting *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2d Cir. 2003)). However, Plaintiffs have failed to even explore less invasive methods of seeking relevant information, and should do so before seeking to depose counsel. For these reasons, attorney depositions are often scheduled at the end of discovery, after all other forms of discovery have been completed and counsel has determined that such attorneys possess unique, relevant information unavailable except through attorney deposition, and even then are subject to strict limitations to prevent disclosure of privileged information. *See e.g.*, *Mitura v. Finco Servs., Inc.*, 739 F. Supp. 3d 231, 236 (S.D.N.Y. 2024) (allowing a limited deposition of in-house counsel, only as to specific topics where there is a minimal risk of encountering privilege and work product issues).

---

[7] The privilege concerns are amplified by the confusion created by Plaintiffs' counsel's assertion that they also represent B&J.

**Weil, Gotshal & Manges LLP**

July 24, 2026
Page 13

In their motion, Plaintiffs erroneously suggest that case law limiting depositions of opposing counsel is inapplicable to in-house counsel. This is false. Courts in this district have made clear that protections with respect to counsel extend to both in-house counsel and outside counsel. *See e.g. In re Hoosick Falls*, 2023 WL 1858081, at *2 (reasoning that "depositions of opposing counsel are generally disfavored" in the context of an in-house counsel deposition, and that the interwoven nature of the attorney's business and legal roles "would make any deposition of her a procedural nightmare, and ultimately of limited use.").

Plaintiffs have declined to discuss the reasonable limitations proposed by Defendants to protect against the disclosure of privileged information, and to protect the parties from the expense and delay of further litigating issues pertaining to privilege. Plaintiffs' preferred method would be the cumbersome "procedural nightmare" envisioned by the court in *In re Hoosick Falls*: no prior discussion of topics, no specific protection for privilege, and therefore, likely numerous disputes as to the proper scope of questioning during the deposition itself, and risk of inadvertent privilege waiver. Courts in this District have previously found such a method for attorney depositions untenable, including because "[i]t seems likely that the only way to manage [such a] deposition would entail this Court attending the proceeding in person and issuing rulings on most questions which the Court believes would be a significant burden on all involved." *In re Hoosick Falls PFOA Cases*, 2023 WL 1858081, at *2. Therefore, Defendants ask this Court to issue a protective order to prevent the depositions of Mr. Eglash and Ms. Vilar, given Plaintiffs have admitted to seeking their depositions for an improper purpose.

We thank the Court for its attention to this matter.

Respectfully submitted,

*/s/ David J. Lender*
David J. Lender

*Attorney for Defendants Unilever PLC and Conopco, Inc.*
*and non-parties The Magnum Ice Cream Company N.V.*
*and Ben & Jerry's HoldCo, LLC*

cc:     All Counsel of Record (Via E-filing)