**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

*VIA ECF*

August 3, 2026

**David J. Lender**
+1 (212) 310-8153
david.lender@weil.com

The Honorable P. Kevin Castel
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

The Honorable Gary Stein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:    *Ben & Jerry's Homemade, Inc. et al. v. Unilever PLC et al.*, Case No. 24-cv-8641-PKC-GS (S.D.N.Y.)**

Dear Judges Castel and Stein:

Pursuant to the Honorable P. Kevin Castel's Individual Practices, Defendants Unilever PLC ("**Unilever**"), Conopco, Inc. ("**Conopco**"), The Magnum Ice Cream Company N.V. ("**TMICC**"), and Ben & Jerry's HoldCo, LLC ("**HoldCo**") (collectively, "**Defendants**") write in response to Plaintiff The Ben & Jerry's Foundation's ("**BJF**") letter-motion of July 28, 2026.[1]  ECF No. 143 ("**Pl.'s Ltr**.").  For the reasons detailed herein, to the extent that BJF seeks specific relief, Defendants respectfully submit that such relief should be denied.  Defendants will appear before the Hon. Magistrate Judge Stein on August 20, 2026, for a hearing related to the currently pending discovery motions.  ECF No. 146 (listing ECF Nos. 138, 141, 142, and 143).

On April 10, 2026, BJF intervened in this litigation, nearly eighteen months after its commencement.  *See* ECF No. 78.  BJF does not belong in this litigation. As detailed in Defendants' Motion to Dismiss the Fourth Amended Complaint, BJF plainly lacks standing to pursue its claims under the Merger Agreement,

---

[1] Pursuant to the Court's order of July 31, 2026, Defendants' response accords with Judge Castel's Individual Practices, notwithstanding the July 28, 2026 assignment of the above-captioned case to Magistrate Judge Stein for all pre-trial matters.  *See* ECF No. 147; ECF No. 145.

**Weil, Gotshal & Manges LLP**

August 3, 2026
Page 2

and its other claims are legally deficient.  *See* ECF No. 118 at 31–32.[2]  The resolution of the currently pending Motion to Dismiss stands to moot the entirety of the Foundation's letter-motion.

Nevertheless, BJF's entry in this litigation hinges on a single development—Defendants' exercise of their clear contractual discretion under the Merger Agreement in December 2025 to discontinue funding to BJF after BJF declined to remediate a host of governance and funding deficiencies.  *See* ECF No. 118 at 10–11.  Those deficiencies were identified months prior through an independent audit, conducted by Ernst & Young ("**EY**"), into BJF's grant-making and internal practices (the "**EY Audit**").  *Id.*

Defendants do not dispute that the EY Audit was conducted in the ordinary course of business—and to that end, Defendants do not assert privilege or work product protections over the final audit report, the underlying auditor work product, or a large swath of auditor communications.  Defendants will produce those documents once a Protective Order is entered by the Court.  But prior to even seeing what Defendants produce concerning the EY Audit, and what is withheld as privileged and logged, BJF rushed to generate a discovery dispute challenging Defendants' privilege objections.  In so doing, BJF largely ignores Defendants' position as to EY Audit-related documents.  Rather, Defendants narrowly seek to maintain attorney-client privilege and work product protection over *attorney* communications and *attorney* work product tangential to the EY audit tied either to this litigation, anticipated litigation, or the direct provision of (or request for) legal advice.  As is the case with any internal business audit, no matter how routine, it is a core function of in-house and outside counsel to freely engage in peripheral discussions—here, unrelated to EY's independent execution of the audit—to address *related* legal considerations.  Such discussions are insulated by applicable privileges, and this bright-line dichotomy does not reflect a selective disclosure or reliance upon privileged information.  It is intended to ensure precisely the opposite.

I.      **Defendants assert a narrowly tailored application of attorney-client privilege and work product protections.**

BJF largely ignores Defendants' stated position on the narrow scope of their privilege assertions in an effort to obtain a sweeping waiver of privilege protections.  To begin, BJF posits that Defendants have asserted a blanket privilege "in response to every audit-related request for production."  Pl.'s Ltr. at 1.  That is entirely inaccurate.  In responding to BJF's twenty different Requests for Production that seek audit-related materials, Defendants' Responses and Objections ("**R&O**") uniformly assert privilege and work product objections only "to the extent" the Request calls for the disclosure of such material.  *See*

---

[2] As detailed in Defendants' Motion to Dismiss, BJF's claims under the Merger Agreement arise under Section 6.14(h), but the Merger Agreement only affords BJF the right to enforce a narrow and unrelated provision of Section 6.15.  *See* ECF No. 118 at 31 (citation omitted).  Relatedly, given the presence of a contract (the Merger Agreement) that governs the relationship between the parties, BJF's equitable claim for unjust enrichment likewise fails as a matter of law.  *Id.* at 32.  Discovery is not needed to test either issue.

