UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
BEN & JERRY'S HOMEMADE, INC.,
CLASS I DIRECTORS OF BEN & JERRY'S
INDEPENDENT BOARD, and
THE BEN & JERRY'S FOUNDATION, INC.,

Plaintiffs,

24-cv-08641 (PKC)

-against-

OPINION AND ORDER

UNILEVER PLC, CONOPCO, INC., BEN &
JERRY'S HOLDCO, LLC, and THE MAGNUM
ICE CREAM COMPANY N.V.,

Defendants.
-----------------------------------------------------------x

CASTEL, Senior District Judge

Ben & Jerry's Homemade, Inc. ("Ben & Jerry's") was founded in 1978. (Fourth Amended Compl't ("FAC" or "Complaint") ¶ 16.) In addition to its ice cream, it is well known for being "outspoken on—and often on the vanguard of—a variety of societal issues, including those involving human rights and social justice." (Id.) The company has taken positions on issues ranging from Cold War spending (it launched the "Peace Pop" in 1988) to LGBTQ+ rights (it has offered benefits to employees' same sex partners since 1991). (Id.) This action arises from the continued desire of the Ben & Jerry's Independent Board (the "Board") to identify the brand with its "social mission" amid pushback from the company's corporate parents, but the issues presented on this motion to dismiss largely turn on contract interpretation.

Plaintiffs in this action are Ben & Jerry's; former independent directors of the Board and Chris Miller, who was nominated but not elected to the Board; and The Ben & Jerry's

Foundation, Inc. (the "Foundation"). They bring ten claims sounding primarily in contract based on the alleged censorship of Ben & Jerry's, the dismantling of the Board, and discontinuation of funding to the Foundation by defendants. Defendants are Unilever PLC ("Unilever") and Conopco, Inc. ("Conopco") (collectively, "Unilever"), who acquired Ben & Jerry's from the famous founders of the business, and The Magnum Ice Cream Company N.V. ("Magnum") and Ben & Jerry's HoldCo, LLC ("HoldCo") (collectively, "Magnum"), who recently succeeded Unilever and Conopco as the corporate parent and shareholder of Ben & Jerry's, respectively.

Defendants seek to dismiss most claims against them and move for the substitution of Magnum and HoldCo for Unilever and Conopco in light of the transaction that placed Ben & Jerry's under Magnum and HoldCo. For reasons to be explained, the motion to substitute will be granted and the motion to dismiss will be granted in part.

BACKGROUND

After more than twenty years of operation in which Ben & Jerry's achieved commercial success, several suitors expressed interest in acquiring the company. (Id. ¶ 18.) One set itself apart from other bidders by agreeing to a unique governance structure that would "preserve[] Ben & Jerry's authenticity and autonomy[.]" (Id. ¶ 19.) That suitor, Unilever, prevailed, and the deal was memorialized in 2000 in the "Merger Agreement." (ECF 110-7.) The Merger Agreement provided that Ben & Jerry's would have an Independent Board with "primary responsibility" over "the objectives of the historical social mission" and "the integrity of the essential elements of the Ben & Jerry's brand-name[.]" (Id. at 54–55.)

Per section 6.14(a) of the Merger Agreement, seven of the eleven seats on the Board must be filled by independent directors. (Id. at 53.) The shareholder of Ben & Jerry's is

required to cause the appointment of new independent directors nominated by a majority of then-seated independent directors. (Id.) With respect to removal, Conopco "shall remove any director of any Class at the written request of at least a majority of the directors of such Class then in office" but "shall not otherwise remove any member of the Company Board[.]" (Id. at 53–54.) Directors serve one-year terms and consult on the appointment and removal of the Ben & Jerry's CEO, among other responsibilities. (Id. at 53–56.) "Each member of the Company Board . . . and all employees of [Ben & Jerry's] shall agree to abide by the Unilever Code of Business Conduct[.]" (Id. at 56.)

Over time, the Board and Unilever began to clash over certain business decisions. For example, when in 2008 the Unilever-appointed CEO of Ben & Jerry's proposed closing the company's factory in Waterbury, Vermont, the Board opposed the closure on the basis that it "would have devastated the local economy." (FAC ¶ 23.) Unilever ultimately agreed to abide by the Board's decision not to close the plant in Waterbury, which is today "one of the company's most efficient[.]" (Id.)

In 2022, the Board and Unilever were no longer able to resolve their differences outside of court. The Board sued Unilever when it licensed Ben & Jerry's trademark rights "in the Occupied Palestinian Territories . . . sans the Independent Board's approval[.]" (Id. ¶ 24.) The litigation ended with a "Settlement Agreement" between Unilever and the Board. (Id.) The Settlement Agreement provides that Unilever and Conopco will "[c]ontinue to source at least 50% of the non-dairy base mix in North America from Canaan Fair Trade for the next ten years, subject to availability of supply, consumer safety or quality concerns." (ECF 110-2 at 2.) Canaan Fair Trade, a Palestinian supplier, has provided Ben & Jerry's with ice cream ingredients "for nearly a decade[.]" (FAC ¶ 51.)

The Settlement Agreement also required Unilever to "make two $2,500,000 payments to Ben & Jerry's" that "[u]nder no circumstances" would be made later than July 30, 2023, for the first payment, or July 30, 2024, for the second. (ECF 110-2 at 2.) The Board's Chair was required to engage in good faith consultation with Unilever on the ultimate recipient of those funds, and Unilever promised that its "consent [would] not be unreasonably withheld." (Id.)

