**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CLASS I DIRECTORS OF BEN & JERRY'S INDEPENDENT BOARD,<br>*Plaintiffs*,<br><br>v.<br><br>THE MAGNUM ICE CREAM COMPANY N.V. and BEN & JERRY'S HOLDCO, LLC,<br>*Defendants*. | Case No. 1:24-cv-08641-PKC<br><br>JURY TRIAL DEMANDED |

**PLAINTIFFS' FIFTH AMENDED COMPLAINT**

1. Plaintiffs the Class I Directors of the Ben & Jerry's Independent Board ("Plaintiffs" or "Class I Directors" or "Independent Board"), by and through their undersigned attorneys, as and for their fifth amended complaint (the "Complaint") against defendants Ben & Jerry's HoldCo, LLC ("HoldCo") and The Magnum Ice Cream Company N.V. ("TMICC" or "Magnum" and together with HoldCo, the "Defendants"), hereby allege upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

2. This litigation arises from a sustained campaign by Unilever PLC ("Unilever") and its successor, Defendant Magnum, to censor Ben & Jerry's social mission, intimidate the Independent Board charged by contract to protect it, and, when confronted with resistance, to manufacture a pretext to purge the Independent Board's leadership mid-litigation, all while holding charitable funds due to the Ben & Jerry's Foundation hostage as a means of leverage. Defendants'

actions are antithetical to their contractual obligations vis-à-vis the parties' Merger Agreement, Settlement Agreement, and Settlement Amendment.

## PARTIES

3. Plaintiffs the Class I Directors of the Ben & Jerry's Independent Board consist of the Class I Directors of Ben & Jerry's Homemade, Inc. ("Ben & Jerry's"), who bring suit in their capacity as Directors of the Independent Board with the authority to enforce the Merger Agreement, Settlement Agreement, and Settlement Amendment. The Class I Directors of Ben & Jerry's Homemade, Inc. are citizens of California, New Hampshire, Nevada, Vermont, and Georgia:

a. Anuradha Mittal – California

b. Aseel Najib – New Hampshire

c. Daryn Dodson – California

d. Jennifer Henderson – Nevada

e. Detavio Samuels – Georgia

f. Chivy Sok – California

g. Chris Miller – Vermont

4. Defendant Ben & Jerry's HoldCo, LLC is a limited liability company formed under the laws of Delaware whose registered office is located in Delaware. Ben & Jerry's HoldCo, LLC provided a sworn interrogatory response in this matter verifying the following: The sole member of Ben & Jerry's HoldCo, LLC is Magnum ICC US HoldCo, LLC, also a Delaware limited liability company. The sole member of Magnum ICC US HoldCo, LLC is Magnum ICC US SpinCo, LLC, also a Delaware limited liability company. The sole member of Magnum ICC US SpinCo, LLC is The Magnum Ice Cream Company NewCo Netherlands B.V. The Magnum Ice Cream Company

NewCo Netherlands B.V. is a private company with limited liability under the laws of the Netherlands with its office in Amsterdam, the Netherlands. The Magnum Ice Cream Company NewCo Netherlands B.V. is held 19.85% by The Magnum Ice Cream Company N.V. and 80.15% by The Magnum Ice Cream Company HoldCo Netherlands B.V. The Magnum Ice Cream Company HoldCo Netherlands B.V. is a private company with limited liability under the laws of the Netherlands with its office in Amsterdam, the Netherlands, and is held 100% by The Magnum Ice Cream Company N.V. The Magnum Ice Cream Company N.V. is a public company under the laws of the Netherlands with its office in Amsterdam, the Netherlands.

5. Defendant The Magnum Ice Cream Company N.V. is a company incorporated and headquartered in the Netherlands.

## PERSONAL JURISDICTION AND VENUE

6. This Court has personal jurisdiction over TMICC because of its contacts with the forum and, as Unilever's successor and assign, TMICC has consented to personal jurisdiction in any federal court located in the State of New York under Section 9.10 of the Merger Agreement and Section 14 of the Settlement Agreement with respect to the claims being brought in this Complaint.

7. This Court has personal jurisdiction over Ben & Jerry's HoldCo, LLC because of its contacts with the forum and, as Conopco, Inc.'s ("Conopco") successor and assign, HoldCo has consented to personal jurisdiction in any federal court located in the State of New York under Section 9.10 of the Merger Agreement and Section 14 of the Settlement Agreement with respect to the claims being brought in this Complaint. Additionally, HoldCo admits it stands in Conopco, Inc.'s shoes with respect to the Merger Agreement.

8. Venue lies within this District pursuant to Section 9.10 of the Merger Agreement and Section 14 of the Settlement Agreement. On information and belief, venue also lies in this District under 28 U.S.C. § 1392(b)(2) because Defendants conduct, transact, and/or solicit substantial business in New York.

## SUBJECT MATTER JURISDICTION

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars.

## FACTUAL BACKGROUND

### I. For over four decades, Ben & Jerry's has been an American institution, pillared on its progressive values and outspoken, courageous advocacy.

10. Founded in 1978, Ben & Jerry's has distinguished itself as a company with a backbone: one that is outspoken on—and often on the vanguard of—a variety of societal issues, including those involving human rights and social justice. As examples, in 1988, Ben & Jerry's launched the "Peace Pop" to challenge Cold War spending policy, and in 1990, Ben & Jerry's co-sponsored a full-page ad in *The New York Times* challenging the Gulf War as "an unnecessary war" and publicly proclaiming that "[t]he price of gasoline should never be a reason to send our sons and daughters off to die in a foreign war." In 1991, Ben & Jerry's became an outspoken advocate for LGBTQ+ rights and began offering benefits to the same-sex partners of its employees. And, in 1998, the company successfully lobbied the Vermont legislature to pass a law that authorizes corporate directors to consider issues beyond shareholder wealth maximization when making company decisions (often referred to as the "Ben & Jerry's Law").

11. Ben & Jerry's authenticity and integrity resonated with the public, with the company quickly becoming a household name. In 1999, a national survey found that Ben & Jerry's ranked fifth among *all companies* in the United States in terms of reputation, a startling fact given that "the top four finishers (Johnson & Johnson, Coca-Cola, Hewlett-Packard, and Intel) were so much larger."[1] This loyal following made Ben & Jerry's attractive to several potential suitors, including Unilever, Defendant Magnum's predecessor.

## II. Due to its commercial success and public recognition, several companies competed to acquire Ben & Jerry's. To separate itself from other bidders, Unilever expressly agreed to preserve Ben & Jerry's autonomy and authenticity via an independent board of directors.

12. In 1999, several potential buyers became interested in acquiring Ben & Jerry's, including industry rivals Dreyer's Grand Ice Cream and Unilever. To distinguish itself from other bidders, Unilever instructed its Chief Counsel, Ronald Soiefer, that his "job was to collaborate with" Ben & Jerry's "to create a governance structure that would set [Unilever's] bid apart from any others."

13. Following over a year of negotiations, the parties' resulting Merger Agreement contractually preserved Ben & Jerry's authenticity and autonomy via the creation of an Independent Board. Specifically, per the Merger Agreement, although Unilever would be able to designate one "Class U" director to the Independent Board, the "majority" of Ben & Jerry's board would be composed of "Class I Directors" or independent directors.[2] To further cement this autonomy, the Independent Board was expressly empowered with "primary responsibility" over Ben & Jerry's social mission and brand integrity and was also given veto authority over Ben & Jerry's CEO—a Unilever appointee—for areas in which the Independent Board held such

---

[1] *See* Exhibit 1 (Excerpts from Brad Edmonson, *Ice Cream Social: The Struggle for the Soul of Ben & Jerry's* (2014)) at 150.

[2] Exhibit 7 (Merger Agreement) at § 6.14(a).

"primary" authority.[3] The Independent Board's additional oversight authority included the responsibility for determining a substantial portion of the CEO's bonus.[4]

14. To further entrench the Board's independence, Unilever was expressly and contractually barred from "removing" an independent director without a "written request of at least a majority" of the other independent directors and was further prohibited from taking actions that would prevent the Independent Board from "fulfilling" its "obligations."[5] Section 6.14(l) of the Merger Agreement also required the parties to amend the company's post-merger Bylaws "to the extent necessary to implement the provisions contained in this Section 6.14," including those related to the Board's independence.[6] Moreover, in tandem with the Merger Agreement, the parties executed a Licensing Agreement which barred Unilever from launching Ben & Jerry's products "in any country deemed by both Amnesty International and Freedom House to be engaged in significant human rights abuses" without Ben & Jerry's consent.

15. As Richard Goldstein, Unilever's then-Chief Executive Officer of North America, described: "The ***only reason*** we were successful in the acquisition is because Ben and Jerry became convinced that Unilever would honor its word. There was no point in buying the brand unless we could get the founders to agree that this is what they wanted" (emphasis added). Unilever's then-Chief Counsel, Soiefer, readily acknowledged: "Perpetuity is what really distinguishes this deal from other deals involving socially responsible businesses. The board of Ben & Jerry's is not going away. They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent. It isn't like Unilever can run out the clock."

---

[3] *Id.* at § 6.14(d), (e), and (f).
[4] *Id.* at § 6.14(c).
[5] *Id.* at § 6.14(a) and (i).
[6] *Id.* at § 6.14(l); *see also id.* at Exhibit B.

16. Goldstein's and Soiefer's analyses were echoed in 2021 by Ben & Jerry's CEO, Matthew McCarthy (a Unilever appointee):

> We may disagree at times, but this acquisition, which happened 20 years ago, has been so successful in part because Unilever got a good schooling from [co-founders] Jerry [Greenfield] and Ben [Cohen] about what they had created and what we're still trying to drive forward. They were also very smart, shrewd guys who put into the sales agreement a certain level of autonomy that would exist in perpetuity, including the creation of an independent board of directors that I sit on and am also partly accountable to. So, there's a certain level of independence baked in.

## III. For twenty-five years, the Independent Board has served as critical custodians for Ben & Jerry's.

17. Since the Merger Agreement's execution in 2000, the Independent Board has played a critical role in fighting back against Unilever's attempts to turn Ben & Jerry's into Breyer's. For instance, in 2008, Unilever's appointed CEO for Ben & Jerry's, Walt Freese, proposed closing the Ben & Jerry's plant in Waterbury, Vermont, which was the company's first factory, built in 1985. The closure of that plant would have devastated the local economy. The Independent Board consequently determined that such closure was inconsistent with the company's social mission and brand integrity. Following months of back and forth, in a letter dated March 14, 2009, Michael B. Polk (Unilever's President of Americas) concluded: "Unilever respects the Board's concerns about the community of Waterbury and of course will abide by the final decision of the Board." Today, Waterbury is one of the company's most efficient plants.