**Weil, Gotshal & Manges LLP**

August 3, 2026
Page 3

Pl.'s Ltr., App'x A (Defs.' RFP R&O Nos. 4, 6–17, 19–22, 25, 26, and 28).  And Defendants have articulated the precise extent to which they will maintain such protections—a position that BJF prominently block-quotes in its letter-motion.  Pl.'s Ltr. at 2, Ex. A at 6.  In relevant part, Defendants explained that they "will produce the final EY audit report *and* EY's audit work papers generated in the ordinary course of the audit."  *Id*. (emphasis added).  Defendants further made clear that they "are not asserting privilege over the final audit report or EY's ordinary-course audit work papers," and, thus, the production of such materials "does not waive any applicable privilege, work-product protection, or other protection."  *Id*.

Yet, even before seeing what Defendants produce, BJF argues that Defendants' position is somehow limited to just a "small subset" of their audit-related Requests, specifically RFP Nos. 4, 6, 7, 17, and 22. Pl.'s Ltr. at 2.  But that's a red herring.  Defendants' position is the same across all twenty audit-related RFPs that the Foundation has served.  *See* Pl.'s Ltr. at 1 (citing Pl.'s RFP Nos. 4, 6–17, 19–22, 25, 26, and 28).

Next, BJF accuses Defendants of attempting to "recast" the scope of EY's engagement to assert work product protections over the EY Audit.  Pl.'s Ltr. at 5.  But that is also inaccurate.   In fact, on this fundamental point, Defendants do not disagree.  As Defendants have repeatedly explained, EY was retained by outside counsel to Unilever to audit the Foundation in connection with Unilever's effort to spin off its ice cream business (comprised of more than a dozen brands, including Ben & Jerry's) into a standalone company (the "**Demerger**")—a process completed on December 6, 2025.  *See* ECF No. 118 at 9; *see also* Pl.'s Ltr. at 4 (listing instances where Defendants have reiterated the same).  It is for precisely those reasons that Defendants do not assert privilege or work product protections over the final EY Audit report *or* the work product generated by EY during the ordinary course of its audit.[3]  Nor, for that matter, do Defendants assert privilege over EY's internal audit-related communications.  But as with nearly any business function, the EY Audit did not occur in a vacuum divorced from the surrounding—and rapidly evolving—legal issues that Defendants confronted.  For that reason, Defendants maintain attorney-client and work product protections over the tangential *attorney* communications and work product hitting on such issues.

---

[3] Notwithstanding Defendants' consistent representations regarding the "routine" and ordinary-course nature of the audit—and BJF's current argument stating the same, *see* Pl.'s Ltr. at 4—BJF has consistently triggered privilege concerns by assailing the audit as "pretextual."  *See* FAC ¶¶ 85–90, 94; Pl.'s Ltr. at 9. After resisting both the scope of the audit *and* the choice of auditor, throughout the course of the audit, the BJF trustees chose to retain the same counsel as the former Class I Directors had retained in this litigation—litigation that was ongoing and in which BJF would later intervene.  *See generally* ECF No. 78. And further underscoring the inconsistency in BJF's current position relating to the ordinary-course nature of the audit, all but two trustees refused to participate in the EY Audit.

**Weil, Gotshal & Manges LLP**

August 3, 2026
Page 4

II.     **The attorney-client privilege and work product protection plainly insulate the narrow ambit of communications and material Defendants maintain such protections over.**

BJF's principal argument is that Defendants cannot assert work product privilege over the EY Audit because courts have "repeatedly rejected efforts to transform routine internal audits into protected work product." Pl.'s Ltr. at 3–4 (collecting cases). But the argument misses the mark; Defendants are producing the EY Audit report *and* EY's underlying work files. *See supra.* However, BJF also seeks privileged *attorney* communications and work product tangential to EY's work, and that effort fails.

Defendants have asserted attorney-client privilege over such materials because in-house and outside counsel were routinely involved in privileged, audit-related discussions where the "predominant purpose" was to "render or solicit legal advice" in connection with the Demerger, the instant litigation, and the repeated threats of related litigation. *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 529–30 (S.D.N.Y. 2015) (explaining that privilege must "account for the multiple and often-overlapping purposes of internal investigations" (citing *Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981))). The attorney-client privilege "protects communications rather than information," and these communications are protected by a paradigmatic application of the attorney-client privilege—anything less would "limit the valuable efforts" of ensuring "compliance with the law." *Id*. (emphasis added). The mere "fact that certain information . . . might ultimately be disclosed"—here, the totality of the EY Audit report and EY's underlying work files—does not "create the factual inference that [*related*] communications were not intended to be confidential at the time they were made." *Id*. The "primar[]y or predominant[]" function of Defendants' attorneys is not colored by the independent function of the EY auditors—the function of Defendants' counsel was, and remains, centered on advising Defendants through a range of anticipated and *ongoing* legal issues. *Cicel (Beijing) Sci. & Tech. Co. v. Misonix, Inc*., 331 F.R.D. 218, 226 (E.D.N.Y. 2019); *see also In re FirstEnergy* Corporation, 154 F.4th 431 (6th Cir. 2025) (underscoring that privileged communications pertaining to "outside counsel's analysis" of an internal investigation were designed to "secure legal advice" regarding potential liability).