After the then-Chair of the Board, Anuradha Mittal, in June 2024 designated Jewish Voice for Peace and the San Francisco-Bay Area Chapter of the Council on American-Islamic Relations as potential recipients, Unilever responded with objections that "were riddled with inconsistencies." (FAC ¶¶ 45–46.) The Complaint describes Unilever's stated reason for blocking the donations, namely wishing "to remain 'neutral' on the Palestinian-Israeli conflict[,]" as pretextual, citing Unilever's previous donation to an Israeli organization that "acts as an auxiliary service to the Israeli Defense Forces (IDF)." (Id. ¶ 47.)

Subsequently, after "months of negotiations at Unilever's behest," the Settlement Agreement was amended. (Id. ¶ 51.) The "Settlement Amendment" provides that "commencing in 2024, Ben & Jerry's/Unilever will make payments totaling $2 million USD annually to Canaan Fair Trade [ ], directly or through a third party, for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers), for at least ten years[.]" (ECF 110-6 at 1.) It also states that these payments "will be verified by auditors selected by the Independent Board" and that confirmation of the payments "will be sent to the Chair of the Independent Board quarterly." (Id.) "Unilever failed to disburse Canaan's 2025 funds or engage in the [ ] review process, [ ] insisting upon conditions which do not appear in the Settlement Amendment, even after being provided context and documents from Canaan." (FAC ¶ 56.)

Earlier, Unilever allegedly blocked Ben & Jerry's from speaking out in support of a ceasefire in Gaza, the free-speech rights of protestors, and Black History Month. (Id. ¶¶ 29–41.) In December 2023, for instance, Unilever was told that Ben & Jerry's would issue the following statement in response to the conflict in Gaza: "Ben & Jerry's calls for peace and a permanent and immediate ceasefire." (Id. ¶ 30.) Unilever allegedly responded by "threaten[ing] to dismantle the Independent Board and sue the board members individually[.]" (Id. (emphasis omitted).)

Eventually, the Ben & Jerry's CEO David Stever became embroiled in the conflict between Unilever and the Board. In early 2025, Stever received a performance review that "chastised [him] for 'repeatedly acquiesc[ing]'" to the Board. (Id. ¶ 64.) In March 2025, Unilever told the Board that it planned to remove Stever as CEO. (Id. ¶ 60.) Despite Unilever's promise in the Merger Agreement to consult in good faith with the Board on the removal of the CEO, it "attempted to impose an arbitrary four-day deadline for the Independent Board to convene, appoint a committee, analyze the merits of removal, [and] draft a 'consultation' in writing[.]" (Id. ¶ 61.) Unilever also refused the Board's request for its "minutes, notes, and materials related to the removal decision[.]" (Id. ¶ 62.) During "Mr. Stever's tenure, Ben & Jerry's outperformed Unilever's ice cream portfolio[.]" (Id. ¶ 63.)

The Ben & Jerry's Foundation, a private charitable organization founded with an initial gift from Ben & Jerry's co-founder Ben Cohen, also has drawn the attention of Unilever, and subsequently, Magnum. (Id. ¶¶ 4, 67, 78.) In 2025, Unilever requested, for the first time, an external audit of the Foundation. (Id. ¶ 84.) The audit was billed as "routine[.]" (Id. ¶ 87.) The media, however, reported that Unilever's "true target" was "a series of grants to the Oakland Institute [where Chair Mittal serves as executive director], a nonprofit that promotes global aid

and is critical of the World Bank and Israel." (Id. ¶ 86.) Instead of reviewing the Foundation's financials or its national grants, the auditors "instead . . . focused on [ ] discretionary grants and purported ideological objections." (Id. ¶ 93.) Though Unilever "committed" to sharing the audit's findings, it had not done so at the time the Complaint was filed. (See id. ¶¶ 89, 96–97, 113.) Apparent leaks, however, "confirmed to the media" that "the audit did not find wrongdoing, ethical malpractice or violations." (Id. ¶ 96.)

Section 6.14(h) of the Merger Agreement provides that Ben & Jerry's "shall continue the Company's practice of making charitable contributions" and that the Board "shall have the responsibility for allocating" those charitable contributions among recipients. (ECF 110-7 at 55–56.) The Board is permitted to disburse funds to the Foundation so long as certain requirements are met, such as that "the Foundation does not significantly change its charitable purpose[.]" (Id. at 56.) From 2000 to 2024, the Board allocated funds to the Foundation on an annual basis without incident, totaling $68 million. (FAC ¶ 84.) The Foundation has not received the contribution that the Board allocated to it in 2025. (Id. ¶ 112.)

In September 2025, Mittal, who served both as Chair of the Independent Board and as trustee of the Foundation, "was informed that Unilever had launched an 'integrity' investigation against her." (Id. ¶¶ 66, 98.) In a meeting with Unilever's General Counsel the following month, Mittal was allegedly presented with an ultimatum. If she were to resign and the Board dropped the present action before this Court, Unilever would provide her "with a prominent position in a multi-million dollar, Unilever-funded nonprofit." (Id. ¶ 100.) If she were to refuse, "Unilever would be making public allegations against her in its forthcoming prospectus." (Id.) "Mittal immediately refused Unilever's inappropriate offer." (Id.)

The allegations against Mittal included that she "had received inappropriate benefits from the Foundation[,]" "breached Unilever's Code of Conduct" by "challenging" Unilever's removal of Stever in this action and disclosing portions of his performance review, and "refused to participate" in the audit of the Foundation. (Id. ¶¶ 103–05.) In response, "the independent directors put forward a series of questions highlighting the weaknesses of Unilever's accusations[.]" (Id. ¶ 106.)