18. Similarly, the Independent Board has prevented Unilever from degrading the quality of the company's products via proposed efforts to cheapen ingredients, pushed for the company to ensure its products are free of genetically modified organisms (GMOs), and ensured the company has continued its principled stances on social justice issues. For example, in June 2022, Unilever sold Ben & Jerry's trademark rights in the Occupied Palestinian Territories

("OPT") sans the Independent Board's approval and despite rampant accounts of human rights abuses. The Independent Board—empowered under the Merger Agreement with "primary" authority over the "licensing or other use of the Ben & Jerry's trademark"—initiated litigation on behalf of itself and the company. The parties settled their dispute in December 2022, with the Independent Board seeking to further reaffirm both its independence and autonomy. Consequently, under the resulting Settlement Agreement, Unilever is contractually obligated to "[r]espect and acknowledge" the Independent Board's "primary" responsibility over the social mission and brand integrity and to work "in good faith with the Independent Board to ensure that both are protected and furthered."[7]

19. The Settlement Agreement provided additional guardrails to further secure the Independent Board's authority as well. For example, the onboarding process for each Ben & Jerry's CEO "will include a comprehensive review of the Merger Agreement and the corresponding role of the Independent Board," and "a set of KPIs reflecting the provisions of the Merger Agreement and the role of the Independent Board will be included in every CEO evaluation."[8] Additionally, Unilever is also obligated to "refrain from making any statement on behalf of Ben & Jerry's regarding the Social Mission that is inconsistent with the Social Mission of Ben & Jerry's as previously stated by Ben & Jerry's or approved by the Independent Board, without the consent of a majority of the Independent Board."[9]

## IV. A new wave of Unilever leadership has developed a distaste for the Independent Board and Ben & Jerry's values.

20. For the last seven years, Ben & Jerry's Independent Board has been led by Chair Anuradha Mittal, who was chosen due to her human rights and social justice efforts on behalf of

---

7 Exhibit 2 (Settlement Agreement) at § 2(b).
8 *Id.* at § 2(i).
9 *Id.* at § 2(j).

indigenous communities as executive director of The Oakland Institute, a nonprofit. The Office of United Nations Special Rapporteur on the Right of Food has described Chair Mittal's work on behalf of The Oakland Institute as "truly inspiring." Under the stewardship of Chair Mittal and the Independent Board, Ben & Jerry's has been praised as the "gold standard" for corporate activism, with the brand's authenticity resonating with consumers.[10] This "gold standard" has translated into commercial success, with Ben & Jerry's being described as one of Unilever's crown jewels, as it outpaced the rest of Unilever's ice cream portfolio.

21. While the Independent Board has continued the struggle to preserve Ben & Jerry's social mission and brand integrity, Unilever's leadership has had significant reshuffles, with its latest executives developing a distaste for Ben & Jerry's outspoken values. For example, in 2024, Peter ter Kulve was appointed as Unilever's President of Ice Cream. In January 2024, in one of Mr. ter Kulve's very first correspondence to Chair Mittal, he referred to her as "manic" and suggested she resign from her position—déjà vu—in response to the Independent Board's proposed post calling for "peace" and a "permanent and immediate ceasefire" with regard to the humanitarian catastrophe in Gaza.[11] Mr. ter Kulve is now CEO of Defendant Magnum. He is a close ally of Nelson Peltz, who joined Unilever's board in May 2022 and has had significant input in Unilever's decision-making, including the appointment of Unilever's last two CEOs and the censorship of Ben & Jerry's. Just two months after Mr. ter Kulve's email to Chair Mittal, Mr. Peltz told the *Financial Times* in a March 2024 interview: "Ben & Jerry's job is to sell ice cream, not to make political statements. And these people use anything for a soapbox that they have no right to do." He added: "What sense is being a billionaire if you're not a bully?"

---

[10] Marie Solis, *Ben & Jerry's Showed America What Real Corporate Activism Looks Like*, Huff Post (Jul. 31, 2020, at 5:45 ET) (updated Aug. 20, 2020), https://www.huffpost.com/entry/ben-jerry-ice-cream-corporate-activism_n_5f1b11dec5b6296fbf423019.

[11] Email from Peter ter Kulve to Anuradha Mittal (Jan. 7, 2024).

## V. Despite the brand's success, Unilever's new leadership has attempted to silence Ben & Jerry's and stifle the Independent Board.

22. Contemporaneous with Mr. Peltz's and Mr. ter Kulve's comments, Ben & Jerry's and the Independent Board became the subject of Unilever's bullying tactics, including Unilever's suppression of the social mission alongside inappropriate censorship, threats, reprisals, and removals—all in violation of the parties' agreements.

**Tactic 1: Unilever censors the social mission, while threatening the Independent Board for its human rights advocacy and Ben & Jerry's CEO for supporting the same.**

23. During the ongoing humanitarian crisis in Gaza, which has claimed the lives of over 20,000 innocent Palestinian children, Ben & Jerry's has on four occasions attempted to publicly speak out in support of peace and human rights. Despite its contractual commitment to "[r]espect and acknowledge" the Independent Board's primary responsibility over Ben & Jerry's social mission and brand integrity, Unilever has silenced each of these efforts.

24. *First*, in December 2023, approximately two months into the humanitarian crisis, the Independent Board alongside Ben & Jerry's management informed Unilever that Ben & Jerry's would be issuing the following statement: "Ben & Jerry's calls for peace and a permanent and immediate ceasefire." By this time, over 140 countries around the world (including England, France, and Canada), Doctors Without Borders, and the Pope had also called for a ceasefire. In response, Unilever threatened to ***dismantle the Independent Board*** and ***sue the board members individually*** if Ben & Jerry's—with its decades-long motto of "peace, love, & ice cream"—issued the statement supporting "peace" and a "ceasefire." These threats were coupled with personal calls from Mr. ter Kulve and Jeff Eglash (Unilever's then-President of Ice Cream and Global Head of

Litigation), who attempted to intimidate Ben & Jerry's personnel with professional reprisals if the company issued the ceasefire statement.

25. *Second*, approximately five months later, in May 2024, Ben & Jerry's social activism managers in Europe sought to release the following statement in support of the safe passage of Palestinian refugees:



Ben & Jerry's UK
@benandjerrysUK

People fleeing war need routes to safety, but right now there are no safe ways for Palestinians affected by war to seek sanctuary in the UK.

So just like the UK did for Ukrainians, we ask that the Government urgently create a Visa Scheme allowing Palestinians to reunite SAFELY with their loved ones in the UK.

Join us in this humanitarian call for a Gaza Family Visa Scheme NOW.

26. This statement was consistent with Ben & Jerry's long history of supporting safe passage for refugees from multiple countries, including Rwanda, Afghanistan, and Ukraine, among others. In fact, Ben & Jerry's showcases a statement titled "The Rights and Dignity of Refugees and Asylum Seekers" under the "Issues We Care About" section of the company's website. Nevertheless, Unilever prevented Ben & Jerry's social activism managers from publishing the statement, without the Independent Board's knowledge or consent.

27. In June 2024, after the Independent Board became aware of Unilever's inappropriate muzzling, Chair Mittal wrote to Mr. ter Kulve emphasizing Ben & Jerry's "long history of work on refugee rights," including supporting safe passage for refugees from multiple countries. Chair Mittal continued: "Safe passage is the right of every single person from every single country; to single out Gazan refugees' right to safe passage is discriminatory and

contravenes international human rights and humanitarian laws, not to mention Unilever's stated commitment to human rights principles in general. This work also falls squarely under the Merger Agreement which grants the Board primary decision-making authority."

28. On July 1, 2024, Mr. ter Kulve responded: "[T]o my understanding the communications team initially reviewed [the statement] and was concerned about the timing of it — it coincided with the Iranian missile attack on Israel. When the matter was escalated to me, I expressed concerns about the continued perception of antisemitism that is a persistent issue. It was my judgment that in light of the timing and nature of the post it, it was not an appropriate message at this time." Disturbed that Mr. ter Kulve would intentionally create a false equivalency between calling for the safe passage of Gazan refugees and antisemitism, Chair Mittal wrote on July 7, 2024: "[O]ther than your clairvoyant intuition, could you please point to any objective data point—such as a market study or third-party evaluation—that objectively confirmed your unilateral judgment that calling for safe passage of all refugees, including from Gaza will be viewed as antisemitism?" To this day, Mr. ter Kulve has not provided any such evidence.

29. *Third*, in June 2024, as college campuses around the country were protesting the civilian deaths and humanitarian catastrophe in Gaza, Ben & Jerry's management and the Independent Board aligned on issuing a public statement supporting the protesters' First Amendment rights. Ben & Jerry's has a long history of supporting such discourse, including a post titled "Silence is NOT an Option" regarding the murder of George Floyd, which remains live on Ben & Jerry's website. When Ben & Jerry's management informed Unilever that they would be publishing the statement supporting the protesters' rights, Mr. Eglash barred its release.

30. *Fourth*, on September 25, 2024, Senator Bernie Sanders issued the following tweet:




31. In conjunction with Senator Sanders's post, Ben & Jerry's management and the Independent Board agreed to release the following statement:

> We Support the Sanders Resolution. As the one-year anniversary of October 7th approaches, with tens of thousands of innocent Palestinian civilians killed and dozens of Israeli hostages still held, we believe in providing critical humanitarian aid, not in sending more weapons. We urge you to join us in calling on the Senate to pass the Sanders Resolution and halt an additional $20 billion in military aid to Israel.

On September 25, 2024, Chair Mittal wrote to Ben & Jerry's CEO requesting publication of the statement as approved by the Independent Board, the entity with "primary responsibility" over Ben & Jerry's Social Mission. The Chair followed up on September 29, 2024, requesting a status

update. The following day, Chair Mittal was informed that Mr. ter Kulve had unilaterally vetoed the statement in what amounted to Unilever's fourth act of censoring Ben & Jerry's social mission in less than a six-month span.

32. Unilever's overreach has also expanded to other portions of the Social Mission as well. For example, following the November 2024 election, Ben & Jerry's management worked collaboratively with the Independent Board to release a post on Inauguration Day that identified several social issues Ben & Jerry's believed would be challenged during the Trump administration, including minimum wage, universal healthcare, abortion, and climate change. Despite their weeks of working on the statement, including feedback from Unilever's Global Head of Litigation, on January 18, 2025, Mr. ter Kulve unilaterally barred Ben & Jerry's from issuing the post because it specifically mentioned "Donald Trump."

33. Mr. ter Kulve's objection, of course, ignored Ben & Jerry's consistent history of challenging the Trump administration, including launching the flavor "Pecan Resist" in 2018 alongside the following public statement: "The company cannot be silent in the face of President Trump's policies that attack and attempt to roll back decades of progress on racial and gender equity, climate change, LGBTQ rights and refugee and immigrant rights — all issues that have been at the core of the company's social mission for 40 years." Mr. ter Kulve—clearly unaware of the Pecan Resist statement—provided ***no evidence whatsoever*** regarding any commercial implications of previous posts regarding the Trump administration or of the Inauguration Day post which he unilaterally blocked. Rather, Mr. ter Kulve appeared to base his decision solely on his intuition.

34. Unilever's ongoing objection to mentioning "Trump" coincides with its prominent board member, Mr. Peltz, publicly supporting Mr. Trump. Within twenty-four hours of Mr. ter

Kulve blocking the Inauguration Day post on the grounds that it was "partisan," he hosted an Ice Cream Townhall, where he publicly touted that Mr. Peltz had been the one to introduce Elon Musk to Donald Trump. According to Mr. ter Kulve, despite Ben & Jerry's four decades of progressive social activism—and years of challenging policies under both Democratic and Republican presidents—criticizing Mr. Trump was now too taboo for the brand synonymous with "Peace, Love, and Ice Cream."