Likewise, while Defendants do not assert work product protections over the *auditor* work product, those protections apply with full force to *attorney* work product prepared "in anticipation of litigation." *See Cicel (Beijing) Sci. & Tech. Co.*, 331 F.R.D. at 223. BJF argues that "a mere possibility of litigation is insufficient," Pl.'s Ltr. at 3 (quoting *Atl., LLC v. Stone & Webster, Inc*., 2011 WL 5439046, at *4 (S.D.N.Y. Nov. 10, 2011) (cleaned up)). But BJF ignores the reality that this litigation had been commenced (a litigation they later sought to intervene in), related litigation was both anticipated and threatened (including by a BJF trustee), and a range of legal hurdles associated with the Demerger remained. At the time the EY Audit was initiated, the former Class I Directors (one of whom, Anuradha Mittal, was a trustee of the Foundation) had already commenced this litigation. The threat of related litigation loomed—a threat repeatedly underscored by Mittal (and her counsel), who refused to cooperate with the audit. And the Demerger, which implicated a maze of legal and regulatory hurdles, was ongoing. The peripheral communications and material prepared by Defendants' in-house and outside counsel, which may pertain to the audit but which were "prepared [by] or for a party, or by his representative," and

August 3, 2026
Page 5

"in anticipation of [ongoing and potential] litigation," are thus likewise insulated by the work-product protection. *See Cicel (Beijing) Sci.*, 331 F.R.D. at 226 (citations omitted) (considering the "nature of the document and the factual situation in the particular case"). This dichotomy is paramount to the core functioning of in-house and outside counsel advising a large corporation.

BJF misses this distinction and instead presses its red herring argument that the work of an "independent auditor" is not protected. Pl.'s Ltr. at 5–6 (emphasis added) (citing *Columbia Data Prods., Inc. v. Autonomy Corp.*, 2012 WL 6212898, at *12 (D. Mass. Dec. 12, 2012)); *see also* Pl.'s Ltr. at 3–4 (citing *In re Leslie Fay Companies, Inc. Sec. Litig.*, 161 F.R.D. 274 (S.D.N.Y. 1995) (similar)). For one, as detailed above, it was *BJF*, not Defendants, who consistently rejected the ordinary-course nature of the EY Audit—the BJF trustees pushed back on the audit's scope and the choice of auditor; during the course of the audit, they retained the same counsel as the former Class I Directors had retained in this litigation; *and* they largely refused to participate in the audit process. *See supra* n.3. BJF's backdoor efforts to now invert that frame and *expand* the ordinary-course nature of the audit, so as to sweep in any attorney communications that may touch on the audit, fail as a matter of law. BJF relies on *Eastman Kodak* to support its efforts to discovery privileged communications that fall outside the ordinary course of the audit, but there, the court merely found that work product generated by Deloitte—a peer auditing firm to EY—"would have been created in essentially similar form irrespective of the litigation." *Eastman Kodak Co. v. Kyocera Corp.*, 2012 WL 4103811, at *4 (W.D.N.Y. Sept. 17, 2012) (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)).[4] BJF does not (and cannot) show that the universe of unprotected *auditor* work product somehow encroaches on the ambit of *attorney* work product Defendants maintain protection over. To the extent in-house and outside counsel "prepared or obtained" materials that may touch on the audit, but which foundationally relate to the "prospect of litigation," they are insulated by the attorney work product protection. *Adlman*, 134 F.3d at 1202.

### III.  Defendants have neither selectively disclosed, nor selectively relied upon, privileged information.

BJF contends that Defendants impermissibly seek to "have it both ways when it comes to the audit materials," leveraging the audit "as both a sword and a shield." Pl.'s Ltr. at 6–7. But Defendants do not seek to "shield" the EY Audit report or the auditor work files that undergird it. And Defendants have not leveraged privileged or work product protected information as a "sword" to support their legal arguments in this litigation. *See In re Cty. of Erie*, 546 F.3d 222, 229–230 (2d Cir. 2008). Where a defendant has neither "offensively used" nor made a "selective or misleading presentation" of privileged information, courts in this District have long recognized that there is "no basis" to find a subject-matter waiver. *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 534. Indeed, a waiver of the sort that BJF

---

[4] BJF's assertion that Defendants have attempted an "after-the fact-re-characterization[]" of the EY Audit fails for the same reason. Pl.'s Ltr. at 5. Defendants' characterization of the audit has not wavered, but that has no bearing on *attorney* work product—generated entirely *outside of EY* by Defendants' in-house and outside counsel—that may reference the audit for purposes of ongoing or anticipated litigation.