On December 6, 2025, Magnum demerged from Unilever and became a publicly traded company, bringing Ben & Jerry's with it. (Id. ¶ 109.) HoldCo and Magnum had stepped into Conopco and Unilever's shoes as the shareholder and ultimate parent of Ben & Jerry's, respectively. (See id. ¶¶ 8, 12, 13; ECF 110-7 at 53.) In the registration statement Magnum filed with the S.E.C. ahead of the demerger, it alleged that Mittal was "unfit to continue in her role." (Id. ¶ 106.)

Magnum began exerting pressure on the Foundation, claiming authority under the Merger Agreement to control its "governance, policies, and practices[.]" (Id. ¶ 113.) It soon informed the Foundation that "it would 'conclude that the Foundation no longer seeks funding'" unless it were to agree to certain changes by December 16, 2025. (Id. ¶ 116.)

Magnum then moved to oust the independent directors. To effectuate the removal, it amended Ben & Jerry's bylaws and articles of incorporation to impose a nine-term limit on directors' one-year terms and require the independent directors to accede to the Magnum code of conduct. (Id. ¶ 117.) On December 15, 2025, "Magnum purported to remove Chair Mittal 'effective immediately'" and "remove directors Jennifer Henderson and Daryn Dodson 'effective December 31, 2025,' should they not resign" before that date. (Id.) As to the other

independent directors, Magnum had "set up" their removal through the new eligibility requirements. (Id.)

Magnum also did an about-face on the nomination to the Board of Chris Miller, a Ben & Jerry's veteran and former Global Social Mission Director. (Id. ¶ 119.) When the independent directors told Magnum on December 11, 2025, that they had nominated Miller, Magnum initially congratulated him and described his nomination as "excellent news[.]" (Id.) A few days later, however, Magnum said Miller had not been "properly appointed" and that the independent directors "were required to inform Magnum of the 'steps taken to ensure his eligibility'" under the amended bylaws. (Id.)

The Complaint does not set forth the date, time, or circumstances of each independent director's removal. There are seven seats on the Board for independent directors, but the Complaint names only six independent directors as plaintiffs, plus Chris Miller. (Id. ¶ 5.) While it is therefore not clear if all independent directors have been removed, the Court will refer to the independent directors who are plaintiffs, along with Chris Miller, as the "Class I Directors" for clarity.

The Complaint conflates the removal of a director and the purported ineligibility of a director for reelection to the Board by failing to distinguish between Class I Directors who were removed before their term expired and those who were deemed ineligible for a new one-year term. (See, e.g., id. ¶ 132.) But the Court construes the Complaint as alleging that that Mittal was "removed" from the Board before the expiration of her term, while the other Class I Directors were informed that they could not begin another one-year term. (See id. ¶ 117.)

The Class I Directors filed the instant action on behalf of themselves and Ben & Jerry's. The Court subsequently permitted the Foundation to intervene. (ECF 77.)

DISCUSSION

I. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth. Id. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Michael Grecco Products, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)). In reviewing a Rule 12(b)(6) motion, courts assume all factual allegations in the complaint to be true and draw all reasonable inferences in favor of the non-moving party. Peretti v. Authentic Brands Group LLC, 33 F.4th 131, 137 (2d Cir. 2022).

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting International Audiotext Network, Inc. v. American Telephone and Telegraph Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies

heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Id. at 153 (quoting International Audiotext, 62 F.3d at 72).

A. Issues Common to All Contract Claims

Counts One, Two, Five, and Seven allege breach of contract claims. At the outset, the Court addresses the relevant choice of law considerations and contract interpretation principles, as well as defendants' arguments that plaintiffs failed to adequately allege damages.

i. Choice of Law

The Court is bound by New York contract law per the choice of law provisions in the Merger Agreement and Settlement Agreement. Section 9.08 of the Merger Agreement states, in relevant part, that "[the Merger Agreement] and any dispute arising out of or relating to the transactions contemplated by this agreement shall be governed by, and construed in accordance with, the laws of the state of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof[.]" (ECF 110-7 at 69.) Similarly, the Settlement Agreement provides: "This Settlement Agreement and any dispute arising out of this Settlement Agreement shall be governed by, and construed in accordance with, the laws of the state of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of law." (ECF 110-2 at 5.) New York law also applies to the interpretation of the Settlement Amendment, as it specifies that besides the single amendment it contains, "[a]ll remaining portions of the Settlement Agreement remain binding, unchanged, and in effect." (ECF 110-6 at 1.)

ii. Contract Interpretation

Several principles of contract interpretation are particularly relevant to this motion. "Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006) (quoting World Trade Center Properties, LLC v. Hartford Fire Insurance Co., 345 F.3d 154, 184 (2d Cir. 2003), abrogated on other grounds by Wachovia Bank v. Schmidt, 546 U.S. 303 (2006)). Further, an "interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" LaSalle Bank National Association v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (quoting Shaw Group, Inc. v. Triplefine International Corp., 322 F.3d 115, 124 (2d Cir. 2003)). Finally, "*expressio unius est exclusio alterius*, that is, that the expression of one thing implies the exclusion of the other." In re New York City Asbestos Litigation, 41 A.D.3d 299, 302 (1st Dep't 2007).