35. Unilever's suppression of Ben & Jerry's Social Mission has reached startling new levels of oppressiveness—and irony. For example, Unilever prevented Ben & Jerry's—the company that has openly called for "Dismantling White Supremacy"—from issuing a post commemorating Black History Month. And, after Columbia graduate Mahmoud Khalil was detained by ICE for expressing pro-Palestine views on a college campus, Unilever blocked Ben & Jerry's from making the following post: "Protect the First Amendment! Free speech and peaceful protests are the lifeblood of our democracy, and student activists have always been at the center of the fight for justice. Political speech is protected by our constitution and peaceful civil disobedience should never be the basis for deportation. Protect your right to dissent and take action with the @ACLU," followed by a link to an ACLU petition calling for Mr. Khalil's release. Once again, Unilever provided no explanation for censoring Ben & Jerry's post attempting to protect free speech, peaceful protests, and the First Amendment.

36. As the aforementioned conduct underscores, Unilever has exhibited a pattern and practice of usurping the Independent Board's authority, while concurrently stymieing Ben & Jerry's social mission and brand integrity.

**<u>Tactic 2</u>: Unilever withholds settlement funds.**

37. As a condition of the Settlement Agreement, Unilever must make a total of $5 million in payments to Ben & Jerry's for disbursement to human rights and humanitarian organizations. Per Section 2(g) of the Settlement Agreement:

> Unilever will make two $2,500,000 payments to Ben & Jerry's Homemade Inc. (totaling $5,000,000). The first payment will occur in 2023 and the second payment in 2024. Under no circumstances will the first payment be made later than July 30, 2023, or the second payment be made later than July 30, 2024. The Chair of the Independent Board in good faith consultation with Unilever will determine to which humanitarian and human rights organizations the funds will be disbursed. Unilever's consent will not be unreasonably withheld.

38. Per the plain terms of the Settlement Agreement, the Chair of Ben & Jerry's Independent Board is to "determine" the donation recipients. It is a breach of contract for Unilever to unreasonably object to the Chair's designees.

39. On June 7, 2024, Ben & Jerry's Chair provided Maria Varsellona—Unilever's Chief Legal Officer—a list of her designees, which included Jewish Voice for Peace and the San Francisco-Bay Area Chapter of the Council on American-Islamic Relations (CAIR-SFBA), among others. This initial correspondence led to a two-month-long negotiation process over the designees.

40. On multiple occasions, the Chair requested any objections Unilever had to the groups in writing. After initially refusing, Unilever finally provided its written objections on August 16, 2024, via a chart of grievances which simply regurgitated offensive stereotypes regarding each of the Chair's designees. These objections were riddled with inconsistencies. For example, despite Unilever expressly agreeing to donate to "human rights organizations" in the parties' Settlement Agreement, each of Unilever's objections boiled down to the same issue: the organizations were advocating for human rights, namely Palestinian human rights. As an

illustration, Unilever's objection to donations to ***Jewish Voice for Peace*** was that the group was too critical of the Israeli government. Unilever's asserted objections were inconsistent with ***its own public*** Human Rights Policy which states that "[b]usinesses ***must not support any actions, directly or indirectly***, which impinge upon human rights defenders' rights to ***freedom of expression***, association or assembly" (emphasis added).[12]

41. Unilever's pretext for blocking the donations was that it allegedly seeks to remain "neutral" on the Palestinian-Israeli conflict. Unilever's actions, however, belie its assertions of neutrality. For example, following October 7, Unilever publicly made a 500,000 Euro donation to Magen David Adom, an Israeli organization which acts as an auxiliary service to the Israeli Defense Forces (IDF). Magen David Adom has appointed to head its rabbinical committee Rabbi Schmuel Eliyahu, who has been repeatedly criticized for his "racist statements and extremist views." Mr. Eliyahu has called on Jews "not to rent apartments to Arabs" and for the indiscriminate bombing of Palestinians: "If they don't stop after we kill 100, then we must kill a thousand. And if they do not stop after 1,000 then we must kill 10,000. If they still don't stop we must kill 100,000, even a million." As Rabbi Rick Jacobs, President of the Union for Reform Judaism, has described: "Rabbi Shmuel [sic] Eliyahu is well known for his racist views which most Jews and supporters of Israel find offensive and which the Israeli Supreme Court strongly condemned."[13] He further described Rabbi Eliyahu as a "purveyor of hatred towards Arabs."[14] Rabbi Eliyahu has also recently called for the nuking of Gaza.[15]

---

[12] *See Unilever Principles in Support of Human Rights Defenders*, Unilever (Sep. 2023), at 7, https://www.unilever.com/files/a9ee0484-3dad-4f48-9f0b-69cea560ebba/unilever-principles-in-support-of-human-rights-defenders-sept-2023.pdf.

[13] Exhibit 3 (Sam Sokol, *Israeli Rabbi Accused of Racism Says Barred from U.S. by 'anti-Zionists'*, Haaretz (May 31, 2022)) at 2.

[14] *Id.*

[15] Exhibit 4 (*Rabbi Backs Remark by his Son, a Far-right Minister, that Nuking Gaza is an Option*, Times of Israel (Nov. 14, 2023)) at 1–2.

42. Further underscoring its lack of "neutrality," although Unilever issued a statement after October 7, it issued no such statement following the massive civilian deaths in Gaza. Additionally, Unilever has erected a host of pretextual hurdles not present when it issued its donation to Magen David Adom, including deeming Medical Aid for Palestinians as a threat the same day the Mayor of London visited the group's offices.

43. Moreover, Unilever has not remained "neutral" in other contexts. For example, Unilever's website contemporaneously showcases its position on the Ukraine/Russia conflict: Unilever "continue[s] to condemn the war in Ukraine as a ***brutal and senseless act by the Russian state***" (emphasis added).[16] In support of this position, Unilever "ceased all imports and exports of [its] products into and out of Russia . . . stopped all media and advertising spend . . . [and] ceased all capital flows into and out of the country."[17]

44. On August 28, 2024, Chair Mittal provided the following response to Unilever's objections chart: "We have provided ample evidence of Unilever taking sides in both this conflict and others completely negating your assertions, including the head rabbi of David Magen Adom calling for a nuclear bomb to drop on Gaza. It is disappointing that you attempt to portray Palestinian human rights as a 'needless dispute' . . . . We have reviewed your 'evidence' and find your objections to be riddled with caricatures and stereotypes. There is nothing unreasonable with promoting basic human rights for Palestinians." Ms. Varsellona never responded. Unilever's artificial objections were also extended to its funding commitments under the Settlement Amendment.

45. Following months of negotiations at Unilever's behest, on August 30, 2023, the Settlement Agreement was amended. Per the Settlement Amendment, Unilever "will make

---

16 Exhibit 5 (*Unilever statement on the war in Ukraine*, Unilever (Feb. 13, 2023)) at 2.
17 *Id.*

payments totaling $2 million USD annually to Canaan Fair Trade ('Canaan'), directly or through a third party, for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers), for at least ten years . . . . Payments to Canaan will be verified by auditors selected by the Independent Board and reported on an annual basis in SEAR. Confirmation of payments made hereunder will be sent to the Chair of the Independent Board quarterly."[18] Canaan has sourced ingredients for Ben & Jerry's products for nearly a decade, with its almonds being recognized for their high quality alongside Canaan's promotion of values-led sourcing and fair trade.

46. Per the plain terms of the Settlement Amendment, "[c]onfirmation of payments made" to Canaan "will be sent to the Chair of the Independent Board quarterly." The end of the first quarter occurred on March 31, 2024. Unilever failed to provide confirmation.

47. Instead, on April 2, 2024, Mr. ter Kulve wrote to the Ben & Jerry's Chair that he "[h]ad not been briefed on this yet and will investigate what the status of this agreement is. Who is this Canaan group could not find when I googled?" The first hit when one Googles "Canaan Fair Trade" is Canaan Fair Trade.

48. As Chair Mittal pointed out in her response, Mr. ter Kulve's ignorance was eye-popping: "We have had a nearly-**decade long** commitment with Canaan. **As referenced in the language of the Settlement Amendment**, they are a supplier of fair-trade ingredients from Palestinian farmers: https://canaanpalestine.com/" (emphasis added).

49. On April 11, 2024, Chair Mittal and Mr. ter Kulve had a telephone conference to further discuss the issue. During the call, Mr. ter Kulve lamented the Settlement Amendment as a bad agreement and suggested that his predecessor, Matt Close, was fired for agreeing to it. When

---

[18] Exhibit 6 (Settlement Amendment) at 1.

Chair Mittal pointed out that the Settlement Amendment involved a multi-month negotiation process and review by multiple Unilever executives, Mr. ter Kulve was at a loss for excuses.

50. In addition to attempting to renegotiate the parties' agreement, Unilever has unilaterally added hurdles to Canaan's receipt of the funds, conditions which do not appear in the Settlement Amendment or in relation to its previous donation to Magen David Adom. These extracontractual conditions highlight Unilever's chronic overreach and disregard of the parties' agreement. Despite the humanitarian and economic crisis in Palestine, Unilever failed to disburse Canaan's 2025 funds or engage in the SEAR review process, again insisting upon conditions which do not appear in the Settlement Amendment, even after being provided context and documents from Canaan.

**Tactic 3: Unilever hastily moves to replace Dave Stever, Ben & Jerry's CEO, for supporting the Independent Board.**

51. Like the Settlement Agreement, Section 6.14 of the parties' Merger Agreement protects the social mission and brand integrity of Ben & Jerry's, positions the Independent Board as the "custodians" of the same, and obligates Unilever to work with the Independent Board in good faith.[19]

52. The Merger Agreement further protects Ben & Jerry's interests by precluding the unilateral removal of its CEO. Specifically, under Section 6.14(c), any decision regarding the replacement of Ben & Jerry's CEO shall only occur "after good faith consultation with, and the participation in the discussion of, an advisory committee of the Company Board (the 'Appointment

[19] Exhibit 7 (Merger Agreement) at 48–52. The good faith cooperation of the CEO, the Independent Board, and Conopco in furthering Ben & Jerry's Social Mission and Brand Integrity is an essential term of the Merger Agreement. Sections 6.14(e) and 6.14(f) provide that the Independent Board "shall work together with the CEO" to integrate the Social Mission into Ben & Jerry's business plan and conduct the business in a manner that "preserves and enhances" Brand Integrity. Section 6.14(d) contemplates that the Company and Conopco shall work together in good faith to devise the annual business plan. And Section 6.14(i) specifically provides that "Conopco shall not prevent [Ben & Jerry's] from fulfilling its obligations" under Section 6.14.

Committee')." The power to appoint members to this committee is vested exclusively in the Class I Directors of the Independent Board.

53. Contrary to its obligations under Section 6.14, Unilever has repeatedly threatened Ben & Jerry's personnel, including CEO David Stever, should they fail to comply with Unilever's efforts to silence the Social Mission.

54. In March 2025, Mr. ter Kulve and Unilever followed through with their threats. Specifically, on March 3, 2025, Unilever informed the Independent Board that it was removing and replacing Mr. Stever as Ben & Jerry's CEO. Mr. ter Kulve informed third parties of the same soon thereafter. Despite the Merger Agreement's clear obligation that any decision regarding the CEO's removal can only occur "after good faith consultation with, and the participation in the discussion of, an advisory committee of the Company Board," Unilever announced its decision before the committee had even been appointed and attempted to force the Independent Board into rubberstamping the decision by unilaterally dictating artificial and hasty deadlines.