August 3, 2026
Page 6

anticipates occurs only in "unusual and rare circumstances," and those circumstances are not present here. *Id.*; *see also N.Y. Times Co. v. Dep't of Just.*, 939 F.3d 479, 496 (2d Cir. 2019) (implied subject-matter waiver of privilege "is not nearly so broad").

In arguing that Defendants have placed the full suite of their privileged communications with EY "at issue," BJF posits that "Defendants seek to prove their case with evidence they refuse to produce." Pl.'s Ltr. at 7 (citing *Abromavage v. Deutsche Bank Secs. Inc.*, 2019 WL 6790513, at *2 (S.D.N.Y. Dec. 11, 2019)). But this characterization of Defendants' legal strategy is incorrect. Defendants have not, and will not, "rely on privileged advice from . . . counsel to make [their] claim or defense." *In re Cty. of Erie*, 546 F.3d 222, 229–230 (2d Cir. 2008) (emphasis added; *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2020 WL 3034792 (S.D.N.Y. June 5, 2020) (finding no waiver where "[movant] has not shown that [the challenged party], as yet, intends to rely on the [privileged communication] to influence a decision maker" (quotation marks omitted)). Rather, they will continue to mount a defense "exclusively through objective proof" found in the EY Audit. *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 502 (S.D.N.Y. 2019). BJF presses that the EY Audit has been referenced to justify withholding funding to BJF and in connection with certain governance reforms. Pl.'s Ltr. at 7. But BJF ignores that Defendants do not assert any privilege protections over the EY Audit report or auditor work files. *See Cicel (Beijing) Sci.*, 331 F.R.D. at 223 (finding that defendant had not "put any particular privileged communication at issue" by asserting that it terminated engagement with plaintiff based on the report's findings (quotation marks omitted)). For this same reason, the "unfairness" considerations they seek to invoke in suggesting that they participated in the EY Audit under the pretense that it "would be independent, transparent, and shared" are of no relevance. Pl.'s Ltr. at 8. The EY Audit and the auditor's work files will be produced.

BJF nevertheless contends that it has a "substantial need" for "factual-audit-related materials." Pl.'s Ltr. at 8–9 (citing *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 80 (S.D.N.Y. 2010)). But here again, that is precisely the universe of unprotected material that Defendants' July 20 letter explains will be produced. *Id*. Ex. A at 6. And to the extent BJF presses for *protected attorney* work product, its own case law explains that "[n]o substantial need exists where a party can obtain the information it seeks through discovery devices such as interrogatories or deposition testimony." *Gucci Am.*, 271 F.R.D. at 80. BJF suggests a need to see the "contemporaneous factual development" that played out during the audit, but there is no need to recreate a "substantial equivalent" when they will have access to the auditor work files illuminating precisely that development. Pl.'s Ltr. at 9.

Finally, BJF's effort to press for attorney-client communications, including attorney communications with EY auditors, is entirely unsupported by governing law. To begin, the "substantial need" argument that they look to carry through here is a derivative of the work product protections and has no application to the attorney-client privilege. *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir. 1989) (citing Fed. R. Civ. P. 26(b)(3)). Where, as here, Defendants do not assert a defense reliant on privileged communications, "there will of course no longer be any basis for implying a waiver." *Felder v. Warner Bros. Discovery*, 2025 WL 1718098, at *14 (S.D.N.Y. June 20, 2025); *see also Robinson v. Vineyard*

**Weil, Gotshal & Manges LLP**

August 3, 2026
Page 7

*Vines, LLC*, 2016 WL 845283, at \*5 (S.D.N.Y. Mar. 4, 2016) (finding no waiver where defendants represented "that they are not asserting the reasonableness of any investigation as a defense in this litigation"). In stark contrast to the circumstances in *Felder*, where the defendant "*partially* disclosed" investigatory materials and indicated a need to *rely* on "subjective beliefs and motivations of its decision maker," Defendants will rely exclusively on unprotected, "objective proof" to support each of the challenged governance decisions relevant to this action. 2025 WL 1718098, at \*17 (emphasis added) (citing *Parneros*, 332 F.R.D. at 502). That full slate of "objective proof" will be provided to BJF in discovery.

We thank the Court for its attention to this matter.

Respectfully submitted,

*/s/ David J. Lender*
David J. Lender

*Attorney for Defendants Unilever PLC, Conopco, Inc.,*
*The Magnum Ice Cream Company N.V.,*
*and Ben & Jerry's HoldCo, LLC*

cc:    All Counsel of Record (Via E-filing)