iii. Allegations of Damages

For reasons to be explained, only the Class I Directors may proceed on the surviving breach of contract claims. Contrary to defendants' contention, the Class I Directors have gone beyond "a conclusory allegation that the defendant[s'] breach caused damages." Alta Partners, LLC v. BitFuFu Inc., 24-cv-6849, 2025 WL 2145557, at *8 (S.D.N.Y. July 29, 2025) (Cronan, J.) (quoting Comfort Inn Oceanside v. Hertz Corp., 11-cv-1534, 2011 WL 5238658, at *8 (E.D.N.Y. Nov. 1, 2011)). They claim, among other harms, "loss of compensation, reputational damages, loss of goodwill, nominal damages, [and] loss of the opportunity to

manage aspects of Ben & Jerry's social mission and brand integrity[.]" (FAC ¶ 134; see also id. ¶¶ 145, 168, 181.) Coupled with the factual allegations in the Complaint, this suffices at the pleading stage. See CWCapital Investments LLC v. CWCapital Cobalt VR Ltd., 122 N.Y.S.3d 595, 600 (1st Dep't 2020) (explaining that "a plaintiff is not obligated to show, on a motion to dismiss, that it actually sustained damages" and must only "plead 'allegations from which damages attributable to [defendant's conduct] might be reasonably inferred'" (quoting InKine Pharmaceutical Co. v. Coleman, 759 N.Y.S.2d 62, 63 (1st Dep't 2003))).

Further, the sole case defendants cite for the proposition that the Class I Directors' loss of bargained-for governance authority does not give rise to cognizable damages is inapt, as it concerns the calculation of damages for wrongful termination under an employment contract. See Quinn v. Straus Broadcasting Group, Inc., 309 F. Supp. 1208, 1209 (S.D.N.Y. 1970) (explaining that "damages [in this context] are limited to the unpaid salary to which the employee would be entitled under the contract less the amount by which he should have mitigated his damages"). Defendants' argument that loss of goodwill and reputational harm are consequential damages, "which is not what Plaintiffs allege[,]" also fails. (ECF 139 at 16.) "There is no heightened pleading requirement for consequential damages[,]" D.K. Property, Inc. v. National Union Fire Insurance Co. of Pittsburgh, 92 N.Y.S.3d 231, 233 (1st Dep't 2019), and plaintiffs have made sufficient factual allegations to permit the inference at this stage that loss of goodwill and reputational harm "were reasonably contemplated by the parties," Bi-Economy Market, Inc. v. Harleysville Insurance Co. of New York, 10 N.Y.3d 187, 193 (2008). Finally, "[a]t the pleading stage of the case, the availability of nominal damages is [alone] enough to prevent these claims from being dismissed." See Saeco Vending, S.P.A. v. Seaga Manufacturing, Inc., 15-cv-3280, 2016 WL 1659132, at *8 (S.D.N.Y. Jan. 28, 2016) (Nathan, J.).

B. Breach of the Merger Agreement (Counts One & Two)

The first and second causes of action allege breach of the Merger Agreement. Plaintiffs assert that Unilever and Magnum breached section 6.14(a), (b), (c), (e), (f), and (i) by, among other things, censoring Ben & Jerry's, improperly "removing" independent directors, failing to consult on David Stever's firing, and declining to elect Chris Miller to the Board. Plaintiffs also claim that Unilever and Magnum breached section 6.14(h) by failing to honor the most recent allocation of funds to the Foundation. Unilever and Magnum respond that plaintiffs fail to state a claim because there was no "removal" within the meaning of the Merger Agreement, and that, in any event, they have no standing to sue under the Merger Agreement with the sole exception of the Class I Directors as to appointment and removal issues.

i. Contractual Standing

The parties disagree on whether plaintiffs may sue under most parts of the Merger Agreement. With the exception of Ben & Jerry's, they are not parties to the agreement, and the agreement expressly limits the conferral of third-party rights. Section 9.07 states that the Merger Agreement is "not intended to confer upon any person other than the parties any rights or remedies" with the exception of "Article II and Sections 6.04(a), 6.05, 6.06, 6.15, 6.16 and 6.18[.]" (ECF 110-7 at 69.) Article II concerns the implications of the Unilever acquisition on the stock of Ben & Jerry's and Conopco. (Id. at 12–15.) Sections 6.04(a), 6.05, 6.06, 6.15, 6.16 and 6.18 cover a range of topics, including employee benefits and the indemnification of directors and officers. (Id. at 44–58.) Section 9.07 specifies which third parties may enforce

these provisions. For example, "[t]he provisions of Section 6.04(a) [on stock options] are enforceable by the holders of the Company Stock Options." (Id. at 69.)

Directors of the Board are among the third parties authorized to enforce certain provisions, but only one, section 6.14(a), is the subject of plaintiffs' claims. Section 9.07 explains:

> Until such time as the Company Board is constituted in accordance with Section 6.14(a), the provisions of Section 6.14(a) are enforceable by any individual who is a member of the Company Board at the date of this Agreement. Thereafter, (i) the provisions of Section 6.14(a) relating to the removal of directors may be enforced by any individual who was a member of the Company Board immediately prior to the alleged breach of Section 6.14(a) and (ii) the provisions of Section 6.14(a) relating to the appointment of a director may be enforced by any individual who was a member of the Company Board immediately prior to the alleged breach of Section 6.14(a) or by any individual nominated for appointment in accordance with the provisions of Section 6.14(a) but not so appointed by the Surviving Corporation.

(Id.)