55. For example, Unilever attempted to impose an arbitrary four-day deadline for the Independent Board to convene, appoint a committee, analyze the merits of removal, draft a "consultation" in writing, and send it to Unilever, despite Unilever claiming it had been contemplating the removal for over four months. According to Unilever, four days was plenty of time for good faith discussions regarding replacing the CEO of a billion-dollar business.

56. In response, the Independent Board pointed out that Unilever's four-day timeline was inconsistent with the Merger Agreement and offered instead to appoint a committee on April 1, 2025, the date for the next Independent Board meeting. The Independent Board also requested access to Unilever's minutes, notes, and materials related to the removal decision so that the

committee—once appointed—could meaningfully participate in the contractually-mandated discussions. Unilever refused the request.

57. On information and belief, Unilever's motive for removing Mr. Stever is his commitment to Ben & Jerry's social mission and brand integrity and his willingness to collaborate in good faith with the Independent Board, rather than any genuine concerns regarding his performance history. Under Mr. Stever's tenure, Ben & Jerry's outperformed Unilever's ice cream portfolio and was ranked #2 on the Brand 500 Authenticity Index in 2024.

58. In fact, in January 2025, Unilever literally wrote out its true intentions in Mr. Stever's annual performance review authored by Gerardo Rozanski (Unilever's President of Ice Cream for North America) and Ronald Schellekens (Unilever's Chief Human Resources Officer). In that review, Unilever chastised Mr. Stever for "repeatedly acquiesc[ing] to the demands of the Independent Social Mission Board" by allowing Ben & Jerry's to post statements the Independent Board had collaboratively worked on with Ben & Jerry's management.

59. Unilever's actions breached the Merger Agreement by obstructing the CEO's duties, purposely undermining Ben & Jerry's social mission and brand integrity, and failing to abide by the agreed procedure for removal of Ben & Jerry's CEO. These actions also breached the Settlement Agreement: Unilever's attempt to replace Mr. Stever for preserving Ben & Jerry's social mission and working respectfully with the Independent Board is antithetical to its contractual obligations to respect the social mission and work with the Independent Board in good faith to ensure it is furthered. The Independent Board consequently filed its Second Amended Complaint on April 4, 2025, challenging Unilever's Trump ban and attempts to replace Ben & Jerry's CEO.

## VI. After getting rid of Ben & Jerry's CEO, Unilever sets its sights on Chair Mittal and the Independent Board, launching a three-step removal scheme.

**Step 1: Unilever launches a pretextual audit of the independent Ben & Jerry's Foundation, where Chair Mittal serves as a trustee.**

60. *Five days* after the Independent Board filed its Second Amended Complaint, Unilever launched a mid-litigation, two-decades-after-the-fact, unprecedented audit of The Ben & Jerry's Foundation, a nonprofit where Chair Mittal was asked to serve as a trustee.

### A. Over the last forty years, The Ben & Jerry's Foundation has awarded over $70 Million in grants to nonprofits supporting social justice.

61. In 1985, Ben & Jerry's co-founder, Ben Cohen, made an initial gift of 50,000 shares of Ben & Jerry's Homemade, Inc. to aid in establishing The Ben & Jerry's Foundation, Inc., a registered 501(c)(3) nonprofit organization dedicated to promoting the same progressive social justice values espoused by the company. Mr. Cohen intended that the Foundation be free of corporate influence in its funding decisions. Mr. Cohen's gift was paired with an unprecedented decision by Ben & Jerry's Board of Directors to commit 7.5% of the company's annual pretax profits to philanthropy.

62. Since 1985, The Ben & Jerry's Foundation has donated over $70 million to nonprofits promoting social justice efforts. These nonprofits include: the Agua Coalition, which ensures that groundwater resources are free from pollution, including arsenic; Homes for All St. Louis, which aided in passing a tenants' bill of right ordinance and organizes campaign efforts for those experiencing poor housing conditions and illegal evictions; and Black Workers Matter, which combats discrimination/segregation in hiring practices. The Foundation's team includes both staff and trustees, with Jerry Greenfield serving as a trustee for several decades. The Chair of Ben & Jerry's Independent Board, Anuradha Mittal, has served as a Foundation trustee for the last eight years.

63. Current Foundation Trustee Jeff Furman previously served for years as Chair of the Independent Board while also serving as a trustee of the Foundation. Thus, for 25 years, the Chair of the Independent Board concurrently served as a Foundation trustee without objection from Unilever.

### B. The Merger Agreement required Unilever to continue supporting the Foundation.

64. Section 6.14(h) of the Merger Agreement required the company to "continue the Company's practice of making charitable contributions" following a formula based on the yearly volume of ice cream sales, with the goal that contributions grow as sales do (but prohibiting them from falling). The agreement gives the Independent Board the "responsibility for allocating annual contributions" among the Foundation, local community charitable initiatives with the support and oversight of employee Communication Action Teams, and charitable institutions selected by the Office of the Chief Executive Officer. The Board is permitted to allocate contributions to the Foundation as long as certain criteria are met, including the Foundation not "significantly" changing its charitable purpose, the trustees not disparaging Ben & Jerry's, and new trustees being "reasonably satisfactory" to Unilever. After an initial ten-year period, the agreement required that the distributions continue under the same formula, unless the "activities and performance" of the Foundation "cease to be reasonably acceptable to Unilever," with the Independent Board retaining responsibility for determining distributions.

### C. For 24 years, Unilever disbursed millions to The Ben & Jerry's Foundation without objection.

65. For *over two decades*, from 2000 to 2024, the Independent Board—including Unilever's representatives on the board—chose the Foundation to receive the entirety of the distribution required under Section 6.14(h).

66. Funds are generally disbursed in two payments. An initial $1.1 million, the minimum due under the Merger Agreement, is disbursed every January. The remaining funds, after application of the formula specified in Section 6.14(h) are disbursed in a May true-up.

67. At no point during this *twenty-four-year period* did Unilever request an audit, challenge the Foundation's governance, or object to any donation recipients, all while disbursing over $68 million to the Foundation.

68. The Ben & Jerry's corporate website publicly trumpets its support of the Foundation, saying, "Learn how we support grassroots groups throughout the U.S. and its territories," identifying the Foundation, and linking to the Foundation's website. https://www.benjerry.com/values/issues-we-care-about.

69. The Foundation has annually used some of the distribution to fund a generous employee matching gift program. Under that program, the Foundation matches Ben & Jerry's employees' donations up to $2,000 per year. The Foundation requires only that the gifts be in line with company values and that the receiving organization be registered under Section 501(c)(3) of the Internal Revenue Code. In the last decade, this program has provided over $327,000 in matching gifts. These donations are unsolicited, and recipients of these gifts have not been asked to document their use of the funds. Unilever never objected to this practice.

70. The Foundation organizes a bi-annual, 3–4 days long Learning Tours for the employee committee members and other interested members of Ben & Jerry's staff, including, often, the Global Social Mission Director and others from the leadership team. These Learning Tours help the committee members further their understanding of the issues they support through the Foundation's grant programs and historically have had a direct influence on the company's own social activism campaigns and interests.

71. The Foundation also funds Community Action Grants. These are grants to local community nonprofits in Vermont. Employee committees at each of Ben & Jerry's three Vermont manufacturing and office facilities decide the funding recipients, and the recipients view these grants as coming from the employees. The requirements to receive these grants are that the organization must be located in Vermont and must be registered under Section 501(c)(3) of the Internal Revenue Code or be a municipal school or a municipality. In the last decade, these grants have totaled over $2.2 million. Recipients of these grants have not been asked to document their use of the funds. Unilever never objected to this practice. The employee committees also plan community service projects for employees at their sites.

72. The Foundation focuses its funding on small organizations with budgets under $350,000. It employs a trust-based philanthropy approach. Trust-based philanthropy is a recognized approach in philanthropy that seeks to facilitate trust and transparency between funders and nonprofits.[20] An important tenet of trust-based philanthropy is to limit the burdens on grant partners, and not ask for unreasonable, unnecessary, or burdensome reporting and paperwork, especially in relation to the size of the grant. The Foundation has followed principles of trust-based philanthropy for many years, and this approach is entirely consistent with the Foundation's size and mission and with the social justice values publicly espoused by Ben & Jerry's.

73. Consistent with the tenets of trust-based philanthropy and with its longstanding practice, once it decides an organization merits a grant, the Foundation does not burden the recipient with onerous reporting requirements, although it does require simple follow-up reports and/or conversations for grants awarded through programs that require an application.

---

20 *See, e.g.*, *What is Trust-Based Philanthropy?*, Trust-Based Philanthropy Project, https://www.trustbasedphilanthropy.org/what-is-tbp (last visited Jan. 11, 2026).

74. The Foundation's largest grants, up to $30,000 per year, are part of its National Grassroots Organizing (NGO) Program. These grants are also decided by an employee committee and awarded to small constituent-led grassroots organizations to support local leadership and grassroots organizing activities to address systemic causes of inequity and injustice in their communities. These grants are not given for specific projects but are general operating support grants to assist the leadership and activities of the organization. The NGO grants are two-year grants. Before the second-year grant is awarded, the grantee puts together a brief interim follow-up report. The employee committee and Foundation staff then have a meeting with the grantee to provide oversight for the grant and review the grantee's work. A second-year report is also required at the end of the two-year grant cycle.

75. The inclusion of employees in the decision-making process is unique for a corporate-founded foundation.

76. Additionally, the Foundation awards discretionary grants to nonprofit organizations designated by its trustees (with each allocated up to $30,000 per year to designate) and Foundation staff (allocated up to $15,000 per year) as a token of appreciation for their services to the Foundation and in lieu of paying the trustees directors' fees. These donations are small, unsolicited, and for general operating support, and therefore recipients of these grants have not been asked to document their use of the funds. Unilever never objected to this practice.

**D. In April 2025, Unilever launched a pretextual audit of the Foundation to exert pressure over Chair Mittal, utilizing the Foundation as collateral damage and holding millions in charitable funds hostage.**

77. On January 22, 2025, as had been the case for two decades, the Foundation received the initial payment of funds allocated to it by the Independent Board in 2024.

78. On April 9, 2025, however, Abhijit Bhattacharya—Magnum's current Chief Financial Officer and the then Chief Financial Officer for Unilever Ice Cream—wrote to The Ben & Jerry's Foundation and demanded an "expeditious" audit: Unilever's first such request in the parties' twenty-four-year history. Mr. Bhattacharya's letter further explained that Unilever would be using Forensic Risk Alliance to conduct the "audit." The Foundation trustees had several immediate concerns regarding Unilever's unprecedented demand:

- *First*, Unilever had never objected to funding the Foundation despite disbursing over $68 million to the organization across a twenty-four-year period.

- *Second,* the Merger Agreement does not provide Unilever with any audit rights. The Foundation, on its own volition, conducts annual audits which are publicly available on its website. It has never been accused of any wrongdoing or subject to any regulatory or IRS scrutiny in its forty-year existence.