Unilever and Magnum persuasively invoke the principle that the expression of one thing implies the exclusion of another, while plaintiffs decline to address the apparent bar on most third-party actions. The Merger Agreement is explicit that third parties may not enforce all of its provisions. By expressly granting directors the authority to enforce section 6.14(a) but not doing so as to any other provision, the Merger Agreement implicitly withholds from directors of the Board the authority to sue under other provisions. Further, unlike directors, the Foundation is not given the authority to sue under any of provisions of the Merger Agreement. (See id.) The Foundation thus may not sue under section 6.14(h) over the charitable allocation it contends it is owed.

The Class I Directors and the Foundation assert alternatively that they can still pursue their claims under section 6.14(b), (c), (e), (f), (h), and (i) not on their own behalf, but on behalf of Ben & Jerry's, which is a party to the Merger Agreement.[1] They claim that otherwise key portions of the Merger Agreement would be effectively nullified. They argue, for example, that Unilever and Magnum would be able to commandeer with impunity the authority under sections 6.14(e) and (f), which name the independent directors as custodians of the Ben & Jerry's brand and social mission, if they are not permitted to sue.

Unilever and Magnum respond that the independent directors have limited powers that do not include the ability to bring a suit in the name of Ben & Jerry's. In addition to the Board's "primary responsibility" for preserving the social mission and brand image outlined in section 6.14(e) and (f), the Board has a role in the appointment and removal of directors (section 6.14(a)), the appointment, removal, and compensation of the Ben & Jerry's CEO (section 6.14(c)), the review of the Ben & Jerry's annual business plan (section 6.14(d)), defining "social performance" metrics (section 6.14(g)), and the allocation of certain charitable contributions to external organizations (section 6.14(h)). (Id. at 53–56.) Other parts of the Merger Agreement, as well as the Shareholders Agreement, which was also executed when Unilever acquired Ben & Jerry's in 2000, are a strong indicator that this list is exhaustive.

Section 6.14(j) of the Merger Agreement provides that "Conopco shall have primary responsibility for the financial and operational aspects of [Ben & Jerry's] and the other aspects of [Ben & Jerry's] not allocated to the Company Board pursuant to this Section 6.14." (Id. at 56.) The Shareholders Agreement mirrors the Merger Agreement in describing the powers allocated to the Board. (See ECF 121-3 at 1–3.) It further states:

---

[1] It is not clear that plaintiffs continue to assert a right to sue under section 6.14(b) or argue that they have stated a claim with respect to that section. (See ECF 133 at 23–24.)

> The rights, powers and authority of the Company Board are set forth in their entirety in this Agreement, and the Company Board shall not have any rights, powers or authority, express or implied, except as specifically set forth in this Agreement. All rights, powers and authority not specifically granted pursuant to this Section 1 are reserved to the Shareholder.

(Id. at 3.) The express exclusion of "any rights, powers or authority, express or implied" other than "as specifically set forth in this Agreement" is clear and very broad. The Class I Directors contend that Exhibit B to the Merger Agreement suggests they can sue for Ben & Jerry's because it "reserves authority to 'Conopco and the Company Board' over matters including the 'selection of . . . Corporate Counsel' and 'all matters not covered by the delegation' to the CEO alone." (ECF 133 at 30 (quoting ECF 110-7 at 79, 81).) However, Exhibit B also states that "as between Conopco and the Company Board the allocation of responsibility between them shall be as provided in Section 6.14[.]" (ECF 110-7 at 79.) And as mentioned, section 6.14(j) gives the shareholder authority over areas not delegated to the Board.

The provisions of the Merger Agreement granting the Board authority over certain aspects of Ben & Jerry's are in tension with the provisions of the agreement that circumscribe the Class I Director's power to sue. The Court, however, applying principles of contract interpretation, gives words their plain meaning and gives effect to as many terms as possible. Insofar as is relevant to the contractual standing of plaintiffs, the provisions of the Merger Agreement repeated in the Shareholders Agreement are unambiguous. The Board's powers, including those of the Class I Directors, are limited and outlined exhaustively, and they do not include the right to sue on behalf of Ben & Jerry's.

Contrary to plaintiffs' assertion, this interpretation does not render the Merger Agreement illusory. A director "who was a member of the Company Board immediately prior to the alleged breach of Section 6.14(a)" or "any individual nominated for appointment in

accordance with the provisions of Section 6.14(a) but not so appointed" may sue over appointment and removal issues on their own behalf. (ECF 110-7 at 69.) As to other parts of the Merger Agreement, Unilever states that the CEO of Ben & Jerry's may pursue enforcement. (See ECF 139 at 10 n.3.) The CEO is ultimately appointed by the shareholder, but the shareholder is bound to consult in good faith with a committee of the Board on CEO appointment, removal, and compensation decisions. (ECF 110-7 at 54.)

Accordingly, the Class I Directors and the Foundation may not sue under sections 6.14(b), (c), (e), (f), (h), or (i) on their own behalf or in Ben & Jerry's name. For this reason, the Court will dismiss the claims alleging breach of the Merger Agreement to the extent they are brought on behalf of Ben & Jerry's or are brought under sections 6.14(b), (c), (e), (f), (h), or (i).

ii. Breach of Section 6.14(a)

As discussed, the Merger Agreement permits individuals seated on the Board immediately prior to an alleged breach of section 6.14(a) related to removal to sue under that provision. (Id. at 69.) Similarly, individuals properly nominated but not appointed to the Board immediately prior to an alleged breach of section 6.14(a) related to their appointment may sue.[2] (Id.) The Class I Directors argue that Unilever and Magnum breached section 6.14(a) by refusing to appoint Chris Miller to the Board and by effectively removing or disqualifying the Class I Directors through new "eligibility requirements," specifically, a nine-term limit on directors' one-year terms and a required commitment to the Magnum code of conduct.