- *Third*, the allegedly exigent, yet two-decades-after-the-fact "audit" followed the series of threats and intimidation tactics directed towards the Independent Board. Unilever also removed Ben & Jerry's previous CEO, Dave Stever, upon four days' notice the *month prior* to the initiation of the audit.

- *Fourth*, in November 2024, the Independent Board initiated this litigation. On April 4, 2025, the Board amended this lawsuit to add claims regarding Unilever's inappropriate efforts to remove Ben & Jerry's CEO.

79. *Five days later*, on April 9, 2025, the Foundation trustees—which include the Chair of Ben & Jerry's Independent Board—received Unilever's two-decades-after-the-fact, mid-litigation, unprecedented demand for the "expeditious" audit. The irregularities only began there.

80. Less than two weeks later, on April 22, 2025, Mr. Bhattacharya's letter was leaked to the media, with an article appearing in *Semafor* referencing the letter and citing Unilever executives disclosing Unilever's true target: "Unilever executives have privately identified a series of grants to the Oakland Institute [where Chair Mittal serves as executive director], a nonprofit that promotes global aid and is critical of the World Bank and Israel."

81. Two days later, on April 24, 2025, Unilever nevertheless issued a public statement claiming that it sought to perform "a routine independent audit" of the Foundation. As of the date of Unilever's public statement, Unilever's chosen auditor (Forensic Risk Alliance) explicitly stated on its website that it does not perform such audits, further underscoring Unilever's motive.

82. Less than two weeks later, on May 6, 2025, despite the mounting evidence demonstrating otherwise, Unilever continued to allege that it was simply seeking to conduct a "routine audit," while simultaneously threatening to withhold millions in funds that the Independent Board had allocated to the Foundation in 2024.

83. As a result of Unilever's explicit threats to defund the forty-year-old nonprofit, the audit was initiated. Unilever committed that a copy of the "routine," "independent" audit report would be provided to the Foundation. As Unilever itself concluded, such disclosure would be beneficial as a means of "transparency for all involved." Unilever further emphasized that "the best organizations embrace transparency."

84. Even after the Foundation was forced to accept the audit, Unilever continued to withhold the majority of the 2024 funds, which were scheduled to be disbursed in May. Unilever disbursed part of the allocated 2024 funds in August, another part in September, and the remainder in October, after the audit was completed. Unilever used the allocated 2024 funds as leverage.

**E. As the audit commences, Unilever's true motive becomes apparent.**

85. Despite Unilever's representations, it quickly became clear that the "audit" would be neither routine, nor independent, nor transparent. Following the trustees highlighting that Forensic Risk Alliance did not perform routine audits, Unilever abruptly switched to an Ernst & Young-led forensics team.

86. To gain clarity regarding the audit's true purpose, the Foundation's trustees requested the audit's scope of work. However, multiple Unilever executives refused to provide what should have been an innocuous document.

87. In addition to Unilever's efforts to hide the scope of work, the audit process itself illuminated Unilever's intentions. As the Foundation's trustees communicated on multiple occasions to Jochanan Senf, Unilever's appointed CEO for Ben & Jerry's, by plain volume and proportion, the questions asked and documents requested by EY overwhelmingly had one intended target: Chair Mittal, consistent with the *Semafor* report regarding Unilever's premeditated and preferred findings. Indeed, the EY team did not review the Foundation's financials, and very few of the Foundation's national grants; instead, they focused on trustee discretionary grants and purported ideological objections.

88. As evidence of the pretextual nature of the audit continued to mount, EY requested interviews of *certain* Foundation trustees. Here again, Unilever's premeditated, targeted tactics were on full display. First, no interview of Jerry Greenfield, Ben & Jerry's co-founder and namesake, was requested. Second, the "independent" auditor forbade the presence of counsel during the interviews of the trustees. Third, despite Chair Mittal's offers to answer questions in writing, the "independent" auditor refused to be presented with information in this format (though the auditor asked *hundreds* of questions in writing itself), while simultaneously refusing to provide its scope of work. Fourth, Unilever subsequently cornered a trustee (also a Ben & Jerry's employee) as an intimidation tactic.

89. Specifically, on September 2, 2025, EY submitted its audit report to Unilever. *Less than 24 hours later*, on September 3, 2025, Unilever's Global Head of Litigation & Business Integrity (Mr. Eglash) and Magnum Chief Integrity Officer and Head of Litigation (Palmina Fava)

attempted to interrogate a Foundation trustee without the presence of counsel. Despite the trustee explaining his discomfort at the inappropriate conversation, as his separate role on the Foundation was distinct from his involvement at Ben & Jerry's, Mr. Eglash and Ms. Fava continued their interrogation, including into matters covered by attorney-client privilege.

**F. Unilever's executives refused to share the audit report or the scope of work.**

90. Unilever then entirely changed its position regarding "transparency." Having received notification from EY that it had submitted a copy of its final report to Unilever, the Foundation trustees demanded the same. Unilever initially dragged its feet, stating that its own legal team needed time to edit the report. Given the obvious lack of impartiality in this process, the Foundation demanded a copy without Unilever Legal's editorializations. It never received it, though a Unilever executive disclosed that the audit report did not include the results that Unilever "was hoping for" (as sources confirmed to the media: "the audit did not find wrongdoing, ethical malpractice or violations"). After weeks of the Foundation demanding the audit report, Unilever again shifted positions, now stating it was affirmatively refusing to disclose a copy of the audit report. Apparently, Unilever no longer believes in "transparency for all involved."

91. Despite refusing to disclose the audit's scope of work and audit report, Unilever's executives alleged that the Foundation had certain "governance issues." ***Issues which—according to Unilever—it had been oblivious to for twenty-four years while disbursing over $68 million to the Foundation.*** As a further sign that Unilever's objections were pretextual, even after the Foundation voluntarily updated its policies and procedures, Unilever has continued to threaten the Foundation's funding. Privately, Unilever executives disclosed to the Foundation's president that there would be no future funding unless Chair Mittal was removed as a trustee. Understanding the

optics of making such a threat publicly, Unilever instead told the media that it had concerns regarding "term limits."

**Step 2: Unilever launches an artificial "investigation," while its executives continue to conceal the audit report.**

92. On September 11, 2025—nine days after EY delivered its audit report, which Unilever Legal was "editing," and eight days after Mr. Eglash and Ms. Fava attempted to interrogate a Foundation trustee without the presence of counsel—Chair Mittal was informed that Unilever had launched an "integrity" investigation against her. The "independent" investigator Unilever had unilaterally chosen was coincidentally a law firm that had strong financial ties with Unilever, had exhibited anti-Palestinian bias, had previously whitewashed Mr. ter Kulve's conduct, and, most importantly, had helped architect the underlying audit, negating any notion of impartiality or independence. The disinterested independent directors were not consulted regarding the selection of the investigator or the investigation procedures and protocols.

93. In response, on September 24, 2025, to ensure that the process would remain "impartial" and "independent," the investigator was asked to "clearly state" whether it "played any role in advising on the Foundation's audit." Rather than responding to the straightforward inquiry, Unilever's unilaterally selected investigator (its preferred counsel) repeatedly ducked the question and then stopped responding altogether shortly thereafter.

94. On October 10, 2025, Chair Mittal met with Unilever's General Counsel, Ms. Maria Varsellona, to discuss the parties' disputes. At this meeting, Ms. Varsellona stated that Mr. ter Kulve was "crazy" and that her boss (Fernando Fernandez, Unilever's CEO) was more risk averse, before offering the following ultimatum: if Chair Mittal resigned and the Independent Board capitulated in the litigation, Unilever would provide Chair Mittal with a prominent position in a multi-million dollar, Unilever-funded nonprofit. If she and the Independent Board refused,

Unilever would be making public allegations against her in its forthcoming prospectus. Chair Mittal immediately refused Unilever's inappropriate offer.

95. On October 14, 2025, Chair Mittal raised the inappropriate offer directly with Unilever's CEO and its Board Chair (Ian Meakins) and requested a copy of the audit to debunk Unilever's phantom allegations:

> I was informed last week that should I not resign as a Chair of the Independent Board, Unilever's next prospectus would include allegations against me. Aside from the obvious fact that the relevant E&Y auditor confirmed there was no evidence to support such a claim, this threat underscores the need for Unilever to disclose the audit's scope of work and E&Y's findings sans the editorializations of Unilever legal. We have asked four Unilever executives to provide these documents, all of whom have actively concealed them. We are now making the request to you directly to clear the record on these issues and avoid claims of defamation and market manipulation. I would also note that in the same conversation that this threat was made, Unilever offered to allow me to head a multi-million dollar nonprofit should I capitulate.

96. At this point, six Unilever executives—including its CEO and its Board Chair—were actively concealing the audit report. Meanwhile, on October 22, 2025, the remaining Independent Board members received a notice from Ben & Jerry's CEO demanding an "urgent" meeting the following day regarding the threatened allegations against Chair Mittal. Given Unilever's previous machinations, the independent directors stated that their counsel would be present and that the meeting would be recorded to ensure transparency. They further requested that Unilever be prepared to thoroughly discuss the purported allegations.

97. The next day, on October 23, 2025, Mr. Senf attended the meeting alongside Magnum's General Counsel, Vanessa Vilar. When the independent directors joined the meeting and expressed their concerns, Ms. Vilar refused to allow their counsel to join; would not admit certain board members into the meeting; and abruptly ended it. Prior to running away, Ms. Vilar stated that if the independent directors sought to have counsel present, the meeting would need to

be rescheduled. However, in another abrupt turn, rather than asking for the independent directors' availability to reschedule the meeting, Ms. Vilar sent a multi-page correspondence making allegations against Chair Mittal and threatening the remaining independent directors' positions should they disagree with Unilever's assertions. The pre-prepared letter demonstrated both that Mr. Senf's calls of urgency were a sham and that Unilever's efforts were a means to thwart the upcoming board meeting, which was to take place the following week.

98. An initial review of Ms. Vilar's letter revealed the infirmity of Unilever's allegations against Chair Mittal. As an example, Unilever's leading allegations—that Chair Mittal had received inappropriate benefits from the Foundation—were ones originally raised by an ideological online outlet in 2021. When the outlet published them, the other Foundation trustees wrote to Unilever's CEO outlining their baseless nature. Unilever responded by "denouncing" the allegations and characterizing them as "extreme personal slander" against Chair Mittal prior to providing her "unprecedented" security. As this flip flop revealed, Unilever had failed to search its own inbox prior to moving forward with its removal scheme.

99. Unilever's other "findings" fared no better and included assertions that Chair Mittal had allegedly breached Unilever's Code of Conduct because the Independent Board filed the Second Amended Complaint challenging Unilever's inappropriate attempt to remove Mr. Stever and had quoted the following words from his performance review: "repeatedly acquiesc[ing] to the demands of the Independent Social Mission Board." Unilever also alleged that Chair Mittal had refused to participate in its pretextual audit and sham investigation while ignoring the contrived nature of each and omitting that its investigators disappeared when confronted with straightforward questions regarding their independence.