To state a claim for breach of contract under New York law, a "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the

[2] "[T]he provisions of Section 6.14(a) relating to the appointment of a director may [also] be enforced by any individual who was a member of the Company Board immediately prior to the alleged breach[.]" (Id.)

plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)). Unilever and Magnum dispute that the Class I Directors have adequately pleaded breach.

As the Ben & Jerry's articles of incorporation from 2000 explain, the shareholder has exclusive authority to amend the bylaws. (ECF 121-2 at 6 ("The by-laws of the Corporation may only be adopted, amended or repealed by the shareholder of the Corporation.").) But HoldCo continues to be bound by the Merger Agreement and cannot escape the restrictions on amendments to the Merger Agreement by simply amending the bylaws in a manner that conflicts with the Merger Agreement. The Merger Agreement provides that it may only be amended with the approval of the parties, and, in some instances, the approval of third-party beneficiaries. Section 8.03 states, in relevant part, that:

> This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties and, where any amendment relates to a provision of this Agreement in respect of which any third party beneficiary is entitled to an enforcement right pursuant to Section 9.07, an instrument in writing must be signed by the person entitled to such enforcement right.

(ECF 110-7 at 65.) There is no allegation that the required approvals were sought when HoldCo instituted the nine-term limit and Magnum code of conduct "eligibility requirements."

The Merger Agreement defines "Ineligible Director" in section 9.03 in a limited manner principally related to the transaction between Unilever, Conopco, and Ben & Jerry's:

> [A]ny member of the Company Board at the date hereof who (a) fails to tender his or her shares of Company Common Stock pursuant to the Offer, (b) makes any public statement disparaging either Parent, Conopco, the Company, any Transaction Agreement or any Transaction, (c) takes any action that, but for Section 9.11, would constitute a breach of this Agreement by the Company or (d)

> takes any other action which is intended to cause any of the Transactions to fail to be completed.

(ECF 110-7 at 67–68.) Nowhere in the enumerated grounds for ineligibility is the concept of a term limit or requirement of adherence to a code of conduct.

The Merger Agreement does provide that "[e]ach member of the Company Board . . . and all employees of [Ben & Jerry's] shall agree to abide by the Unilever Code of Business Conduct" in section 6.14(j). (ECF 110-7 at 56.) But it is evident that the Merger Agreement does not define "Ineligible Director" with reference to the code of conduct requirement. The Court assumes for the purposes of this motion that Magnum and HoldCo, as successors in interest, could impose a comparable requirement with respect to the Magnum code. But noncompliance with such a requirement would not present an eligibility question, but rather a removal question. Further, the Merger Agreement provides for one-year terms in section 6.14(a). (ECF 110-7 at 53.) Its silence on the issue of a term limit in both section 6.14(a) and the section 9.03 definition of "Ineligible Director" indicates that the creation of a term limit in the bylaws is incompatible with the Merger Agreement. By acceding to the Merger Agreement, Unilever and Conopco, and by extension Magnum and HoldCo, bargained away the ability to impose such a limit. And as section 6.14(a) makes plain, removing a director requires a written request by a majority of the other directors in his or her class. The Court concludes that the Complaint plausibly alleges that no Class I Director could be deemed ineligible by reason of having served nine terms. Accordingly, the Class I Directors have stated a claim for breach of section 6.14(a) based on their removal.

The Class I Directors have also stated a claim for breach based on the failure to appoint Chris Miller to the Board. Section 6.14(a) states that once a "candidate[ ] for election" to a class of directors on the Board is nominated by a majority of that class, the shareholder

"shall cause the election of" the candidate. (ECF 110-7 at 53.) The Class I Directors allege that they nominated Miller to the Board, but that HoldCo did not elect him. (FAC ¶ 119.) Unilever and Magnum urge that Miller was not in fact nominated, and that the Class I Directors failed to inform HoldCo "of the steps taken to ensure his eligibility, including [by] demonstrating that [he] signed the [Magnum] Code." (ECF 118 at 26.) But as explained above, whether Miller signed the code is not an eligibility question. The separate question of whether Miller was, in fact, nominated, is a factual issue that cannot be resolved at this stage.

Count One, as it relates to the claims under section 6.14(a) on the appointment and removal of the Class I Directors, survives at the pleading stage. The Court concludes that the Class I Directors have plausibly alleged that they were wrongfully deemed ineligible and thus removed, or not appointed, in violation of section 6.14(a).

C. Breach of the Settlement Agreement (Count Five)

The Class I Directors maintain that Unilever and Magnum breached the Settlement Agreement resolving the dispute over Unilever's sale of Ben & Jerry's trademark rights in Israel by interfering with the Board's authority and failing to make a required payment. Unilever and Magnum do not dispute that Unilever failed to make a $2,500,000 payment due to Ben & Jerry's under section 2(g) of the agreement. They do contend, however, that the Class I Directors fail to state a claim for breach of section 2(b) and (j).

Section 2(b) requires Unilever and Magnum to "[r]espect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity" and "work in good faith with the Independent Board to ensure that both are protected and furthered." (ECF 110-2 at 1.) The Class I Directors allege that Unilever

and Magnum breached by, among other things, "[c]ensoring Ben & Jerry's social mission, including from publicly voicing support for peace and refugee rights[,]" "[r]eplacing Ben & Jerry's CEO for respecting the social mission and collaborating with the Independent Board[,]" and "implementing retroactive term limits requiring removal[.]" (FAC ¶ 163.) More specifically, for example, when Ben & Jerry's sought to issue a statement that "Ben & Jerry's calls for peace and a permanent and immediate ceasefire" in Gaza in 2023, plaintiffs allege that "Unilever threatened to dismantle the Independent Board and sue the board members individually if Ben & Jerry's" issued the statement. (Id. ¶ 30 (emphasis omitted).) These and other factual allegations in the Complaint suffice to plausibly allege that Unilever and Magnum violated section 2(b) of the Settlement Agreement.