100. Despite the facial frivolity of Unilever's assertions, on October 24, 2025, the independent directors put forward a series of questions highlighting the weaknesses of Unilever's accusations and again demanded a copy of the audit report and the scope of work. Further underscoring Unilever and Magnum's pretextual efforts and the premeditation behind their removal scheme, both dodged the questions and refused to provide the requested documents. Instead, on November 4, 2025, Magnum filed its Form 20-F Registration Statement with the U.S. Securities and Exchange Commission as a precursor to the demerger and public listing. In that filing, as Unilever had foreshadowed in its inappropriate offer to Chair Mittal, Magnum weaponized the contrived "integrity" process to attack Chair Mittal on a global stage, alleging that following "investigations" conducted by "external advisers," Magnum and Unilever had deemed Chair Mittal as unfit to continue in her role. Magnum and Unilever conveniently omitted that their advisers were Unilever's preferred law firms that had orchestrated the underlying audit, that their leading allegations were ones Unilever itself had previously "denounced" as "extreme personal slander," and that they had simultaneously offered Chair Mittal a prominent role in a multi-million dollar, Unilever-funded nonprofit.

101. While the independent directors were preparing a robust response to Unilever's allegations, Unilever and Magnum were busy preparing the final step of their removal scheme, with Mr. Senf informing Ben & Jerry's personnel that the January meeting of the Independent Board would not occur, while simultaneously canceling check-ins with the Independent Board and blowing off correspondence from Independent Board members.

102. On December 3, 2025, the Class I Directors responded to Magnum's allegations with a detailed twenty-six-page rebuttal highlighting their severe deficiencies, along with the

following cover correspondence addressed to Unilever's CEO, Unilever's Board Chair, Magnum's CEO, and Magnum's General Counsel:

> Attached please find our response to your October 23, 2025, correspondence and the allegations contained therein. During the time we have been preparing our thorough response to your serious assertions, we have been informed that Unilever and Magnum (collectively, "Unilever") have been orchestrating a plan to remove us, with Mr. Senf apparently informing Ben & Jerry's employees that our January board meeting will not occur. This maneuvering underscores Unilever's contractual, fiduciary, and securities breaches—already outlined in our previous correspondence—particularly when juxtaposed with yesterday's public revelation that the "audit did not find wrongdoing, ethical malpractice or violations."
>
> This confession further establishes that Unilever has mounted a multi-month, costly, counsel-directed campaign—anchored by a pretextual mid-litigation "audit" and a contrived "integrity" investigation—to manufacture leverage, undermine the Independent Board's authority, threaten the Chair and the undersigned, and inappropriately influence Magnum's public listing. Perhaps most paradoxically, should we *disagree with allegations that Unilever's own executives have previously "denounced" as "extreme" slander*, Unilever will apparently pursue its plot. We will not accede to any intimidation or the misuse of contrived processes to erode our authority and are fully prepared to respond swiftly to any such attempts.

103. On December 6, 2025, Magnum demerged from Unilever. Two days later, on December 8, 2025, Magnum's General Counsel stated that Magnum would be responding to the Board's letter in "due course." To date, Magnum has not provided a response to the Board's robust letter detailing the deficiencies in Magnum's allegations. Instead, Magnum launched the final step in its removal scheme.

**<u>Step 3</u>: Magnum completes the removal scheme, amending bylaws overnight, prior to removing Chair Mittal and the independent directors.**

104. In its December 3, 2025, European prospectus, Magnum assured investors that the Independent Board's governance protections would remain in place after the demerger:

> In connection with the acquisition, a series of agreements and other documents were entered into which contained a bespoke set of corporate governance arrangements. Under these provisions, Ben & Jerry's Homemade was allowed to maintain, among other things, a defined purpose board of directors **comprising a majority of independent members** (the "Ben & Jerry's Board"). **These corporate governance arrangements will not change as a result of the Demerger.**

(emphasis added).

105. Magnum lied and instead swiftly moved to remove the Independent Board members, while utilizing the Foundation as collateral damage.

106. As it has every year since the Merger Agreement, the Independent Board met in October 2025 to determine the allocation of the charitable contribution required by Section 6.14(h) of the Merger Agreement, providing Unilever the opportunity to raise objections and provide a copy of the audit report and scope of work. Receiving nothing, the Independent Board again allocated 100% of the contribution to the Foundation. The Foundation has not received that contribution.

107. Instead, on Saturday, December 13, 2025, as it continued to withhold the audit report and scope of work, Magnum nonetheless sought to impose significant demands on the Foundation based on the purported audit findings. In so doing, Magnum relied on Section 6.14(h) of the Merger Agreement and claimed, among other things, that Section 6.14(h) gave it "every right to audit" the Foundation, as well as to impose significant control by Magnum over the Foundation's governance, policies, and practices, including those the Foundation had already updated.

108. Magnum told the Foundation that, "following the audit," it viewed the Foundation's "activities and performance" as not "reasonably acceptable," and then used that assertion to demand sweeping structural changes, including retroactive trustee term limits; a ban on trustees criticizing Magnum; and a prohibition on Ben & Jerry's directors or management serving as trustees, amongst others. The combination of these provisions would ensure that almost all the Foundation's trustees would soon be replaced with people preferred by Magnum.

109. Again, purportedly relying on Section 6.14(h), Magnum further sought to impose policy changes inconsistent with the Foundation's commitment to trust-based philanthropy and to

override the Foundation trustees' powers, asserting that Magnum would have to pre-approve new policies and any "subsequent amendments" would be subject to Magnum's "review and approval."

110. Magnum also imposed a forced-choice ultimatum with a December 16, 2025, deadline, warning it would "conclude that the Foundation no longer seeks funding" absent agreement to these two-decades-after-the-fact conditions that have no support in the Merger Agreement.

111. Simultaneous with its threats to the Foundation, Magnum swiftly enacted the final touches of its removal scheme. In just three days (December 12–15, 2025), Magnum quickly moved to finalize the removal scheme by enacting: (i) new governance documents designed to automatically "disqualify" every independent director upon execution; and (ii) a new ***retroactive*** nine-year term limit. In a series of same-day letters, Magnum informed the independent directors that they had allegedly violated the new code of conduct and term limit provisions rendering all Class I Directors as either ineligible or potentially ineligible, thereby triggering automatic removal. Specifically, on December 15, 2025, Magnum purported to remove Chair Mittal "effective immediately"; remove directors Jennifer Henderson and Daryn Dodson "effective December 31, 2025," should they not resign; and set up the removal of the remaining Class I Directors through the new not-bargained-for removal mechanism—labeled an "eligibility" standard—that was adopted late Friday, December 12, 2025, purportedly incorporated within the Ben & Jerry's articles of incorporation on Sunday, December 14, 2025, and executed for the first time on Monday, December 15, 2025.

112. Alongside its independent director purge and Foundation freeze, on December 15, 2025, Magnum utilized PR Newswire—a paid publicity service—to issue a press release in

multiple languages to gloat about its concurrent efforts against the Independent Board and the Foundation.

113. In addition to removing the current directors, Magnum also attempted to block the appointment of a new director to the Independent Board, highlighting the machinations behind its removal scheme. Specifically, on December 11, 2025, the independent directors wrote to Magnum, informing it they had nominated Chris Miller—a seventeen-year Ben & Jerry's employee and former Global Social Mission Director—to serve as an independent director. The next day, on December 12, 2025, Magnum's CEO, Mr. ter Kulve, wrote: "This is excellent news. Welcome to the board the management team will enjoy working with you and driving the mission." Nevertheless, during the December 15, 2025 purge, despite Magnum's CEO having congratulated Mr. Miller on his appointment four days earlier and describing it as "excellent news," Magnum made another flip-flop, alleging that Mr. Miller was not properly appointed and that the Class I Directors were required to inform Magnum of the "steps taken to ensure his eligibility" based on the Amended Bylaws that were enacted *following* his appointment and made retroactively effective on December 12, 2025, the same day as Mr. ter Kulve's congratulatory email. Not only was Magnum's extracontractual eligibility verification condition nonexistent in the Merger Agreement, it was particularly ludicrous given Mr. Miller's background and service at Ben & Jerry's for nearly *two decades*.

114. The cherry on top of Unilever and Magnum's removal scheme has been a coordinated effort to inappropriately shift the independent directors' authority to Ben & Jerry's CEO, including by diluting the Independent Board's oversight authority over the CEO. As the Merger Agreement makes clear, the Independent Board, among other responsibilities, is to take part in the selection of a CEO, is to determine a substantial portion of his bonus, and may expressly

"prevent any action by the CEO in the areas of new product introduction, the changing of product standards and specification, [and] the approval of the content of marketing materials." Nevertheless, following a selection process where Unilever failed to engage with the Independent Board in good faith—including by unilaterally eliminating all internal minority candidates, excluding the Board from appointment discussions and interviews, and selecting a third-party consultant sans Board involvement and providing the consultant's underlying analysis months after the fact—Unilever installed Jochanan Senf as Ben & Jerry's CEO. Mr. Senf is a close ally of Mr. ter Kulve, and his tenure has been marked by several failures, including:

- Threatening employees and third parties;
- Failing to onboard with the CEO appointment committee;
- Inappropriately silencing the social mission and censoring posts;
- Failing to respond to multiple inquiries, including those related to brand integrity;
- Late cancelling regularly scheduled meetings;
- Attending interim board meetings with no meaningful updates; and,
- Attempting to prevent management from speaking to the Independent Board.

115. The Independent Board brought these failures directly to the attention of Unilever's CEO, Unilever's Board Chair, and Magnum's CEO on October 20, 2025. It received no response. Emboldened, Mr. Senf, in conjunction with Magnum, has since: inappropriately hijacked Independent Board meetings and restricted meaningful updates while denigrating independent directors (including by telling a female Board member she was being "too emotional" during a Board meeting); prevented the Board from engaging in its oversight authority, including on issues regarding marketing and product integrity (such as pushing through products sans Board approval); whitewashed Board minutes; misled the Board regarding the release of a flavor that would have addressed the humanitarian crisis in Gaza; and, facilitated the threats and intimidation that Magnum and Unilever have directed towards the Independent Board and Ben & Jerry's employees.

116. In fact, Magnum has laid bare its plan of inappropriately shifting the independent directors' authority to its control. Specifically, in connection with its midnight amendments and purge of the independent directors, Magnum attempted to enact a two-decades-after-the-fact quorum change which now purportedly allows Ben & Jerry's Independent Board meetings to occur ***without the presence of any independent directors***:

> A majority of the number of directors appointed in accordance with Section 3.2 of these bylaws shall constitute a quorum for the transaction of business at any meeting of the Board of Directors, provided that a quorum shall require the presence of at least one Class I director and at least one U director, ***or if there are no eligible Class I directors then at least one Class U director.***

117. The following timeline contextualizes Defendants' coordinated campaign:

- **2000–2024:** Following the Merger Agreement, the independent directors oversee Ben & Jerry's social mission and brand integrity as the company outpaces Unilever's other ice cream companies. Prior Independent Board chair Jeff Furman also serves concurrently as a Foundation trustee for years. Unilever makes no mention of term limits. Concurrently, Unilever disburses over $68 million to the Foundation. Unilever makes no objections or audit requests.

- **January 2024**: Peter ter Kulve—an ally of Nelson Peltz—is appointed as Unilever's President of Ice Cream. In one of his initial communications to Chair Mittal, he calls her "manic" and pushes her to resign.

- **February 2024**: Mr. ter Kulve threatens Dave Stever: "You need to fix your board. I will get rid of them or fire you if they don't change."