Section 2(j) of the Settlement Agreement requires Unilever and Magnum to "refrain from making any statement on behalf of Ben & Jerry's regarding the Social Mission that is inconsistent with the Social Mission of Ben & Jerry's as previously stated by Ben & Jerry's or approved by the Independent Board, without the consent of a majority of the Independent Board." (ECF 110-2 at 3.) The Class I Directors claim that Magnum "breached this provision by issuing statements not approved by the Independent Board, including [a] PR Newswire press release[,]" (FAC ¶ 165), issued on December 15, 2025, "gloat[ing] about its concurrent efforts against the Independent Board and the Foundation[,]" (id. ¶ 118).

Accordingly, the Class I Directors have plausibly stated a claim for breach of section 2(b), (g), and (j) of the Settlement Agreement. For the reasons described earlier, however, they may proceed only on their own behalf and not on behalf of Ben & Jerry's.

D. Breach of the Settlement Amendment (Count Seven)

The final breach of contract claim in this action concerns payments promised to Caanan Fair Trade in the Settlement Amendment. The Settlement Amendment requires "Ben & Jerry's/Unilever" to "make payments totaling $2 million USD annually to Canaan Fair Trade . . . for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers), for at least ten years[.]" (ECF 110-6 at 1.) "Payments to Canaan will be verified by auditors selected by the Independent Board and . . . . [c]onfirmation of payments . . . will be sent to the Chair of the Independent Board quarterly." (Id.) According to the Complaint, Unilever and Magnum have not made required payments, engaged in the review process, or fulfilled the quarterly reporting requirement. (FAC ¶ 179.) The Class I Directors have plausibly alleged a breach, and the claim will not be dismissed, except to the extent that it purports to be brought on behalf of Ben & Jerry's.

E. Declaratory Judgment Claims (Counts Three, Four, Six & Eight)

The Class I Directors, and the Foundation as to Count Four, seek declaratory relief outlining the parties' rights and obligations under the Merger Agreement, Settlement Agreement, and Settlement Amendment. Unilever and Magnum urge that the requested relief is either moot or duplicative of the breach of contract claims.

"The decision on whether to grant declaratory relief is subject to the court's discretion, which turns on the following considerations: '(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.'" Optanix, Inc. v. Alorica Inc., 20-cv-09660, 2021 WL 2810060, at *3 (S.D.N.Y. July 6, 2021) (Woods, J.) (quoting Duane

Reade, Inc. v. St. Paul Fire & Marine Insurance Co., 411 F.3d 384, 389 (2d Cir. 2005)). "Courts in this Circuit 'routinely dismiss requests for declaratory judgment when the parties' rights will be adjudicated through a breach of contract claim in the same action.'" StandardAero Aviation Holdings, Inc. v. Signature Aviation Ltd., 22-cv-7515, 2024 WL 125574, at *5 (S.D.N.Y. Jan. 11, 2024) (Torres, J.) (quoting Commercial Lubricants, LLC v. Safety-Kleen Systems, Inc., 14-cv-7483, 2017 WL 3432073, at *17 (E.D.N.Y. Aug. 8, 2017)).

Count Three, insofar as it relates to the appointment and removal of directors under section 6.14(a) of the Merger Agreement, seeks a declaration that Unilever and Magnum (1) "may not remove any Class I Director without the written request of at least a majority of the Class I Directors then in office" and (2) "must recognize Chris Miller as a duly elected Class I Director[,]" and that (3) "removing individual members [of the Board] without a majority vote of the remaining members . . . would materially breach the Merger Agreement[.]" (FAC ¶ 154.) The Class I Directors already ask the Court to decide whether their removal and the failure to elect Miller constituted breach. The Class I Directors also ask the Court to enjoin Unilever and Magnum from "taking any action, directly or indirectly, to . . . [p]revent [the Class I Director plaintiffs] from exercising all rights held by Class I Directors of Ben & Jerry's[,]" "[r]emove, or attempt to remove, any of the Class I Director Plaintiffs . . . without the written request of at least a majority of the Class I Directors in office as of December 1, 2025[,]" or "elect[ ] any new Class I Directors other than Chris Miller[.]" (Id. ¶ 198.) The Court therefore concludes that the parties' rights and obligations under 6.14(a) implicated in Count Three will be resolved through Count One. The Court will dismiss Count Three in its entirety, as the remainder of the requested declaratory relief concerns sections 6.14(b), (c), (e), (f), and (i) of the Merger Agreement, under which none of the plaintiffs has contractual standing to sue.

Nor will the declaratory relief sought in Counts Six and Eight as to the Settlement Agreement and Settlement Amendment "serve a useful purpose in . . . settling the legal issues involved." Duane Reade, Inc., 411 F.3d at 389. The requested relief largely replicates the determinations necessary to resolve the breach of contract claims under those agreements. (See, e.g., FAC ¶ 176 (seeking declaration that "[a]ny attempt to eliminate or remove the independent directors . . . would breach Defendants' obligations under the Settlement Agreement"); id. ¶ 186 (seeking declaration that "[u]nder the terms of the Settlement Amendment, Unilever must make annual payments of $2 million to Canaan Fair trade, for the use of Palestinian almonds or the direct benefit of Palestinian almond farmers, for a period of ten years").) Further, the Court is unable to provide relief as to hypothetical matters. (See id. ¶ 176 (requesting a declaration that "[a]ny attempt to prevent Ben & Jerry's from criticizing the Trump administration's policies or speaking out on other social issues under the purview of its social mission would constitute a breach" of the Settlement Agreement).) Counts Six and Eight will therefore be dismissed.