- **March 2024**: Mr. Peltz tells the *Financial Times*: "Ben & Jerry's job is to sell ice cream, not to make political statements. And these people use anything for a soapbox that they have no right to do." He adds: "What sense is being a billionaire if you're not a bully?"

- **April 2024**: Mr. ter Kulve threatens Mr. Stever again: "This almond contract [the Settlement Amendment] is crazy. Matt was fired for this. This needs to be fixed or I will take it out on you. ***You will bleed for this***" (emphasis added). The "Matt" Mr. ter Kulve referenced is Matt Close, Unilever's former head of Ice Cream and Mr. ter Kulve's predecessor.

- **May 2024–October 2024**: Unilever censors multiple Ben & Jerry's posts, including those calling for the safe passage of refugees from Gaza. This censorship is ongoing.

- **<u>November 2024</u>**: The Independent Board initiates litigation to enforce its contractual rights and safeguard Ben & Jerry's social mission and brand integrity.

- **<u>December 2024</u>**: Jostein Solheim (Unilever's CEO of Health & Wellbeing) is tasked by Unilever and Mr. ter Kulve with attempting to convince Ben & Jerry's founders to take Unilever's side against the Independent Board. Mr. Solheim threatens Mr. Stever: "If the founders keep supporting Anuradha [Ben & Jerry's Chair], Unilever will start taking it out on the management team."

- **<u>January 2025</u>**: In Mr. Stever's annual performance review, authored by Gerardo Rozanski (Unilever's President of Ice Cream for North America) and Ronald Schellekens (Unilever's Chief Human Resources Officer), Unilever chastises Mr. Stever for "repeatedly acquiesc[ing] to the demands of the Independent Social Mission Board."

- **<u>February 2025</u>**: Mr. Solheim threatens Mr. Stever again: "You need to limit the board's access to management to show you are controlling them. As we go to a public listing, the board's behavior will make that more difficult. If they don't get in line, Peter's [i.e., Peter ter Kulve's] only move now that [Chris] Miller [Ben & Jerry's former Global Social Mission Director] is gone is to fire you."

- **<u>March 3, 2025</u>**: Unilever moves to replace Mr. Stever on four days' notice.

- **<u>April 4, 2025</u>**: Ben & Jerry's and the Independent Board file their Second Amended Complaint.

- **<u>April 9, 2025</u>**: After Unilever removes Dave Stever (who Unilever considered friendly to the Independent Board) as Ben & Jerry's CEO, Unilever—via Abhijit Bhattacharya (Unilever's Chief Financial Officer for Ice Cream)—demands an "expeditious" audit of the Ben & Jerry's Foundation for the first time in *over twenty years* and states that Unilever plans to use Forensic Risk Alliance for the audit. The Foundation trustees have immediate concerns regarding the pretextual nature of the audit given its mid-litigation and exigent timeframe, Unilever's threats against the Independent Board and Ben & Jerry's employees, Unilever's lack of any audit right under the Merger Agreement, and a twenty-four-year precedent of no Class U Director ever objecting to disbursements to the Foundation.

- **<u>April 22, 2025</u>**: Mr. Bhattacharya's letter is leaked to the media. An article appearing in *Semafor* referencing the letter includes information from Unilever executives, and affirms the pretextual nature of the audit and Unilever's predetermined and desired findings: "Unilever executives have privately identified a series of grants to the Oakland Institute, a nonprofit that promotes global aid and is critical of the World Bank and Israel."

- **<u>April 24, 2025</u>**: Unilever publicly claims that it seeks to perform "a routine independent audit" of the Foundation. As of the date of this public statement, Unilever's chosen auditor (Forensic Risk Alliance) explicitly states on its website that it does not perform such audits, further underscoring the pretextual nature of Unilever's efforts.

- **<u>May–September 2025</u>**: The Foundation trustees repeatedly raise objections regarding the audit (which EY ultimately conducts), including: (i) the fact that multiple *Semafor* articles have outlined and confirmed the pretextual nature of the audit; (ii) the audit was launched mid-litigation; (iii) Unilever's litigation counsel was involved in the audit; (iv) the audit timeline was rushed to line up with Magnum's public listing; (v) Unilever has no audit right under the governing agreements; (vi) for twenty-four years, Unilever's representative on the Independent Board had never once objected to contributions to the Foundation or suggested wrongdoing; (vii) by sheer volume and magnitude, both the questions asked and documents requested during the "audit" had one intended target: Chair Mittal; (viii) the auditor EY refused to permit counsel for the Foundation's trustees to attend trustee interviews; (ix) EY refused to allow trustees to respond to certain questions in writing; (x) Unilever threatened to withhold funds unless Chair Mittal was removed as a trustee; and (xi) EY refused to provide its written scope of work (i.e., the directions Unilever provided it)—despite Unilever's public representations that the audit was "routine" and "independent."

- **<u>September 3, 2025</u>**: EY releases the audit to Unilever. Unilever refuses to provide it to the Foundation despite its previous commitment to transparency.

- **<u>September 4, 2025</u>**: *Less than twenty-four hours later*, on September 3, 2025, Jeff Eglash (Unilever's Global Head of Litigation & Business Integrity) and Palmina Fava (Magnum's Chief Integrity Officer and Head of Litigation) attempt to interrogate a Foundation trustee without the presence of counsel.

- **<u>September 11, 2025</u>**: Unilever launches an integrity investigation against Chair Mittal. The "independent" investigator Unilever has unilaterally chosen is a law firm with deep ties to Unilever that aided in engineering the underlying audit.

- **<u>September 22–23, 2025</u>**: The investigator refuses to admit or deny whether it was involved in the underlying audit.

- **<u>October 10, 2025</u>**: Unilever presents Chair Mittal with the following ultimatum: if Chair Mittal resigns and the Independent Board capitulates in the litigation, Unilever will provide Chair Mittal with a prominent position in a multi-million dollar, Unilever-funded nonprofit. If she and the Independent Board refuse this offer, Unilever will make public its allegations against her in their forthcoming prospectus. Chair Mittal immediately refuses Unilever's inappropriate offer.

- **<u>October 14, 2025</u>**: Chair Mittal raises her concerns about the inappropriate offer directly to Unilever's CEO and its Board Chair.

- **<u>October 22, 2025</u>**: Ben & Jerry's CEO calls an urgent meeting with the other directors on the Independent Board (i.e., not including Chair Mittal) set to take place via Microsoft Teams within twenty-four hours to discuss allegations against Chair Mittal.

- **October 23, 2025**: Mr. Senf joins the Teams meeting as does Magnum's General Counsel, Vanessa Vilar. When the directors of the Independent Board begin joining the meeting and express their concerns, Ms. Vilar refuses to allow the Independent Board's counsel to join and states that if the Independent Board seeks to have its counsel present, the meeting would need to be rescheduled. She also will not admit certain Board members to the meeting and then abruptly ends the meeting. Rather than rescheduling the meeting, Ms. Vilar sends a multi-page, threatening correspondence, in which she makes allegations against Chair Mittal and threatens the positions of the remaining directors of the Independent Board should they disagree with Unilever's assertions.

- **October 24, 2025**: The Independent Board raises its concerns about Unilever's "findings" against Chair Mittal to Unilever's CEO, Unilever's Board Chair, and Magnum's CEO, including that Unilever's leading assertions were the same allegations Unilever had previously "denounced" as "extreme personal slander."

- **November 4, 2025**: Magnum publishes its prospectus, claiming "[f]ollowing investigations . . . conducted by external advisers," Chair Mittal was allegedly unfit to serve in her role. The prospectus claims that Ben & Jerry's "corporate governance arrangements will not change as a result of the Demerger" from Unilever.

- **December 3, 2025**: The Independent Board provides a robust twenty-six-page, single-spaced response identifying the infirmities of Unilever/Magnum's allegations.

- **December 6, 2025**: Magnum demerges from Unilever.

- **December 13, 2025**: On a Saturday, Magnum threatens to cut off the Foundation's funding unless it agrees to extracontractual conditions by December 16, 2025, including retroactive trustee term limits; a ban on trustees criticizing Magnum; and a prohibition on Ben & Jerry's directors or management serving as trustees.

- **December 14, 2025**: In direct contravention of its claim in the prospectus that "corporate governance arrangements will not change," Magnum purports to amend Ben & Jerry's bylaws two decades after the fact—including by changing quorum rules to allow Independent Board meetings to occur with Magnum representatives only (i.e., outside the presence of any independent directors)—and back dates the amendments to be effective on December 12, 2025.

- **December 15, 2025**: Magnum attempts to remove Chair Mittal and each of the directors of the Independent Board.

- **December 17, 2025**: The independent directors seek relief against the removal scheme.

- **December 18, 2025**: The Foundation requests the opportunity to intervene.

- **January 22, 2026**: Magnum informs *The Wall Street Journal*—in further contravention of the Merger Agreement's appointment process and antithetical to the term "independent"—that Magnum "would appoint an independent chair who would then appoint new independent directors to the ***new*** Ben & Jerry's board."[21]

- **August 26, 2026:** Defendants purport to nominate three Class I Directors—Nora Benavidez, Michael McAfee, and Eva Schulte—without obtaining the consent of a majority of the Class I Directors as required by Section 6.14(a) of the Merger Agreement.[22] Specifically, a majority of the Plaintiff Class I Directors did not designate these three individuals for election to the Company Board. And given the invalidity of the purported removals of the Plaintiff Class I Directors, the Plaintiff Class I Directors constitute the Class I Directors from whom Ben & Jerry's was required to obtain majority consent.

118. In sum, Unilever and Magnum's efforts constitute a degradation of an American institution. As Mr. Senf himself explained when he served as Ben & Jerry's Managing Director for Europe:

> I think there was one unique thing in that whole acquisition deal and that was that Ben & Jerry's still would keep an Independent Board of Directors. [It] would basically be responsible for the integrity of the brand and the social mission. It's been a unique clause in that acquisition agreement, and I don't think it has ever been repeated in, you know, in the world of business today. But I think it's been a very fertile and a good relationship and has led us to, you know, many new paths and many new, you know, scalable opportunities to run this business across multiple countries in the world and to do more with more impact when it comes to our sourcing, when it comes to our people etc., etc.
>
> . . .
>
> It's just a great board by the way. Can you imagine we've got quarterly board meetings with a real bunch of social activists, you know, people, you know, that work for Greenpeace, people that work for foods and civil rights movement, people that actually run, run, NGOs. That board is there for, you know, to approve our plans as a management team. Which of course is very nice, but actually I think the role of the board is also to really inspire us and instigate things.[23]

---

21 Look, A (2026, Jan. 22) Magnum Ice Cream Says New Independent Ben & Jerry's Board Members to be Appointed, *The Wall Street Journal*. https://www.wsj.com/business/magnum-ice-cream-says-new-independent-ben-jerrys-board-members-to-be-appointed-221544a0.

22 Look, A. (Aug. 26, 2026) Ben & Jerry's to Name New Board Members After Long Process, Rejection, *The Wall Street Journal*. https://www.wsj.com/business/ben-jerrys-to-name-new-board-members-after-long-process-rejection-be1b4ced?msockid=36b86b7e6d3962ba05ee7cd46c0363a5.