Finally, Count Four, which seeks declaratory relief pertaining to section 6.14(h) of the Merger Agreement, will also be dismissed for plaintiffs' lack of contractual standing.

F. Breach of the Covenant of Good Faith and Fair Dealing (Count Nine)

The Class I Directors bring a claim for breach of the implied covenant of good faith and fair dealing in the alternative to each breach of contract claim. This Count will be dismissed as duplicative of the surviving breach of contract claims, see Harris v. Provident Life & Accident Insurance Co., 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair

dealing when a breach of contract claim, based upon the same facts, is also pled."), and for lack of standing to sue under the remaining provisions of the Merger Agreement.

G. Unjust Enrichment (Count Ten)

Plaintiffs' final cause of action is the Foundation's claim for unjust enrichment based on Unilever and Magnum's retention of funds allocated to it by the Board. Unilever and Magnum maintain that the claim may not stand because the issue of the funds is governed by section 6.14(h) of the Merger Agreement, which the Foundation is without power to enforce. They also contend that the Foundation lacks the requisite possessory interest in the funds, which it would disburse to other charitable organizations upon receipt.

The Court only finds it necessary to address the first argument. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 388 (1987). "New York state courts and [courts] in this district have consistently held that" this is so "even if one of the parties to the lawsuit is not a party to the contract." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 202 (S.D.N.Y. 2011) (Sullivan, J.) (quoting American Medical Association v. United Healthcare Corp., 00-cv-2800, 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007)).

Though the Foundation is not a party to the Merger Agreement, section 6.14(h) governs the payment of the funds in issue to the Foundation. It provides that Ben & Jerry's "shall continue to make contributions . . . unless the activities and performance of the Foundation cease to be reasonably acceptable to Unilever, and provided that the Foundation meets the other

requirements set out in the previous sentence." (ECF 110-7 at 56.) Unilever and Magnum's obligation to remit the funds to the Foundation as allocated by the Board is thus "an obligation that exists solely by virtue of" the Merger Agreement. See Hudson Neurosurgery, PLLC v. UMR, Inc., 20-cv-9642, 2023 WL 6311218, at *8 (S.D.N.Y. Sept. 28, 2023) (Karas, J.). The Foundation therefore fails to state a claim for unjust enrichment.

II. Motion to Substitute

Defendants seek to substitute, pursuant to Rule 25(c), Fed. R. Civ. P., Magnum and HoldCo for Unilever and Conopco as parties to this action in light of certain agreements tied to the demerger that transfer all rights and obligations relating to the Merger Agreement, Settlement Agreement, and Settlement Amendment from Unilever and Conopco to Magnum and HoldCo. In the alternative, defendants seek dismissal of Unilever and Conopco from the action based on mootness.[3]

Rule 25(c) provides that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." "A primary consideration in deciding a motion pursuant to Rule 25(c) is whether substitution will expedite and simplify the action." Banyai v. Mazur, 00-cv-9806, 2009 WL 3754198, at *3 (S.D.N.Y. Nov. 5, 2009) (Stein, J.). After substitution, "[t]he merits of the case . . . are still determined vis-à-vis the originally named parties." Berall v. Teleflex Medical Inc., 10-cv-5777, 2022 WL 2666070, at *3 (S.D.N.Y. July 11, 2022) (Preska, J.) (quoting Minnesota Mining & Manufacturing Co. v. Eco Chem, Inc., 757 F.2d 1256, 1263 (Fed. Cir. 1985)), aff'd, 2025-1124, 2026 WL 1906715 (Fed. Cir. July 2, 2026).

[3] The Court observes that it is unusual to make an argument concerning Article III standing in the alternative.

The Court will make the requested substitution under Rule 25(c). The Class I Directors do not dispute that their claims are no longer redressable through Unilever and Conopco. Unilever and Conopco agree that they "may possess some documents relevant to this action and [that] certain persons employed by Unilever and Conopco may have relevant knowledge[.]" (ECF 120 at 10.) However, they agree "to accept service of any Rule 45" subpoena and "transfer any application related to compliance with a subpoena to the Southern District of New York." (Id.) Further, while plaintiffs urge that section 9.09 of the Merger Agreement "bars assignment without consent" and "voids unauthorized assignments," (ECF 133 at 46), that is only the case if the other parties to the Merger Agreement have not consented, (see ECF 110-7 at 70). But plaintiffs make no allegation that such consent was not given to facilitate the demerger. On balance, therefore, the purposes of the rule will be served through substitution.

CONCLUSION

The motion to dismiss is GRANTED in part. Count One is dismissed except to the extent that it alleges the improper removal of, or the imposition of new eligibility requirements on, the Class I Directors and the failure to appoint Chris Miller in violation of section 6.14(a) of the Merger Agreement. Counts Two, Three, Four, Six, Eight, Nine, and Ten are dismissed in their entirety. The motion to dismiss is otherwise DENIED. The motion to substitute is GRANTED. The Clerk is respectfully directed to terminate the motions at ECF 117 & 119.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
August 21, 2026