23 B Corp Europe, *B Inspired | Jochanan Senf from Ben & Jerry's*, at 10:52–12:06, (YouTube, May 26, 2015), https://www.youtube.com/watch?v=meVVuTfghzA.

## CAUSES OF ACTION:

### COUNT I – BREACH OF CONTRACT: MERGER AGREEMENT § 6.14(a)
***(Class I Directors v. all Defendants)***

119. Plaintiffs the Class I Directors replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

120. Section 6.14(a) of the Merger Agreement provides that a "majority" of the Independent Board shall consist of Class I Directors and that Conopco, and its successors and assigns, shall remove any Class I Director only "at the written request of at least a majority" of the Class I Directors then in office "and shall not otherwise remove" any Class I Director. Section 6.14(a) also provides that "a majority of directors then in office in each Class shall designate the candidates for election to the Company Board in such Class each year."

121. Section 6.14(b) of the Merger Agreement provides that Ben & Jerry's "shall delegate authority to the CEO to manage the affairs of the Company" "substantially in the form of Exhibit B" to the Merger Agreement. Merger Agreement Exhibit B § A expressly states that "Conopco and the Company Board retain authority with regard to" a laundry list of managerial matters, including "[a]ny amendments of the By-laws of the Company." (Merger Agreement, Ex B. at §A(7)). Regarding how responsibility for this list of managerial affairs is allocated between Conopco and the Independent Board, Exhibit B provides that "the allocation of responsibility between them shall be as provided in Section 6.14." (*Id.* at § A)

122. Section §6.14(c) of the Merger Agreement provides that decisions with respect to the appointment, compensation, and removal of the CEO shall be made by Conopco only after good faith consultation with an Appointment Committee created by Class I Directors, in the event Ben Cohen and Jerry Greenfield are not members of the Company Board at the time.

123. Sections 6.14(e) and (f) of the Merger Agreement grant the Independent Board "primary responsibility" over the social mission and brand integrity including veto authority over the CEO.

124. Section 6.14(i) of the Merger Agreement further provides that Unilever shall not prevent Ben & Jerry's from fulfilling its obligations under § 6.14 of the Merger Agreement.

125. The Class I Directors have fulfilled their obligations under the Merger Agreement, including all conditions precedent, if any, and but for Defendants' breaches, the Class I Directors and Defendants are each able to continue performing their obligations under the agreement.

126. Defendants have breached the foregoing sections of the Merger Agreement by, among other things:

a. Removing one or more Class I Directors without the written request of at least a majority of the Class I Directors then in office;

b. Not recognizing the valid election of Chris Miller as a Class I Director;

c. Attempting to change the composition of the Independent Board so that a majority of the members are no longer Class I Directors;

d. Unilaterally amending the Bylaws in a way that dilutes the Independent Board's powers;

e. Launching and continuing their removal scheme, including a pretextual audit of the Foundation and sham Business Integrity Investigation of Chair Mittal; and,

f. Purporting to elect Class I Directors without complying with the requirement to obtain the consent of a majority of the Class I Directors, including the Class I Directors who remain in office despite their invalid and void removals.

127. Defendants' breaches of the Merger Agreement have caused the Class I Directors to suffer damages, including attorneys' fees and expenses.

128. The Class I Directors' damages include loss of compensation, nominal damages, loss of the opportunity to manage aspects of Ben & Jerry's social mission and brand integrity (including their roles as "custodians" of the same), including oversight authority over Ben & Jerry's CEO.

129. Further, in the Merger Agreement, the parties agreed that "irreparable damage would occur in the event that any of the provisions" of the agreements were not performed in accordance with their terms or were breached. (Merger Agreement at § 9.10).

**COUNT II – BREACH OF CONTRACT:**
**SETTLEMENT AGREEMENT §§ 2(b), (j), and (g)**
**(Class I Directors v. all Defendants)**

130. Plaintiffs the Class I Directors replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

131. Plaintiffs and Defendants entered into the Settlement Agreement in December 2022.

132. Per Section 2(b) of the Settlement Agreement, Defendants must "[r]espect and acknowledge the Ben & Jerry's Independent Board's primary responsibility over Ben & Jerry's Social Mission and Essential Brand Integrity" and "work in good faith with the Independent Board to ensure that both are protected and furthered." These commitments echo previous promises Defendants made to Plaintiffs in the Merger Agreement. The Class I Directors have fulfilled their obligations under the Settlement Agreement, including all conditions precedent, if any, and but for Defendants' breaches, the Class I Directors and Defendants are each able to continue performing their obligations under the agreement.

133. Defendants have breached this provision by, among other things:

a. Threatening to dismantle the Independent Board, sue Board members, and intimidate Ben & Jerry's personnel;

b. Censoring Ben & Jerry's social mission, including from publicly voicing support for peace and refugee rights and for social and economic justice under the Trump administration;

c. Failing to ensure that the social mission is protected and furthered, often acting unilaterally;

d. Hindering Ben & Jerry's social mission and tarnishing its brand integrity, areas over which the Independent Board retains primary responsibility;

e. Replacing Ben & Jerry's CEO for respecting the social mission and collaborating with the Independent Board;

f. Unilaterally amending the bylaws in a manner that dilutes the Independent Board's powers and implementing retroactive term limits requiring removal;

g. Failing to engage with the Independent Board regarding grievances about the Foundation;

h. Disregarding the Independent Board's funding decisions related to the Foundation and failing to disburse approved funds;

i. Launching and continuing their removal scheme, including the pretextual audit of the Foundation and sham Business Integrity Investigation of Chair Mittal; and,

j. Purporting to elect Class I Directors without complying with the requirement to obtain the consent of a majority of the Class I Directors, including the Class I Directors who remain in office despite their invalid and void removals.

134. Per Section 2(j) of the Settlement Agreement, Defendants must "refrain from making any statement on behalf of Ben & Jerry's regarding the Social Mission that is inconsistent with the Social Mission of Ben & Jerry's as previously stated by Ben & Jerry's or approved by the Independent Board, without the consent of a majority of the Independent Board."

135. Defendants have breached this provision by issuing statements not approved by the Independent Board, including their PR Newswire press release.

136. Per Section 2(g) of the Settlement Agreement, Unilever and Conopco, and their successors and assigns "will make two $2,500,000 payments to Ben & Jerry's Homemade Inc. (totaling $5,000,000). The first payment will occur in 2023 and the second payment in 2024." Unilever failed to make the 2024 payment, and Defendants have not cured this default.

137. Defendants' breaches of the Settlement Agreement have caused the Class I Directors to suffer damages.

138. The Class I Directors' damages include loss of compensation, nominal damages, loss of funding to their bargained-for beneficiaries, loss of the opportunity to manage aspects of Ben & Jerry's social mission and brand integrity (including their roles as "custodians" of the same), and attorneys' fees and expenses.

**COUNT III – BREACH OF CONTRACT: SETTLEMENT AMENDMENT**
**(*Plaintiffs the Class I Directors v. all Defendants*)**

139. Plaintiffs the Class I Directors replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

140. Per the 2023 Settlement Amendment, Unilever "will make payments totaling $2 million USD annually to Canaan Fair Trade ('Canaan'), directly or through a third party, for the use of Palestinian almonds (or for the direct benefit of Palestinian almond farmers), for at least ten years . . . . Payments to Canaan will be verified by auditors selected by the Independent Board and reported on an annual basis in SEAR. Confirmation of payments made hereunder will be sent to the Chair of the Independent Board quarterly." The Class I Directors have fulfilled their obligations under the Settlement Amendment, including all conditions precedent, if any, and but for

Defendants' breaches, the Class I Directors and Defendants are each able to continue performing their obligations under the agreement.

141. Defendants have breached the Settlement Amendment by failing to abide by the quarterly reporting requirements, by failing to engage in the SEARS review process, and by failing to make payments in compliance with the Settlement Amendment's requirements.

142. Defendants' breaches of the Settlement Amendment have caused the Class I Directors to suffer damages, including attorneys' fees and expenses.

143. The Class I Directors' damages include loss of funding to its bargained-for beneficiary, nominal damages, loss of the opportunity to manage aspects of Ben & Jerry's Social Mission and Brand Integrity (including their roles as "custodians" of the same).

**REQUEST FOR INJUNCTIVE RELIEF**

144. Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs request a permanent injunction requiring Defendants to specifically perform their obligations under the Merger Agreement and Settlement Agreements, requiring the election of Chris Miller as a Class I Director, enjoining the purported nomination or appointment of Nora Benavidez, Michael McAfee, and Eva Schulte, and prohibiting Defendants from taking any action, directly or indirectly, to:

a. Prevent Plaintiffs Anuradha Mittal, Aseel Najib, Daryn Dodson, Jennifer Henderson, Detavio Samuels, Chivy Sok, and Chris Miller ("Class I Director Plaintiffs") from exercising all rights held by Class I Directors of Ben & Jerry's Homemade, Inc., including, but not limited to, attending, participating, and voting at all meetings of the Independent Board of Ben & Jerry's Homemade, Inc.;

b. Remove, or attempt to remove, any of the Class I Director Plaintiffs as directors of Ben & Jerry's Homemade, Inc. without the written request of at least a majority

of the Class I Directors in office as of December 1, 2025 or elect any new Class I Directors other than Chris Miller;

c. Implement or enforce the Second Amended and Restated Bylaws of Ben & Jerry's Homemade, Inc., adopted effective December 12, 2025, to the extent those Bylaws impose term limits or eligibility requirements that would have the effect of establishing grounds for the removal of any of the Plaintiffs as directors of Ben & Jerry's Homemade, Inc. without the written request of at least a majority of the Class I Directors in office as of December 1, 2025;

d. Inappropriately censor Ben & Jerry's social mission, including blocking various posts, preventing Ben & Jerry's from criticizing the Trump administration's policies or speaking out on other social issues under the purview of its social mission; and

e. Introduce new products, change product standards and specifications, approve the content of marketing materials and the licensing or other use of the Ben & Jerry's trademark without a majority vote of the Class I Director Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, the Class I Directors respectfully request judgment in their favor and other appropriate relief against Defendants as follows:

1. Actual, direct, indirect, unjust enrichment, incidental, consequential, specific performance, and nominal damages;
2. Injunctive relief as requested herein;
3. An award of Plaintiffs' reasonable attorney's fees and costs; and
4. Any and all other relief that this Court deems just and proper.

Dated: October 30, 2026

Respectfully submitted,

**AHMAD, ZAVITSANOS & MENSING PLLC**

/s/ *Shahmeer Halepota*
Shahmeer Halepota
Joseph Y. Ahmad
John Zavitsanos (admitted *pro hac vice*)
Daryl Moore (admitted *pro hac vice*)
Kelsi White (admitted *pro hac vice*)
Weining Bai (admitted *pro hac vice*)
Thomas Frashier (admitted *pro hac vice*)
Sean Healey (admitted *pro hac vice*)
Sara Fatima Dhanji (admitted *pro hac vice)*
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone: (713) 655-1101

*Attorneys for Plaintiffs the Class I Directors of the Ben & Jerry's Board*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically on October 30, 2026. As such, this document was served on all counsel of record pursuant to the Federal Rules of Civil Procedure.

*/s/ Shahmeer Halepota*
Shahmeer Halepota